```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
     Civil Action No. CIV-16-1133
 3   _____

 4   DEPOSITION OF MICHAEL H. SEID
     December 18, 2019
 5   _____

 6   PATRICK PIZELLA, ACTING SECRETARY OF LABOR, UNITED
     STATES DEPARTMENT OF LABOR,
 7
     Plaintiff,
 8
     v.
 9
     JANI-KING OF OKLAHOMA, INC., a foreign corporation,
10
     Defendant.
11   _____
12                   A P P E A R A N C E S
13   For the Plaintiff:      TYLER P. McLEOD
                             U.S. Department of Labor
14                           Office of the Solicitor
                             1244 Speer Boulevard
15                           Suite 515
                             Denver, Colorado 80204
16
     For the Defendant:      CARRIE B. HOFFMAN
17                           PETER LOH
                             BRANTLEY SMITH
18                           Foley Gardere Foley
                             & Lardner, LLP
19                           2021 McKinney Avenue
                             Suite 1600
20                           Dallas, Texas 75201
21   Also Present:           Stephen Hagedorn
22
23
24
25
```

EXHIBIT 1

1           Deposition of MICHAEL H. SEID, the
2    Witness herein, called by the Plaintiff in the
3    above-entield matter on Wednesday, the 18th day of
4    December, 2019, commencing at the hour of 9:08 a.m.,
5    at 2021 McKinney Avenue, Suite 1600, Dallas, Texas
6    before Audra B. Paty, Certified Shorthand Reporter,
7    with and for the State of Texas, said deposition being
8    taken pursuant to Subpoena and Federal Rules of Civil
9    Procedure.
10   _____
11                        I N D E X
12                                          Page Number
13   Examination by Mr. McLeod                   3, 147
14   Examination by Ms. Hoffman                     145
15
16                     E X H I B I T S
17   Exhibit Number                    Initial Reference
18      1   Professional Qualifications and
             Experiences                            5
19
        2   Expert Report of Michael Seid          25
20
        3   Declaration of Michael Seid            23
21
        4   Franchise Agreement                    81
22
        5   Merry Maids Franchise Agreement        87
23
24
25

P R O C E E D I N G S

MICHAEL H. SEID,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. McLEOD:

Q. Mr. Seid, my name is Tyler McLeod. I'm an attorney with the U.S. Department of Labor.

A. Good to meet you.

Q. We met just right before this started?

A. We did.

Q. Right? Have you been deposed before?

A. I have.

Q. And approximately how many times?

A. Over 25, 30 years probably 50, 60.

Q. Okay. So you're familiar with the rules. I guess I would start, is there anything that would prevent you from truthfully answering questions today? Are you on any medications or substances that would prevent that?

A. No. I mean, I had a bit of a migraine last night, but I don't think it will affect me today.

Q. Okay. And what did you do to prepare for the deposition today?

A. Read my report, went back, read some of the depositions again, looked at the complaint, read some of the memos, had a meeting here yesterday with counsel for Jani-King.

Q. Okay. And who did you meet with?

A. I met with Carrie, met with Peter. Stephen Hagedorn was here, and we met for, I don't know, four hours or so.

Q. Okay. And so how long total with your review of your materials and preparation would you say you spent?

A. In preparation for this?

Q. Yeah.

A. Probably over, you know, the last week or so, a few days.

Q. Okay. So I'm going to ask you a series of questions today, and if you don't understand something that I ask, if you could please make sure you ask me to repeat it so that you do understand. Can we agree on that?

A. Thank you.

Q. Is that a yes?

A. That is a yes.

Q. And if you need to take a break, also let me know.

A. We'll do.

Q. And I want to confirm your hourly rate. Is it $600?

A. It is.

(Exhibit No. 1 marked.)

Q. (BY MR. McLEOD) So I'm going to hand you what's been marked Exhibit 1. Do you recognize that document?

A. It looks like my CV.

Q. Okay. Did you prepare this?

A. Yes, at some point.

Q. And what is your current occupation?

A. Management consultant, I guess is the best way to put it.

Q. Okay. And that's with MSA Worldwide?

A. Yes.

Q. Anything else that you do?

A. I'm an adjunct professor at the Ohio State University. I am a social franchisor in Africa. That's about it.

Q. Okay. So those are things you do that are separate from MSA Worldwide functions?

A. No, they're all kind of blended together.

Q. Okay.

A. And I founded the company, so I'm not sure where MSA ends and Michael Seid begins.

Q. Okay. And it says on page 1 of this Exhibit 1 document, you received an undergraduate degree from Long Island University?

A. I did.

Q. Any other college degrees?

A. No. I mean, I attended Temple University and then moved over to Long Island University.

Q. Okay.

A. There was a stint in there in the military. So somewhere in there I got it.

Q. Okay. No other graduate studies following college?

A. Nothing other than really continuing education, got my CPA and things like that.

Q. Okay. Other than a CPA, any other professional licenses?

A. It's not a license, I guess, but I'm a certified franchise executive for whatever that is.

Q. Who provides that certification?

A. That's provided by the education foundation of the International Franchise Association.

Q. Okay. And how did you obtain that?

A. It's a course of study, an exam. It's the industry's attempt at an equivalent to the bar or the CPA exam. I wouldn't put it on that level, but it's -- I was in the first class that got it. I also

7

1  teach in that program.
2      Q. When did you get that certification?
3      A. I don't know, 15, 20 years ago.
4      Q. Okay.
5      A. And I recertify every couple of years. It is
6  continuing education similar to staying, you know,
7  current on your CPA or the bar. CLE credits, we have
8  CFE credits.
9      Q. Okay. And sticking with page 1 of this
10 exhibit, you reference in the second paragraph that
11 you've been a senior operations officer --
12     A. Uh-huh.
13     Q. -- a financial executive, and an accountant.
14     A. Yeah.
15     Q. What organizations did you hold those
16 positions with? Is it multiple or...
17     A. It's multiple.
18     Q. So, for example, who are your senior
19 operations?
20     A. I was chief operating officer of one of the
21 British fine art auction houses, company called
22 Phillips & O'Neill. It's the Sotheby's, Christie's.
23 Phillips is the third largest. So I was chief
24 operating officer there. I was the senior -- one of
25 the senior officers at a company called Supercuts.

8

1      Q. Okay.
2      A. Those are the main organizations where I was
3  a senior officer.
4      Q. When you say senior officer --
5      A. Or one of the senior officers. I was a
6  chairman and things like that.
7      Q. So, for example, here it says, financial
8  executive. Is that with Supercuts or the British
9  company or...
10     A. No, financial executive would be more of an
11 outsourced role where I, as a CPA, practiced with
12 clients and would fill in their role as a CFO and
13 things like that.
14     Q. Okay. Is Supercuts a franchise?
15     A. Supercuts is a franchise, started somewhere
16 in the '70s or '80s.
17     Q. And then you were in the corporate office of
18 the franchisor?
19     A. Yeah, I was in -- it was an odd setup. There
20 were four of us that were on a level -- level field,
21 so we all had our offices in different regions, but we
22 actually had offices in San Rafael, California. It
23 was a very odd setup.
24     Q. Okay. How long were you with Supercuts?
25     A. Total of about six years, I guess.

9

1      Q. Okay. Are there any other franchise
2  organizations that you were directly employed with as
3  opposed to consulting?
4      A. Yeah, I don't know if employ is right. Right
5  now I'm an active franchisor. So it's -- I don't draw
6  any money out of it, but it is a member of the
7  franchise community. So I am an active franchisor as
8  we sit here right now.
9      Q. Okay. Multiple or just one franchise as a
10 franchisor?
11     A. Yeah, it's -- it's what we call a social
12 franchisor.
13     Q. Oh, okay.
14     A. And a social franchisor differs from a
15 commercial franchisor only that we don't take any
16 royalties.
17     Q. Okay. So aside from your social franchising
18 functions, are you directly affiliated or have you
19 been directly employed by a commercial franchisor
20 organization?
21     A. Other than Supercuts, probably not. It's
22 mostly been consulting or, you know, some board level,
23 things like that.
24     Q. And I'm forgetting already if I asked you
25 this. How long were you with Supercuts?

10

1      A. Six years about.
2      Q. Have you worked with any commercial
3  janitorial businesses?
4      A. You mean as a consultant?
5      Q. No, as a direct employee. I'm sorry.
6      A. No.
7      Q. Okay. When did you find -- or when did you
8  found MSA Worldwide?
9      A. 1987.
10     Q. You have been affiliated with that
11 organization since you founded it?
12     A. Yes. I have chosen not to fire myself.
13     Q. No sabbaticals?
14     A. No, nothing of any significance.
15     Q. And on page 1 again, sticking with Exhibit
16 1 --
17     A. Uh-huh.
18     Q. -- the third paragraph summarizes some of the
19 things that you have done.
20     A. Correct.
21     Q. And is that a description of what MSA
22 Worldwide does?
23     A. It's what MSA Worldwide does. It's also
24 things that I do or have done within the organization.
25     Q. Okay. Are there things not identified here

11

1   that MSA Worldwide does?
2       A. I don't understand the question. I'm sorry.
3       Q. Yeah, so are there functions that MSA
4   Worldwide performs that are not identified in this
5   third paragraph?
6       A. I'm sure there are, but nothing of any
7   materiality.
8       Q. Can you just briefly explain what MSA
9   Worldwide does?
10      A. MSA Worldwide is a strategic and tactical
11  advisor primarily to franchisors, not exclusively. We
12  do work in the design and development of new franchise
13  systems, companies that want to become franchisors.
14  We are strategic and tactical advisors to mid size and
15  larger franchisors. We are strategic and tactical
16  advisors to companies that are not in franchising, but
17  may be in licensing and joint ventures and downstream
18  distribution.
19      Q. Okay.
20      A. And we perform those functions on a global
21  basis. We are -- we also do tactical things such as
22  manuals and training programs and franchise -- not
23  direct franchise sales, but franchise sales management
24  strategy and things like that. And occasionally we'll
25  do litigation support.

12

1       Q. And you mentioned sometimes you might work
2   with franchisees in what capacity?
3       A. Litigation support where I'm acting as an
4   expert for a franchisee.
5       Q. Okay.
6       A. I will also do -- on a fairly regular
7   basis -- and I don't -- we don't get paid for it, but
8   we do a lot of pro bono work with franchisees.
9   They'll call me off of one of my books or somebody
10  left my e-mail and my phone number in the book and
11  I'll get calls regularly from people. And I'll
12  sometimes spend hours on the phone with somebody
13  looking to get into franchising. So it's not part of
14  the practice, but it's part of the practice --
15      Q. Okay.
16      A. -- if you know what I mean.
17      Q. Yes. All right. And moving to page 2 here,
18  I just want to review briefly your publications and
19  you also have a list of litigation cases, and it's the
20  second full paragraph on page 2. So you have been the
21  author of two books in the Dummies easy learning
22  series, right?
23      A. I'm not sure they're easy learning, but they
24  certainly are the Dummies. They've done well.
25      Q. And I was just trying to characterize --

13

1       A. No, no, no, no, that's fine. It's used as a
2   textbook in many schools, so it's okay.
3       Q. Okay. So one was you coauthored with David
4   Thomas, the founder of Wendy's, right?
5       A. Uh-huh, yep.
6       Q. And the other one was by Joyce Mazero with
7   Polsinelli. And Polsinelli is a law firm; is that
8   right?
9       A. It's a law firm or a pizza shop. I'm never
10  quite sure, but it's a law firm.
11      Q. It is a law firm?
12      A. Yeah.
13      Q. Okay. So what is her specialty?
14      A. Franchising. I think that's what I would
15  characterize it, franchising.
16      Q. Is she more of working with franchisors or...
17      A. I don't know. I couldn't tell you.
18      Q. Okay. And then you have a list -- it's on
19  page -- I think it's 11 to 16. And just my question
20  is, is this a complete list of your publications?
21      A. Oh, probably not. I mean, it's what -- it's
22  when I write something, I will try to remember to put
23  it on the list, but I can't be certain that I have.
24  It certainly doesn't include all the lectures I give
25  and it probably doesn't include some of the chapters

14

1   that I have contributed to the books, but it's what --
2   you know, as I'm putting the list together, it's as
3   close as I can remember to do it.
4       Q. Okay.
5       A. But I can't guarantee that every single thing
6   is on here.
7       Q. And if you look starting on page 2 in the
8   upper left-hand corner, there is a date, July 23,
9   2019.
10      A. Uh-huh.
11      Q. Is there any -- are there any publications
12  you would add since that time?
13      A. Probably, yes. I just did an article two
14  days ago, so, yeah, that's fairly --
15      Q. What article did you do two days ago?
16      A. It was a rebuttal for a piece in the New York
17  Law Journal.
18      Q. What was the topic?
19      A. A good friend of mine that is a franchisee
20  lawyer, Ron Gardner, wrote a column in the New York
21  Law Journal, which I read, and I wrote a rebuttal
22  piece to that. And it's -- just submitted it
23  literally two days ago.
24      Q. Okay. So was he writing something from the
25  franchisee perspective and you're commenting from the

15

1   franchisor perspective?
2   A. No, I wouldn't call it that way. Ron is --
3   Ron and I see things differently, but Ron is a -- he's
4   an excellent lawyer. He is actually one of the people
5   that I've asked to teach a couple of hours of law
6   classes at my course at Ohio State. Ron wrote a piece
7   about why he sees some difficulties with franchisees,
8   they don't read the contracts or things like that. He
9   had some issues about terms that are in the common
10  franchise agreements, which I took exception to, but
11  it was a -- it was a general philosophical piece on
12  his part. He's a litigator, and most of the time when
13  I see Ron, he is sitting in your seat, but we're still
14  very good friends. I say we're close friends. We're
15  good friends.
16  Q. Okay. So starting on page 3 at the bottom,
17  you have a fairly extensive list and it goes to page
18  11.
19  A. Yeah, keep in mind that's over 20 some-odd
20  years, so it's not extensive.
21  Q. And these are cases where you provided
22  testimony in some regard, whether it's a trial or
23  deposition; is that correct?
24  A. Yes.
25  Q. Are there any cases on this list -- or let me

16

1   reask that. Are there cases not included on this list
2   that you've testified in since July 23rd?
3   A. No, no.
4   Q. Is there a common topic you're typically
5   asked to testify about?
6   A. I guess, you know, the common thing would be
7   something to do with downstream distribution,
8   probably, you know, more franchising than others, but
9   the general topic would be, you know, something with
10  franchising employment matters come up, brand
11  standards come up all the time, the definition of what
12  is a franchise when there is a claim of whether
13  something is or is not a franchise comes up, but
14  mainly it's -- given my background and where I am in
15  franchising, it's what are the generally accepted
16  standards in franchising. I'm frequently asked that
17  question either in deposition or, you know, in
18  interviews or things like that. It's just an area
19  people call on me to do. What are the general
20  accepted standards in franchising.
21  Q. Okay. What are the general accepted
22  standards in franchising is something that is common
23  that you're asked to speak to?
24  A. Yeah, I mean, there's always an issue of, you
25  know, experts deal in what are generally standards of

17

1   practice in franchising and that -- since I wrote
2   the -- since I'm the principal author of what those
3   standards are in a codified form, people will call me
4   on that.
5   Q. And then you mentioned also employment
6   matters. What did you mean by that?
7   A. We will -- it will go back to, you know, one
8   of the common practices of a restaurant staff as far
9   as tip wages or not and whether it's common for a wait
10  staff person to be paid, you know, sub minimum wage
11  when they're rolling napkins and things like that,
12  when they're doing work like that. Most of the time
13  it's dealing with issues around standards and controls
14  related to vicarious liability, joint employment, and
15  things like that.
16  Q. Okay. And so does that involve the question
17  whether someone is an employee versus independent
18  contractor?
19  A. It comes up on a, you know, fairly regular
20  basis either directly or indirectly when you're
21  dealing in -- you know, any vicarious liability claim
22  is going to bring that in and any claim of joint
23  employment or control features is going to bring that
24  up.
25  Q. How many -- how frequently have you provided

18

1   testimony or reports regarding the question of whether
2   franchises are employees or whether there is a joint
3   employment situation?
4   A. Most of the time and I'm going to put it
5   under the context of blending joint employment with
6   vicarious liability, but let's see for a second. And
7   I apologize. A lot of these cases, I just don't
8   remember what they are.
9   Q. I'm asking you approximately, too. I'm not
10  expecting a specific account.
11  A. Any of the ones that would deal with a
12  Massage Envy or one of those things would go into
13  those. Probably if there are 60 cases here, maybe a
14  third of them, I would guess at that. Just guessing.
15  Q. Okay. But as I understand it, you're saying
16  that this usually comes up in the context of vicarious
17  liability?
18  A. It comes in the context of vicarious
19  liability. It has come up in other matters, but
20  mainly the issue of co-employment, joint employment,
21  control features in a franchise system will come up in
22  vicarious liability simply because those are the cases
23  that bubble up and people want my expertise.
24  Q. Okay.
25  A. But we've seen, you know, you know,

19

1    Browning-Ferris and things like that bubbling up in
2    even the vicarious cases even today, so I can't give
3    you a clear distinction. That's not my field.
4        Q. And when you say Browning-Ferris, that's a
5    case that -- it's the NLRB case?
6        A. Yes, NLRB case.
7        Q. And have you testified on behalf of Jani-King
8    before?
9        A. I testified on behalf of Jani-King in one
10   case. I think it was called Juarez. I think it was a
11   California case.
12       Q. Okay. And have you provided reports for
13   Jani-King in other cases, either reports or
14   declarations?
15       A. I'm sure I have.
16       Q. Do you know which ones?
17       A. I don't. I would have to go into my files to
18   do that. I just don't know, I mean...
19       Q. So...
20       A. If it's on here -- if you see Jani-King on
21   here, then the answer is, yes, I issued a report on
22   that.
23       Q. Well, I do have a question about one of the
24   items, number 26 on page 6.
25       A. 26 on page 6.

20

1        Q. Giovanni versus DWI International. Is that
2    affiliated with Jani-King?
3        A. I think the Giovanni case may be. I don't
4    know why it's DWI International. That may be
5    Jani-King. I don't know. I just don't remember.
6    What is this, 2009? My brain doesn't go back that
7    far.
8        Q. Do you remember submitting declarations in a
9    Giovanni versus Jani-King of, I believe, Boston and
10   other affiliates?
11       A. Could have been. That's quite possibly. I
12   just don't know. Again, I would have to go back and
13   take a look at files.
14       Q. And the Juarez case, I don't know if that's
15   listed on here.
16       A. I don't know. I mean, it's -- I know there
17   was a case out in California. There might have been a
18   case in Massachusetts and there might have been
19   something in Pennsylvania at one point, but I think I
20   testified in one of them. I just don't remember which
21   one.
22       Q. When you say testified, was that --
23       A. Deposition.
24       Q. Okay. Thank you. And so did you submit
25   declarations in the Philadelphia or Pennsylvania case?

21

1        A. I wouldn't have, but the attorneys might
2    have. I just don't know. I mean, I don't follow
3    these.
4        Q. Is there any reason why you wouldn't have
5    included the Juarez case?
6        A. If I didn't testify in it, I wouldn't have
7    included. This is only cases I have testified.
8        Q. The Juarez California case?
9        A. I don't know if -- as I said, I'm not sure if
10   I testified in it or was involved in it in some way.
11   It's just a name I recall, but I'm not sure I
12   testified in it. I would have testified in the one
13   you just cited in Massachusetts. If I'm thinking of
14   one testimony, that might have been the one.
15       Q. Just to be clear, it was my understanding you
16   said you testified in the Juarez case in California?
17       A. I said I wasn't sure. I said I remember
18   there is a case called Juarez. I just don't remember
19   if I testified in it. If I testified in it, it should
20   be on this list.
21       Q. Okay. And you've had involvement with the
22   International Franchise Association quite a bit, it
23   seems?
24       A. I've been involved for a long time, yes.
25       Q. And you were a board member; is that right?

22

1        A. Yes, I was.
2        Q. And that was up until February 2018?
3        A. Yes, that was my last term.
4        Q. And I'm referring to page 2 of Exhibit 1.
5        A. Yeah.
6        Q. You also reference in here that you were the
7    first professional ever elected to the IFA's board.
8    What does that mean?
9        A. IFA has three legs, franchisors, franchisees,
10   and suppliers to the industry, which would be, you
11   know, under the professionals, not that franchisors
12   are not professionals. There was a prohibition about
13   anybody other than franchisors or franchisees being on
14   the executive committee or the board. I was the first
15   person elected to the executive committee that was not
16   a franchisor, franchisee, and then two years later I
17   was the first person directly elected to the board of
18   directors who was not a franchisor, franchisee at the
19   time. So it's kind of a unique place that I have.
20       Q. Okay. And were you involved at all in the --
21   it sounds like you're familiar with the Jani-King
22   Pennsylvania case?
23       A. Familiar is a very -- very wide. I mean, am
24   I familiar with it, I probably was at one time. If
25   you're asking me if I have any remembrance of it, the

## 23

1  answer is no.
2     Q. I got ahead of myself on marking.
3       Mr. Seid -- Seid, sorry.
4     A. Doesn't matter.
5     Q. I hand you what has been marked as Exhibit 3.
6       (Exhibit No. 3 marked.)
7     Q. (BY MR. McLEOD) And this is the first and
8  last page of a declaration from Myers versus Jani-King
9  of Philadelphia, Inc. Do you recognize this?
10    A. I see my signature on it. Do I recognize it,
11  no, but I see my signature on it. So at one point, I
12  did recognize it.
13    Q. Do you recall submitting this declaration on
14  behalf of Jani-King in this case?
15    A. Truthfully it's my words, but I don't recall
16  submitting it, but it's truthful in my words.
17    Q. Okay. And this is clearly just two pages of
18  a longer document?
19    A. Probably.
20    Q. I guess my question is, did you have any
21  other involvement with this case other than submitting
22  this declaration? As an example, I'm wondering if you
23  were involved in the appeal of this case?
24    A. I wasn't involved in the appeal of this case.
25  My involvement would have been as an expert witness

## 24

1  and, you know, litigation advisor, if that's the
2  proper term.
3    Q. And would you have been involved with the IFA
4  in their submission of briefs supporting Jani-King on
5  appeal?
6    A. No, I have never been involved with the IFA
7  on an amicus brief on Jani-King.
8    Q. In other cases, have you been involved?
9    A. With the IFA?
10    Q. Yeah, in submitting amicus briefs?
11    A. On Jani-King or anybody else?
12    Q. Anybody.
13    A. I actually wrote an amicus brief for a
14  company in Washington State, Money Mailer.
15    Q. When was that?
16    A. 2018-2019. It was fairly recently. Probably
17  in the last -- I would probably say the second half of
18  2018.
19    Q. When you say you wrote it, what do you mean?
20    A. That is the oddest thing. I'm baffled to
21  this date. I was asked to write an amicus brief. I
22  said I'm not a lawyer so I can't write an amicus
23  brief, and they said, would you write an amicus brief.
24  And I did and they got a law firm to put some type of
25  legal wrap-around, but there was a brief out there

## 25

1  which I wrote and which was submitted to the court.
2    Q. Is your name on it?
3    A. Oh, yeah. No, no, it's purely me. It just
4  had a law firm's cover page on it.
5    Q. And do you know, was that state or federal
6  court?
7    A. State. It's -- it was a very odd thing to
8  do, but I felt pretty strong about it.
9    Q. So other than Jani-King, have you provided
10  testimony, whether by deposition or at trial, for
11  other commercial janitorial franchising companies like
12  JAN-PRO or Vanguard or Coverall?
13    A. I'm going to have to look. I'm not sure what
14  Clean It does, but there is a company Clean It. They
15  may do residential cleaning.
16    Q. Do you remember anything about that case?
17    A. Not a clue. I don't see anybody else on this
18  list. My answer would have to be no based on this
19  list.
20      (Exhibit No. 2 marked.)
21    Q. (BY MR. McLEOD) Okay. All right. I'm going
22  to hand you what's been marked Exhibit 2. Can you
23  identify that document?
24    A. It appears to be my expert report in this
25  case.

## 26

1    Q. And you prepared this?
2    A. I did.
3    Q. Did you have any assistance preparing it?
4    A. No.
5    Q. Okay. On page 2, first paragraph, it says
6  you were engaged by Foley Lardner on October 11th,
7  2019?
8    A. Yes.
9    Q. And you issued the report, I believe, on
10  November 3rd; is that correct?
11    A. November 3rd.
12    Q. And did you do anything with respect to this
13  case involving Jani-King of Oklahoma prior to October
14  11th?
15    A. I would have read the amended complaint. I
16  would have read the response. I don't know if I asked
17  for any other documents before I agreed to take the
18  case, but I would have read at least those two major
19  documents. And I might have -- I probably had some
20  conversation with legal counsel for Jani-King if I had
21  any questions. I just don't recall.
22    Q. Would that have been Mr. Hagedorn?
23    A. No, it definitely would not have been
24  Mr. Hagedorn. It would either been Ms. Hoffman or
25  Mr. Loh.

27

1    Q. Oh, I see. Okay.
2    A. No, I wouldn't have spoken to Stephen.
3    Q. And part of this report repeats some of the
4    background information that was in Exhibit 1, but on
5    page 2 it says that you have reviewed the terms
6    contained and would estimate to be in excess of a
7    thousand international licensing, distribution, and
8    franchise offerings during the course of your career?
9    A. Yeah, it is probably more than that now.
10   Q. Okay. So -- well, it says, in excess of a
11   thousand?
12   A. Yeah, no, it's voluminous.
13   Q. So -- and I'm sure it is. I guess I'm trying
14   to understand what sort of documents you're
15   referencing there, what types of documents you
16   reviewed to understand the systems.
17   A. Primarily, you know, at one point, it would
18   have been called a uniform franchise offering
19   circular, and another point it would have been called
20   the franchise disclosure document. Back in 2007 the
21   name changed, but that would have been the primary
22   document. We review them frequently and extensively
23   when dealing with any client.
24   Q. So when you're talking about a thousand or
25   more than a thousand, you're referring to domestic

28

1    U.S. under the FTC franchising?
2    A. Not necessarily. I mean, we also view what
3    documentation we can get internationally. For
4    instance, the first case that you'll see on my list on
5    number 1 is an international case for Nestles with the
6    international arbitration. So when we do work
7    internationally, the franchise agreements are not as
8    readily available as you have them in the U.S. in many
9    markets. So -- but we do accumulate what agreements
10   we can find. So the answer is, yeah, primarily it's
11   U.S. domestic, but there's a significant number of
12   international agreements both in master franchising
13   and direct franchising on a global basis. We just
14   won't have the same percentage.
15   Q. Okay. So I think I understand what sort of
16   documents you're referring to that you reviewed for
17   these various franchise systems, and I guess I'm just
18   trying to understand it. You're referring to U.S.
19   franchises where it's over a thousand that you -- more
20   than a thousand that you have reviewed and been
21   familiar with?
22   A. U.S. and international. And it's not just
23   the franchise documents. It's also depending on the
24   nature of the engagement, we'll look at comp sets in
25   those countries or those regions. We'll look at

29

1    supply chain issues in those regions. We'll look at
2    labeling issues in those regions. We'll look at
3    employment-related matters, whether it's an adoption
4    country or, you know, normal employment-related
5    country. It's a very broad piece, but it's easier for
6    most people to understand from outside of franchising
7    that there's a disclosure document. So shorthand I
8    say disclosure document, but it's a lot of documents
9    we review.
10   Q. So just based on your review of disclosure
11   documents and all the other information, approximately
12   how many domestic U.S. franchise systems are you
13   referring to?
14   A. I would have to say probably, you know --
15   Q. More --
16   A. -- of the more than the thousand -- stop at
17   the word more -- at least a thousand.
18   Q. Okay. And just -- I want to just reference
19   that you have an Exhibit B here that includes a list
20   of documents that you reviewed. It's on page 55.
21   A. That's correct.
22   Q. Any other documents not on this list that you
23   would have reviewed?
24   A. Other than what's been cited in footnotes in
25   my report, the answer to that is no.

30

1    Q. Okay.
2    A. So if it's footnoted in my report, I would
3    not have put it on this list.
4    Q. Okay. And how about pleadings? I don't
5    think there are any pleadings on this list.
6    A. The only pleadings -- there should be two.
7    There should be your original amended complaint and
8    there should have been a Jani-King response to it.
9    And somewhere in this list they should appear, and if
10   not, then I missed them, but they should be on this
11   list.
12   Q. Okay. Other than the amended complaint and
13   the answer or response as you've referenced, any other
14   pleadings or discovery responses?
15   A. If it was attached to a deposition or
16   anything like that, the answer would be yes because I
17   didn't list every attachment to these depositions, but
18   I can't recall anything else.
19   Q. In preparing your report, did you gather
20   facts from any other written source other than what's
21   on this list, pleadings you've referenced and of
22   course anything that has been cited in your report?
23   A. Not that I -- you know, not that I can think
24   of.
25   Q. And how about individuals? Did you gather

31

1   any information from speaking with individuals in
2   preparing your report?
3       A. Other than Jani-King's lawyers?
4       Q. Yes.
5       A. No.
6       Q. And the list is fairly voluminous. There's,
7   I think, over 30,000 pages of exhibits that are listed
8   from defendants and over a thousand from plaintiffs
9   listed here. Can you explain just how long you spent
10  reviewing that material and in what scrutiny you gave
11  to various items. And my question is really kind of
12  aimed at what did you focus on more than others
13  because, for example, there's a lot of pages --
14  thousands of pages of franchisee monthly reports. And
15  I don't know if you reviewed each of those.
16      A. I reviewed -- I reviewed a couple of them and
17  then realized they were all repetitive, and they had
18  no, you know, relevance to my testimony. So the
19  answer is, no, I reviewed a couple and then passed
20  them by. I read all the depositions.
21      Q. Okay.
22      A. I have read all the -- I have looked at
23  pieces of the videos, the training videos. I have
24  looked at certain sections of the manuals. I have
25  read a couple of franchise agreements to make sure

32

1   that they are the same, but I did not read every
2   single one because they're identical other than the
3   name of the person generally. I've read -- I read a
4   lot. I read a lot. This consumed my waking hours for
5   a long time.
6       Q. After October 11th?
7       A. After October 11th.
8       Q. And in your report, you identified topics
9   that you might be called to testify about. You have
10  opinions throughout the report. You have summaries of
11  opinions. And I just want to ask you if, you know,
12  all your opinions are included in this report
13  concerning the relationship between Jani-King of
14  Oklahoma as a franchisor and its franchisees and how
15  Jani-King and its systems -- or its system compares to
16  generally accepted standards, practices, duties and
17  responsibilities --
18      A. Yes.
19      Q. -- customarily observed in franchising?
20      A. Yes, unless you raise something which I
21  hadn't thought of.
22      Q. Okay.
23      A. But everything I thought of is in the report,
24  all my opinions.
25      Q. So as of today, are there any opinions you

33

1   have developed that you'd testify to if called to
2   testify in this case or whether at trial or deposition
3   or any proceeding?
4       A. That are not in this report?
5       Q. Yeah.
6       A. No, there is nothing that I would testify on
7   again unless you asked a question that I hadn't
8   thought of.
9       Q. Okay. Page 7 at the bottom you identified
10  three limited circumstances based on your review of
11  materials where Jani-King has made an exception to
12  their normal practice.
13      A. Uh-huh.
14      Q. So I want to ask you some questions about
15  that.
16      A. Okay.
17      Q. And I guess I would first ask what do you
18  mean by exceptions to the normal practice?
19      A. Jani-King is a franchisor. They're not in
20  the cleaning business. They have a management
21  company, which is fairly typical in franchising, where
22  they are managing -- not them directly, but I
23  understand an affiliate company or a company somewhere
24  down the channel where they are managing the
25  franchisee's action, but they are not doing it as the

34

1   franchisee. And that's a very common practice in a
2   lot of industries in franchising where there is a
3   management company running the business of the
4   franchisee and it may or may not be owned directly by
5   the franchisor.
6           In two other instances, they have -- as I
7   understand it, based upon requests of the end user
8   customer, they have a supervisory person on-site. I
9   didn't find it to be surprising or material given the
10  amount of contracts that the Jani-King system globally
11  does.
12      Q. Okay.
13      A. Three didn't bother me.
14      Q. So I'm going to ask you some questions about
15  this.
16      A. I assumed you would.
17      Q. The KOC Franchise Management that you
18  reference first --
19      A. Yeah.
20      Q. Well, let me ask it this way. You state in
21  here that it manages certain aspects of the day-to-day
22  operations of a franchisee.
23      A. Right.
24      Q. What are the certain aspects you're referring
25  to?

35

1    A. I don't know. I mean, the -- the issue is
2 that the role of a -- I didn't get into the management
3 agreement between the two because it wasn't really
4 essential for my opinion. What happens in franchising
5 is there are a lot of franchisors -- franchisees that
6 are merely investors that do not want to run the
7 franchise business on a day-to-day basis. And you'll
8 find the hotel industry -- whatever hotel you stayed
9 in last night, I can almost assure you was run by a
10 management company, not the franchisor -- not the
11 franchisee.
12    Q. And is that what you're referring to when you
13 say it's common practice?
14    A. Yeah, it's common practice. Of course, I
15 mean --
16    Q. Are there specific industries it is more
17 common in than others?
18    A. It's very common in -- it's growing in
19 commonality. Let me say that. It's not controversial
20 at all. It's been done almost from the beginning in
21 the hotel industry. It's done in the oil and gas
22 industry. It's done in the convenience store
23 industry. It's done in any industry where there is
24 private equity or investor dollars that are not there
25 on an operating level. It's one of the classes of

36

1 franchisees that we specifically review. Almost every
2 single one of our clients today, we go through an
3 analysis of whether we're going to be using management
4 companies, and those could be very big companies or
5 very small companies.
6    Q. Are these typically third-party management
7 companies? So take, for example, a hotel chain --
8    A. No, Marriott --
9    Q. -- that's franchised.
10    A. -- has their own.
11    Q. Okay.
12    A. I mean, they're typically -- there is no
13 typical. I mean, if you look at the -- if you look at
14 the oil and gas company and go look at Exxon and Shell
15 and Mobile and all those guys, those are going to be
16 generally independent companies. Some are affiliated
17 with distributors as well as franchisees. In the
18 hotel industry, you have lots of hotels. Wyndham has
19 its own group. Marriott has its own group. You'll
20 see it in the conven -- in the quick service industry
21 where you have somebody who owns multiples.
22        Understand that more than 50 percent of
23 all franchisees today own more than one location.
24 Many of them own more than one brand. So the advent
25 of a management company is not untypical. I mean,

37

1 it's not in every single system, but it's not
2 something that I would look at and say, wow, that's
3 new. It's been around for years.
4    Q. Okay.
5    A. The fact that Jani-King has only one in their
6 type of industry, that is a surprise.
7    Q. So what is your understanding that KOC
8 Management does for --
9    A. I would expect -- I would expect, like any
10 other management company, for a fee they run the
11 day-to-day operation that would normally be done by
12 the franchisee. In essence, you know, of making sure
13 that the contracts that Chickasaw Nation is engaged to
14 serve are being handled appropriately. That's what I
15 would expect them to do, but it's -- I wouldn't --
16 it's not -- keep in mind it is not Jani-King we're
17 talking about here. It's an affiliated or another
18 entity.
19    Q. Do you know how that entity is affiliated
20 with Jani-King?
21    A. No. I mean --
22    Q. How did you learn about this arrangement?
23    A. It just would have been a normal question I
24 would have normally asked because it's so common.
25    Q. Did you review any documents?

38

1    A. No. I mean, as far as the relationship
2 between KOC and Chickasaw or what KOC and -- no.
3    Q. Okay. Do you know what the name of the
4 franchisee is that is serviced by the KOC Management?
5    A. Chickasaw Nation.
6    Q. Okay. Did you speak with anybody with the
7 franchisee?
8    A. No. I'm not a fact witness, so why would I
9 do that?
10    Q. Who did you speak with to learn acts about
11 this arrangement?
12    A. Probably the -- the only people I spoke to on
13 this was counsel to Jani-King, so I probably got it
14 from them.
15    Q. And do you know who any of the employees are
16 for this management company?
17    A. No.
18    Q. And do you know if Jani-King of Oklahoma has
19 had any role in assisting this management company in
20 its functions?
21    A. I would hope they would.
22    Q. Why do you say that?
23    A. Because the management company would step
24 into the shoes as a -- under a contract with the
25 Chickasaw Nation. It would generally be approved by

**39**

1    the franchisor, which is normally in place, and the
2    back and forth for the day-to-day operations that need
3    to be responded to, whatever those may be, they would
4    then not be from Chickasaw to the franchisor, but they
5    would be to the management company because that's what
6    the role of the management company is.  I mean, if you
7    look in the McDonald's system, which, you know, I do
8    have familiarity with it, that's a fairly common
9    thing.
10       Q.  Do you know if this management company
11   arrangement is utilized by other commercial janitorial
12   franchise companies?
13       A.  I would be really surprised if it's not, but
14   I haven't looked at it there.
15       Q.  Is your answer yes or no on that?
16       A.  My answer would be that I would bet a lot
17   that it is, but have I looked at their documents, no,
18   but if you give me a couple of hours, I'll give an
19   answer.
20       Q.  I'm asking you right now.
21       A.  I have no idea right now, but I would be very
22   surprised if it's not.  It's a common thing.
23       Q.  So there's a reference between a liaison with
24   a school district.  Can you explain how this is an
25   exception to normal practices?

**40**

1        A.  Yeah, that came up -- I was reading in some
2    of the depositions when they started to deal with a
3    middle school, I think it was, and a sports stadium,
4    that there was a coordinating person from Jani-King of
5    Oklahoma on the site and wanted to know why that was
6    there.  So, again, I asked the legal counsel in that,
7    and what I pulled together from the depositions, it
8    was a contractual requirement of coordination given
9    the number of people.
10       Q.  Can we just focus on one at a time, like the
11   school district?
12       A.  I didn't focus on them in my own mind
13   separately, so let me look at them both -- I looked at
14   them both as --
15       Q.  What would be the role of the liaison?
16       A.  Probably -- most of the time when that
17   happens, and it happens frequently when you're looking
18   at mass gathering locations -- stadiums, arenas,
19   ballparks, universities, transportation facilities,
20   government facilities.  There is frequently a
21   requirement in those contracts, especially when you're
22   dealing with the federal government or state
23   governments, local governments, that there be --
24   instead of having periodic reviews of whether the
25   franchisee is meeting brand standards, those type of

**41**

1    entities will frequently ask that the franchisor
2    provide more frequent reviews of brand standards.  And
3    when that happens, you may see a franchisor personnel
4    on the site, but it's not frequent, but it's not, you
5    know, something that is, you know, the moonshot.  It
6    happens in franchising.
7            It depends upon the entity.  You will see
8    it in -- you see it in medical facilities a lot.
9    You'll see it in any place where it's a secure
10   facility.  So if I'm going -- if the franchisor is on
11   a military base, depending on the military base, it
12   might be there, but it's not unusual.  It's just a
13   requirement of the contract or the agreement that
14   somebody is there to look it over.
15       Q.  And did you look at the arrangements here
16   contractually on the requirement of liaisons?
17       A.  No, because it was only such a limited number
18   that it really didn't matter to my opinion.  If this
19   were, you know, every single contract, Jani-King was
20   on the site, but it wasn't.  Jani-King was on the
21   site -- or Jani-King had a person on the site.  And
22   best I can tell -- and from what I asked, three times
23   out of thousands of relationships, that's such an
24   insignificant blip that it really didn't interest me
25   that much.

**42**

1        Q.  And do you know what the liaison was doing or
2    does in these situations --
3        A.  Based upon --
4        Q.  -- for Jani-King of Oklahoma specifically?
5        A.  Yeah, based upon the depositions that I saw
6    there, their role was mainly to verify that brand
7    standards were being met and really no other.  They
8    had communications directly with the property
9    management or the entity that was running those
10   facilities, but not a lot more than that.
11       Q.  Is your understanding of what they were doing
12   based on your review of the deposition testimony?
13       A.  Based upon review of the deposition testimony
14   and possibly what I got from discussion with legal
15   counsel.  It blends in my mind where I got the
16   information from.
17       Q.  So what information would you have got from
18   talking with legal counsel?
19       A.  Just the fact of when I picked this up in the
20   depositions, I asked the questions about what it was,
21   and I did probe whether there were a lot more of them,
22   and they said, no, this is it.  So based upon that, it
23   wasn't something of any significance to focus in on.
24   I mean, it's a one-off type thing, which doesn't
25   really matter.

---

43

1      Q.  Is there anything described in the deposition
2   testimony about the way this arrangement worked that
3   you have an opinion as to whether it was true or not?
4      A.  Oh, I don't question whether people are being
5   truthful or not.  That's not my job in life.  I
6   accept -- I accept testimony for what it was unless I
7   see something in the record that the person didn't
8   understand or appeared to be untruthful.
9      Q.  So no one advised you that the arrangement
10   with this -- with the liaison situation operated a
11   certain way but not another?
12      A.  Not that I recall.  And also as I said, this
13   is just a -- such a small happenstance in an overall
14   large organization that we probably spent more time in
15   it right now than it's worth, in my opinion, but, you
16   know, if you want to continue, we can.  It's just --
17      Q.  Yeah, I'm just trying --
18      A.  It's an insignificant blip.  It's no
19   different than -- you know, it's no different than
20   when McDonald's has their general counsel behind the
21   counter serving hamburgers at restaurants, which they
22   do on a regular basis, or everybody in the
23   organization of most franchisors are going to stand
24   behind the counter at a Marriott hotel or something.
25   It happens all the time.  It's just -- this is just a

---

44

1   blip, so I didn't see it as a big deal.
2      Q.  In some of the testimony regarding, for
3   example, working to clean university football
4   stadiums --
5      A.  Uh-huh.
6      Q.  -- there was testimony that Jani-King would
7   assist -- Jani-King personnel would assist in staffing
8   those on behalf of franchise owners, that they would
9   track hours.  Is that -- just so I understand, I mean,
10   this is something that you're saying is just a de
11   minimis blip?
12      A.  Yeah, tracking hours is -- look, Domino's
13   Pizza, let's go to one.  Domino's Pizza has a tracking
14   system that tracks every single employee, franchisee
15   or franchisor, from the time of the phone call through
16   the making of the pizza through the delivery of the
17   pizza.  It just went through with Schneiderman in New
18   York.  The software systems and recruiting of
19   personnel, you'll find franchisors all over the United
20   States and internationally which will have job sites.
21   This is nothing unusual.  This is how, you know,
22   franchising under the Federal Trade Commission and
23   state rules operate.  It's just part of the business
24   model.
25      Q.  But I'm understanding your -- the reason you

---

45

1   mention this in your report is that these practices
2   are an exception to what generally occurs?
3      A.  To be honest, I mention it in my report
4   because knowing that you're the Department of Labor
5   and this is a Department of Labor issue, I realize
6   that it would be coming up in a case, and I wanted to
7   address it in the way that it should be addressed in
8   one small paragraph, but I didn't want to ignore it as
9   if I was hiding it.
10      Q.  Okay.  So when you determine that, given the
11   vast number of end users -- and I'm reading from page
12   8.
13      A.  Uh-huh.
14      Q.  -- in the Jani-King system, this is a de
15   minimis number of direct relationships and in your
16   opinion are merely exceptions and not an indicator of
17   overall Jani-King franchise system?
18      A.  Well, it's not an indication of the overall
19   practices in Jani-King, but quite frankly, in
20   other franchise systems out there, they do a lot of this,
21   but it's unusual only in the sense that Jani-King does
22   so little of it.
23      Q.  How did you determine that it was de minimis?
24      A.  There are thousands of end users in the
25   Jani-King system globally that I know of.

---

46

1      Q.  Do you know how many there are in Jani-King
2   of Oklahoma?
3      A.  I don't know, but just in the paperwork that
4   I saw that you sent over that was part of the case,
5   there were just thousands and thousands of them.
6      Q.  So like the -- so you're saying there's
7   thousands of Jani-King of Oklahoma end users?
8      A.  Customers that are using the product, I'm
9   guessing there were thousands of end user customers
10   within the Jani-King system.  I don't know, but these
11   are three instances.
12      Q.  So I'm asking with respect to Jani-King of
13   Oklahoma.
14      A.  Jani-King of Oklahoma is a large territory.
15   I'm assuming that three is quite small within the
16   population.  I don't know.  I don't know the exact
17   number of end users in Jani-King.
18      Q.  Okay.  Do you know how many -- for example,
19   the franchise owned by the Chickasaw Nation as
20   referenced in your report, do you know how many end
21   users that franchisee services?
22      A.  I don't.
23      Q.  And do you know what the gross revenue is of
24   that franchisee compared to the other franchises in
25   the Jani-King of Oklahoma system?

---

47

1    A. No.
2    Q. So as I'm understanding it, you didn't
3  undergo some formal analysis to determine whether this
4  was de minimis?
5    A. Other than from looking at the scope of all the
6  depositions and the sales reports and seeing that
7  people had hundreds of thousands of dollars of sales
8  and yet their weekly billings were $185 or $200, the
9  answer is, no, I interpreted that it was de minimis.
10  I also just to -- again, this is so not unusual in
11  franchising that the only reason I even mentioned it
12  was I assumed it would be brought up in testimony, and
13  I didn't want you to think, like, I ignored it.  So
14  this is --
15    Q. So as I'm understanding, there is no formal
16  analysis to determine what's de minimis?
17       MS. HOFFMAN:  I'm going to object that it
18  mischaracterizes what he's already testified to.
19    A. Look, did I do an analysis?
20    Q. (BY MR. McLEOD)  Let me ask it this way.
21  What's the definition of de minimis?
22    A. De minimis means that it's almost something
23  you could ignore.  It means something that is so small
24  and irrelevant that it shouldn't even raise somebody's
25  eyebrows, so when I'm --

48

1    Q. So how did you determine --
2    A. No, no, let me finish.  Let me finish the
3  answer to my question.
4       So when I review the depositions, and I
5  can get a business person, not a franchise person, a
6  business person's sense of how many accounts people
7  have, some had one, some had two, some had three.
8  When I look at their financial -- when I look at their
9  reports that had hundreds of thousands of dollars in
10  sales and I look at what they're saying in the numbers
11  of dollars that are being charged, I can interpret
12  that to be a system of a significant size.
13       So three is de minimis in a system of
14  significant size.  Do I care if it's 300 or 3,000?
15  No.  It's still a small number in a fairly large and
16  complex and moving system where people are adding and
17  subtracting.  The other piece is there's nothing
18  unusual about this other than the fact that you're
19  sitting for the Department of Labor and I didn't want
20  to ignore it.  That's the only reason it's in the
21  report.
22    Q. Aside from it being not unusual --
23    A. Yeah.
24    Q. -- I'm just trying to understand the method
25  you used to make this -- to give this opinion.

49

1    A. A business judgment.
2    Q. And so what I'm trying to understand is what
3  you looked at and what you considered.  And, you know,
4  I'm wondering if you have -- I mean, you mentioned the
5  operating reports of Jani-King?
6    A. Uh-huh.
7    Q. How did that factor into your analysis that
8  this was just de minimis?
9    A. Given the testimony that I read through of
10  the amount of dollars that are charged to an average
11  customer, and that came up frequently you can impugn
12  that this is a fairly large system with a lot of
13  pieces.  I also want to make the point that this is so
14  typical in franchising that while I think it's de
15  minimis --
16    Q. Right.
17    A. -- that's secondary to the fact that it's
18  irrelevant.  It is one of the things that happens
19  frequently in franchising on a global basis.  It's --
20  the only reason, again, I put it in here was so that I
21  could show you that I saw it, but if I thought it was
22  a big deal, I would have made paragraphs out of it.
23    Q. So do you know how many franchises there are
24  in the Jani-King of Oklahoma system?
25    A. I don't.  I saw the list at one time and it

50

1  was probably in the hundreds, but I don't know.  There
2  was a long list of franchisees.
3    Q. And did you do any sort of comparison based
4  on their gross earnings as to how many or what the
5  earning distribution is amongst the franchisees?
6    A. I don't know why I would do that.
7    Q. Okay.  And would you agree that Jani-King has
8  the authority to actually perform cleaning services
9  for customers?
10    A. Unusual for them to do it.  They're not in
11  the cleaning business, but I guess have authority to
12  clean, I guess.  I don't know what that means, that
13  question, whether they have the authority.
14    Q. Well, for example, the franchise agreements
15  specifically identify circumstances where they can put
16  their own staff in to clean a customer account if they
17  need to.
18    A. I think you'll find that in every agreement,
19  that franchisors can correct any deficiency by a
20  franchisee.
21    Q. Are you --
22    A. I don't know.  If you have the agreement,
23  show me the paragraph you're talking about.
24    Q. Well, I can show it to you, but are you aware
25  of whether Jani-King of Oklahoma has personnel that

---

51

1    perform cleaning services for its customers?
2         A.  On a regular basis, they do not.  On a
3    fixed --
4         Q.  Why do you say that?
5         A.  Well, I've asked and I didn't see anything in
6    the record that shows that they do.  Jani-King is not
7    in the cleaning business.  They are in the franchising
8    business.
9         Q.  Are you -- did you review any monthly reports
10   of in-house cleaning accounts?  So, for example, where
11   Jani-King sends out its own personnel to clean certain
12   accounts?
13        A.  I've asked whether they do or they don't, and
14   I'm told that they don't.  It's not in the general
15   nature.  I do --
16        Q.  So you don't know the dollar amount each year
17   that they perform cleaning services on their own?
18        A.  No.  And let's -- let's -- let's be clear
19   about something.  Franchisors all over the world have
20   company-owned locations.  In those company-owned
21   locations, they may be doing functions that the
22   franchisees do, but the main role of a franchisor is
23   as a franchisor.  Using that as a criteria of
24   McDonald's, which has 20 percent of its locations
25   company owned, wouldn't be a franchisor.  And I don't

---

52

1    think anybody would say McDonald's is not a
2    franchisor.  Same thing with Marriott, same thing
3    with, you know, any franchise system.  I don't know of
4    any franchise system that doesn't have company-owned
5    at point or licensed or joint ventures.
6         Q.  Do you know if Jani-King has a company-owned
7    outlet?
8         A.  I don't know, but I would assume they would.
9    But that wouldn't bother me anyway.  The business of
10   Jani-King and its relationship with the franchisees is
11   as a franchisor the same way McDonald's, same way
12   Marriott, same way Burger King, Domino's.  You know, I
13   can go through a thousand franchisors with the same
14   exact relationship.  That doesn't change the nature of
15   the franchisor's business if they have company-owned
16   operations.
17        MS. HOFFMAN:  Is it a good time to take a
18   five-minute break?
19        MR. McLEOD:  Sure.
20        (Recess 10:14 to 10:29.)
21        Q.  (BY MR. McLEOD)  All right.  Mr. Seid, I want
22   to direct your attention to page 17 of your report.
23        A.  Yes, sir.
24        Q.  You say in this first full paragraph, last
25   sentence, in my expert opinion, this ability to reject

---

53

1    opportunities is a factor that supports independent
2    contractor status.
3         A.  Where are we looking?  Page 17?
4         Q.  Last sentence, second paragraph.
5         A.  Sure.
6         Q.  Okay.  I'm curious what -- why did you state
7    that opinion?
8         A.  Goes to fact.
9         Q.  Okay.  And what's it based upon?
10        A.  I don't know.  35 years of experience.
11        Q.  Is there some --
12        A.  The fran -- it's -- what you have in a
13   franchise system is independent businesses operating
14   under a branded system to brand standards.  All
15   franchisors -- all franchisees make choices about the
16   customers they serve.  You see it all the time in the
17   press when somebody throws somebody out of their
18   restaurant.  This is just that -- there was something
19   in your -- when I say yours, I mean the Department of
20   Labor.  I don't know if you wrote it yourself.  There
21   was something in your original complaint that
22   franchisees, you know, were given accounts and how to
23   accept the accounts and accept the accounts with the
24   terms that were in there.  And the point is that none
25   of that is true, so quite frankly I put it down --

---

54

1         Q.  Okay.
2         A.  -- that they could reject an account if they
3    wanted to.
4         Q.  So you put it down as a fact they can reject
5    their account?
6         A.  Well, it is a fact, but I put it down that it
7    supports my opinion.
8         Q.  And how does it support your business?
9         A.  It shows that the franchisee is an
10   independent business person and it can make decisions
11   and that the franchisor does not have day-to-day
12   control over the franchisee.
13        Q.  In what sort of definition of independent
14   contractor are you operating under when making that --
15        A.  I think the one that everybody has, that a
16   franchisee -- in a franchise system, the franchisee
17   meets the franchisor's brand standards, but how they
18   conduct their business in meeting the brand standards
19   is their choice.  Who they serve, when they serve
20   them, what personnel is serving those people, what
21   they're being paid, what their human resource policies
22   are, and a long list of other things, but the -- well,
23   there are franchise systems galore that control the
24   hours of a franchisee.  Dunkin Donuts, you have to be
25   open 24 hours a day.  A lot of McDonald's, you do,

---

## 55

1 too. It's a requirement. Here you don't, but the
2 ability to turn down an account because you don't want
3 it or it's too far away is an independent management
4 decision. It shows a significant degree of management
5 control.
6 Q. Okay. And just staying on the definition of
7 independent contractor --
8 A. Uh-huh.
9 Q. -- do you have a definition that's codified
10 in some regulation or statute that you're relying upon
11 or is it something else?
12 A. Well, I have the classic definition that, you
13 know, has been in place for, I don't know, most of my
14 career until you all changed it with David Weil and
15 the -- you know, the definition is that the franchisor
16 in this situation has a right to establish the
17 standards, but the franchisee is in control of when
18 the work is done, who does the work, and those parts
19 of it. It's the difference between what has to be
20 done and how it is being done.
21      Even under the current definition of
22 independent contractor which, you know, came out
23 during -- during David Weil's term, you have, you
24 know, the issues of control that factor in there were
25 between management and -- between an employee and non.

## 56

1 So under both definitions I don't see any big
2 difference.
3 Q. So I have to ask you, I don't know where
4 to -- where would you find the classic definition of
5 independent contractor? I don't know what you're
6 referring to.
7 A. Well, I would refer -- well, if you want to
8 find the classic definition of independent contractor,
9 in your office, I would probably turn to David Weil's
10 book in the first section of the book where he
11 discusses that, but the definition of independent
12 contractor, the Internal Revenue Service defines
13 independent contractor. I probably have somewhere in
14 here the IRS definition of independent contractor.
15 That definition has been in place, I don't know, since
16 I became a CPA back in the '80s.
17      Then there is a definition that changed,
18 you know, during the Obama years with David Weil and
19 he put in the five steps. You know, there are certain
20 states that have their own definition of independent
21 contractor like in California, but, you know, the
22 general definition historically of franchising
23 generally dealt with the difference between who has
24 the authority to do what in that relationship. The
25 new definition you guys are working under is

## 57

1 different.
2 Q. What definition are you using?
3 A. For my purposes, both the current definition
4 and the historic definition, neither of them make a
5 franchisee into an employee. I mean, one is clearer
6 than the other and one is designed to capture as many
7 people into -- into employment as possible, but either
8 one -- under both the definition that's in place now,
9 which I understand is being changed in the next week
10 or so, under both definitions, you find that the
11 franchisee is not an employee.
12 Q. I don't want to belabor this. It's not my
13 intent.
14 A. Okay.
15 Q. But I don't understand when you're saying the
16 current definition, like what you're referring to.
17 A. There was a change -- there was a change in
18 the Department of Labor.
19 Q. Are you referring to a Department of Labor
20 definition?
21 A. Yeah, your definition. I mean, you guys
22 changed your definition.
23 Q. Is there is a specific agency in the
24 Department of Labor? Are you referring to the wage
25 and hour division?

## 58

1 A. Yeah.
2 Q. Okay.
3 A. I mean, David Weil said it from the day --
4 David Weil established a new definition factor. In
5 the materials in this case, there's a memorandum from
6 David Weil, which reminded me of what he was doing.
7 Defining what he has as five steps of what becomes an
8 independent contractor, that is different -- that is
9 materially different from what the IRS definition has
10 been. It's materially different than what the states
11 have been using for years. It's a redefinition, but
12 even under David Weil's revised definition from wage
13 and hour, franchisors especially, you know, including
14 Jani-King, are not employers. They're independent
15 contractors.
16 Q. Just so I understand your opinion here, that
17 their ability to reject offers made is just -- you
18 were pointing this out because it's a fact?
19 A. I'm pointing it out because in the definition
20 from -- in the definition cited in the material that
21 was provided by the Department of Labor in one of the
22 depositions is whether the franchisee is managing
23 their business. And there was a big issue about
24 capacity to manage and being able to make management
25 decisions. This is an indicia of the fact that the

59

1  franchisee does indeed manage their business. They
2  can reject the accounts.
3      Q. Okay.
4      A. An employee -- for instance, you're here
5  because somebody in your office said to be here. You
6  didn't have a choice. I had a choice. I could have
7  said, yes, I want the account or not. I'm not an
8  employee. A franchisee can accept or reject the
9  accounts. That's a pretty significant management
10  decision.
11      Q. And where did you get the information to let
12  you be able to say that a franchisee is free to reject
13  an account?
14      A. I think I read, what, about 20 depositions,
15  and in every single one there was some mention that
16  people rejected accounts on a fairly regular basis.
17      Q. That's where you got that information?
18      A. From the franchisees.
19      Q. The depositions --
20      A. And also from the contract. I mean, if you
21  go -- if you go to the contract and the disclosure
22  document on Jani-King, you're going to find that
23  language in there that they can reject agreements.
24      Q. Okay.
25      A. I mean, that's almost -- that's a very

60

1  important piece.
2      Q. And you make this assertion in the context of
3  discussing system accounts being common in
4  franchising?
5      A. Uh-huh.
6      Q. And you also reference that franchisors like
7  Midas Muffler, Hertz and Marriott rely on system
8  accounts?
9      A. Oh, countless franchise systems.
10      Q. And in those situations, it's my
11  understanding the point you are making is that they
12  can't refuse a particular customer from a national
13  account?
14      A. When you're getting into some systems, the
15  franchisee, if they did reject a national account,
16  would never be offered another national account
17  opportunity. It's very disruptive. So when you're
18  checking into the Marriott Hotel, the Marriott
19  franchisee can't reject your status working for the
20  government and getting a different rate than I would
21  get. I mean, that's a national account. If you're
22  driving down the highway in -- where are you, in
23  Denver? If you're driving down the highway in Denver
24  and see people cutting the grass on the side of the
25  road, that may be a national account with a franchise

61

1  organization or system account.
2      Q. Right.
3      A. Franchisee can't say I'm not doing those
4  parameters. That's part of their agreement.
5      Q. Right. So the franchisor might have
6  contracts, with the national -- national account
7  contracts and in situations like Midas Muffler, if
8  there is only one Midas Muffler or same with Marriott,
9  there is only one Marriott in a particular
10  geographical area, the agreement with the franchisor
11  is that they can't reject somebody from the national
12  account because there is nowhere else for that
13  customer to go?
14      A. Well, no, that's not the point. They can
15  certainly reject the person.
16      Q. There's a distinction, though, wouldn't you
17  agree, with Jani-King where if a Jani-King
18  franchisee -- they have the freedom to reject an
19  account because it will just be offered to another
20  franchisee?
21      A. No. I mean, quite frankly, if I -- I have
22  status at Marriott properties for lots of reasons. I
23  spend a lot of nights there. If I ever showed up at a
24  Marriott property and they did not have my reservation
25  available for me, they'll send me over to Choice or

62

1  Hilton or someplace locally. That happens any time.
2  They're not guaranteeing they're going to service you,
3  but they're guaranteeing under those agreements that
4  they're servicing you under the conditions in the
5  national account.
6      So if I have a Maaco -- if I have a Hertz
7  rental car dealership and I get into a car accident, I
8  can choose wherever I want to go to get that Hertz car
9  fixed or I can go to the national account that we
10  have -- that they with Maaco and Maaco will fix that
11  car at a precise price that's been predetermined.
12      Q. In your Marriott example, they're not
13  rejecting you; they just didn't have your reservation,
14  so they're making it good by sending you somewhere
15  else?
16      A. Yeah, but if I walked into -- if I walked
17  into the Ritz Carlton next door where I'm staying, if
18  I walked into the Ritz Carlton and they rejected my
19  platinum elite lifetime status, they can't. That's
20  a -- that's one of the programs that Marriott set up
21  as a national account program with folks like me that
22  travel a lot. If you walked into whatever hotel chain
23  that a Department of Labor or the Department of
24  Defense or one of the other agencies -- if they have a
25  pricing structure with your agency, the franchisee

## 63

1  doesn't have a choice. He's going to charge you what
2  the national contract is. You guys do it all the
3  time. Everybody does.
4       In this situation, it's different. This
5  is not a matter of the franchisee rejecting that
6  particular customer just because they've showed up and
7  there was no rooms, they didn't want to do it.
8  Jani-King -- when a franchisee signs an agreement,
9  Jani-King is required to offer them certain dollar
10  amounts based upon the contract.
11      Q. For a certain period of time?
12      A. For a certain period of time. As the
13  relationship matures, you've now got past this initial
14  period, Jani-King will say to a franchisee, I have an
15  account for you. The franchisee can accept it or
16  reject it. That's a -- you know, they're not forced
17  to do anything. I mean, the sheer fact that a
18  franchisee can go out and get his own accounts, which
19  they're trained to do, is an important statement of
20  management.
21      So, you know, this is not a -- this is
22  not a -- like if I were an employee -- like, I'll say
23  to one of my staff, I need you to be in Phoenix
24  tomorrow. That's not a request. I mean, I may say it
25  politely. That's not a request. Or I say to them,

## 64

1  you have to be with me in Vienna in January. That's
2  not a request and they can't it turn it down if they
3  want to keep their job, but a franchisee can say, nah,
4  I don't want to do that. I don't want to do that at
5  all. You have that all the time in franchising.
6  Franchisees are -- you know, as long as the French
7  fries taste fine, franchisor can't say to you, you got
8  three people doing it, we only wanted two. Not their
9  job.
10      We don't control the middle. We control
11  the brand standard. The fact that a franchisee can
12  turn down at account in this particular company,
13  they're not employees. They're independent
14  contractors.
15      Q. Okay. So moving on, you have -- on the same
16  page you have listed the franchisor's major areas of
17  responsibility.
18      A. Uh-huh.
19      Q. And where did you gather information to
20  create this list?
21      A. Out of my head. This is stuff that I do all
22  the time. This is what a franchisor does.
23      Q. Did you review any documents?
24      A. Yeah. I reviewed the Jani-King disclosure
25  documents, their agreements, my knowledge of Jani-King

## 65

1  from the industry, prior relationships. I mean, this
2  is standard -- this is standard in any franchise
3  system. They're major areas.
4       Q. I'm trying to understand specifically where
5  you drew that these are the Jani-King of Oklahoma
6  major areas of responsibility.
7       A. From their disclosure documents, from their
8  manuals, from their training programs, from
9  interaction with Jani-King and other companies and
10  franchising regardless of industries for 30 years.
11      Q. Okay.
12      A. This is what a franchisor does.
13      Q. Did you speak with anybody at Jani-King in
14  order to determine this list of major areas of
15  responsibility?
16      A. I didn't, but quite frankly if they're not
17  doing all these things, I would be incredibly
18  surprised.
19      Q. Well, for example, establishing criteria for
20  franchise offices and approving franchisee offices?
21      A. Yeah, it's actually in the agreement.
22      Q. Yeah. Do you know how many franchisees have
23  offices?
24      A. I don't, but the requirement, the right to do
25  so, is in the franchise agreement. Franchisees can

## 66

1  work at home or franchisees can have an office. If
2  they choose to have an office according to the
3  agreement, the franchisor has the right of approval,
4  so that is a major consideration.
5       Q. But would you agree that if no franchisees
6  have offices, it's not really a responsibility?
7       A. No, because even if they are at a home
8  office, we have clients -- look, I'm a franchisor. I
9  want to audit you -- I want to audit your books and
10  records as my franchisee, which the contract allows me
11  to have. The fact that you have your office in the
12  house doesn't make it any less an office than having
13  it in this building here. It's an office. It has a
14  desk, it has records, it has filing cabinets, has
15  computers. That's an office. I mean, the first years
16  of MSA were in my home.
17      Q. Do you know what Jani-King does to approve
18  home offices if anything?
19      A. No. It doesn't matter. They have their own
20  internal reasons for approving offices, but the fact
21  is according to the contracts, they have the right to
22  approve offices.
23      Q. They have the right to contractually?
24      A. Contractually. It's in the agreements.
25      Q. All right. You have an item here at the

67

1  bottom of 17, contract administration, what are you
2  referring to?
3       A. Renewals, terminations. In the Jani-King
4  case, it also can be -- although, I think I have a
5  separate line item for it. Yeah, I have a separate
6  line item for system account sales administration.
7  This is franchise agreements meeting the Federal Trade
8  Commission requirements, making certain that the
9  franchise agreement has all of the -- in any franchise
10 system, you have somebody who is responsible for
11 compliance, check the boxes to make sure that, you
12 know, the agreements are signed, guarantees are
13 signed, checks received. That's what contract
14 administration is. Can't run a franchise system
15 without it.
16      Q. What does operations and standards reviews on
17 page 18 refer to?
18      A. That's somebody going out to physically
19 review whether the floors are clean in the Jani-King
20 system.
21      Q. So inspections?
22      A. Yeah, inspections.
23      Q. Okay. And does customer service fall into
24 one of these categories?
25      A. Does cust -- well, customer service would

68

1  fall into all of these categories from a brand
2  standard. If you're looking for a specific one,
3  enforcing brand standards pursuant to the terms of the
4  court documents, that would be customer service. One
5  of the standards in Jani-King is customer service
6  communications. You see a lot of that in their -- in
7  their manuals and agreements.
8       Q. Do you know what role Jani-King plays in
9  customer service?
10      A. Jani-King has a pretty -- not a unique role,
11 but it has a pretty important role, their customer
12 services, making sure that the bills go out on time
13 and that they collect on time. They also have a
14 customer service to their franchisees again different
15 than they had with employees. They...
16      Q. Other than with respect to the customer,
17 other than billing, are you aware of any other
18 customer service they provide, not to franchisees, but
19 to the customer?
20      A. Well, Jani-King will -- Jani-King will have
21 field staff that will go out and inspect the location.
22 They'll have people that will talk to the end user.
23 So as far as making certain that the franchisee who is
24 responsible for the day-to-day execution of the
25 cleaning is doing it to brand standards, that is the

69

1  role of Jani-King, as any franchisor is, to make
2  certain that the franchisee is meeting brand
3  standards.
4       Q. Okay. On page 26 and 27, just similarly, you
5  identify a list of things that franchisees have
6  exclusive right and responsibility to do. How did you
7  come up with this list? What information did you rely
8  upon?
9       A. Well, I relied upon, you know, the fact that
10 this is what franchisees in general do, and I relied
11 upon the fact that when I read the agreements and the
12 manuals and the depositions, that none of the things
13 on what I consider my standard list of things
14 franchisees independently do -- none of them I had to
15 take off. This is -- this is as broad a list as I
16 would make if I were looking at a McDonald's.
17      Q. So do you know how many franchisees financed
18 their investment?
19      A. I would assume -- well, they could finance it
20 either internally or externally, but they had the
21 right to finance it.
22      Q. Okay.
23      A. That's -- again, that's a management
24 decision.
25      Q. I'm just wanting to know -- and what you're

70

1  saying they have the right to do. So, for example,
2  determine their lenders, do you know how many
3  franchisees actually use lenders?
4       A. Yeah, there was actually some discussion of
5  that in the depositions. Some of the franchisees, you
6  know, claim that they could not get, you know, loans
7  from banks, which is a relatively silly statement.
8  They just didn't know how to do it. Most of them
9  relied upon going --
10      Q. When you say they didn't know how to do it,
11 is that what they said in the deposition or is that an
12 opinion of yours?
13      A. No, it's clear from the depositions when you
14 read the depositions that the franchisees, many of
15 them -- there was several franchisees that said, I
16 couldn't get a loan for the following reasons. The
17 truth is that janitorial franchises all over the
18 United States -- and I know this as a fact -- will go
19 to community banks, they'll go to lending banks,
20 they'll get SBA loans. I mean, the small business
21 administration will lend on this.
22      Q. How do you know this is a fact?
23      A. Because I have seen it in franchising. We
24 have seen lists of companies that get SBA loans.
25      Q. Can you identify one? I mean, you just said

---

71

1  an opinion, and I need to ask you the basis of it.
2      A.  Yeah, I mean, you look at Service Master, you
3  look at JAN-PRO.  I mean, all those folks are on lists
4  of SBA loans.  There was a comment in here, which I
5  thought was a little bit --
6      Q.  And you're referring to franchisees?
7      A.  Franchisees, sure.
8      Q.  Are you talking about master franchisees
9  or --
10      A.  No --
11      Q.  -- or franchisors or to the sub franchisees?
12      A.  Sub franchisees -- not sub franchisees,
13  direct franchisees.  You're looking at, you know,
14  there are programs in various states that are focused
15  on low-wage, low -- low-wage, low-skilled workers
16  becoming franchisees -- there are grant programs.  I
17  mean, if you go to Denver, I'm almost positive that
18  I'll probably be able to find a half a dozen agencies
19  that give grants to women.
20          There's lots of ways that people finance
21  these.  There was a comment in -- there was a comment
22  in one of the depositions, and I don't remember which
23  one, that said I can't get a loan because I don't own
24  a contract.  Well, the whole statement was a bit odd
25  and seemed a little cooked, but putting that aside --

---

72

1      Q.  Why do you say it seemed a little cooked?
2      A.  Because it's not a statement that somebody
3  would make.  It just seemed to fit the case more than
4  it fit the dialogue that went around it, but putting
5  that aside, even if it's not cooked -- and that may be
6  a bad thing for me to say that it was cooked --
7  McDonald's franchisees don't own their customers.  So
8  they're in the exact same place as a Jani-King
9  franchisee.
10          If you asked McDonald's whose customer
11  just ate the Big Mac, it's the guys in Oak Brook.  I
12  mean, if you look at any franchise agreement in the
13  United States, it's going to say we own all customer
14  information.  The fact that Jani-King has long-term
15  relationships with -- the end user wants to use the
16  services and the services aren't at $5.50 per burger,
17  they're more like 200 or more dollars a month for
18  cleaning, those need contracts, but there is no
19  difference between the customer -- the end user at
20  Jani-King than the end user at Marriott Hotels or, you
21  know, Fatburger or Firehouse Subs.  There is not one
22  of the franchise system that don't consider the
23  customer theirs.  That's the nature -- that's the
24  nature of a license business.
25      Q.  Okay.  With respect to hiring employees, do

---

73

1  you know how many Jani-King of Oklahoma franchisees
2  have employees?
3      A.  Some of them clean themselves.  Some of them
4  have multiple employees.  Some of them have employees
5  that -- depending on the Oklahoma State game.
6      Q.  What are you basing that statement on?
7      A.  Depositions.
8      Q.  Okay.
9      A.  The depositions are filled with franchisees
10  that have employees.
11      Q.  Separate and apart from the depositions, do
12  you know how many franchises have employees?
13      A.  No.  I go by the case record.
14      Q.  Okay.
15      A.  I'm not -- you know, I'm not a fact witness.
16  So if you show me that they don't have employees, but,
17  again, that's a management decision they made.
18      Q.  And as far as selecting employees or
19  independent contractors --
20      A.  Uh-huh.
21      Q.  -- where are you basing that they have that
22  right from?
23      A.  Well, from the depositions.  You have the
24  franchisees stating that I'm paying them on 1099s,
25  they say, or I'm giving them a W-2.  They're saying

---

74

1  they get it from their accountants or their
2  bookkeepers or they just don't really know the rules
3  and make everybody a 1099.  Whether they're in
4  violation of the law or not, I don't know, but, you
5  know, in every single deposition when the question was
6  asked of them -- and I think it was asked by you or
7  one of your associates -- they all said, you know,
8  they mentioned 1099 employees and W-2 employees.
9  That's the way that most of them referred to it, but
10  they all had it.
11      Q.  Okay.  Do you know how many franchises have
12  management personnel?
13      A.  Every one of them.
14      Q.  Why do you say that?
15      A.  Because the franchisee is managing the
16  business.
17      Q.  Okay.  Do you know how many franchises other
18  than a franchise owner have separate individuals they
19  hire as managers or supervisors?
20      A.  I would have no idea, but the senior manager
21  would be the franchisee.
22      Q.  Do you know how many franchises have human
23  resource policies and practices in writing?
24      A.  100 percent of them.  Oh, in writing?
25  Probably none at that level -- at that level of a

---

75

1  franchisee maybe the Chickasaw Nation does, but I --
2  you know, whether they have written policies or not,
3  you would have to ask the franchisees. Do they have
4  policies? Sure they do. Whether they're rational or
5  not or written down, I have no idea, but they have
6  policies.
7      Q. And you have an item here, respond to
8  communications from government and regulatory
9  authorities. Do you know what Jani-King of Oklahoma
10  franchisees are responding to from the government and
11  regulatory authorities?
12      A. Yeah, they responded to you guys when you
13  sent them out a notice. They respond to IRS, they
14  respond to sales tax, they respond to government, you
15  know, authorities locally.
16      Q. Are you saying that because a franchisee's
17  owner said that or is it just general that you're
18  saying that?
19      A. I'm saying that because they're not in
20  prison. No, seriously. The idea that a business
21  person who claims that they're filing W-2 forms and
22  1099s and going to their accountant to do their annual
23  taxes is not interacting with some government agency,
24  even the fact that you sent out -- and I don't mean
25  you personally.

76

1      Q. That's okay.
2      A. You guys sent out a short letter that said,
3  hi, we're coming out to see you because we have a
4  claim against Jani-King. They responded. I mean,
5  they didn't do it voluntarily. They responded. So
6  the answer to that, if nothing is there, is you're a
7  government agency.
8      Q. Regarding the franchise in the Oklahoma City,
9  did you review any executed franchisee agreements?
10      A. Every one that was attached to a deposition,
11  I looked at, but I didn't read every one to see if
12  they were different.
13      Q. Beyond what was included in the depositions
14  as exhibits --
15      A. No. No. Why would I?
16      Q. Do you know the differences between various
17  versions of Jani-King of Oklahoma franchise
18  agreements?
19      A. I have seen different versions over the
20  years, maybe not in Jani-King of Oklahoma. I didn't
21  see any differences that I can recall in the docs that
22  I reviewed, but they may have been there. I just
23  didn't see them.
24      Q. And you made some citations in your report to
25  the franchise agreement. What version are you citing?

77

1      A. I would have to go back and look. It was one
2  of the -- I probably had one referenced document,
3  which I took from a PDF and turned into a Word, so I
4  would have to see which one he used.
5      Q. Right now you don't know what it was?
6      A. I don't know. I mean, I would have to go
7  back and see which document I converted from a PDF to
8  a Word document because when I quoted from them, I
9  wasn't retyping it. I didn't want to go out of a PDF.
10  I went from a Word.
11      Q. So just to kind of finish my understanding of
12  what you know about the ownership of franchises in the
13  Jani-King of Oklahoma system, do you know how many are
14  owned by one individual, whether directly as an
15  individual or through a corporate entity?
16      A. Most of them seem to have -- from the
17  depositions, most of them seem to have formed a
18  corporation. Some of them didn't know themselves. I
19  mean, it was a little odd. There was a husband and
20  wife team that thought they were a partnership. They
21  weren't certain of it. So the answer is, I don't know
22  what entity. Again, that's a --
23      Q. Well --
24      A. Again, that's a management decision or tax
25  decision that each of those franchisees make.

78

1      Q. No, my question is -- my question is, do you
2  know how many are owned by one individual, whether
3  it's directly or indirectly?
4      A. I don't know.
5      Q. Okay. Or by two individuals?
6      A. I don't know. Most of them seem to be
7  husband and wife team.
8      Q. Do you know what Jani-King's requirement is
9  for a franchise owner to participate in the day-to-day
10  operations of its business?
11      A. If you look at their disclosure document, the
12  franchisee has to have day-to-day responsibilities in
13  the business, but can sub that down to a manager or an
14  employee of their choice, but regardless of their --
15  regardless of whether they do or they don't according
16  to the agreement, they have responsibility as if they
17  do. So the franchisee, again, can make that
18  management decision whether they want to be involved.
19  Many of these franchisees it seems have multiple jobs.
20  So, you know, in a couple of cases, franchisee has his
21  wife doing it or vice versa.
22      THE WITNESS: I'm just going to get some
23  coffee.
24      MR. McLEOD: Yeah, let's take a
25  two-minute break while you do that. Let's go off the

79

1    record for a minute.
2                (Recess 11:02 to 11:07.)
3        Q. (BY MR. McLEOD)  So you have a section in
4    here referred to as differing roles, rights,
5    responsibilities.  It starts on page 23.  And I just
6    want to go over to just some basic facts about the
7    Jani-King system and then ask you some questions, but
8    it's fair to say that Jani-King of Oklahoma
9    essentially acts as a regional master franchisor; is
10   that fair?
11       A. Well, they are a regional master franchisor
12   to Jani-King.  They are a franchisor --
13       Q. That's what I mean.
14       A. But they're a franchisor to the franchisees.
15       Q. Right.
16       A. So they have a dual role.  At one level
17   they're a master franchisee, but to the franchisees
18   themselves they are the franchisor.
19       Q. Okay.  Is it fair to refer to that as a
20   master franchisor?
21       A. Yeah.
22       Q. That role?
23       A. That is one of the ways you can describe it.
24       Q. Are you familiar then with how JAN-PRO and
25   Vanguard and similar commercial janitorial cleaning

80

1    franchises are set up?
2        A. Off the top of my head, no.
3        Q. Okay.  So Jani-King of Oklahoma sells
4    franchises within a defined territory, right?
5        A. Correct.
6        Q. And that's identified the franchise agreement
7    with the territories?
8        A. Okay.
9        Q. Would you agree?
10       A. Yeah.
11       Q. Okay.  You have reviewed the franchise
12   agreement, I take it?
13       A. Uh-huh.
14       Q. And they also sell to customers within that
15   territory?
16       A. Both --
17       Q. Jani-King.
18       A. Jani-King and the franchisees do.  They both
19   do.
20       Q. Do you know how many accounts Jani-King --
21   out of the universe of customer accounts of Jani-King
22   of Oklahoma, do you know how many were sold by
23   Jani-King and how many by franchises?
24       A. No.
25       Q. And I think we can agree on this because you

81

1    discuss it in your report, but it's Jani-King of
2    Oklahoma that secures and owns the customer account?
3    They have ownership on the account?
4        A. They have contractual responsibility.  I'm
5    not sure I'm qualified to say whether they own it or
6    not.  They have contractual responsibility over it.  I
7    mean, they are the contracting party, but I'm not sure
8    if that's ownership.
9        Q. Okay.
10              (Telephone interruption.)
11           THE WITNESS:  I apologize.  This is about
12   your invoice so... Okay.  She didn't know whether to
13   put travel on there or not.
14           MR. McLEOD:  I'm going to need a break.
15   We are going to have to go off the record for a
16   second.
17              (Recess 11:10 to 11:12.)
18              (Exhibit No. 4 marked.)
19       Q. (BY MR. McLEOD)  All right.  I'm handing you
20   what has been marked Exhibit 4.  Does this look
21   familiar?
22       A. It sure does.
23       Q. Can you identify this document, please?
24       A. It is a Jani-King of Oklahoma franchise
25   agreement.

82

1        Q. Okay.  And if I could direct your attention
2    to section 6, which is on page 19.
3        A. Correct.
4        Q. Paragraph 6.1.1, second sentence, the
5    contracts under which franchisee will provide service
6    are and will remain the property of franchisor.
7        A. Correct.
8        Q. Okay.  Is it your understanding that it's
9    Jani-King of Oklahoma that has ownership of the
10   customer accounts?
11       A. Again, the -- you're asking for a definition
12   of ownership.  I said they were the one contracting
13   it.  They were the contracting party.  I'm not sure
14   there is a material difference to those two
15   statements.
16       Q. Okay.  Let me understand and make sure we are
17   on the same page on this, then.  So if a franchise --
18   if Jani-King offers an account to a franchisee --
19       A. Uh-huh.
20       Q. -- and for whatever number of reasons that
21   could occur, that franchisee transfers off that
22   account.
23       A. Correct.
24       Q. Jani-King still has control of that account
25   to offer to other franchise?

83

1    A. And the obligation to serve that account with
2  a customer, sure.
3    Q. Okay. And so they have an ownership interest
4  or contractual interest in that customer, and it's
5  exclusive to Jani-King of Oklahoma?
6    A. Correct.
7    Q. Okay. All right. So kind of getting back to
8  my wanting to establish just some general
9  understanding, that this territory that Jani-King
10  sells franchises in, it's fair to say it's a
11  nonexclusive territory?
12    A. Correct.
13    Q. With respect to franchisees?
14    A. Correct.
15    Q. Okay. And in general just based on your
16  experience in franchising, some franchisors offer
17  exclusive geographical territories?
18    A. Less and less, but some do, sure.
19    Q. In fact, it's common? Some do, some don't,
20  but it's fair to say it's common?
21    A. Well, actually today it's not because
22  starting in 2007 -- where before you would give a
23  franchisee an exclusive territory, beginning in 2007
24  with the change to the Federal Trade Commission rule
25  on franchising, the offering of an exclusive territory

84

1  pretty much vanished for any franchisor that was in
2  alternative distribution, which most are in.
3    So when you say they're getting a
4  territory, it's not an exclusive territory. Most of
5  them are getting some form of protected territory, but
6  I don't know of a single franchisor today -- and that
7  may be wrong because I'm not thinking that clearly on
8  it -- but the majority of franchisors would not be
9  offering exclusive territories today. They would be
10  offering some form of protected territory, and that
11  could be very broad or very limited depending on the
12  next four paragraphs in that offering.
13    Q. And just so we're clear, when I say an
14  exclusive geographical territory, I mean in the sense
15  that other franchisees can't necessarily operate
16  within that territory, the franchisor might reserve
17  some rights?
18    A. No. In fact, if you go into the majority of
19  trades franchises, trades being in plumbing,
20  electrical, roofing, contracting, any of those, the
21  ones that deal in Snap-on Tools, for instance, any of
22  the cleaning franchises, residential or commercial,
23  none of those that I know of are going to give an
24  exclusive or even a protected territory. You're going
25  to see vans going both ways.

85

1    There have been multiple cases with
2  franchisees that, you know, the issue is -- and I'll
3  give you the example. I won't open up an office in
4  whatever your protected area is, and they call it an
5  office location or something, but that doesn't stop
6  another franchisee from servicing a customer in your
7  territory if the customer calls you. So the only
8  restriction that takes place in their exclusivity is
9  the franchisor won't open up another office.
10    Q. And there is different ways to skin the cat
11  on protected geographics?
12    A. No, no, but the fact that a franchisee -- you
13  know, let's think about it a second. I can't open up
14  another office in Dallas, Texas, but the franchisee
15  from Fort Worth can come into Dallas, Texas and do the
16  servicing. Is that a protected territory? Not
17  really.
18    Q. Yeah, and that's one example.
19    A. Well, that's what's common in the trades.
20    Q. Well, let me ask you this. Have you ever
21  done an analysis to see how many exclusive
22  geographical territories franchisors offer versus
23  those that do not?
24    A. An analysis, no, but I can tell you what we
25  advise our clients.

86

1    Q. I'm asking -- my question all started with
2  whether offering some -- either an exclusive
3  geographic territory or protected, as you refer to it,
4  whether that's common. And I'm getting the sense you
5  are not probably ever going to agree with me that it's
6  common.
7    A. No, I won't.
8    Q. But I'm wondering if you have done any sort
9  of analysis to determine that?
10    A. Only from going to conferences, our extensive
11  list of clients, reviewing franchise agreements all
12  the time, being a professor at a university, writing
13  about it in some of those articles that you saw in
14  there. The issue is protected territory since
15  exclusive territories are becoming less common. And
16  in the trades franchises specifically, they're almost
17  nonexistent.
18    Q. They might be becoming less common based on
19  your experiences, but they have been common in the
20  past, right?
21    A. Well, yeah, but so is a crank car back in
22  1917. The industry has evolved.
23    Q. Like I used to represent a franchisor and
24  they had exclusive geographic territory.
25    A. Sure, they did. I had them when I was with

87

1    Supercuts. Wouldn't have it today with hair company.
2        Q. You just don't advise --
3        A. No, it's not just me. It's -- you know
4    there's -- I may not be a lawyer, but I'm a member of
5    the ABA. I go to all the conferences. I speak at the
6    conferences. I know what people are talking about
7    when we are designing franchise systems. We don't put
8    in exclusive territories now specifically because of
9    the Federal Trade Commission definitional changes.
10   And second of all, in certain franchise systems, it
11   makes no sense. We're all looking at -- we're looking
12   at the Starbucks model of putting the location when
13   we're talking about a physical location where the
14   customer wants it. Well, you're dealing with a trades
15   franchise, and the franchisee is going to the
16   customer. The idea of giving a territory is suicidal.
17   Makes no sense.
18       Q. Okay. But it is something that -- well, let
19   me mark an exhibit.
20       A. Does it happen, sure. Is it something where
21   I'm going to say it's generally done, not anymore. It
22   was at one time, but it's on the serious decline
23   globally.
24       Q. I'm handing you what's been marked as Exhibit
25   5.

88

1              (Exhibit No. 5 marked.)
2        Q. (BY MR. McLEOD) And it's entitled a Merry
3    Maids Franchise Agreement.
4        A. Okay.
5        Q. And you can see at the bottom there it's
6    reference -- you can see there is a reference to Merry
7    Maids franchise disclosure document --
8        A. Sure. I have seen these before.
9        Q. -- dated April 24th, 2019.
10       A. Uh-huh.
11       Q. Are you familiar with the Merry Maids
12   Franchise Agreement?
13       A. Sure.
14       Q. Okay. So in Merry Maids they do provide a
15   franchisee with a geographical territory?
16       A. Give me the paragraph.
17       Q. Well, 1B on page -- it's the third page. It
18   says page 61 of 271.
19       A. 1B.
20       Q. First sentence under 1B is franchisor hereby
21   grants to franchisee a license to use the franchise in
22   the geographical area specified in Exhibit A?
23       A. That doesn't say exclusive. There could be
24   50 franchises.
25       Q. I know. And we could walk through this

89

1    agreement.
2        A. Yeah.
3        Q. But, for example, it says -- on 1F, first
4    sentence, franchisee must be willing to service
5    customers throughout the entire geographical area
6    comprising the market and must offer services to all
7    customers within the market at equitable prices?
8        A. Yeah, but there could be 20 franchisees in
9    the market.
10       Q. But if you read this agreement, there's not.
11   I mean, I know that you're saying that --
12       A. Merry Maids, first of all, is a residential
13   cleaning --
14       Q. Okay.
15       A. Let me finish. Merry Maids is a residential
16   cleaning franchise that's recently been transferred
17   over to Neighborly down in Waco, Texas. It is one of
18   7,000 franchise systems out there. If you would like
19   me to provide you with all of the franchise systems
20   that don't have exclusives, but you're not showing me
21   an exclusive territory in here.
22       Q. Well, okay. If you look at 4H. It's on page
23   65 of 271, is what it says at the bottom.
24       A. Yeah, I got it.
25       Q. Franchisor will not locate, establish, or

90

1    license another to establish any other Merry Maids
2    franchise within the franchisee's market.
3        A. Yeah.
4        Q. Franchisee is prohibited from soliciting
5    sales or accepting orders outside the designated
6    market so...
7        A. But it doesn't say they can't service in the
8    market. They can't solicit in the market is different
9    than they can't service in the market. That's not
10   exclusive. That's just the stuff we put in there to
11   make the franchisee feel good.
12       Q. So -- and I'm really just trying to make a
13   point here.
14       A. Frankly making my point.
15       Q. No, again, if you look at paragraph 6D --
16   says, franchisee shall solicit and market to the
17   customer in the market. So as this franchise
18   agreement reads -- and I really -- it's not my point
19   to prove what this does. I mean, I want to ask you
20   questions about it.
21       A. Well, you're bringing it out for some proof.
22   You're bringing it out --
23       Q. I'm bringing it out as a comparison of one
24   model to another.
25       A. You're comparing apples and oranges. This is

91

1  a residential franchise.
2      Q.  What makes residential different than
3  commercial?
4      A.  The nature of the contract, the fact whether
5  it's being bid or not, the consumer, the fact of the
6  equipment they're using, the hours that they work, the
7  staff that they have, the relationship that they have,
8  the fact that a franchisee in Merry Maids can walk
9  into a homeowner, which they generally do, and make
10  the sale.  They're not making national accounts or
11  large consumer accounts where they have to get the
12  keys to somebody's house.  I have a cleaning service
13  that comes to my house, you know, twice or three times
14  a month.  I don't know what my wife has.  They don't
15  have keys to my house, but they do have keys that are
16  commercial.  The point I'm trying to make is, you're
17  picking a -- first of all, you're picking two
18  different industries.  You're picking commercial
19  cleaning and residential.
20      Q.  Yeah, and I'm asking what the differences
21  are.
22      A.  I have done that.  The other piece you have
23  to realize is what you cited in here is not exclusive
24  of anything.  You haven't shown me anywhere in the
25  agreement -- and you won't -- that the Merry Maid

92

1  franchisee in Dallas/Fort Worth can't go clean
2  somebody's house in Fort Worth, Texas even though
3  their office is in Dallas.  They can't market, but I
4  will --
5      Q.  No, I believe this contract -- and, again,
6  it's not my intent to walk through all of the
7  provisions of this, but let's just make some
8  assumptions.  Let's just talk theory.
9      A.  Okay.
10      Q.  This document is what it is.  It says what it
11  is.
12      A.  Yeah.
13      Q.  But let me represent to you not as the truth
14  of that document because you don't want to sit here
15  and -- but let's just assume that I'm right and I'm
16  not -- we're just -- for purposes of the discussion
17  this document speaks for itself, but that the
18  franchisee in a Merry Maid system gets a geographic
19  territory in which they're required to market to
20  customers in that defined territory.
21      A.  Yeah.
22      Q.  They are only allowed to service customers in
23  that territory.
24      A.  That's not what it says, but go ahead.
25      Q.  And, well, and if they get a lead in

93

1  another -- they can go outside their territory?
2      A.  Yeah.
3      Q.  But if that territory is owned by another
4  franchisee, they have to give it to that other
5  franchisee.
6      A.  No, they don't.  I would be blown away if
7  they did that.
8      Q.  So you're, like, contradicting my premise.
9  I'm saying, could you just assume what I'm saying is
10  correct for purposes of my questions.
11      A.  No, because it's illogical.  It's like me --
12  it's like me accepting a statement from you that, you
13  know, we are going to talk about this under Canadian
14  law, no.
15      Q.  But there are some franchises that give a
16  geographical territory and you are only allowed to
17  service customers within that geographical territory.
18      A.  I know I'm not supposed to ask you a
19  question, but I got to do it.  You realize that there
20  is a whole body of law under the Federal Trade
21  Commission which requires a franchisor to disclose the
22  terms, and the terms are not decided on by the Federal
23  Trade Commission or the State of California, and the
24  fact that you may not like the terms of a franchise
25  offering doesn't bother the Federal Trade Commission

94

1  or anybody else.
2      So I'm trying to understand, even if
3  every franchise system -- if you showed me 100 percent
4  of the franchise system except for Jani-King that gave
5  exclusive territories, what does it matter under the
6  Federal Trade Commission definition or requirements
7  since all the franchisor has to do is disclose what
8  they're offering.  It's personal property.  So the
9  fact that you -- that Merry Maids and Jani-King are
10  different doesn't matter to the Federal Trade
11  Commission, doesn't matter to the State of
12  California.
13      Q.  Doesn't matter to my questions either.
14      A.  Well, it does because you're pointing out
15  something which is disclosed to a franchisee.  It's
16  just part of the relationship.  So, okay, but I'm not
17  going to accept your -- I'm not going to accept your
18  premise when your premise is patently false.  So if
19  you want to ask me a question where I can get close to
20  yours, I'll be happy to, but I'm not going to answer a
21  question and then point out later on that it was based
22  upon something I didn't believe in.
23      Q.  Under the Merry Maids, would you at least
24  agree that someone who is given the geographical
25  territory, they go out and they find customers, sell

95

1 accounts to customers for -- I believe it says
2 reasonable prices?
3       A. Yeah.
4       Q. And they independently contract with the
5 customers?
6       A. That's typical in the residential franchises.
7       Q. And I understand what you've said about the
8 difference between the residential and the corporate
9 janitorial business -- or commercial janitorial
10 business.
11      A. It's a totally different industry.
12      Q. Okay. That's fine. And I appreciate your
13 explanation on that, but in this situation with Merry
14 Maids, the franchisor has essentially sold that
15 territory to a franchisee in which that franchisee is
16 going to sell the cleaning services?
17      A. No, they haven't sold the franchisee a
18 territory. They license to the franchisee.
19      Q. Okay.
20      A. And they've only licensed to the franchisee
21 the right to have an office in the territory and to
22 market directly to consumers in the territory. They
23 haven't licensed to the franchisee the exclusivity
24 that they're the only ones to clean in that territory,
25 which is the important element of a franchise

96

1 relationship.
2       Q. Okay.
3       A. So besides the fact you're comparing a
4 football team's rules to a baseball team's rules,
5 you're saying, aren't they the same because it's a
6 sport, it's not. It's two different industries.
7       Q. I understand it's two different industries,
8 but it's two different ways to sell a franchise.
9       A. I can show you 15 other ways if you'd like me
10 to go through it with you.
11      Q. And that's my point. There are different
12 ways to sell a franchise, right?
13      A. Depending upon the industry requirement.
14      Q. Okay.
15      A. It's not a matter of we just pick one out of
16 the air. We build it upon a strategy necessary for
17 that particular industry. What I do in Marriott
18 hotels, my advice to a Marriott, is different than my
19 advice to Ford Motor Company. They're both
20 franchisors.
21      Q. So have you -- were you involved in
22 establishing the franchising model for any commercial
23 janitorial cleaning business?
24      A. The answer to that is yes. The second answer
25 to that is one which you won't like. One of the major

97

1 cleaning manufacturers, well known national,
2 international brand, is thinking about going into the
3 janitorial business, whether it's commercial or
4 residential. And we did a deep dive through the
5 industry for that company. No, I'm not going to tell
6 you the name of the company because we're under
7 confidentiality with them and they're kind of the big
8 guys, but, yeah, we have gone through. In fact, we
9 have structured what we think the offering should be
10 if they ever do go into those industries. So the
11 answer is, yeah, for an international brand which is
12 bigger than most companies can deal with.
13      Q. And what did you do to make those
14 determinations and assessments?
15      A. Me or staff went through and identified every
16 single entity in the commercial, residential disaster
17 relief franchise and where we could, if it was
18 necessary, small regional companies that might have
19 relationships, and we did a deep dive.
20      Q. Anything more specific than that?
21      A. Not that I'm going to give you.
22      Q. Okay. So on page 23, you have a paragraph
23 here under the differing rules section. It's the
24 second full paragraph, and it starts off, franchising
25 is an alternative to vertical integration.

98

1       A. Right.
2       Q. Where a business owns its entire distribution
3 channel.
4       A. Right.
5       Q. Franchisors do not own the channels of
6 distribution for their products and services.
7       A. Uh-huh.
8       Q. Instead, franchisors license independent
9 third parties to distribute their product or service
10 to end users.
11      A. Uh-huh.
12      Q. So if we have a situation like Jani-King
13 where the franchisor actually owns all the customer
14 accounts and sells the customer accounts, the majority
15 of them --
16      A. Uh-huh.
17      Q. -- how is the franchisor in that situation
18 relinquishing their distribution channel to the third
19 party?
20      A. Because they're not servicing the customer.
21 It's the same thing. I'll keep going back to
22 McDonald's. McDonald's owns the customer that comes
23 in to buy the burger. It's not the franchisee. The
24 contract will say that. The fact is that
25 McDonald's -- the franchisee has the responsibility to

99

1  execute the downstream distribution just as the
2  Marriott does at the Ritz Carlton if it's a franchise
3  location. There is -- the fact that Jani-King has a
4  contractual relationship with the end user customer
5  and McDonald's doesn't is a matter of the industry
6  they're in, but it doesn't change the meaning of my
7  sentence.
8      Q. In the Jani-King context, what's the channel
9  of distribution?
10     A. Channel of distribution is who does the
11  cleaning.
12     Q. Why is that? Why is it not selling the
13  contract?
14     A. Because that's not the channel of
15  distribution. The channel -- look, same thing with
16  the McDonald's. McDonald's gets its customers by
17  advertising, by being on the Super Bowl, by people
18  walking in the door. That's a destination franchise.
19  It's a destination franchise where the average ticket
20  price is probably under $7. Jani-King's customer is
21  different. There just happens to be a contract in
22  between that needs to be serviced on a consistent
23  basis, but the relationship between McDonald's and its
24  customer and Jani-King and its customer, other than
25  the fact that there is a piece of paper in between on

100

1  one, is comparatable. Comparatable. Comparable.
2  Comparable. Comparatable is different.
3      Q. Would you agree, though, that, you know, in
4  the -- and I understand that they're different
5  industries, is what you're saying, and apples to
6  oranges, but if you're a franchisor that provides a
7  geographical territory to a franchisee, license them
8  to market, that you as a franchisor are relinquishing
9  a degree of control in their marketing and selling to
10  customers within that territory and performing
11  services in that territory?
12     A. I'm not relinquishing -- my control is the
13  fact that I have brand standards.
14     Q. Yeah.
15     A. How I get to those -- how I get to those
16  brand standards is in the franchisee's hands, but, for
17  instance, Merry Maids gives to its franchisee online
18  in their IT system -- if you go to their IT system,
19  which is probably run by FranConnect, and you open it
20  up, you're going to find a whole portfolio of
21  brochures and other pieces that can be used. The
22  franchisee can even modify them in certain areas,
23  pricing, address, and things like that, but the
24  franchisee can't use anybody else's marketing
25  material. If they did -- if they did, they have to go

101

1  back to the franchisor, and we'll find it in the
2  agreement if you want me to without looking at it.
3  And they have to say to the franchisor, mother may I.
4      Q. Yeah, it's all approved materials.
5      A. So the fact that a customer that the
6  franchisee is marketing directly, because that's
7  appropriate for that industry, they're still only
8  marketing with the tools that the franchisor lets them
9  use.
10     Q. Yeah.
11     A. They can't do anything else. So the issue
12  that you're dealing with is, why does Jani-King have a
13  contract directly and why doesn't Merry Maids have a
14  contract directly, and they're two different customer
15  bases.
16     Q. Yeah. I mean, there's different ways of
17  managing -- a franchisor can manage brand standards,
18  it can set brand standards and manage them. There's
19  not one defined way of doing that?
20     A. No, but there is a defined way of not going
21  out of business. And if you are going to run a
22  Jani-King using the Merry Maid piece with a different
23  customer base like they do have, Jani-King would last
24  about a week.
25     Q. Why is that?

102

1      A. Because you would have chaos in the system.
2      Q. Okay.
3      A. Billing would be off. You could not get into
4  contracts. You have sophisticated businesses or any
5  business being sophisticated -- if you can imagine --
6      Q. Why can't an independent business owner do
7  billing?
8      A. Oh, I am a -- go to the federal government.
9  The FTC published a description of the janitorial
10  franchise. And the only reason I'm going to say this
11  is because the federal government has now given me
12  permission to say it. The franchisee at Jani-King, as
13  they are in many of the janitorial franchises, is
14  often an immigrant with English being a second
15  language. Many of them, as you found in the
16  depositions, have an 8th grade or lower education.
17  They can walk into the casino and say, hi, I would
18  like your account. And the person would say, let me
19  see your organization. Well, it's only me. Well, how
20  many people do you have working for you? I don't have
21  anybody. But if you give me the account, I'll find
22  50. The fact that they can walk in with a Jani-King
23  brand, which gives them trust or that Jani-King walks
24  in with their brand with a history of being able to
25  perform, they can get the stadium, they can get the

103

1  casino, they can get the government building, they can
2  get the hotel.
3         That little franchisee -- what you're
4  talking about here, which irritates me the most, is
5  this is one of the premier franchise systems that is
6  able to take somebody like my grandfather in the 1890s
7  or 1910s, whenever the hell he worked. Those
8  opportunities don't exist today for immigrants.
9  They're not going to go push a milk truck across the
10  Brooklyn Bridge. This is a first rung franchise
11  opportunity for people that want to move up in the
12  United States and become you and me and their
13  children. They want their kids to go to college.
14        Q. So they're not sophisticated enough to
15  perform billing?
16        A. No, not to the level that a company wants it
17  without mistakes. Plus the fact, look, you and I, if
18  we don't get -- and I can't speak for you. I'll talk
19  about myself. If I don't have -- if my billing this
20  month didn't go out, my staff is going to get paid.
21  Okay. I got enough money to get my staff paid. If a
22  franchisee walks into a place and they have five
23  employees or 20 employees or just themselves and they
24  bill, let's assume that the customer pays on time,
25  which most don't because that's the general nature of

104

1  commerce. I know some companies that don't pay for
2  nine months. Their franchisee is out of business. He
3  has no cash flow. In this particular system, they
4  bill, they get paid, they get cash flow. They can
5  survive.
6         Q. That's actually not how it works.
7         A. Oh, that's exactly how it works. Now, they
8  can get charged back if the customer doesn't pay.
9         Q. Which as you just said, it's often nine
10  months, so they're still out of the money.
11        A. The fact is that they could not survive the
12  first month, most of them, with any payroll that
13  wasn't billed, that wasn't collected. So they would
14  work 30 days, then they would bill, and during that
15  period of time, now you have 60-day time. I'm unable
16  to clean your office in Denver. I'm not going to come
17  in with my crew. It's January 1st. Come January 31st
18  I'm going to send you a bill, which you're not going
19  to pay me until February -- until March 1.
20        So from January 1 to March 1, I have to
21  have enough money in my pocket to do that for whatever
22  the crew is to get your office building, which I
23  couldn't have gotten without the Jani-King name,
24  because your company -- Department of Labor is not
25  going to go over and say, yeah, we want you individual

105

1  and, yeah, go ahead and we're going to trust the fact
2  that you're going to go find 20 people.
3         Q. You're assuming that the franchisee went and
4  got that on their own, that account, customer account
5  using the Jani-King name?
6         A. I'm assuming that they didn't initially, and
7  that's why the Jani-King model is so important the way
8  it's laid out. And while taking away that opportunity
9  from the individual immigrant -- first rung
10  opportunity, why -- why -- taking that opportunity
11  away from them is just mind boggling.
12        Q. Am I understanding that -- couldn't a
13  franchisor -- and, again -- well, couldn't a
14  franchisor screen their franchisee applicants to make
15  sure they have the sophistication to perform business
16  functions such as billing and collections?
17        A. So, again, I'm going to ask this and I don't
18  mean to be rude. Again, the Department of Labor wants
19  to change the regulation on franchising. Did you guys
20  even ask the Federal Trade Commission if you have the
21  right to do this? I, as a licensor -- if I was a
22  franchisor -- have the right to select franchisees.
23  If I were only going to pick franchisees that had this
24  level of business experience, those people might be
25  interested in a Massage Envy. The fran --

106

1         Q. You just put your hand up saying high level
2  of business experience.
3         A. Well, a higher level.
4         Q. It doesn't reflect on the record. That's why
5  I'm saying it.
6         A. A higher level of business experience. Those
7  people have more money, more sophistication. People
8  sometimes say to me, when I'm doing lectures to
9  franchisee, what business should they go into. They
10  think I'm some guru and I'm going to give them
11  their -- and everybody expects me to say, why don't
12  you go into McDonald's or Burger King or Marriott.
13  And I'll usually say to them, why don't you go into
14  cleaning toilets and people laugh. It makes them
15  uncomfortable. You know, I'm never going to go clean
16  a toilet. Okay.
17        My old nanny who came out of Mexico and
18  spoke English -- Spanish down here, she cleaned them
19  all day long at my house. She had no problem with
20  that. That was because she was culturally ready to do
21  that. My grandfather, my great grandfather, they had
22  no problem picking up horse dump droppings. I don't
23  think I could do it today.
24        Immigrants are different. People who
25  have not had the opportunity to go to grad school are

---

**107**

1  different. It doesn't make them lesser people. It
2  just makes them on a different rung of the ladder, and
3  the thing which frustrates me a little bit is that
4  this is one of the great opportunities in the United
5  States -- this and JAN-PRO and some of the others --
6  that allow somebody who has an 8th grade education to
7  make enough money to send their kids to college. It's
8  just -- you know, it's just mind boggling what's going
9  on here.
10   Q. Okay. I'm going to shift gears for a second.
11   A. Okay.
12   Q. On -- I think it's page 18, top of 20.
13   A. 18?
14   Q. Yeah. The IFA statement of guiding
15  principles.
16   A. Yes.
17   Q. And you select a few that you recite on these
18  pages, right?
19   A. I picked the ones that I thought were
20  relevant to this case, but keep in mind I wrote them
21  all.
22   Q. And that was going to be my question. You
23  wrote these, right?
24   A. I wrote these.
25   Q. Okay. And that was when you were with the

---

**108**

1  IFA on the board?
2   A. I happened to be on the board and I wrote
3  them. It was presented to the board, to the executive
4  committee, then the board and was unanimously voted
5  on. It wasn't -- that's not an easy thing to get in
6  any organization.
7   Q. And item 10, there is just a reference to --
8  and it carries over on page 20 that I'm going to refer
9  as franchisor should support their franchisees and
10  enforce brand standards necessary to enhance the
11  economic performance for both franchisees and
12  franchisors.
13   A. Right.
14   Q. And the next sentence that you have
15  highlighted, it's the responsibility of franchisees to
16  manage the day-to-day affairs of their business to
17  meet the franchisor's brand standards.
18   A. Uh-huh.
19   Q. Is there ever a situation in your experience
20  where brand -- where there is a question what brand
21  standards are necessary because brand standards might
22  kind of go too far to interfere with day-to-day
23  management activity?
24   A. Brand standards are fairly consistent, but
25  let's talk about those for a second. I drive from my

---

**109**

1  house in Connecticut up to Rhode Island and I order
2  some French fries at McDonald's and they serve it to
3  me with vinegar. I drive south from my house to North
4  Carolina and I walk into a Wendy's, and they serve it
5  to me with coleslaw. I go out to California and
6  there's one restaurant out in California that's a
7  Baskin-Robbins where I can get green tea ice cream.
8   The franchisor has allowed differences in
9  those businesses based upon the consumer. I'm a
10  Dunkin Donuts franchisee. Now, most of the Dunkin
11  Donuts franchisees in the United States have
12  requirements of very extended hours, but I go to Cape
13  Cod and I go in December because I really want that
14  hot cup of Dunkin Donuts coffee. Only problem is that
15  restaurant is closed. It's a seasonal business.
16   I go to this baseball stadium and they're
17  selling pizza and I like my pizza with pepperoni on
18  it. Franchisee doesn't have to have pepperoni because
19  he can't get it through the day. Of course there are
20  differences in brand standards. It depends upon --
21  we're not in a business of exact. We're in a business
22  of consistent. And do we have differences by region
23  or territory or customer? All the time. You know, we
24  don't want to go out of business in an industry.
25   Q. How do you know what is necessary to protect

---

**110**

1  the brand?
2   A. I make that --
3   Q. What standards are necessary?
4   A. I, as a franchisor -- or my clients, as
5  franchisors now, what I do in Africa with my
6  franchisees, we make that decision and we make it as
7  best as we can and then we either -- if it's a major
8  decision and has to be disclosed, the Federal Trade
9  Commission says, hey, you got to make that disclosure.
10  If not, based upon the terms in the contract, I make
11  it either by sending out a memo or changing the
12  manual. It depends on the standard. I can't change
13  somebody's royalties.
14   Q. But how do you -- is there a method that is
15  involved or process for determining what is necessary
16  to protect the brand?
17   A. It depends on the company, depends upon
18  discussions with franchisees sometimes.
19   Q. Well, how do you go about doing that? Like,
20  what --
21   A. Every company is different.
22   Q. But is there a process, some sort of
23  scientific method of going about it?
24   A. It's whatever the sophistication of the
25  franchise or management is. If you want to sit

---

111

1    down -- you know, there is a huge difference.  I mean,
2    look at a -- look at the way that McDonald's will make
3    a change of adding coffee or a new product line to
4    their system, look at -- look at the decision-making
5    process when Dunkin Donuts came out and said to its
6    franchisees, we're now a 24-hour business.  Look at
7    the issue when you say to a franchisee, your next
8    location has to have a drive through even though your
9    last one didn't.  These are decisions that are made
10    because the technology changes, the consumer changes.
11    Q.  The franchisor retains the right to make the
12    changes like that?
13    A.  Well, yeah, that's what the Federal Trade
14    Commission and the Lanham Act says we have to do.  You
15    know, this is not a -- you don't have to like the
16    terms -- the nice thing about being in the United
17    States and most markets -- even in China.  I just got
18    back from Shanghai.  They have the same rules as we
19    do.  I get to decide on my intellectual property how I
20    want to license it out to a third party.  It's my
21    property.  It's not the government's property.  And
22    the government says, you know, you're absolutely right
23    to do that.  Follow the Lanham Act.  The Lanham Act
24    which requires me to protect my mark so you, as the
25    consumer, don't die eating my burger and you know

112

1    where it came from.  And the Federal Trade Commission
2    says, hey, put those terms in an offering.  Here is
3    the format of the offering.  We're not going to tell
4    you what to put in the offering.  We got 22 items and
5    a receipt.  Just fill up those items where you want.
6    Now, the interesting thing about being in
7    the United States is that I didn't publish that
8    disclosure document either -- I give it to somebody or
9    it's available in a registration statement.  And the
10    consumer at that point is a prospective franchisee.
11    And they can say, great opportunity, I want it, or
12    this is a lousy opportunity.  I think I'll go to
13    another franchisor in the same industry.
14    That's how our system of government --
15    system of commerce works.  It doesn't work because
16    somebody in the federal government says they like the
17    terms of the agreement or not.  That -- and I say this
18    as politely as I can.  That's not the role of you, the
19    Department of Labor, or anybody in the federal
20    government up to this point.  Now, it could change if
21    there is a huge change in the structure of our
22    government, but that's not the way it's structured
23    right now.
24    Q.  Mr. Seid, I just asked you how you go about
25    determining what is necessary.  I mean, I understand

113

1    that you cite the definition of franchise and you say
2    in your report that there has to be brand standards.
3    I don't think there's any question about that.  I'm
4    wondering how you determine what is necessary.
5    A.  No, you actually -- you actually said
6    something in there which triggered that whole long
7    thing of whether you liked or didn't like.  I made
8    that decision as the property owner, the franchisor,
9    to best serve the offering of my franchise and my end
10    user customer's brand standards.  I make those changes
11    on an everyday basis, and sometimes I make it as the
12    chairman of the company and I wake up in the middle of
13    the night and I say, wow, this is good, and sometimes
14    I make it by talking to my franchisees.
15    Q.  Have you done any specific analysis with
16    respect to Jani-King as to whether its brand standards
17    are necessary?
18    A.  I have looked at the Jani-King system.  I've
19    looked at the way that they go to market with that
20    system.  I have compared it to other businesses in
21    that industry.  I have compared it to other franchise
22    systems.  I have looked at it for myself as one of the
23    leading experts in franchising.  And I said, hey, this
24    is how I would have designed it.  I might have some
25    little tweaks on it.  I might turn some things around

114

1    because Michael Seid is different than Cavanaugh or
2    Jerry Crawford or whoever else runs the company, but
3    that's, you know, the role of a consultant, but, yeah,
4    I've looked at it and I've said, yeah, it's there.  I
5    don't know what you mean by study.
6    Q.  Well, it sounds to me like you're just --
7    you're just looking at the way they're doing it and
8    say it makes sense; is that fair?
9    A.  Well, that's what I --
10    Q.  I'm trying to understand, like, have you done
11    any study that shows, okay, if we say we're not going
12    to have a Jani-King operations person come and inspect
13    on a regular basis --
14    A.  Uh-huh.
15    Q.  -- you know, have you done any assessment,
16    well, we can't do that because that's necessary or we
17    want to retain control to remove a franchisee from the
18    account when the customer complains?  Is that
19    something that is necessary?  And I'm wondering what
20    sort of process is involved in making those sorts of
21    determinations?
22    A.  40 years' experience, 30 of it considered one
23    of the leading experts in my field.
24    Q.  And did you write up any sort of analysis
25    with respect to Jani-King's control measures to

115

1    determine whether they were necessary with
2    explanations?
3        A.  No.  Why would I?
4        Q.  Are you aware of any changes that Jani-King
5    has made to its brand control standards in recent
6    years, if any?
7        A.  Yeah, they have made some changes to the term
8    of the offering.  I think they went from 20 down to
9    10.  They may have made some others changes.
10       Q.  You're referring to years of the franchise
11   agreement?
12       A.  Uh-huh.  They may have made some other
13   changes to it.  If they didn't make changes, I would
14   be surprised.  Every franchise system makes some
15   changes, but have I looked at the changes, again I
16   have to go back and look at the different agreements.
17       Q.  So do you have any way to ascertain that if
18   they changed some of their control standards such as
19   inspections, what would happen to their brand?
20       A.  Yeah, I know exactly what would happen to
21   their brand based upon my experience with, you know, a
22   whole lot of companies that are smaller and larger.
23   The franchise system -- it's in the nature of
24   franchising.  The reason that we don't --
25       Q.  And are you referring to janitorial companies

116

1    where they inspect cleaning services?
2        A.  I'm referring to every single franchise
3    system.  I'm referring to every single business.  If
4    you don't think that Nordstrom's -- somebody from
5    headquarters goes and checks out the local Nordstrom
6    shop even though it's managed by an employee, if you
7    don't think that somebody from the Department of Labor
8    from Washington doesn't look at your records in the
9    Department of Labor in Denver and say, hey, are they
10   doing a good job.  I mean, you just had this now in
11   the press with Pfizer.  You know, the FBI wasn't being
12   looked at.  Every single organization -- brands are
13   fragile.  Your brand is as fragile as Jani-King's.
14       Q.  So you're saying it's common?
15       A.  It's not only common, it's necessary.
16       Q.  Why is it necessary?
17       A.  Because it -- first of all, you have to do it
18   under the Lanham Act.  There is a requirement under
19   the law.
20       Q.  To protect your brand, but it doesn't say how
21   to do it?
22       A.  Oh, Jesus.
23       Q.  Right?
24       A.  What you're suggesting is that --
25       Q.  I'm just trying to understand.

117

1        A.  No, no.
2        Q.  You're saying that the control measures that
3    Jani-King employs are necessary and I'm wondering why.
4    That is all.
5        A.  Because in order to protect your marks and
6    your intellectual property under a federal law that
7    was passed in 1947, we need to do inspections.  We
8    also need to do lots of other things.  We pick up the
9    phones and make calls, but the idea is that you would
10   not inspect location and not every location.  You
11   sample and you pick which ones you want to inspect,
12   but there's a requirement to protect the mark and
13   inspections every --
14       Q.  Yeah.
15       A.  Find me -- look, find me one franchise
16   system -- and I'll give you a list of every franchise
17   system in the United States.  Find me one that doesn't
18   do inspections.  Give me one.
19       Q.  So you're saying Merry Maid franchisors go to
20   your residence and inspect the work?
21       A.  Yeah, what they also do is they pick up the
22   phone and they call.  There's a warranty program in
23   this company.  If you look at this document or the
24   manuals, you're going to find a warranty program where
25   there is a 1-800 number for the consumer to call.

118

1        Q.  And I want to point out that I'm not
2    advocating that, you know, the inspection is necessary
3    or not.  I'm trying to understand why it is you're
4    saying it is.
5        A.  I'm saying it is because it's necessary.
6        Q.  Okay.
7        A.  All right.
8        Q.  So on page 34...
9        A.  Yes, sir.
10           MR. McLEOD:  Can we go off the record for
11   a second?
12           (Recess 11:58 to 12:08.)
13       Q.  I'm just going to run through some of your
14   opinions stated in your report and ask you some brief
15   questions about them.
16       A.  Sure.
17       Q.  I do think that I'm nearing the finish line.
18       A.  Good.
19       Q.  On page 34, you state with respect to the
20   methods used by Jani-King and other janitorial
21   franchisors to secure cleaning accounts and offer them
22   to franchisees --
23       A.  Right.
24       Q.  -- is in your expert opinion the most
25   sensible and responsible method for the franchisees,

**119**

1   the end user, and the franchise system.
2        A.  Right.
3        Q.  And how did you reach that determination?
4        A.  I looked at the nature of the consumer.  I
5   looked at the nature of the economics of the
6   relationship between a licensor and a licensee.  I
7   looked at the requirements of the Lanham Act and how
8   you control the brand.  I looked at the issues around
9   how do you support the brand, what do you need to do
10  to support a brand in the sense of going back to what
11  you said earlier, inspections, the cost of the
12  inspections, the cost of the support, the economics of
13  the relationship.  All these factor into my opinions
14  of what's appropriate in any particular franchise
15  system.
16           So you got to understand that in a
17  franchise system, the franchisee -- there's only a
18  certain amount of revenue available to the franchisor,
19  and there's only a certain amount of revenue available
20  to the franchisee splitting the revenue in some
21  format, whether it's royalty or something else.  And
22  within that you have to make decisions about all the
23  elements of the franchise offering, all those 22 items
24  in the receipt from how big should the territory be --
25  and when you're talking about how big should the

**120**

1   territory be, you're dealing with driving distance.
2   How far can the franchisee drive and service a
3   territory effectively.
4           You're looking at how many locations the
5   franchisor can afford to visit and inspect based upon
6   the revenue that's available to them.  How much
7   training can the franchisor afford to give and what
8   type of training is based upon the fees available.
9        Q.  And we're still talking about securing
10  cleaning accounts for franchisees?
11       A.  You're also talking about what's the most
12  effective way to secure accounts and clean accounts.
13  So as I said earlier, if a low-skilled, untrained
14  person walked in a -- just about any business, doesn't
15  have to be a big business and doesn't have a brand
16  they're going to be competing against a JAN-PRO or a
17  local regional chain that's been there for years,
18  what's the most effective way for that franchisee or
19  that individual to get that account?
20           And if Michael Seid walks in to say to
21  Chili's, I would like to clean your restaurant and
22  somebody came in from Vantage or JAN-PRO and wanted to
23  clean the same restaurant, well, Vantage and JAN-PRO
24  have a long track record and history.  They have
25  processes in place.  They have a reputation.  I don't

**121**

1   have one.  The chance of me getting that opportunity,
2   unless it was my brother, would be slim to none.  So
3   how the customer wants it -- I mean, all these brand
4   standards are led by what the consumer, the end user,
5   wants.
6           What the end user wants is brand --
7   brands signify a lowering of risk.  You buy an IBM
8   computer or an Apple computer not because it may not
9   be the best computer on the market, but because those
10  brands have less risk than picking some other unnamed
11  brand.  So the consumer defines what they want.  Now,
12  what the consumer wants in the janitorial industry is
13  they want their location cleaned to a recognized brand
14  standard and they recognize that a Jani-King over
15  JAN-PRO has methodologies of evaluating how to clean a
16  carpet, how to dust, how to clean a bathroom.
17           And they also have standards that the
18  franchisee has to meet in an organization that will
19  support them as a consumer they're likely to get
20  a better job than somebody who doesn't have the same
21  brand standards.  So what you're looking at is this is
22  a consumer-driven process where the consumer being a
23  commercial enterprise wants the comfort of a brand.
24  That's the analysis that we go through.  It's
25  different than -- it's different than the consumer

**122**

1   driving up and getting a burger or taking a risk.
2   This is a risky business that I'm going to let
3   somebody into my business and they want a brand to
4   stand behind it.
5           That's why it's appropriate and that's
6   why it's very hard for an individual to enter this
7   business without a brand like a Jani-King or a
8   JAN-PRO.  That's just the reality of this business.
9        Q.  Right.  So I understand you're explaining the
10  importance of a brand and how that can help obtain
11  business, but how does the method used by Jani-King to
12  secure cleaning accounts and offer them to
13  franchisees -- meaning Jani-King going out getting the
14  account and, in turn, offering it to franchisees, why
15  is that the most sensible and responsible method?
16       A.  Within the structure of a Jani-King or a
17  JAN-PRO or a Vantage or any of the others, they have
18  an organization that can go into a business enterprise
19  and say, hi, we have been around X number of years.
20  We have a national, international reputation.  We have
21  billings practices and here's what they are.  We have
22  practices that relate to your complaints.  And we have
23  a franchisee organization where the franchisees are
24  contractually obligated to meet our brand standards.
25  That gives the consumer, the end user customer, the

### 123

1  comfort that they wouldn't get from the individual.
2  The opportunity for the franchisee is that they didn't
3  have to go out and spend hour after hour banging on
4  doors and making sales.
5          They actually had the opportunity, if
6  they wanted to, to get the next account that was
7  offered to them.  Now, they can go out and bang on
8  doors, and some of them do from the depositions, but
9  the most efficient way for the commercial janitorial
10  industry to work is that central billing leveraging --
11  I mean, you're looking at consistent, sustainable
12  replication.  And the replication part of consistent
13  and sustainable is that the franchisor leverages the
14  system for the benefit of all of the stakeholders.
15  That's the nature of this industry as it is in any
16  other franchise system.  No difference on anything
17  else on that.
18          Q. You state in here that franchisees may prefer
19  or even require Jani-King to perform the function of
20  securing end user accounts.  How did you make that
21  determination?
22          A. Reading the depositions.  Some of the
23  franchisees said, yes, I know I can go out to get
24  accounts.  Yes, I know that Jani-King has trained me
25  to do that and...

### 124

1          Q. Do you remember who said that or how many
2  people said that?
3          A. Many -- most of them said that, quite
4  frankly.  And we can go down the list of franchisees,
5  and I don't remember which ones said it, but most of
6  them said something similar.  There was a question, I
7  think -- or one of your compatriots asked that says,
8  even though you're paying a finder's fee, and they
9  said, yeah, I understand, but it is more efficient for
10  me to do this.  I don't like sales.  I'm not good at
11  sales.  But there was some of them that actually did
12  make some sales.  That's just a different between one
13  franchisee and another.  Some like sales, some don't.
14          Q. So to say that Jani-King's method of securing
15  accounts and then offering to franchisees is the most
16  sensible and responsible, what is the point of
17  including that in your report and your opinions?  What
18  are you -- does that have any bearing on whether or
19  not a franchisee is an independent contractor or an
20  employee?
21          A. It's a choice of -- yeah, it does because it
22  has the -- first of all, it gives you a foundational
23  level of the franchise system, what it does as part of
24  its offering.  I think it's necessary to understand
25  what the franchisor does and doesn't do.  It also --

### 125

1  if you go back to the five points that David Weil put
2  together on the definition of an independent
3  contractor, one of them is that the independent
4  contractor exercise managerial decisions, that they
5  actually make decisions.  It's one of the five points
6  that David put in there, David Weil put in there.
7          The fact that the franchisee can get
8  accounts from the franchisor is part of the offering.
9  The fact that the franchisee can also go out and sell
10  his own accounts and has the right to choose which
11  accounts they're doing is a very important managerial
12  decision that they make, which fits the definition of
13  an independent contractor.  So I think it's important
14  for me to point out that they have a choice.
15          Q. So you state on page 35, the last paragraph,
16  if Jani-King and other janitorial franchise systems
17  did not execute the cleaning service contract with the
18  end user, there would be no way any janitorial
19  franchisee could remain in business.
20          A. Correct.
21          Q. Why is that?
22          A. Well, as I said earlier and frequently, they
23  likely couldn't get the account.  Given the profile of
24  the franchisee, they likely -- even if they were doing
25  the account themselves without employees, unless they

### 126

1  were able to get -- collect the money after they got
2  billed, even if there was chargebacks later, they
3  would have nothing to live on.  There was an
4  interesting --
5          Q. Wouldn't the strength of the Jani-King
6  brand -- you know, can't they use that to make --
7          A. Yeah, let me finish my question -- my answer
8  from before.  There was an interesting piece in one of
9  your depositions where I think it was you asked the
10  franchisee, why didn't you accept this account that
11  was offered to you.  And I felt bad for the franchisee
12  because the franchisee said something like, it was $10
13  for the gas and we didn't know if it was worth it for
14  the gas.  Those are the decisions that the franchisee
15  makes from a managerial point of view.  That's pretty
16  tight, you know, management decisions of the
17  day-to-day operation of the business.  Is the account
18  worth $10 in gas for me to drive back and forth
19  because I think they said it was an hour and a half
20  away or 45 minutes away.
21          That's a type of thing where if the -- if
22  the franchisee -- if the franchisor was not able to
23  offer them accounts, they couldn't get the account.
24  If the franchisor didn't do the contracting, they
25  couldn't get the account because the customer wants

127

1   consistent billing.
2          You also have a system where from just a
3   business point of view -- and we do this all the
4   time -- you can't have a system that does everything.
5   It's not efficient. It's not -- it's not effective.
6   It's not cost effective. So having some accounts that
7   are direct bill, some accounts that are not direct
8   billed on a regular basis would just be chaotic. Part
9   of the brand standards, part of the brand promise that
10  Jani-King makes to its end user consumer is that their
11  billing will be accurate, it will be timely, it will
12  be defined. That's not something you are going to get
13  out of a franchisee that doesn't have the expertise
14  and the capabilities to do that. That's -- you know,
15  that's wholly different than the Merry Maids one you
16  got where the guy is picking up each week a $147
17  check.
18      Q. But there are some franchisees where the
19  franchisee does do the billing and the franchisor
20  might carve out a requirement that, you know, we
21  retain the right to do national account contracts, et
22  cetera? I mean, some franchises do that?
23      A. Some franchises do. They may have more
24  sophisticated franchises. They may have different
25  systems, but, again, each company chooses how it goes

128

1   to market. The Federal Trade Commission says and the
2   states say that, you know, every franchise system
3   doesn't have to be the same. And we have gone through
4   the issues in franchising of having a common contract
5   across all franchise systems, and it's been debated
6   and basically laughed at.
7          What makes franchising interesting is the
8   fact that every company can have its own offering. In
9   this particular system, given the end user customer
10  and given the franchisee who is going to be servicing
11  that customer, in my opinion, based upon my experience
12  and based upon my analysis and my understanding of all
13  of the other commercial and residential franchise
14  systems, this is the most appropriate structure that I
15  would recommend to them.
16      Q. Okay. You have a section in here on page 41,
17  Jani-King has lower barriers to entry.
18      A. Uh-huh.
19      Q. And essentially the point is it provides --
20  it's a low-cost investment that provides opportunities
21  to people of modest means?
22      A. Yes.
23      Q. Why did you include this section in your
24  report?
25      A. Because I think it's important. Jani-King

129

1   is -- Jani-King serves a bunch of functions. Most
2   people who want to go into business can't afford a
3   Supercuts. It's a quarter million dollar investment.
4   They can't afford a McDonald's. It's a million and a
5   half dollar investment. They can't afford a Massage
6   Envy. They look around and they want to go into
7   business themselves. They don't have a lot of
8   opportunities. They can go to work for somebody and
9   make their $7.50 or $12 an hour.
10         People want the great American dream of
11  business ownership and to send their kids to college.
12  Jani-King does a couple of things, which I think are
13  important to consider. They offer an opportunity to
14  people to get into business for themselves that they
15  own, which I will tell you from experience is --
16  provides those people with incredible internal dignity
17  to themselves. They're treated as business owners
18  because they are. They can tell their friends they
19  own a business. They can tell their children they own
20  a business. They don't have to say to their children
21  they're working behind the counter of a McDonald's.
22  Nothing wrong with that, but that's -- you know,
23  people want to own a business.
24         They're provided with support that
25  without that support they could not stay in business.

130

1   Both support in sales and service and brand standards
2   and intellectual property and the weight of an
3   international organization with marketing programs and
4   wrapped cars and tells them what tools they need to
5   use, even though they can choose where to buy it
6   themselves.
7          This is a franchise system that
8   provides -- just like my system does in Africa. This
9   provides somebody with an opportunity to do something
10  which they couldn't do without it. You can't -- we
11  all forget at a certain point in our lives -- as we go
12  through college and you go to law school and I go to
13  business school, we can't forget the fact that these
14  folks don't have that opportunity. It's not that
15  they're stupid or anything else. They just haven't
16  had the opportunities we've had. Jani-King is giving
17  them that opportunity. I think that's essential to
18  understand that if you take that opportunity away from
19  these people, they are damaged.
20      Q. And does this point factor into your opinion
21  that franchisees operate independent businesses or
22  independent contractors?
23      A. Yeah. Well, it does factor into it.
24      Q. How?
25      A. Because they are. They're not employees.

131

1  They can honestly -- if you ask somebody -- ask every
2  one of the depositions that you asked, every one of
3  the depositions that Jani-King's counsel asked -- the
4  question that was asked to those people -- and when I
5  say every one of them, there may be one or two it
6  wasn't. Are you an employee of Jani-King? And every
7  single one of them said, no, it's my business. I'm
8  sure that when they said it, they sat back and their
9  chest puffed up.
10       No, they see themselves as independent
11  contractors. They've taken out loans. They've hired
12  employees. They -- they make business decisions.
13  They decide where to bank. There was a whole bunch of
14  discussions about, you know, where do you get your
15  insurance. They make decisions about where to buy
16  their insurance. They make all these decisions.
17       Q. How many franchisees made decisions where to
18  buy insurance?
19       A. Two that I saw in there. Most of them went
20  along with Jani-King, and a couple of them actually
21  said they went out and shopped it myself and I found
22  out that I couldn't get it as cheaply as I can get
23  from Jani-King. So -- but they did shop. One of them
24  actually looked at it and said something in there
25  about Jani-King does it on gross sales and I wanted to

132

1  do it on employee for workman's comp.
2       That's a very complicated piece which
3  they've learned to do as business owners. That's not
4  something an employee would do. I mean, that's a
5  management decision. Look, the franchisees decide who
6  they want to bring with them to clean and whether they
7  want to -- one of the franchisees said, I don't want
8  to have an employee because I'm afraid that that
9  employee will not do as good a job as me. That's a
10  business decision.
11      So, yeah, I think it's really important
12  when you look at this, that you look at the totality
13  of the franchisee's comments throughout your
14  depositions. And the franchisee took great pride in
15  all saying -- maybe there is one in there that didn't
16  say it, but I think they all said it. No, I'm not an
17  employee. I'm an independent contractor. I own my
18  own business.
19      Q. And you said this earlier and it's in your
20  report on page 41, that based on your experience in
21  franchising, a majority of franchises today are owned
22  and operated by entities that own and operate multiple
23  locations?
24      A. Uh-huh.
25      Q. And do you know how many Jani-King

133

1  franchisees or Jani-King of Oklahoma franchisees own
2  multiple franchisees?
3       A. There were -- in the depositions that you
4  had, there were two that had bought additional
5  territories. I don't know how they were structured.
6       Q. Who are they?
7       A. Oh, I don't remember the names. I would have
8  to go back and look at the --
9       Q. What would be the benefit of purchasing a
10  second Jani-King of Oklahoma franchise?
11      A. Franchisee wanted a bigger territory, the
12  franchisee wanted more accounts.
13      Q. But there isn't -- you don't get a territory.
14  You're just one of many franchisees in a nonexclusive
15  territory?
16      A. Yeah, but they may have wanted -- whatever
17  the franchisee's motivation was -- I'm not going to be
18  the one to be there, but, you know, today 53, 54, 55
19  percent, somewhere in that 53 to 55 percent range
20  all -- most -- 55 percent of all franchisees own more
21  than one location.
22      Q. I'm talking about Jani-King of Oklahoma.
23      A. It's irrelevant to my analysis, quite
24  frankly, but I don't know how many more, but some
25  more of them will own more because that's just the way

134

1  they want to structure. Look, the territory is quite
2  large possibly and the drive time from one area to the
3  next, there's only a certain amount of drive time you
4  can put into this type of business. Franchisee can't
5  drive four hours and then drive four hours back.
6  That's eight hours lost in driving. So they may have
7  different offices. They may want to buy an account.
8       Q. Do you have examples of this or are you just
9  suggesting this is what could happen?
10      A. No, you're asking me -- you're asking me why
11  they would do that, and I'm giving you the answers why
12  they might do it. I said to you, you don't know, but
13  I'm giving you -- you asked me questions why they
14  would and I'm giving you reasons.
15      Q. Well, so, for example, like you reference
16  actually Zarate in your report.
17      A. Uh-huh.
18      Q. She bought the lowest plan and is now one of
19  the top revenue generators. She didn't buy an
20  additional franchise.
21      A. No.
22      Q. So I was wondering why would somebody buy an
23  additional franchise if you get offered the big
24  accounts?
25      A. It depends upon the franchisee and what they

135

1   want to do. If you're asking me why I would do it, I
2   can give you an answer why I would do it.
3   Q. No. You put this in your report that many
4   own multi locations.
5   A. Yeah.
6   Q. I'm just asking you about that.
7   A. It's just statement about the nature of
8   franchising. Look, what I got from reading your
9   depositions and reading the complaint, there's a lack
10  of understanding at the Department of Labor what
11  franchising is all about. No disrespect. And what I
12  wanted to do when I was writing this intentionally was
13  to put some foundation in this so that you or the
14  court would understand what franchising is all about,
15  but there is just -- you know, just the way that the
16  questions were asked may have been asked from an
17  employer or employee standard, but even the inspectors
18  that went out, the deposition of them, the two of
19  them, said, I have no idea what franchising is about.
20  They said, I have zero background.
21       So the reason some of the statements are
22  in here is just to educate the court, yourself, maybe
23  the attorneys at Foley, but I thought there was a real
24  gap in here about what franchising is about, and it
25  really colored the case in a way which I didn't think

136

1   was fair to anybody. That's possibly why I put it in.
2   Q. And you reference Ashley Zarate in here and
3   it's on page 31. You just mentioned she is someone
4   who has sold accounts through word of mouth. I'm
5   wondering where you obtained that information? Was it
6   the deposition or did you talk to her specifically or
7   anyone else?
8   A. I think I took that actually from -- there
9   was a two-pager in there which she signed.
10  Q. A declaration?
11  A. Some declaration in there. I think it was
12  actually in her declaration. It could have been in a
13  deposition. I don't recall, but it was in her words
14  in there.
15  Q. And I want to talk to you about -- and I'm
16  almost done -- your section starting on page 20 -- I
17  take that back. On page 20. That is what I meant.
18  A. The one on contract?
19  Q. Yes.
20  A. Uh-huh.
21  Q. So you make the statement that based on your
22  extensive experience, the breadth and limitations of
23  the franchise agreement between Jani-King and the
24  franchisees are clearly drafted and unambiguous. Why
25  did you include that point?

137

1   A. Couple of reasons. Number one, it's a
2   statement of fact. As I said earlier, each franchisor
3   decides what goes into their license agreement to
4   license their intellectual property. That's embodied
5   in a contract which is then put into a disclosure
6   document. One of the reasons I wanted to put this in
7   is just, first of all, to explain that to the court
8   and yourself that these are contractual documents.
9       It's also the nature of the relationship
10  has been defined by those agreements and disclosures,
11  and changing the nature of those agreed upon
12  relationships and standards or anything else doesn't
13  necessarily mean the contract changes. It just means
14  the reality it's working in changes. So I thought it
15  was important to point out that what you're dealing
16  with here is a contract. And as I said earlier, a
17  disclosed relationship and that the terms of the
18  offering were important and that the terms of the
19  offering were disclosed in advance of the franchisee
20  and franchisor. That's the reason for it.
21  Q. On page 22 you include the statement that
22  it's only because contract law as supplemented or
23  modified by franchise relationship laws governs the
24  franchise relationship. How has franchise
25  relationship laws -- how have they modified contract

138

1   law?
2   A. You get California, for instance, which came
3   up with a -- something or other last year, which
4   started to deal with questions of rights of
5   succession. Can a franchisee -- can a franchisor
6   restrict next gen programs? There's requirements
7   there that if a franchisee is terminated, what's fair
8   to the franchisee, and the California court said
9   something -- California legislature said, you can
10  terminate, but I got to buy back the assets.
11       So franchise relationship laws of
12  Pennsylvania, for instance, there's requirements for
13  renewal. State laws or federal laws can actually say
14  what contract provisions are legitimate or not.
15  That's the nature of state and federal legislatures.
16  That's what you guys live under, and I have to abide
17  by those. So that's where relationship laws will
18  factor in, but there are no relationship laws that say
19  you have to have certain royalty or certain training
20  or certain territories or certain things like that.
21  Most relationship laws deal with termination and
22  renewal provisions. That's where the relationship law
23  is modified.
24  Q. And just so I understand, you're referring to
25  various laws, whether state or federal, in the

139

1  franchise context that may have some bearing on how
2  franchise contracts are drafted?
3      A. Well, it's whether the franchise contract is
4  enforceable. I mean, it goes back to the basics that
5  in -- you know, how California defines what is a
6  franchise is different than what the federal
7  government defines as what is a franchise. What
8  California and Washington State allow in post-term
9  covenants is different than what might be found in
10  Wisconsin.
11          So, yeah, I mean, certainly. California
12  says that I can't have certain post-term covenants,
13  but they're enforceable in 49 of the other states.
14  Certainly California law allows for that. We don't
15  have a federal system. We have a state system when it
16  comes to contracts. So, yeah, they do have an
17  impact.
18      Q. The context of this paragraph, I mean, you
19  give the opinion that the Department of Labor is
20  attempting to impose obligations upon Jani-King that
21  undermine the general and well recognized contractual
22  relationship?
23      A. Right.
24      Q. And so I'm trying to understand what is it in
25  franchise law that somehow does not allow the

140

1  Department of Labor to take the position that it has?
2      A. Okay. If you look at the Jani-King contract,
3  it defines the relationship as an independent
4  contractor.
5      Q. Can --
6      A. Let me finish. Whether you agree or not. It
7  says in there, that, you know, in that role, I can't
8  do certain things. I can't hire and fire your staff.
9  They're not my staff. I can't hire and fire you. I
10  have termination rights, but I can't fire you at will.
11  I don't pay your taxes because you're an independent
12  business person and you go do your own taxes. Now
13  what the Department of Labor wants to do, if I'm
14  understanding what your agency wants to do, is you
15  want to change that to an employment status where the
16  franchisor now would have obligations that make the
17  franchisee and their employees employees of the
18  franchisor.
19          Now, that means you would have to go back
20  into -- you know, in the United States 800,000
21  contracts because every franchise system in this
22  context is exactly the same. We all -- every
23  franchise system signs a contract. They all have
24  independent contractor status in there. So you change
25  a portion of the contract because you now call

141

1  somebody an employee, but you don't give the
2  franchisor now the rights of an employer because they
3  can't. The contract specifically says you don't have
4  these rights. The franchisor doesn't have the right
5  to control day-to-day obligations.
6          So all of a sudden the franchisor doesn't
7  have the right to hire and fire people contractually
8  but you want to give them the obligation of paying
9  taxes. What you really need to do is go out and
10  figure out -- and that's what this paragraph says --
11  how do you override 800,000 contracts in the United
12  States.
13      Q. What 800,000 contracts are you referring?
14      A. 800,000 franchise locations in the United
15  States. I'm saying that Jani-King is the same as
16  every other franchise system when it comes to
17  independent contractor status on that. So you want to
18  make Jani-King responsible for certain things, but the
19  contract doesn't give them the right to do that. And
20  I'm not certain if the Department of Labor is now
21  going to go in and rewrite every single contract in
22  the United States. That's what this paragraph means.
23      Q. Is it your opinion that if Jani-King of
24  Oklahoma -- the court ruled that the Department of
25  Labor is correct in their action, that that will all

142

1  of a sudden change the relationship among franchisees
2  and franchisors across country in all of them?
3      A. I think what it will do is starting with an
4  Oklahoma decision in a federal case by the Department
5  of Labor against a franchisor, now have the Department
6  of Labor look at other franchisors in a similar
7  situation saying, hey, we have won here, so McDonald's
8  there -- and you start to get this going down. That's
9  the nature of change.
10      Q. Do you have a basis for saying that?
11      A. Yeah. I've seen cases where one state will
12  pass a law and the next state will adopt. You see
13  that now with the AB5 test out in California. Courts
14  will generally go along with things like that. I have
15  seen it in my past. But even if you're only looking
16  at Jani-King of Oklahoma, if you wipe out the other
17  franchisees around the country, around the world,
18  Jani-King doesn't have the right to control day-to-day
19  in the contract. So on all of the contracts that
20  you're talking about here, how does Jani-King hire and
21  fire people and the contract says they can't? How
22  does Jani-King control day-to-day operations when the
23  contract says they can't when you want to just impose
24  upon them something which the contract says they're
25  not? That's going to require somebody to go to each

143

1　franchisee and mandate to them that their contract,
2　which they paid for, is no longer valid and here is
3　the one we are going to impose upon you.
4　　　　I don't know how you are going to do
5　that. I don't know how the Department of Labor is
6　going to impose a new contract on independent parties,
7　but that's what you're talking about here.
8　　　Q. Okay.
9　　　A. I mean, I -- as a franchise guy, I love it
10　because my clients will call me up and we'll consult
11　about it all day long, but I don't know how you're
12　going to do that. You're about to override a bunch of
13　contracts. How do you do that? That's what this
14　paragraph means.
15　　　Q. Do you know what statute this lawsuit has
16　been brought up under?
17　　　A. This statute -- do I know the exact statute?
18　I know that you're looking under the Fair Labor
19　Practices.
20　　　Q. Okay.
21　　　A. Look at the definition of whether the control
22　statutes are in place to be an employee. I don't know
23　which the statute is.
24　　　Q. In your mind, is there a difference between
25　the terms used differently throughout the report,

144

1　independent contractor and independent business? Is
2　there a difference?
3　　　A. No, not the way I was writing in general.
4　There may be by sentence structure, but not the way I
5　was thinking.
6　　　Q. You don't mean there to be different
7　meanings?
8　　　A. It would depend on the sentence. You would
9　have to point it out, but if it's just whether I'm
10　thinking that the franchisee is an independent
11　business owner or that the business is independent of
12　each other, in that context I mean it to be the same.
13　　　MR. McLEOD: Okay. Can you give me a
14　couple of minutes. Y'all don't need to go anywhere.
15　I'm just going to take pause.
16　　　(Recess 12:42 to 12:43.)
17　　　Q. (BY MR. McLEOD) I guess one thing I want to
18　clarify, the FDC rule and the regulations, there is no
19　definitions for employee, independent contractor to
20　your knowledge for either?
21　　　A. I would have to go back through the
22　commentary. There is some discussion in there, but I
23　would have to go back. It may not be in the rule. It
24　may be in the commentary to rule, so I would have to
25　go back and look at it, so I can't answer your

145

1　question right now without that, but there's a whole
2　commentary book on that.
3　　　Q. And I was wondering, specifically you cite in
4　your report the regulations. Is there a specific --
5　you cite the definition of franchise. There's not a
6　definition of independent contractor or a definition
7　of employee, right?
8　　　A. No, but there is a tie-in to the Lanham Act
9　on the licensing of the intellectual property. Is
10　there a definition in there, I would have to go back
11　and look at it. I haven't, but by the general nature
12　and practices in franchising, you know, going back to,
13　hell, the 1900s, that relationship has been well
14　defined and part of the structure of franchising
15　globally. So, you know, whether it's written down or
16　not in the commentary, I would have to look but based
17　upon 150 years of practice, it's been that way.
18　　　MR. McLEOD: Okay. I'm done.
19　　　MS. HOFFMAN: I have a few hopefully.
20　　　　EXAMINATION
21　BY MS. HOFFMAN:
22　　　Q. Mr. Seid, what methodology or analysis did
23　you undertake to determine Jani-King's level of
24　control and whether it was appropriate?
25　　　A. I reviewed the nature of the consumer that

146

1　they were trying to serve. I looked at their revenue
2　stream, where they're getting their revenue from and
3　the royalty. I looked at whether they were building
4　their visitation and support in a logical way for
5　their industry, how much training they were going to
6　give and how they were deciding which accounts to
7　visit and which accounts not to visit.
8　　　　I compared it to other franchise systems
9　that I was aware of in their industry based upon an
10　analysis we did for another -- for a large
11　manufacturer outside of franchising. And, you know, I
12　looked at that relationship and I made those
13　decisions. So it was a structured look at how do they
14　compare to the competitors so they can go to market
15　and whether they were able to sustain their system
16　based upon their structure. That's all I was looking
17　at.
18　　　Q. And their level of control is based on the
19　brand standards?
20　　　A. Their level of control is based on the brand
21　standards, but it's also based on what the consumer
22　needs in order to make the sale. So you look at
23　consistent, sustainable in franchising, and
24　sustainability is the ability to sustain the brand
25　both economically and at the consumer level.

147

1  So where a consumer today complains, it's
2  no longer a local complaint. It's -- the complaint
3  hits Yelp and Yahoo! and all the others immediately.
4  You know, there's lots of stories I can tell about
5  that from Burger King in France affecting the sales in
6  the United States and Wendy's with the finger in the
7  chili.
8  So, yeah, that brand standard issue is
9  very, very important in how it's achieved, and how
10  it's measured is very important. And what Jani-King
11  is doing, given the limited revenue that it gets, it
12  doesn't get 100 percent of the revenue in the account.
13  So it really can't visit every day. That's not the
14  nature of it. It can't visit every account every
15  time. So, yeah, I looked at those type of things.
16  MS. HOFFMAN: I'll pass the witness.
17  EXAMINATION
18  BY MR. McLEOD:
19  Q. You mentioned that you considered the level
20  of control based upon what the customer needs to make
21  the sale. How did you determine what the customer
22  needs?
23  A. I determined what the customer needs from my
24  working with clients and making those type of
25  decisions with them how they're going to be operating

148

1  their business. I understand what my clients need
2  from me from a consistency, and I understand what they
3  need from their property management companies because
4  we'll deal with -- we deal with a lot of companies
5  that will do things like lawn care for commercial
6  businesses. We deal with companies that do, you know,
7  lots of services. So we understand what the consumer
8  is looking for at the commercial building level, at
9  the building level. What does our franchisor clients
10  need for their restaurants, the ones owned by the
11  franchisees.
12  So I understand from my experience with
13  those companies that what they are looking for is
14  ease, they're looking for safety, safety in the sense
15  of that it didn't make a mistake. They're looking for
16  something which is when a franchisor is approving a
17  vendor -- and often they will approve one vendor over
18  another -- they want to make certain that they don't
19  risk their own brand to the franchisees. So Burger
20  King approving somebody is a risk to Burger King.
21  That's what I did, but it's based upon unique
22  knowledge of working with these companies that are the
23  type of companies which a Jani-King would serve.
24  Q. So what sort of analysis did you do
25  specifically with customers of commercial janitorial

149

1  cleaning services and what their needs are?
2  A. No, I mean, the analysis of whether -- the
3  analysis of whether, you know, Jani-King's brand
4  standards are correct is based upon the fact that if
5  they were not correct, a consumer would not buy them.
6  So since the Jani-King system has been
7  around quite a while and the Jani-King system is a
8  sustainable business, which is well recognized in
9  there, the lack of their not being a sustainable
10  business indicates that their brand standards are
11  correct for the market as they see it. That's -- this
12  is a consumer driven analysis and the fact that the
13  consumer of the Jani-King services is satisfied with
14  the brand, they continually are able to sell contracts
15  to the end user customer, that's the indication that
16  their brand standards make sense.
17  Q. But if some of the controls were retracted,
18  you don't know that their sales would change?
19  A. If some of their controls were contracted.
20  Q. Retracted.
21  A. Retracted or changed, number one, there is
22  no, you know -- there is no requirement for them to do
23  so because they want to protect their own mark, but
24  would they impact the brand, that's a Jani-King
25  decision. From my own perspective since I've looked

150

1  at it and I think what they're doing is appropriate, I
2  would find changes to them, as a consultant, if I was
3  consulting with them, very scary, but could I say that
4  they could change from a 30-day billing cycle to a
5  31-day billing cycle, I don't know. Could I look and
6  say whether they -- I mean, I would be concerned if
7  they weren't visiting customers at the level they
8  think they need to visit the customers. That's
9  appropriate, and that's where my expertise or
10  expertise of business people come in. Yeah, I would
11  not want to see them make wholesale changes.
12  Q. Are you familiar with the changes they have
13  made as part of the settlement in the case in
14  Pennsylvania?
15  A. I'm not.
16  MR. McLEOD: I have no further questions.
17  MS. HOFFMAN: We don't have anything
18  additional at the time.
19  (Deposition concluded at 12:51 p.m.)
20
21
22
23
24
25



Michael H. Seid
*Managing Director*

94 Mohegan Drive
West Hartford, CT 06117

860-604-7559

mseid@msaworldwide.com
www.msaworldwide.com

*Strategic Advice and Guidance
Based on Real World Experience*



## Professional Qualifications and Experience

I am the founder and Managing Director of MSA Worldwide ("MSA"), a provider of domestic and international franchise advisory services.

During my professional career I have been a senior operations officer, financial executive, consultant or accountant for companies within the franchise, retail, restaurant, personal services, healthcare, education and service industries. The International Franchise Association has published that MSA Worldwide, the firm I founded, is "the leading strategic and tactical advisory firm in franchising."

I have consulted both domestically and internationally for companies on the appropriateness of franchising, licensing and other methods of down-stream distribution of products and services; the design, development and implementation of franchise and licensing systems; and for established franchisors, non-franchisors and other multi-unit operators. MSA Worldwide also provides other professional services including but not limited to manuals; training programs; franchisee recruitment strategies; franchisor expansion strategies; real estate site selection and site development; franchisee advisory councils; franchise relations; joint-employment; crisis management; change strategies; and litigation support and the strategic restructuring of established companies.

Since 1987 through the present, I have primarily been a consultant to the franchise industry. I graduated from Long Island University with a BS in Accounting in 1975 and obtained my CPA in New York State in 1978. During the period 1970 through 1976, I was a member of the US Army Reserve and was honorably discharged in 1976 with the rank of Staff Sergeant.

I am a frequent speaker at programs for the International Franchise Association, universities, law schools, and retail and professional organizations and have lectured and written for the ABA Franchise Forum and the IFA's Legal Forums. I have lectured at several universities and law schools including St. Thomas University, Georgetown Law

School, New York University School of Law, Benjamin N. Cardozo School of Law, Nova University, the University of Arizona, Johnson & Wales University, MIT Sloan School of Management, Harvard Business School, University of California San Francisco (Berkeley), Howard University and Emory University School of Law. I have spoken at the Doha Economic Conference in Qatar on the use of franchising to create a middle class in the Middle East and on behalf of the International Franchise Association I have testified and presented to Federal, State and Local legislators and regulators on franchising.

I have been appointed as an Adjunct Professor at The Ohio State University's Fisher College of Business and have developed and teach a graduate course of studies on Commercial and Social Franchising.

I have published numerous articles on franchising. I am the author of Franchising for Dummies, published by Wiley Publishing, Inc. My co-author for Franchising for Dummies was the late Dave Thomas, Founder of Wendy's International. I am also the author of Franchise Management for Dummies, published by Wiley Publishing, Inc. My co-author for Franchise Management for Dummies is Joyce Mazero, Esq., partner at Polsinelli. I have presented to the World Franchise Council, The World Bank, Harvard University, OPIC and University of New Hampshire, among other universities and private and public agencies on Social Franchising. I am the first recipient of the Franchise Update Hall of Fame Award.

MSA Worldwide is a member of the International Franchise Association's (IFA) Supplier Forum (SF). I serve on the SF's Board of Directors as a Past Chairman. In February 2018 I stepped down as a member of the IFA's Board of Directors after serving a combined total of over thirteen years and was the first professional ever elected to the IFA's board. During that period I also served as a member of the IFA's Executive Committee (1997 and 1998). I have served, and currently serve, as the chair or member of several committees and task forces and was a trustee of the IFA's Education Foundation.

I have completed the requirements and have been awarded the designation of CFE (Certified Franchise Executive) by the International Franchise Association's Education Foundation ("IFAEF"). I have developed and presented several courses for the



IFAEF.

I am a Certified Public Accountant (inactive status) in the State of New York. I am a member of the American Institute of Certified Public Accountants ("AICPA"), New York State Society of CPAs ("NYSSCPA") and am an associated member of the American Bar Association ("ABA").

I have been qualified as an expert in franchising in Federal and State Courts and in Arbitrations. I have testified in cases involving franchising, licensing and labor for franchisors and franchisees in the United States and internationally.

I am Chief Concept Officer and a member of the Board of Directors and Executive Committee of CFWshops, a Social Sector Franchisor established to provide clinical services and essential medicines in the peri-urban areas of Sub Saharan Africa. I also serve on the board and executive committee of the HealthStore Foundation and One Family Health as part of my commitment to the use of business format franchising as a method for improving the human condition and for having a world-changing impact on poverty, diseases and economic development. CFWShops is a franchisor member of the IFA, and I am the representative of CFWShops at the International Franchise Association.

I am on the Board of Directors of the William Rosenberg International Center of Franchising at the University of New Hampshire. I was appointed to the State of Connecticut Low Wage Employer Advisory Board, as a person with experience in the labor force needs of the large business community. I am a member of the External Advisory Board of The Ohio State University's Global Water Institute and on the Board of Advisors for Woman 360 in Ghana.

During the past twenty years, I have provided testimony in the following cases, in deposition, trial, or arbitration.

1. *Nestle Middle East, FZE vs. Crest Foods, Inc.* in the International Chamber of Commerce, International Court of Arbitration, ICC Case No. 22328/TO, retained by Mayer Brown LLP, 19 January 2018.



2.  *Jos. A. Bank Clothier, Inc. vs. J.A.B – Columbia, Inc. et al.*, in the United States District Court for the Northern District of Maryland, Northern Division, Case Number 1:15-cv-03075 ELH, retained by Tayman Lane Chaverri, LLP, 2 April 2018.

3.  *Clifford M. Gonzalez et al. vs. Famiglia-DeBartolo Franchise Systems, LLC et al.*, American Arbitration Association, Case No. 13114Y0054712, retained by The Richard Rosen Law Firm, 27 November 2013.

4.  *PuroSystems, Inc. v. Michael Allen*, American Arbitration Association, Case No. 01-16-0003-8352, retained by Kostopoulos Rodriguez, PLLC, 11 November 2016.

5.  *Sandra Villatoro et al. vs. CleanNet USA, Inc. et al.*, American Arbitration Association, Case Number 02-15-0005-2115, retained by Bartko Zankel Bunzel and Hahn Law, 25 February 2017.

6.  *Barbara Kubiak et al. vs. Massage Envy Spa Uptown at West Village #211 et al.*, in the District Court 193rd Judicial District, Dallas County, Texas, Cause Number DC-15-11559, the Honorable Judge Carl Ginsberg, retained by Thorpe Shwer, 31 March 2017

7.  *LMP Enterprises LLC et al. vs. Franchisor International LLC et al., in the* Superior Court of the State of Washington in and for Clark County, Case Number 14-2-00904-0, the Honorable Judge Addo Collier, retained by Faegre Baker Daniels LLP, 7 June 2016.

8.  *Dr. Rocco Nelson, et al. vs. Dr. Mark Doyle, et al*, in the Superior Court for the State of Washington in and for King County, Case Numbers 16-2-02143-3 SEA and 16-2-02617-6 SEA, the Honorable Judge Jim Rogers, retained by Foster Pepper PLLC, 4 October 2016

9.  *Emily Bruner, et al., v. James John Liautaud, et al.*, in the United States District Court for the Northern District of Illinois, Eastern Division, Case Numbers 14-CV-5509, 14-CV-1681, 15-CV-6010, the Honorable Judge Kocoras, Magistrate Judge Schenkier, retained by Seyfarth Shaw LLP, 11 January 2017.

10. *Lamington Resources, Inc. v. Burger King Corporation, et al.*, International Chamber of Commerce, International Court of Arbitration, Case No. 20786/RD, retained by Genovese Joblove & Battista, 19 October 2016.

11. *New Amsterdam Coffee & Tea Co. et al. v. International Coffee & Tea, LLC et al.*, American Arbitration Association, Action Number 72-Y-114-000138-14-JRL, retained by Bryan Cave LLP, 3 March 2014.

12. *PuroSystems, Inc. v. John Burke*, American Arbitration Association, Southeast Case Management Center, Case No. 01-14-0000-3162, Arbitrators John Barkett, Thomas Schultz, and Michael Nachwalter, retained by Faegre Baker Daniels LLP, 10 March 2015.



13. *The Estate of William Moran et al. v. Intercontinental Hotels Group Resources, Inc. et al.*, in the Circuit Court of Kanawha County, West Virginia, Civil Action Number 12-C-469. Judge Tod J. Kaufman. Retained by Shuman, McCuskey & Slicer, PLLC, 6 August 2014.

14. *David Zaroff, Tom Hymanson & AJJN Group, LLC v. Planet Beach Franchising Corp. et al.,* American Arbitration Association, Case Number 69 20 1200 2007. Case Administrator Alyson DiBlasi, retained by Pugh, Accardo, Haas, Radecker & Carey, LLC, 13 August 2014.

15. *PuroSystems, Inc. v. John Woods, American Arbitration Association*, Case Number 32 114 Y 000002 14. Arbitrators: Lawrence A. Saichek, Esq, James Bowdish, Esq, Jack Coe, Esq., retained by Faegre Baker Daniels LLP, 22 January 2014

16. *Major Brands, Inc. v. Diageo North America, Inc. et al.,* in the Circuit Court, Twenty-Second Judicial District, St. Louis City, Missouri, Cause number 1322-CC00534. Circuit Judge Robert H. Dieker. Retained by Diageo Americas, Inc., 19 March 2014.

17. *Kevin K. Cushing, v. AlphaGraphics, Inc.; AlphaGraphics, Inc., v. Kevin K. Cushing,* In The Third Judicial District Court, Salt Lake County, State Of Utah, Civil Action No. 120900947. Judge Constandinos "Deno" Himonas. Retained by Parsons Behle & Latimer, 24 September 2012

18. *Michael A. Lind and Lisa A. Bishop, Jointly as Administrators of the Estate of Corey M. Lind v. Domino's Pizza, LLC, Domino's Pizza, Inc. and Alex A. Morales*, In the Superior Court Department, Commonwealth of Massachusetts, Civil Action Number 09-600. Judge Richard J. Carey. Retained by Morrison Mahoney LLP on behalf of Domino's Pizza, 20 December 5, 2012.

19. *Canadian Union of Postal Workers v. Canada Post Corporation et al,* before the Canada Industrial Relations Board, Canada, Province of Quebec, CIRB Files 27977-C, 27978-C, 27979-C, 27980-C, 27981-C, 28229-C, 28230-C, 28231-C. Panelists: Madam Commissioner Louise Fecteau and members Mr. Patrick J. Heinke and Mr. Norman Rivard. Retained by Norton Rose on behalf of Canada Post Corporation, 16 February 2011.

20. *Syed Ali Husain and Khursheed Husain v. McDonald's Corporation et al*, In the Superior Court of California, County of Marin, Case Number CV096177. Judge James R. Ritchie. Retained by McDonald's Corporation, 5 January 2012. Attorney Kirkland & Ellis LLP.

21. *Edgar Zapata v. Hawthorn Suites Worldwide, Inc. et al*, In the Second Judicial District Court, County of Bernalillo, State of New Mexico, Case Number CV 2008-00744. Judge Nan Nash. Retained by Hawthorn Suites Worldwide Inc., 9 December 2010. Attorney Armstrong Teasdale LLP.



22. *Egg's 'N Things International Holdings PTE, Ltd et al v. ENT Holdings, LLC et al*, Dispute Prevention and Resolution, ARB Case Number 10-0211-A. Arbitrator Ken Marcus. Retained by Eggs 'N Things International Holdings, 24 September 2010. Attorney Alston Hunt Floyd & Ing.

23. *Cold Stone, Inc. et al v. Cindy Kilman et al*, American Arbitration Association, Case Number 76-114-Y-252-09. Arbitrator Lawrence Berkowitz. Retained By Kahala Corporation, October 2010. Attorney Snell & Wilmer.

24. *Cold Stone, Inc. et al v. Reid & Andrew, Inc. et al*, In the Superior Court Of The State Of Arizona In And For The County Of Maricopa, Case Number CV 2010-000348. Judge John Buttrick. Retained By Cold Stone, November 2010. Attorney Kutak Rock.

25. *Cold Stone, Inc. et al v. Jason Pinnock and Jack Pinnock and Pin Knox, Inc.*, American Arbitration Association, Case Number 76-114-00366-08 LGB. Arbitrator Judge Alverez. Retained by Kahala Corporation, August 2010. Attorney Snell & Wilmer.

26. *Vincent De Giovanni, Mariette Barros, et al v. DWI International, Inc., et al*, In the United States District Court, District Of Massachusetts, Docket No. 07-10066 RCL. Retained by DWI International. Date of engagement 22 July 2009. Attorney Faegre & Benson.

27. *Jacqueline Snaza et al v. StudentCity.com, Inc. and Howard Johnson International et al*, In the United States District Court, District of Massachusetts, Civil Action No. 1:09-CV-10017. Judge Saris and Magistrate Collings. Retained by Howard Johnson International. Date of engagement 23 February 2010. Attorney Campbell Campbell Edwards & Conroy.

28. *Handling et al v. AABB Fitness Holdings, Inc.* (formerly known as Contours Express) et al, In The Circuit Court Of State Of Missouri, Cause No. 2107CC-001021. Judge Colleen Dolan. Retained by AABB Holdings. Date of engagement 30 April 2009. Attorney Armstrong Teasdale, LLP.

29. *Tankersley and Diehl v. Collision On Wheels International, LLC*, American Arbitration Association Number, Case Number 74 114 0073 09. Arbitrator Lawrence C. Root. Retained by Collision on Wheels International. Date of engagement 3 November 2009. Attorney Fisher Zucker.

30. *Sayles and O'Neill, et al. v. G & G Hotels and Howard Johnson International, et al.* in the Superior Court of New Jersey, Camden County, Docket Numbers CAM-L-2909-07 and CAM-L-4496-07. Retained by Howard Johnson International, Inc. Date of Engagement 24 July 2009. Attorney Greenbaum, Rowe, Smith & Davis LLP.



31. *Bird Hotel Corp, et al. v. Super 8 Motels, Inc.* in the United States District Court, Southern Division for the District of South Dakota, Case Number CIV.4:06-cv-04073-LLP, Judge Lawrence Piersol. Retained by Super 8 Motels, Inc. Date of Engagement December 18, 2007. Attorney Armstrong Teasdale LLP.

32. *Bob Peterson, et al v. H. Martin Sprock, III, et al* in the United States District Court, Northern District of Georgia, Atlanta Division, Case Number 1: 06-CV-3087. Retained by Bob Peterson, et al. Date of Engagement October 8, 2008. Attorney Zarco, Einhorn Salkowski & Brito, P.A.

33. *Colorado Coffee Bean, LLC, et al v. Peaberry Coffee, Inc.* et al in the District Court, City and County of Denver, Colorado, Case Number 2006CV4514. Retained by Peaberry Coffee, Inc. Date of engagement October 17, 2007. Attorney Wheeler Trigg Kennedy LLP.

34. *ELB Enterprises of Dallas, et al v. McDonald's Corporation, et al* in the County Court at Law, Court Number 4, Dallas County, Texas, Case Number CC-06-17226-D. Retained by McDonald's Corporation. Date of engagement June 5, 2008. Attorney Winston & Strawn LLP.

35. *Institute for Motivational Living, Inc., v. Sylvan Learning Center, Inc.* in the United States District Court, Western District Of Pennsylvania, case number 06-0828. Retained by Sylvan Learning Center, Inc. Date of engagement: August 2007. Judge: Gary Lancaster. Attorney: Miles & Stockbridge.

36. *Gabana Gulf Distribution, Ltd., et al v. Gap International Sales, Inc., et al.* in the United States District Court, Northern District of California, San Francisco Division, case number C 06 2584 CRB. Retained by Gap International Sales, Inc. Retained by Gap International Sales, Inc., et al. Date of Engagement: July 2007. Judge: Charles Breyer. Attorney: Keker & Van Nest.

37. *DeSimone v. Sara Lee Fresh, Inc., et al.* in the Superior Court of the State of California in and for the County of San Mateo, Unlimited Jurisdiction, case number CIV 430555. Retained by Sara Lee Fresh, Inc. Date of Engagement: July 2007. Judge: information not available. Attorney: Sonnenschein Nath & Rosenthal.

38. *Nick Vlahos and Jim Vlahos v. Sara Lee Fresh, Inc.* in the Superior Court of the State of California in and for the County of San Mateo, Unlimited Jurisdiction, case number CIV 429005. Retained by Sara Lee Fresh, Inc. Date of Engagement: July 2007. Judge: information not available. Attorney: Sonnenschein Nath & Rosenthal.

39. *Joseph Szentpaly v. The McDonough's Investment Group, Inc. d/b/a Chicken Kitchen, et al.*, in the Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida, General Jurisdiction Division, case number 04-10065 CA-11. Retained by Chicken Kitchen. Trial testimony. Date of Engagement: August 2006. Judge: Robert Scola. Attorney: Buchanan Ingersoll & Rooney.



40. *San Francisco Oven, LLC v. Fransmart, Inc., Rowe Bright Company and Fransmart, LLC*, American Arbitration Association, Case No. 16 114 00601 05. Retained by San Francisco Oven, LLC. Date of Engagement: November 2005. Arbitrator Charles Lee Eisen. Attorney: Shumaker, Loop & Kendrick.

41. *Daniel J. King et al v. GNC Franchising Inc. et al,* in the United States District Court for the State of New Jersey, Civil Action Number 05125-KSH-PS. Retained by McGuire Woods. Date of Engagement: November 18, 2005. Attorney: Gordon Schmidt.

42. *David and Faye Lackey v. Window Fashion Professionals, Inc.*, American Arbitration Association, Case No. 71 114 00347 05. Retained by Window Fashion Professionals, Inc. Date of Engagement: March 2006. Judge: information not available. Attorney: Haynes & Boone.

43. *Ron Douglass v. Bharat Patel, Kesau Patel, Kirti Patel, Dan Patel, Shanker, Inc. And Super 8 Motels, Inc.*, in the United States District Court for the District Of Wyoming, Civil Action No. 04 CV 322 D. Retained by Super 8 Motels, Inc. Date of Engagement: June 2005. Judge: information not available. Attorney: Ross, Ross & Santini.

44. *Anthony Hobby, et al. v. Snap-on Tools Company, et al.*, American Arbitration Association, case number 11 114 01884 04. Retained by Snap-on Tools Company. Date of Engagement: October 2004. Arbitrator: information not available. Attorney: Jenkens & Gilchrist.

45. *TES Franchising LLC, et al. v. T. Barry Stephens, et al.*, American Arbitration Association case number 12 114 00967 01. Retained by T. Barry Stephens. Date of Engagement: September 2004. Arbitrator: information not available. Attorney: Mark J. Klein, PC.

46. *Lee Hotchkiss, et al. v. Little Caesar Enterprises Inc., et al.*, in the District Court, 166th Judicial District, Bexar County, Texas, case number 99-CI-16042. Retained by Little Caesar Enterprises, Inc. Trial testimony. Date of Engagement: April 2004. Judge: Bernard Friedman. Attorney: Honigman, Miller, Schwartz and Cohn.

47. *Nisar Ahmed et al. v. Shakey's Incorporated*, in the Superior Court of the State of California, for the County of Los Angeles, case number BC 287817. Retained by Shakey's Incorporated. Date of Engagement: October 2003. Judge: information not available. Attorney: Jenkens & Gilchrist.

48. *RDR Enterprises, Inc., et al. v. Copy Club, Inc., et al.*, in the Superior Court of the State of California, for the County of San Diego, case number GIC 774596. Retained by Copy Club, Inc. Date of Engagement: August 2003. Judge: information not available. Attorney: Sedgwick, Detert, Moran & Arnold.



49. *Gerald K. Smith, et al. v. Arthur Andersen LLP, et al.*, in the United States District Court, for the District of Arizona, case number(s) CIV-01-218-PHX-PGR, CIV-01-246-PHX-EHC, CIV-02-1162-PHX-PGR, CIV-02-1248-PHX-PGR (Consolidated). Retained by Arthur Andersen LLP. Date of Engagement: December 2003. Judge: information not available. Attorney: Williams & Connolly.

50. *J&E Oil, Inc. v. ATOFINA Petrochemicals, Inc.*, in the District Court, 206th Judicial District of Hidalgo County, Texas, Case Number C-2174-00-D-2. Retained by ATOFINA Petrochemicals, Inc. Date of Engagement: October 2001. Judge: information not available. Attorney: Roerig, Oliveira & Fisher.

51. *Auto-Chlor System of Minnesota, et al. v. JohnsonDiversey*, in the United States District Court, District of Minnesota, case no. 02-535. Retained by Auto-Chlor System of Minnesota. Date of Engagement: March 2003. Judge: information not available. Attorney: Dorsey & Whitney.

52. *Steve and Jennifer Burrows v. Pete and Andrew, Inc. D/B/A Super 8 Inn and Super 8 Franchise Systems, Inc.*, in the Circuit Court of Jasper County, Missouri at Joplin – Case Number 01-CV-682785. Retained by Super 8 Inn and Super 8 Franchise Systems, Inc. Date of Engagement: May 2003. Judge: William Crawford. Attorney: Armstrong Teasdale.

53. *Serena McDermott and Jennifer Gentry on behalf of themselves and all others similarly situated v. Cracker Barrel Old Country Store, Inc.*, in the United States District Court for the Northern District of Georgia Rome Division Civil Action File No 4:99-CV-01. Retained by Serena McDermott. Date of Engagement: September 2002. Judge: information not available. Attorney: Gordon, Silberman, Wiggins & Childs.

54. *Brenco Enterprises, Inc., et al. v. Takeout Taxi Franchising Systems, Inc., et al.*, in the Circuit Court of Fairfax County, Virginia, Chancery No. 177164. Retained by Takeout Taxi Franchising Systems, Inc. Trial testimony. Date of Engagement: September 2002. Judge: R. Terrance Ney. Attorney: Bean, Kinney & Korman.

55. *Andrews v. Avis Rent a Car System, Inc. and Cendant Car Rental, Inc.*, in the Circuit Court, 11th Judicial District, Miami-Dade County, FL, Case No. 00-30417 CA 23. Retained by Avis Rent a Car System, Inc. Date of Engagement: February 2003. Judge: information not available. Attorney: Buchanan Ingersoll.

56. *Mike And Lori Baer, et al. v. Jamba Juice et al.*, American Arbitration Association, AAA No. 75 114 00426 00GLO. Retained by Jamba Juice. Date of Engagement: March 2002. Arbitrator: information not available. Attorney: Genovese, Lichtman, Joblove & Battista.



57. *Edwards Theatres Circuit, Inc., et al., v. IMAX Corporation*, in the United States Bankruptcy Court - Central District Of California - Santa Ana Division - Case No. SA 00-16475-LR - Adversary Case No SA 01-1445-LR. Retained by IMAX Corporation. Date of Engagement: January 2003. Judge: John E. Ryan. Attorney: Gibson Dunn & Crutcher.

58. *Grady's American Grill, LP v. Michael K. Reilly, et al. v. Bruegger's Corporation, et al.*, in the United States District Court - for the Southern District of Texas - Houston Division, Civil Action No H-98-4015. Retained by Bruegger's Corporation. Date of Engagement: November 2001. Judge: information not available. Attorney: DLA Piper.

59. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc., et al.*, in the Jefferson Circuit Court - Division Three, case number 98-CI-03199. Retained by Bass Hotels & Resorts, Inc. Date of Engagement: August 2001. Judge: information not available. Attorney: Frost Brown Todd.

60. *O'Neil v. Sonana Systems, et al.*, in the Circuit Court Of The Ninth Judicial Circuit - in and for Osceola County, Florida. Retained by Sonana Systems. (Information not available)

61. *Carousel's Creamery, LLC v. Marble Slab Creamery, Inc. et al.*, in the District Court of Harris County, Texas - 55th Judicial District, Case Number 2000-22503. Retained by Marble Slab Creamery, Inc. Date of Engagement: February 2001. Judge: information not available. Attorney: Jenkens & Gilchrist.

62. *Burger King Corporation v. H&H Restaurants, LLC*, in the U.S. District Court, for the Southern District of Florida, Case Number 99-2855 Civ- Jordan. Retained by Burger King Corporation. Date of Engagement: December 2000. Judge: information not available. Attorney: Genovese, Lichtman, Joblove & Battista.

63. *COC Services, Ltd. v. CompUSA, Inc.*, in the 116th Judicial District, Court of Dallas, Texas, case Number 00-8358-F. Retained by CompUSA, Inc. Date of Engagement: October 2000. Judge: information not available. Attorney: Jenkens & Gilchrist.

64. *Fisher and Hester v. Super 8 Franchise Services, Inc.*, in the U.S. District Court, Southern Mississippi, case number 99-163-CV10. Retained by Super 8 Franchise Services, Inc. (information not available)

65. *Thomas Fritz v. Factual Data*, American Arbitration Association, Arbitration Number 77 114 00092 00. Retained by Factual Data. Date of Engagement: October 2000. Arbitrator: information not available. Attorney: Dorsey & Whitney.



66. *Steamatic Inc. v. Randall C. Donald et al.* – Steamatic, Inc. v. Randall C. Donald and Randy Benedict Defendants, Randall C. Donald, Counter-Plaintiff v. Steamatic, Inc., Counter-Defendant in the 48th Judicial District Court, Tarrant County, Texas, case number 48-175484-98. Retained by Randall C. Donald. (Information not available)

67. *Moto Photo Inc. v. Thomas C Law III*, American Arbitration Association. Retained by Moto Photo, Inc. Date of Engagement: June 1999. Arbitrator: information not available. Attorney: Nelson Mullins Riley & Scarborough.

My writings and presentations include:

1.  Acquisition Fever (Franchising World Magazine)
2.  Analysis of Royalty Elimination in Manufacturing Franchisors (Leaders Franchising Business & Law Alert)
3.  Are You an Inadvertent Franchisor? (Retailing Update – Publication Of PWC)
4.  Best Practices – Royalties That Do More Than Pay the Rent (Leaders Franchising Business & Law Alert)
5.  Best Practices: Understanding Why Companies Operate at The Head of The Pack (35th Annual International Franchise Association Convention)
6.  Bias in The Media Coverage of Franchising (Franchise Update Magazine)
7.  Can You Still Become A Millionaire in Franchising? (Successful Franchising)
8.  Cooperation in Franchising (Franchise Update Magazine)
9.  Corporate Culture – DuPont Becomes A Franchisor (Leaders Franchising Business & Law Alert)
10. Counseling A Start Up Franchisor (Presentation to The American Bar Association Forum on Franchising)
11. Developing A Proper Franchise Program (Executives Guide to Franchise Opportunities)
12. Developing A Start-Up Franchisor (Entrepreneur Magazine)
13. Elements of Successful Franchising (International Franchise Exposition)
14. Encroachment (Restaurant and Hospitality Group, Dallas, Texas)
15. Fair Franchising Standards - Fair to Whom (Franchise Update Magazine)
16. Financing Expansion Through Franchising (KPMG)
17. Forward to Franchise Buying Book (Entrepreneur Magazine)
18. Forward to Franchise Development Book (Entrepreneur Magazine)
19. Franchise or Business Opportunity? Making the Choice (California Franchise and Business Guide)
20. Franchising – The Engine for Growth (Franchise Update Magazine)
21. Franchising for Dummies, 1st And 2nd Edition (Wiley Publishing)
22. Franchising: Expansion Opportunity for Small Stores (Nat'l Federation Convention and Exposition)
23. Getting the Information for International Expansion (8th IFA International Symposium on Franchising;)
24. Global Expansion (KPMG)



25. Global Expansion – *Pricing Negotiating and Selling* (National Restaurant Association)
26. How Can I Provide Meaningful Support to My Franchisees in Site Selection Without Creating Potential Claims for Cause of Unit Failure at A Later Date? (Franchise Update Magazine)
27. How Do I Get My Franchisee to Move Through Adolescence into Maturity? (Franchise Update Magazine)
28. How to Expand Your System Through Non-Traditional Franchisees and Sites (10th Annual International Franchise Association Marketing Conference)
29. If They Can See It - They Can Do It (Franchise Update Magazine)
30. International Expansion (Franchise Update Magazine)
31. Making the Franchise Decision (Workbook)
32. Managing Your Reputation in Times of Crisis (Leaders Publications – Franchising Business & Law Alert)
33. Market Dynamics V. Legislation.)
34. Is There A Place for Both in Franchising? (Continental Franchise Review)
35. Neighborhood Franchise Project (Local Initiatives Support Corporation)
36. New Markets - Closer to Home (Franchise Update Magazine)
37. No Victors Only Victims (Franchise Update Magazine)
38. Planning for Growth: Creating and Using the Business Plan (International Franchise Association)
39. Pricing of Franchisees: How to Charge for Fees, Area Development Fees, Etc (International Franchise Association)
40. Retail Modeling - The Science Behind Encroachment Avoidance? (Leaders Publications – Franchising Business & Law Alert)
41. Selecting Your Professional Advisor (Directory of Franchise Attorneys)
42. Shared Business Enterprise - Toward A New Franchise Paradigm? (Franchise Update Magazine)
43. Should I Institute Collective Bargaining to Settle Franchise Disputes? (Franchise Update Magazine)
44. Should There Be Mandatory Earnings Claims? (Franchise Update Magazine)
45. Strategic and Long-Range Planning (International Franchise Association)
46. Success in Franchising (Franchise Update Magazine)
47. Symposium Global Retailing (University of Arizona Southwest Retail Center for Education and Research)
48. Tactical Planning (Capital Franchise Association)
49. The Changing Landscape (Franchise World Magazine)
50. The Circus Comes to Town (Franchise Update Publications)
51. The Franchise Media and The McCall's Decorating Den Article (International Franchise Association)
52. The Franchisor Business Plan (Franchise World Magazine)
53. The National Franchise Council – Is This the Proper Forum for Self-Regulation in Franchising? (Franchise Update Magazine)
54. The Power of Franchising - As an Economic Development Strategy (International Franchise Association)



55. The Strategic Process: Developing the Financial Structure of a Franchise (Handbook of Franchise Management)
56. Timothy Bates Two - An Analysis of SBA Franchise Failure Study (Franchise Update)
57. Using Franchising as A Growth Model (Success Magazine)
58. Where It All Began: The Evolution of Franchising (Franchise Update Magazine)
59. The Role of Technology in Tactical Execution (International Franchise Assn.)
60. What Do We Do with Brokers? (North American Securities Administrators Association)
61. Articles As On-Line Expert For Entrepreneur.Com (Entrepreneur.Com)
62. Articles as On-Line Expert for Allbusiness.Com (Allbusiness.Com)
63. Adding A New Product (Franchise Times Magazine)
64. Area Representative (Franchise Times Magazine)
65. Back to Africa (Franchise Times Magazine)
66. Can't Any Lawyer Do It (Franchise Times Magazine)
67. Dealing with Real Estate Concerns (Franchise Times Magazine)
68. Discovery Days (Franchise Times Magazine)
69. Downturn in The Economy (Franchise Times Magazine)
70. Encroachment – The Role of The Lawyer and Consultant in Advising Clients (Franchise Times Magazine)
71. Encroachment Avoidance (Franchise Times Magazine)
72. Failure Rate (Franchise Times Magazine)
73. Going International (Franchise Times Magazine)
74. Grass Roots (Franchise Times Magazine)
75. Impact Policies (Franchise Times Magazine)
76. Is Now A Good Time to Franchise My Business (Franchise Times Magazine)
77. Making Changes to Established Systems (Franchise Times Magazine)
78. Money Mess (Franchise Times Magazine)
79. Negotiating Agreements (Franchise Times Magazine)
80. Patriot Act (Franchise Times Magazine)
81. Rebates or Kickbacks (Franchise Times Magazine)
82. The Real Challenge (Franchise Times Magazine)
83. Trying Times – Standard Solutions (Franchise Times Magazine)
84. Veterans Transition Franchise Initiative (Franchise Times Magazine)
85. What to Do About Franchisee Litigation (Franchise Times Magazine)
86. What Just Happened in America (Franchise Times Magazine)
87. Go for Brokers (Franchise Update)
88. How Will Wall Street's Melt Down Affect Small Business (Franchise Update)
89. Helping Franchise Systems Succeed:
Avoiding the Pitfalls Encountered in The Early Stages of Franchising (International Franchise Association Legal Symposium)
90. The Respective Roles of The Franchise Consultant and The Franchise Lawyer in Structuring the Franchise System (American Bar Association Forum on Franchising)
91. Social Sector Franchising (HealthStore Foundation)



92. Creating a middle class through the development of franchising in the Middle East to deal with the causes of the Arab Spring (Eleventh Annual Doha Economic Conference, Doha, Qatar)
93. Social-sector franchising for healthcare (Micro-Franchising – How Social Entrepreneurs are Building a New Road to Development – Greenleaf Publishing)
94. Building a Change Culture (52nd IFA Annual Convention)
95. Basics of Developing a Franchise System (International Franchise Exposition)
96. Top Ten Mistakes Every Franchisor Should Avoid (53rd IFA Annual Convention)
97. Setting Fees and Marketing the Opportunity (ICFE Special Session)
98. Managing Change (ICFE Special Session)
99. Exit, Succession and Estate Planning for Baby Boomer Franchise Owners (IFA 2014 Annual Convention)
100. Grow Your Business with Franchising & Licensing (Baker Donelson 2014 NOLA)
101. The Father of Franchising (About.com)
102. Negotiating Franchise Agreements (About.com)
103. Advantages and Disadvantages of Buying a Franchise (About.com)
104. Advantages & Disadvantages of Joining a Mature Franchise System (About.com)
105. Advertising Fees and Strategies for Franchisors (About.com)
106. Albert Singer: The Myth about the 'Father of Franchising' (About.com)
107. Are You Ready to Be a Franchisee? (About.com)
108. Are You Ready to Franchise Your Business? The Threshold Analysis, Part One (About.com)
109. The Threshold Analysis, Part Two: Franchisability criteria (About.com)
110. The Threshold Analysis, Part Three: Available franchisees (About.com)
111. The Threshold Analysis, Part Four: The support system and fees (About.com)
112. The Threshold Analysis, Part Five: Your ability to expand (About.com)
113. Basic Forms of Multi-Unit Development (About.com)
114. Benjamin Franklin – Inventor, Statesman, Printer, Franchisor, Philanthropist (About.com)
115. Buying an Existing Franchise (About.com)
116. Failure Rate: Dealing with Failure in a Franchise System (About.com)
117. Finding the Best Advisors in Franchising (About.com)
118. Franchise or Business Opportunity? Making the choice (About.com)
119. Franchise Relationship Structures (About.com)
120. Franchising Definitions (About.com)
121. Franchising Your Business, Part One: Overview (About.com)
122. Franchising Your Business, Part Two (About.com)
123. Franchising Your Business, Part Three (About.com)
124. Franchising Your Business, Part Four (About.com)
125. Franchising Your Business, Part Five (About.com)
126. Going International (About.com)
127. How Do You Spot a Franchise Opportunity to Avoid? (About.com)
128. How Much Does a Franchise Cost? (About.com)
129. How to Determine Your Royalty Fee Structure (About.com)
130. How to Understand a Franchisor's Financial Performance Representation (About.com)



131. If it walks like a duck – You may already be a franchisor (About.com)
132. If You Are Thinking of Franchising Your Business (About.com)
133. Is Every Franchise Going to Be a Success? (About.com)
134. Negotiating a Franchise Agreement (About.com)
135. Requirements to Open a McDonald's Restaurant (About.com)
136. Roles of the Franchise Consultant and Franchise Lawyer (About.com)
137. Start-Up Costs: Determining your initial franchise investment (About.com)
138. The Franchise Disclosure Document (About.com)
139. The History of Franchising (About.com)
140. Top Ten Reasons to Invest in a Franchise (About.com)
141. Understanding the Franchise Agreement vs. the FDD (About.com)
142. What is a Franchise? (About.com)
143. Won't Any Lawyer Do? (About.com)
144. Union Challenges to Franchising in the U.S. (About.com)
145. The NLRB and SEIU – A Joint Enterprise Against Franchising (About.com)
146. Exclusive Territory (About.com)
147. Default and Termination (About.com)
148. The Bar Has Been Raised for Relationship Law Consideration (About.com)
149. Retail Theatre – Successful competing in an etail economy (About.com)
150. Retaining the NLRB Rider (About.com)
151. Franchising Creates over 27% of All Private Sector Jobs (About.com)
152. The Sky is Not Falling – At least not from Browning Ferris (About.com)
153. California 525 – What has been achieved (About.com)
154. Financial Performance Representation (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
155. The Basics of Developing a Franchise System (International Franchise Exposition)
156. Franchise Your Business (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
157. Where Is the Point of No Return in Guiding Franchisees in People Matters? (International Franchise Association)
158. Franchise Training Programs (About.com)
159. How to find a franchise with a good Return on Investment (About.com)
160. The process of buying a franchise (About.com)
161. What support can you expect from a franchisor (About.com)
162. The history of franchising (About.com)
163. Sexual and Reproductive Care (International Franchise Association)
164. Social Sector Franchising (World Franchise Council)
165. Richard Griffin - How a Partisan Lawyer Can Get It So Very Wrong (Franchising World Magazine)
166. An Inventory of Potential Outcomes from Richard Griffin's NLRB opinion on Franchising – White Paper (International Franchise Association)
167. Fight for $15: The Tipping Point for Generational Poverty (About.com)
168. Franchise Management for dummies (Wiley Publishing, Inc.)
169. Social Franchising (International Franchise Association)
170. Joint Employment (International Franchise Association)



171.   The Basics of Developing a Franchise System – An Educational Seminar for the
International Franchise Association Staff (International Franchise Association)

I have presented at professional and trade associations, including, but not limited
to, the International Franchise Association; the International Franchise Association
Education Foundation; the International Franchise Association's Legal Symposium; the
National Restaurant Association; the National Retail Federation; the American Bar
Association; Franchise Finance Forum; Franchise Update Multi-Unit Conferences;
Australian Franchise Association; British Franchise Association; New Zealand Franchise
Association; Italian Franchise Association; World Franchise Association; U.S. Embassy
Rwanda; Global Health Conference; Service Employees International Union; The World
Bank; OPIC; and PharmAccess and for universities and law schools, including, but not
limited to, St. Thomas University, Georgetown Law School, New York University School Of
Law, Benjamin N. Cardozo School Of Law, Nova University, University Of Arizona,
Johnson & Wales University, Harvard, MIT, UCSF (Berkeley), Emery University School of
Law, University of New Hampshire, Howard University and The Ohio State University.





EXHIBIT
2
SEID

# IN THE UNITED STATES DISTRICT COURT
# FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **EUGENE SCALIA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,**<br><br>                   **Plaintiff,**<br><br>       **vs.**<br><br>**JANI-KING OF OKLAHOMA, INC., a foreign corporation,**<br><br>                 **Defendant.** | **Case Number: 5:16-CV-01133-G** |

**Expert Report Of Michael H. Seid**
**Managing Director**
**MSA Worldwide**

**Submitted On Behalf Of**
**Jani-King of Oklahoma, Inc.**

On 11 October 2019, Foley & Lardner LLP, counsel for defendant Jani-King of Oklahoma, Inc., retained me as a testifying expert in the above referenced litigation with the United States Department of Labor. My fees are based upon my standard hourly rate and I am also reimbursed for all out of pocket expenses.

## Credentials

My name is Michael H. Seid. I am the founder and Managing Director of MSA Worldwide and I have been engaged in that work for over 30 years. During that period, my practice has been devoted to licensing, distribution and franchising matters, in all the facets of domestic and international business. Included in my advisory work to clients is the design, development, implementation and refinement of franchising, licensing and other down-stream distribution programs; counseling clients; litigating support and acting as an expert witness. I have been the principal business advisor in the structuring and development of several hundred domestic and international franchise, licensing and distribution systems and have been an advisor to a significant number of established licensors, distributors, manufacturers and franchisors on a global basis. I have also reviewed the terms contained in what I estimate to be in excess of a thousand domestic and international licensing, distribution, and franchise offerings during the course of my career.

I am frequently referred to as a leading expert in franchising and MSA Worldwide, the firm that I founded, has been acknowledged by the International Franchise Association as "the leading strategic and tactical advisory firm in franchising."[1]

For well over twenty-five years I have served and continue to serve in a leadership position in the International Franchise Association ("IFA"). In February 2018, after combined terms totaling more than thirteen years, my most recent term on the Board of Directors of the IFA ended. During that twenty-five year period, I have served as a member of the IFA's executive committee, a board member and the chair of franchising's professionals organization, the Supplier

---

[1] The International Franchise Association Franchise Opportunities Guide - 2016

Forum. I currently chair or am a member of several committees and task forces for the IFA.

I have written and contributed to several books and other publications in the areas of franchising, licensing, and distribution. I have had numerous articles published and have contributed to a number of other publications, both legal and commercial in nature. I have spoken extensively on these subjects throughout the world. My knowledge of the subject of franchising and licensing and their standards and practices is extensive and is well respected by my peers, including those that practice franchise law.

I am an Adjunct Professor at the Fisher College of Business at The Ohio State University and developed and deliver a graduate school course on commercial and social franchising.

I am the principal author of the IFA's Statement of Guiding Principles and participated in the drafting of its Code of Ethics. I have offered expert opinions domestically and internationally for both plaintiffs and defendants and for franchisees and franchisors. My C.V., presented in Appendix A to my report, includes my credentials and accomplishments in franchising and business.

Scope of Engagement

Based upon my experience and expertise in franchising, I was engaged to address the issues raised in this matter from the perspective of generally accepted industry custom and practices. I am not offering any legal conclusions nor am I a fact witness.

I have reviewed pleadings that have been filed in this case, depositions and the exhibits attached to those depositions, certain agreements, manuals, training materials, and other documents listed in Appendix B of this report. Based upon my review of the material provided, and my experience, I may be called to testify on all aspects of franchising, including but not limited to, the relationship between franchisors, franchisees, and the standards, practices, duties, and responsibilities customarily observed in the franchisor/franchisee relationships.

I have been asked to prepare this report and am prepared to respond to the issues and opinions that may be raised in this matter. My opinions in this matter are and will be based on recognized standards and practices as they relate to franchising, the core relationship-defining document and the factual record, including the documents identified in Appendix B. I reserve the right to supplement my opinions based on additional discovery or in response to additional or supplemental expert reports. I also may supplement my report based on evidence that I have not had an opportunity to consider or if ongoing discovery reveals additional facts.

There are arguably three sources for standards in any industry: (1) rules, laws, and legal precedents that govern the industry; (2) customs and practices found in that industry; and (3) declarations made by acknowledged and recognized associations that represent industry members. My opinions will reflect those recognized standards.

The scope of my engagement was to explain the franchise business model, and the business operations of the franchisor including the standards, practices, duties and responsibilities customarily observed in such a relationship; and how Jani-King of Oklahoma, Inc. ("Jani-King" or "Franchisor"), as a franchisor and as a franchise system, compares to the generally accepted standards and practices in franchising.

I will discuss:

- That Jani-King and its franchisees are in separate and distinct businesses;
- That Jani-King is a licensor and its franchisees are licensees;
- That the roles and relationship of a franchisor and franchisee are distinct, substantive, and independent;
- That the Jani-King system operates in a manner common to other franchise systems in the United States;
- That, as is common in franchising, Jani-King and its franchisees share a common brand;

- That Jani-King offers a franchise opportunity with low barriers to entry, which is relatively unique among franchise systems and allows entrepreneurs of modest means to start their own business;

- That without the structure, support, and brand recognition of the Jani-King franchise system, entrepreneurs of modest means would be deprived of a beneficial opportunity to start and grow their own business;

- That Jani-King, as is required under the Lanham (Trademark) Act,[2] sets brand standards and then monitors its licensees' performance to those brand standards;

- That Jani-King does not license a method for the complete operation of the franchisee's independent business;

- That the degree of skill in managing and operating any business, including in the janitorial industry, is significant and is not limited to the cleaning of end user's facilities;

- That the Jani-King franchisees, as independent business owners—and not employees of Jani-King—are free to determine how they manage, supervise, and operate their business in meeting Jani-King brand standards;

- That Jani-King and its franchisees operate separate businesses, under an interdependent relationship, each having distinct and substantial operations; and

- Jani-King's role as the signatory in the commercial cleaning contracts entered into with end user customers is typical and necessary to maintain brand standards and prevent adverse consequences such as intra-brand competition, in the commercial cleaning industry.

In this type of relationship, the franchisor is responsible for developing its franchise system; establishing its brand standards; licensing it; protecting it; and supporting its franchisees in the marketing of their janitorial services and the delivery of those services to end users. The franchisee's business, on the other hand, provides the janitorial services to end users in a way that consistently follows the system's brand standards. Consistency in the delivery of brand standard products

---

[2] 15 U.S.C. § 1051 (1946)

and services to end users is essential to the successful operation and sustainability of every franchise system.

## Factual Understanding

Among other facts discussed below, my opinions are based on the following key factual understandings:

The business of Jani-King is to own and operate a franchise system that licenses individuals and entities use of the Jani-King system, including its trade or service marks, to deliver janitorial services to end users in a manner that complies with the Jani-King brand standards.

In contrast, the business of the Jani-King franchise owners ("Franchisee" or "Licensee") is the actual delivery of janitorial services to end users in a manner that complies with Jani-King brand standards and delivers a uniform, consistent, sustainable and repeatable experience that end users expect from a Jani-King branded operation.

In this matter, the United States Department of Labor ("DOL") alleges in its Amended Complaint, among other things, that Jani-King improperly classifies it Franchisees as independent contractors rather than as employees.

## Summary of My Opinions

As a franchisor, Jani-King does not control, manage or participate in the day-to-day operations of its Franchisees' businesses or have the right to do so. Jani-King has never hired, supervised, set wages, established working conditions, standards of employment, or discharged any of the employees of its Franchisees. Jani-King is not an officer, shareholder, supervisor, or partner in its Franchisees' janitorial businesses.

As with every other franchisor in the United States and internationally, Jani-King sets brand standards and reserves certain rights in its Franchise Agreement to protect its intellectual property licensed to its Franchisees. In the United States, this is a requirement of the Lanham Act. As discussed later in this report, control is also a

definitional requirement of the Federal Trade Commission's Franchise Rule that governs franchising in the United States.

It is well recognized that in a business format franchise, a franchisor like Jani-King, setting brand standards and supporting their franchisees in delivering those brand standards does not equate to day-to-day control over the franchisee's management of their independent business by franchisors. While each franchisee must perform in a way that is consistent with the franchisor's brand standards, how they do so are matters within each individual franchisee's control.

In a fast-food franchise system, for example, the franchisor may specify the type of french fries used, the source from where the french fries are purchased, how they are stored, how they are defrosted and the methods required for preparation. But, it is the franchise owner that selects which employee prepare the french fries, how many hours that employee will work and how much they are paid and which employee will deliver the food to the customer. In addition to preparing the french fries so that they taste and look precisely as the franchisor's brand standards require, in delivering the french fries to consumers, the brand standards set by the franchisor will also specify the time frame from ordering to delivery, the wrap the franchisor mandates and even which sack the order will be placed in. Consistency is what the consumer expects from any branded location.

In the commercial cleaning franchise business, the franchise owner provides cleaning services to end users and does so to the franchisor's brand standards. As with the franchise owner who sells the french fries, the Jani-King Franchisee controls the day-to-day operation of its business, including scheduling the cleaning (subject to end user's needs), hiring employees, addressing end user's concerns, and selling additional cleaning services that the end user may need. A franchisor's ability to trust in its franchisees doing so is a foundational element of every franchise relationship.

In three limited circumstances, based on my review of the materials provided, Jani-King has made exceptions to their normal practice. In one instance, Jani-King has established an affiliate company ("KOC Franchise Management, LLC") that manages certain aspects of the day-to-day operations for the Jani-King franchise

owned by the Chickasaw Nation. In two other instances, Jani-King has on location a liaison between the franchisee and the end user. In the first instance the end user is a school district and, as a contractual condition to securing the account, required the liaison. In the second instance the end user is a sports stadium owned by a major university and requested the liaison. Given the vast number of end users in the Jani-King system this is a *de minimis* number of direct relationships and, in my expert opinion, are merely exceptions and not an indicator of the overall Jani-King franchise system.

There is a difference between "sharing a brand" and being a part of a franchisor's operations. In all franchise systems, franchisors and franchise owners share a common brand. Sharing a common brand sometimes leads to the incorrect assumption that franchisors and franchisees operate the same "business," or are even in the same industry.

The Jack in the Box franchisor[3] and franchisees, for example, share the same brand, but only the franchisees prepare and serve burgers to customers. CertaPro Painters and its franchisees share the same brand, but only the franchisees paint houses. Likewise, Jani-King and its Franchisees share the same brand, but, with limited exception, only its Franchisees perform commercial cleaning. What each party to the relationship does as part of its business in bringing the product or service to market is different. While the roles are symbiotic (as with any national brand and its downstream delivery system), it is the role of the franchisor to manage the system, and it is the role of the franchisee to deliver to the end user the services marketed by the brand.

As further discussed in this report and based on my review of the material provided for my review; my experience in franchising; the customs and practices found in franchising; and the declarations by the acknowledged and recognized association that represent franchising, it is my expert opinion that:

---

[3] Jack in the Box, like many restaurant franchise systems, owns and operates some corporate stores ("owned operations") in addition to having franchised stores. In its role as a franchisor, however, Jack in the Box's business is distinct from that of its franchisees and does not include preparing and serving hamburgers to customers. Jani-King does not have any direct ownership of a cleaning franchise and thus there is a clear division between the business purpose of Jani-King and its franchisees.

(1) Jani-King is a well-structured business-format franchise system in the janitorial services industry and operates in a manner comparable to other franchise systems that provide janitorial services. Business-format franchise systems, like Jani-King, are ubiquitous in the United States and abroad, and play a substantial role in the United States economy.

(2) Like all business-format franchise relationships, the relationship between Jani-King and its franchisees is a contractual one, agreed to and codified in the relevant documents that define the Jani-King franchise relationship—that is the Jani-King Franchise Agreement, the Jani-King confidential operations manual and the training materials (the "Documents"). The obligations owed by each party, except where limited or required by law, are found only in these Documents. The agreement between Jani-King and its Franchisees is unambiguous. I am unaware of any generally accepted business or franchise industry practice that would recognize or acknowledge duties or standards other than those contained in the parties' agreement.

(3) The rights and obligations contained in the Franchise Agreement are substantially the same as those generally found in franchising, are directed toward ensuring compliance with Jani-King brand standards, as required by the Lanham Act, and do not demonstrate control over the day-to-day operations of Franchisees by Jani-King.

The obligations (policies) required for the management and operation of a Jani-King business by Franchisees are clearly set out in the Documents. These policies and procedures are essentially identical to the standards, practices, duties and responsibilities customarily observed in franchising, are not unique to Jani-King and similar/identical policies and procedures are extensively employed by other franchise systems, including those in the janitorial industry, based on my experience.

(4) Jani-King Franchisees are independent business owners operating under a license with Jani-King. Franchisees are solely responsible for their actions or inactions with respect to the manner in which they operate the day-to-day

affairs of their businesses. They are independently responsible for understanding their contractual rights and obligations, including their right to independently obtain new janitorial end users for their business as they were trained to do[4] and Jani-King is entitled to rely on its Franchisees' compliance within the terms of their agreements and other Core Documents.

(5) New franchisees, in all franchise systems, lack the necessary skills to manage and operate their businesses, and franchisors generally provide an initial training program. Based on my review, Jani King provides Franchisees with extensive training consisting of classroom and on-site training programs supported by operating manuals and training videos.

Managing any business, including a janitorial franchise business, is complicated and requires a significant degree of business skill. While a Franchisee's staff cleans the end user's facility and may be low wage, low skilled workers, managing and operating a janitorial franchise for a franchisee is complicated. Franchisees must be able to budget and manage their finances, conduct sales, recruit personnel and manage their human resources, schedule end user jobs, manage their ongoing relationship with the end users, identify and upsell new services to offer, maintain equipment, etc. While Jani-King's initial training and support provides some of these important skills, as in all franchise systems, the franchisor does not provide a system that delivers everything a business owner needs to know, and all franchisees seek support of outside professionals and other sources to obtain those additional skills.

(6) As required by the Jani-King Franchise Agreement, Jani-King provides its Franchisees with operational, marketing, contracting, billing, and administrative support in a manner consistent with industry standards and practices customarily observed in franchising, including in janitorial franchises. Based on my experience, these services are not unique to Jani-King and are present in many other franchise systems.

---

[4] Deposition of Vonnisha Dawn Freeman – page 12, line 4. Q. And when you say book on how to do training can you be more specific? I'm trying to understand what the train – that two-week training consisted of substantively. A. Yeah – The – book was kind of like a – a handbook, and so we would have to read it on how to go out and market ourselves to get new building, to go out and market our self….

**Jani-King Operates a Business Format Franchise System**

Based on the material provided for my review, including the DOL's Amended Complaint and the deposition questions the DOL's legal counsel asked, I think it is essential that I include in this report some foundational information about Business Format Franchising, the recognized style of franchising used by Jani-King and most franchisors in the United States and internationally.

Franchising enables individuals to no longer work for others and instead achieves the "Great American Dream" of independent business ownership. It is said frequently that when you become a franchisee "you are in business for yourself and not by yourself."[5]

The roots of franchising are well-established and are very deep in the commercial history of the United States. Commercial franchising (then called "co-partnerships" under British law) was first used in the American Colonies starting in 1731 by Benjamin Franklin (in his role as postmaster) to establish printing businesses. Included in each agreement was a provision that "the business of printing and disposing of the Work shall be under the Care, Management and Direction of the said [co-partner's name] and the working Part performed by him or at his Expense."

During the eighteenth and nineteenth centuries the government used franchising to develop municipal services including railroads, steamboats, ferries, water, gas, and electricity. In the second half of the nineteenth century, during the industrial revolution and the shift from an agrarian to a merchant economy, companies like the McCormick Harvesting Machine Company, General Motors, Ford Motor Company, oil and gas companies, and beverage companies like Coca-Cola established traditional franchise systems.

While some business-format franchises, including White Castle, Hertz, Howard Johnson, Roto-Rooter, Arthur Murray, and Dairy Queen, began between the

---

[5] International Franchise Association - http://www.franchise.org/industrysecondary.aspx?id=10008.

1930s and early 1940s, business-format franchising first became widespread following World War II due to the pent-up consumer demand, returning veterans, and the passage in 1947 of the Lanham Act. The Lanham Act made it possible for franchisors to license their brands to franchisees and obligated licensors to police the use of their intellectual property by licensees. Franchises are a defined type of license under federal law and those of several states.[6] During this period, business-format franchise systems like Dunkin' Donuts, Kentucky Fried Chicken, Burger King, McDonald's, Tastee-Freeze, Midas Muffler, H&R Block, Holiday Inn, and International House of Pancakes were established.

Beginning in 1971 in California and then in Washington in 1972, states began to enact regulations that required pre-sale disclosure and franchise registration. In 1979, the Federal Trade Commission ("FTC") enacted the Franchise Rule mandating pre-sale disclosure throughout the United States.

Franchising today, as a method of doing business, is thriving throughout the United States and is a material part of the U.S. economy. The IFA's Education Foundation records that in 2018 there were over 759,000 franchised establishments in the United States responsible for the creation of over 8 million jobs and $757 billion in economic output. Because of franchising, people in the United States have unparalleled access to products and services.

Franchising is a contractual relationship where the licensor/franchisor licenses to a licensee/franchisee/franchise owner the right to distribute a branded product or service using the licensor's prescribed method of doing business.

In a franchise relationship, the franchisee gains the advantages that come from the use of the franchisor's trade names, expertise, distinctive business appearance, standardization of products and services, and support. The franchisor is responsible for establishing its brand standards and for developing, licensing, supporting, and protecting the franchise system. The franchisee is responsible for

---

[6] https://www.investopedia.com/terms/f/franchise.asp - A franchise is a type of license that a party (franchisee) acquires to allow them to have access to a business's (franchisor) proprietary knowledge, processes, and trademarks in order to allow the party to sell a product or provide a service under the business's name. In exchange for gaining the franchise, the franchisee usually pays the franchisor an initial start-up and annual licensing fees.

providing the franchised products and services to end users in a way that consistently follows the system's brand standards.

The franchisor and franchisees perform different functions. The franchisor, by the nature of the relationship, delegates to the franchisees the responsibility, whether directly or through its employees and subcontractors, to operate according to the franchisor's prescribed brand standards. The franchisor does not generally manage, supervise, or operate the franchisees' day-to-day business.

There are essentially two forms of franchising in the United States today. The first is product distribution or "Traditional Franchising." This was the most common form of franchising prior to World War II. Under this model, the franchisor manufactures and sells finished or semi-finished products to dealers or franchisees. The franchisee, in turn, resells the product to consumers or others in the chain of distribution. Classic examples of this form of franchising are automobile, gasoline station, and soft drink franchises.

Much less common prior to World War II, but present everywhere today, is the "Business Format Franchise," which includes companies like Jani-King. What franchising does is provide individuals with an opportunity—an opportunity to own their own business.

The United States Department of Commerce ("DOC") in _Franchising in the Economy_[7] describes franchising as "a major force in the U.S. economy." The DOC defines a business-format franchise as including "not only the product, service, and trademark, but the entire business format itself—a marketing strategy and plan, operating manuals and standards, quality control, and continuing two-way communication," and notes that franchising offers "tremendous opportunities to individuals seeking their own businesses." Franchisees, according to the DOC enjoy "a competitive edge over other small business entrepreneurs."

Franchisors, like Jani-King, as with all licensors in the United States, are

---

[7] U.S. Department of Commerce, Franchising in the Economy 1986–1988.

required under the Lanham Act to exercise controls[8] over its licensees/franchisees use by of their marks and other intellectual property. Franchisors' periodic inspections, including those Jani-King performs, determine whether the delivery of branded products and services to consumers by their franchisees meet brand standards. They are precisely those required under the Lanham Act in order for the franchisor to protect its rights to their intellectual property.

Business-format franchisees deliver products or services to end users. Quick-service restaurants are often the brands people think of when they think of franchising. However, service franchise systems are widespread and there are at least 500 service-based franchise systems currently operating in the United States, including H&R Block, CertaPro Painters, Benjamin Franklin Plumbing, Critter Control, and Jani-King.

Franchisees in a business-format franchise system receive extensive training from the franchisor on the products and services they will deliver as well as ongoing support and evaluation in meeting the franchise system's brand standards. Franchisees are generally inexperienced in the trade when they enter the franchise system but through the training provided by the franchisor, gain a new trade.

It is a mistake to assume that the skills required by franchisees are limited to the delivery of products and services to end users. Managing and operating a McDonald's requires more than an understanding of how to prepare a hamburger. Likewise, the Jani-King Franchisee needs more than simply the knowledge of how to clean a commercial location.

Most franchisors, including Jani-King, provide franchisees with initial and on-going training. In the Jani-King system, this includes classroom and on-site training, supported with manuals and training videos. It is essential to understand that franchisors do not provide an entire business system to franchisees required to operate their entire business. And, as in any business, the business owner needs to

---

[8] https://www.justia.com/intellectual-property/trademarks/categories-of-marks/certification-marks/ - The Lanham Act places four requirements on those that own certification marks: standards, objectivity, exclusivity of use, and non-discrimination. First, the owner has to set relevant standards for quality, safety, or other characteristics and control the use of the mark by any parties it certifies.

supplement their skills with those provided by outside professionals and knowledge and experience obtained from other sources. During their initial training and support, in addition to learning how to clean commercial locations to Jani-King's brand standards, the franchisee is taught other important business skills including sales, scheduling, etc. The Jani-King franchise system, and its franchisees, are identical to every other franchise in this regard. Successful business owners learn the business skills they require over time and through actual experience.

Franchisees are independent business owners, so the franchisors do not generally manage, supervise, or direct the day-to-day operations of the franchisees in how they meet the franchise system's brand standards. Franchisees are free to sell their businesses during the time they are in the franchise system to individuals or entities that meet their franchisor's standards for new franchisees. The sale of a franchisee-owned business is a common occurrence throughout franchising for a franchisee's retirement or to maximize their investment.

It is essential to understand that in a franchise, while a franchisor and its franchisees **share a common brand**, the franchisor and its franchisees are **not in the same business;** each have different interdependent purposes in the relationship; and each operate independent businesses in distinctly different industries (functionally, practically, economically, and realistically). Franchisors, like Jani-King, are the licensor and Franchisees are the licensees whose rights, obligations, and limitations are included in the terms of the license found and governed by the written license (franchise) agreement.

As noted above, the offering of franchises throughout the United States is regulated by the FTC that mandates pre-sale disclosure. The FTC Rule defines a "franchise"[9] as follows:

*Franchise* means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

---

[9] Federal Trade Commission - "FTC Rule", 16 C.F.R. 436.

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or **has authority to exert a significant degree of control over the franchisee's method of operation**, or provide significant assistance in the franchisee's method of operation; and (Emphasis added)

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

Franchisors, like Jani-King, establish brand standards sufficient to deliver to consumers a quality and consistent end user experience, protect their trademarks and other intellectual property, and police the use of their intellectual property as required under the FTC Rule and the Lanham Act.

As noted earlier, franchisors do not license to franchisees every aspect of a business model required to operate their independent businesses and can only require adherence to the terms included in the underlying license. Understood, in all business-format franchise relationships, is that the franchisor is licensing a system for conducting a business under its—the franchisor's—marks that includes the products and services offered and sold by the franchisees as well as other elements of the consumer brand experience. The essential tool used to define the intended relationship between the franchisor and the franchisee in every business-format franchise system is the written franchise agreement.

Franchisors typically refer in the media to their overall business according to the products and services provided to consumers by their franchisees. This is the nature of franchising where the franchisor and franchisee are in different businesses while sharing a common brand. However, as discussed in this report, there are many functions a franchisor performs distinguishing it from their franchisee's business.

For example, major fast-food franchisors will typically have a research

department devoted to developing new products to bring to market similar to Jani-King's internal personnel who are focused on the development of new cleaning techniques and processes.

System accounts are common in franchising. I would be surprised if the DOL did not have negotiated pricing and terms with hotels and rental car companies as the Department of Defense and other federal and state agencies have for its employees. Similarly, Jani-King negotiates terms with end user cleaning opportunities that Franchisees can accept or reject. In most system accounts found in franchising, the franchisee does not have the same right to accept or reject the negotiated terms as does a Jani-King franchisee. In my expert opinion, this ability to reject opportunities is a factor that supports independent contractor status.

Franchisors, like Midas Muffler, Hertz, and Marriott, rely on system accounts to support their franchisees, have departments devoted to system accounts and execute system account agreements with end users. Others, including Express Personnel, ATC Healthcare, Goosehead Insurance, and commercial cleaning franchisors like Jani-King, provide accounting and other services to Franchisees and have departments dedicated to these functions. The functions the DOL highlights as indicative of an employment relationship between Jani-King and its Franchisees are, in fact, common throughout franchising and indeed fall within the mainstream of franchising in the United States.

In the Jani-King franchise system, the franchisor's major areas of responsibility include:

- Designing, developing and managing the franchise system;
- Setting brand standards;
- Recruiting and selecting of Franchisees;
- Establishing criteria for the Franchisees' offices;
- Approving Franchisees' offices;
- Initial and continuing training of Franchisees;
- Initial and continual headquarters and field support;
- Contract administration;

- Organizational administration;
- Research and development;
- System-wide account sales and administration;
- System consumer marketing;
- Brand communications;
- Operations and standards reviews;
- Meeting federal and state franchise rules and regulations;
- Capital formation; and
- Enforcing brand standards pursuant to the terms of the Core Documents.

None of the above includes providing cleaning services to end users as that is not generally a function of Jani-King as a franchisor.

### The Generally Accepted Standards in Franchising Support Independent Contractor Status for Franchisees

The IFA is the oldest and largest trade association in the world representing franchisors, franchisees and suppliers to the industry. Promulgated by the IFA is a Statement of Guiding Principles[10] detailing the relationship between the franchisor and the franchisee, which was unanimously adopted by the IFA's Board of Directors. I was the principal author of the IFA's Statement of Guiding Principles. In addition to me as its chairperson, included in the task force that drafted the Statement of Guiding Principles were one (1) franchisor and three (3) franchisees.

In drafting the IFA's Statement of Guiding Principles, our purpose was to detail and define certain industry standards and practices generally found in franchising. These standards are important, and several elements of the Guiding Principles are relevant to this matter. The unanimous adoption of the Statement of Guiding Principles by the IFA's Board of Directors supports the fact that these principles are generally accepted standards and practices in franchising. In part, the IFA's Statement of Guiding Principles state:

(1) Franchising is a unique business model. It is in the interest of the franchisor,

---

[10] https://www.franchise.org/about-us/mission-statement-vision-code-of-ethics.

each franchisee, the suppliers to the franchise system and the consuming public that **franchisors define, maintain, and enforce Brand Standards** throughout the franchise system. (Emphasis added)

(2) It is the goal of every business that each stakeholder be successful and franchising is no different. Franchisors and franchisees need to be profitable to be successful. However, as in any business model, **franchising is not immune to the risk of failure and neither the franchisor nor the franchisee is guaranteed economic success.** (Emphasis added)

(3) Franchisees should clearly understand the franchise business model before investing. It is the **responsibility of each prospective franchisee to conduct a thorough due diligence of the franchise system, to retain competent lega**l and other advisors, and to **fully understand** the terms contained in the Franchise Disclosure Document before signing any **Franchise Agreement**. (Emphasis added)

(6) The licensor is the owner of its intellectual property, including without limit, its trademarks, trade secrets, methods and standards of operations. The Licensor has the right and also the obligation, under the law, to protect its intellectual property and **to define the terms under which it licenses to others the use of its intellectual property**. It is the terms contained in **the Franchise Agreement that define the license granted to franchisees and which govern the relationship between the franchisor and franchisee**. (Emphasis added)

(9) Clarity and transparency are essential for establishing and maintaining positive franchise relationships and for the goal of continuous improvements in the franchising environment. **Franchisors and franchisees should maintain proactive business policies, communication practices and regularly consult with each other for the enhancement of franchise relations**. (Emphasis added)

(10) Subject to the requirements under the law, franchisors should focus primarily on the business requirements of managing and striving for improvements to

their franchise system. Franchisors should support their franchisees and enforce Brand Standards necessary to enhance the economic performance for both the franchisees and the franchisor. **It is the responsibility of franchisees to manage the day-to-day affairs of their businesses to meet the franchisor's Brand Standards**. (Emphasis added)

These principles are the generally accepted customs and practices in franchising and reflect the shared understanding of franchisors and franchisees that it is the franchisee's, and not the franchisor's, right and responsibility to "manage the day-to-day affairs of its business to meet the franchisor's brand standards."

Franchise systems rely on the trust that the franchisee will operate to the franchisor's brand standards, the *sine qua non* of every franchise system. Based on my extensive experience, the breadth and limitations of the franchise agreement between Jani-King and its franchisees are clearly drafted and unambiguous.

### Franchising is Governed by Contract Law

The relationship between Jani-King and its franchisees are governed by comprehensive, clearly written agreements that establish each party's rights and obligations. The unsupported extra-contractual duties that the DOL is attempting to impose relate to the purported ability of Jani-King to exercise control over its Franchisees. These rights and obligations do not exist in a properly-functioning franchise system and are not evident in any of the material I have reviewed, including in the Jani-King Franchise Agreement. Indeed, the obligation that the DOL is attempting to impose on Jani-King by arguing it as an employer to its Franchisees could not exist unless Jani-King and each of its Franchisees negotiate substantial and fundamental changes to their agreements and changes to how they operate in an interdependent relationship.

There are numerous references in franchise literature that support the generally accepted principle that the franchisor and franchisee share a common brand and that contract law governs the relationship between them.

"Parties to a Franchise Agreement are obliged to honor the terms of the

agreement during its term."[11]

"The relationship between the Franchisor and the Franchisee is essentially contractual. As such, principles of contract law govern the respective rights and obligations of the parties to the Franchise Agreement."[12]

"The Franchise Agreement describes explicitly the entire extent of the franchisor's relationship with its franchisees, outlining the terms and considerations by which the franchisees will be expected to operate their franchises. By establishing standards of operation, the agreement helps to both alert a franchisee as to what is expected of him or her as well as ensure system-wide uniformity throughout a franchise."[13]

"Franchising is a relationship between a franchisor and franchisee that is governed by a written agreement—the contract."[14]

"The law governing contacts is crucial in the franchise arena."[15]

"The entirety of the franchisor-franchise relationship is embodied in at least one contract—the Franchise Agreement—and perhaps other contracts concurrently entered into as well (such as development agreements, option agreements, construction agreements, leases and so forth)." "It is the franchise and franchise-related agreements alone which will govern the parties' rights, duties and obligations during and after the franchise relationship (augmented in eighteen states by the "franchise relationship" laws described earlier)."[16]

"Franchising is a form of business relationship based on a contract."[17]

---

[11] American Association of Franchisees and Dealers - Fair Franchising Standards (Standard 12.5), Keith J. Kanouse, Esq. Chair, Fair Franchising Standards Committee, April 1996.
[12] _Franchising – A Planning and Sales Compliance Guide_, Axelrad and Rudnick (Commerce Clearing House, Inc.) (Page 103).
[13] _How to Buy and Manage a Franchise – The Definitive Resource Guide If You're Thinking of Purchasing a Franchise or Turning Your Business Into One"_ Boroian and Mancuso (Simon and Schuster) (Page 209).
[14] Franchising for Dummies, Thomas and Seid (Wiley Publications).
[15] An Introduction To The Law Of Franchising, Kaufmann and Oppenheim (The International Franchise Association) (Section 16 Page 1).
[16] Id.
[17] Federal Trade Commission – Enforcement of the Franchise Rule" dated July 2001 (Page 39).

Over the life of any business relationship, issues will arise, and guidance will be required by each of the parties on their respective rights and obligations. Were it ever adopted as a practice to ignore the clear, precise and explicit terms and boundaries contained in complex, well-written and negotiated bargains, and extra-contractual rights or obligations were allowed to override the express written terms, there would never be four corners of a document to examine for guidance.

It is only because contract law, as supplemented or modified by franchise relationship laws, governs the franchise relationship that government agencies, the courts, and the parties to the agreements can be certain of their rights and obligations. In this matter, based on my review of the material provided, it is my expert opinion that the DOL is attempting to impose obligations upon Jani-King that undermine the general and well recognized contractual and independent ownership relationship between a franchisor and franchisee.

One of the primary goals of business-format franchising is to assure uniformity in the end user experience from one franchised location to another. Blair and Lafontaine in *The Economics of Franchising* describe this principle:

"For all these reasons, franchisors care about maintaining uniformity. To this end, they exercise control over many important aspects of the franchisee's business, including appearance, hours of operation, location, and product quality. A major function of the franchise agreement under these circumstances is to specify contractual provisions that will remove or at least mitigate the fundamental incentive issue that arises because franchisees care about their own outlets' profits while the franchisor cares about system profits. Almost all franchise contracts contain specific provisions concerning expected franchisee performance. In fact, most franchise contracts incorporate by reference the whole set of directives contained in a very thick and detailed operations manual. Further, the contracts provide for the franchisor's right to monitor the performance of the franchisee through inspections, audits, mystery shopper programs, and so on. Most contracts also give franchisors the right to terminate the contract for good cause. Finally, the terms of franchise contracts typically give rise to *ex-post* rent,

namely amounts of money that the franchisee can earn within the relationship that are above what he could earn in his next best alternative."

The very brand standards and controls that the DOL claim establish an employee employer relationship between Jani-King and its Franchisees are the type of brand standards, controls, and support that are common in all franchise systems. They form the very definition of a business format franchise under the FTC Rule and are the elements required under the Lanham Act.

### Franchisor and Franchisee: Differing Roles, Rights and Responsibilities in a Business Format Franchise System

From an economics perspective, franchising is "just one of many ways a firm can choose to distribute its product or service."[18] "The essential economic rationale for franchising is that it permits businesses to achieve whatever benefits of large scale may be available in, for example, brand name and development and organization design, while harnessing the profit incentive and retailing efforts of local owners."[19]

Franchising is an alternative to vertical integration, where a business owns its entire distribution channel. Franchisors do not own the channels of distribution for their products and services. Instead, franchisors license independent third parties to distribute their product or service to the end user. There are significant trade-offs when a company licenses to others instead of selling the product or service themselves. The franchisor loses the profits from local sales activity and instead gets a defined fixed fee. The franchisee also trades stable employment for the opportunity and risk of owning their own business and, if successful, growing that business and creating equity for themselves and their family.

This tradeoff also comes with markedly different roles for the franchisor and franchisee. Because the franchisor is not actually delivering any products or services to the end user, and the franchisee has obtained a license to use the franchisor's brand in delivering those products and services, the franchisor must ensure that the

---

[18] Benjamin Klein, "The Economics of Franchise Contracts," Journal of Corporate Finance 2 at 10 (1995).
[19] *Id.*

products or services delivered to the end user by the franchisee are uniform from one franchise owner to another as required to meet end user expectations and comply with the Lanham Act. This is true in every franchise system.

Franchisees independently operate their own business within the framework of the established franchise system and attain the benefit of the brand recognition and consumer base. In that respect, franchisors, including Jani-King, must rely on their franchisees' performance because the franchisee is an independent business owner. Franchising is, at its foundation, a licensing relationship whereby each contracting party agrees to relinquish a certain amount of pre-relationship independence and opportunity and thereby gains an agreed-upon set of rights and obligations. Franchising is not a means by which the franchisor controls the franchisee's day-to-day management of its business.

The franchisee is contractually free of supervision, direction, and control in the performance of the day-to-day management and operation of their business by the franchisor. Just like every other franchisor throughout the United States, Jani-King has established brand standards, marketing standards, end user service and cleaning standards appropriate for its industry required to protect its intellectual property.

### The Necessity of Enforcing Brand Standards

For a franchisor such as Jani-King, the franchise brand is equivalent to its reputation with the public.[20] Consumers want to do business with brands they know and trust. Because of the equity inherent in a brand, consumers will generally pay more for a branded product or service rather than chance the purchase of a similar product or service from a brand they do not recognize or to which they have no emotional tie. Consumers equate purchasing a branded product or service with reducing their purchasing risks.[21] To create brand value, successful brands, like

---

[20] Fundamentals of Franchising, Fourth Edition, ABA Forum on Franchising, Chapter 1, IID.
[21] Hong-Youl Ha, The Effects of Consumer Risk Perception on Pre-Purchase Information in Online Auctions: Brand, Word-of-Mouth, and Customized Information, available at https://academic.oup.com/jcmc/article/8/1/JCMC813/4080398 (last accessed February 20, 2019).

Jani-King, must consistently deliver to end users an experience that matches or exceeds the brand's promise as presented in its marketing materials.

Intellectual property has replaced tangible assets as a major source of a company's value. As an example, it is often said that if all of Coca-Cola's plants and other physical assets in Atlanta were to disappear overnight, the company would still continue to operate simply because the value inherent in its brand exceeds that of its fixed assets. To protect the value of Coca-Cola's brand to its stakeholders, Coca-Cola sets and enforces its brand standards throughout its downstream channel of distribution, including those merchants that sell its products to consumers.[22]

Jani-King is a valuable and well-known brand in commercial cleaning. The Jani-King brand signals to potential end users a certain experience and level of quality. End users are purchasing not only the services delivered by Jani-King's franchisees but the entire end user experience associated with the Jani-King brand. This includes sales, billing, and end user service. Jani-King has made a significant investment in building, promoting, and protecting its marks and goodwill and has done so for many decades.

Successful brands must consistently deliver to their end users an experience that matches or exceeds the brand's promise in order to protect the brand's equity. Strong brand positioning brings with it the risk that misuse of the brand can lead to questioning of overall quality and consistency and damage to the equity value each other franchisee in the system has built in their businesses. In the age of instant, global communication, local experiences can have worldwide impact. This is the power, value, and frailty of any well-recognized brand.

In addition to brand risk, legal regulations applicable to franchising require franchisors to exercise certain controls. To comply with the Lanham Act, franchisors must control the use by its franchisees of its marks and other intellectual property. A franchisor's failure to police and control the use of its marks may imperil the franchisor's rights to those marks.

---

[22] https://www.coca-colacompany.com/stories/quality (last accessed February 20, 2019); http://klminc.com/brand_valuation/brand-valuation-and-corporate-assets (last accessed February 20, 2019).

In reviewing the material provided in this matter and based on my business and franchise experience, the types of brand standards and the recommendations of best practices Jani-King uses are consistent with those that are customarily used in janitorial franchise systems and typical of those used in franchise systems generally.

Jani-King's rights are limited by the terms contained in its Franchise Agreement. Under that Agreement, Jani-King does not have the contractual right to, and, indeed, does not exercise any management controls over the Franchisees' businesses. The Franchisees are contractually free of supervision, direction, and control by Jani-King in the day-to-day management and operation of their businesses. Jani-King has the right to control the **result of a Franchisee's work** in specifying its brand standards but does not have the right to determine **when the work will be done or how or who will do the work.**

It is the Franchisees that clean the end users' facilities and perform the day-to-day management of their businesses. And, it is the Franchisees that choose how and when to meet Jani-King's brand standards.

Jani-King does not license to its Franchisees a complete business system prescribing a step-by-step mandated approach on how to meet Jani-King's brand standards. The Franchisees have the sole and exclusive right and responsibility to make critical decisions and manage their businesses, including the right and responsibility to:

- Decide which system to join;
- Decide whether to select an outside advisor and which outside advisor to assist them in conducting a thorough due diligence of the licensor's opportunity;
- Evaluate the terms contained in the agreement;
- Determine how much to invest in their businesses;
- Determine whether to finance all or a portion of their investments;
- Determine their lenders;

- Decide whether and when to hire employees (and who to hire) or to engage independent contractors (and which if any independent contractor to engage);

- Select employees or independent contractors;

- Select their management, professional staff, and other workers;

- Direct and evaluate the performance of its workers and contractors;

- Establish their human resource policies and practices including wages, bonuses, vacations, retirement, discipline, termination, and other employee benefits;

- Set the hours their staff work;

- Establish the responsibilities of their workers;

- Establish the work schedules for themselves and their workers;

- Supervise the performance of their workers, contractors, and professionals;

- Earn the financial rewards of business ownership and bottom line performance;

- Suffer the down-side risk of business ownership and bottom line performance;

- Meet all of their federal, state, and local regulatory obligations;

- Make all required federal, state, and local employee tax remittances;

- Respond to communications from government and regulatory authorities;

- Decide if and when to sell their businesses;

- Decide how to invest any profits or how to satisfy any loss incurred on the transaction; and

- Decide how to meet the brand standards of Jani-King.

The above list of independent actions is non-exhaustive but shows the breadth of independence that Franchisees have in operating their businesses.

## The Role of Franchisors in General and Jani-King in Particular

Franchise systems are crafted to meet the needs of the end users served by the system's franchisees. To do so, franchisors like Jani-King design and develop their system to do several important functions. These include but are not limited to franchisee recruitment, sales, development, and contract administration, franchisee training and support, research and development for new products and services, or improvements to existing offerings, and marketing to the end user.

In addition to the functions listed above, franchisors engage in a broad range of other activities related to its business of supporting franchisees in delivering their product and services to end users consistent with the brand standards. In some franchise systems, the franchisor also manufactures the products that franchisees sell to end users or use in the products or services provided to the end users. For example, in the Chem-Dry franchise system, the franchisor sells the chemicals used to clean carpets. An affiliate of the franchisor manufactures them. Similarly, Little Caesars' franchisees purchase flour, dough, sauces, and toppings—the ingredients needed to make a Little Caesars' branded pizza to brand standards—from Blue Line, the distribution company an affiliate of the franchisor owns.

There are any number of franchisors also offering administrative and accounting services to their franchise owners. And, it is quite common in the "trades" franchise systems (i.e., plumbing, painting, electrical, foundation repair, pool services, disaster services, and residential and commercial cleaning services) for franchisors to have call centers or other means to help the franchisee connect with end users, make sales and schedule appointments.

There are many franchisors today that have introduced apps for consumer sales and communications that flow through the franchisor's server with back end support to track elements of the production and sales process. Domino's has recently offered consumers a product guarantee that franchisees must abide by similar to the guarantee Supercuts introduced in the 1980s, and few, if any, quick service restaurant franchisors do not mandate some form of pricing controls as they relate to their value meal offerings.

Based on my review of the information provided and my extensive experience in franchising, it is my expert opinion that Jani-King operates their respective businesses as a typical franchisor in the types and kinds of administrative support it provides to Franchisees. Similarly, Franchisees operate their independent business as a typical franchisee.

It is also clear that the day-to-day business operations of Jani-King are as a franchisor and that its role does not generally include performing commercial cleaning services for end users. That role is typically reserved for the Franchisees.

It is the role of the franchisees, as independent business owners, to deliver products and services to the end user consistent within the franchise system's brand standards. This is an essential element of any franchise system and why consumers prefer to purchase from branded providers.

While franchisees are required to meet the system's brand standards, how they achieve those requirements, including how they manage their businesses, supervise their staffs, recruit new end users, satisfy their existing end users, and "up-sell" additional products and services to their end users is exclusively up to them.

If the franchisees are aggressive in developing new accounts or up-selling existing accounts, if they exercise care in finding the right employees or independent contractors for each account, and if they control their expenses and manage their businesses well, they will prosper and be successful. If they do not, they are not likely to succeed. This is no different from any other business, whether in franchising or other business models.

Unlike Jani-King, the Franchisees provide commercial cleaning services to end users. Their businesses include one or more commercial cleaning accounts Jani-King either offers them and they choose to accept or which Franchisees independently sell and secure. Franchisees control their business activities and are responsible, as are all independent business owners, for managing their businesses.

Franchisees decide:

- What accounts to accept from Jani-King;
- When to clean the account (within the window of time set by the end user);
- The details concerning the manner in which the services will be performed for the account;

- Who—themselves, their employees or independent contractors, or both—will service the account;
- The compensation and benefits their employees and independent contractors receive;
- The equipment and supplies used; and
- A host of other independent account and business decisions they need to make.

Franchisees also decide how long they wish to keep a particular account and can, at their will, resign from any end user account, regardless of how their decision may impact Jani-King, its brand, or its goodwill.

As part of being independent business owners, Jani-King Franchisees must make decisions related to their human resources, including who to hire, the amount of compensation and benefits provided to each employee or independent contractor, and how they wish to conduct training. The Franchisees also make independent decisions regarding what vehicles to use for transportation; the equipment and supplies they need to purchase and where they will purchase them; the frequency and means of communicating with their end users; and whether they will provide only the services asked for or attempt to up-sell additional services their end users may need. Additionally, Franchisees, like all independent business owners, need to manage cash flow; pay their taxes; keep their books and records in a way that allows them to deduct appropriate business expenses; decide how to incorporate their businesses; obtain appropriate business licenses; purchase insurance coverage; engage appropriate legal and financial advisors; and perform a host of other administrative details.

As in any franchise system, Franchisees may not have the necessary skills or experience to manage and operate the day-to-day affairs of their business when they enter the franchise system. Franchising is the largest training engine for entrepreneurial skills in the world, and it is through the initial training and support of franchisors, including Jani-King, that franchisees learn these skills and are able to apply those skills to additional business opportunities. More than 50% of all franchises in the United States are owned by franchisees that own more than one

location and frequently in multiple brands. This is one of the major benefits to franchisees, including the Franchisees, of joining a well-developed franchise system.

As I would expect from a collection of independent business owners, Franchisees choose to operate their businesses in a variety of ways. Some Franchisees, like Ashley Zarate, sell accounts themselves, marketing to end users through word of mouth and referrals from existing end users. Franchisees like Carlene Williams rely on opportunities offered by Jani-King. Both Zarate and Williams have declined accounts offered to them by Jani-King without any consequence. Franchisees like Jermaine Russell do not clean end users' locations and instead focus on providing training and other support to their staff who perform the cleaning services. Franchisees like Vonnisha Dawn Freeman, in addition to having staff, also participate in cleaning end users' facilities. Franchisees in their deposition testimony or affidavits state that they independently recruit, hire, set the pay rate, and determine the W-2 or 1099 status for their staff and set the schedules for their own personnel. In addition, each Franchisee typically schedules when to provide their services to end users directly based on direct discussions with their end users. Franchisees in their depositions or affidavits viewed themselves as business owners and not as employees of Jani-King.

Running a franchised business requires substantial work and generally franchisees must dedicate, directly or indirectly, their efforts towards managing the operation and marketing of their businesses to achieve success. The same is true in the Jani-King franchise system. While many Jani-King franchises are small enterprises where the Franchisees and their families may perform some or all of the services to end users, the business still involves much more than performing cleaning and requires significant time and attention from the Franchisees. For example, in addition to cleaning end user accounts, based on the information I reviewed, Franchisees sell to end users additional services (such as window washing), can set the prices for those services themselves in discussion with their end users, and carefully analyze whether it makes sense to accept any new accounts that Jani-King may offer to them.

Franchisees do not, however, perform the franchisor functions that comprise Jani-King's core business activities. Franchisees have no role in ensuring that Jani-King complies with applicable rules and regulations governing franchising. They do not draft or update the Franchise Disclosure Document. They do not recruit new franchisees, train and support new franchisees, or set system brand standards. Although the size and success of Franchisees vary, all have a substantial set of business activities that are distinct from Jani-King's business activities.

### Selling Accounts and Handling Billing Are Support Services that Jani-King and Other Franchisors Provide, and They Help Make the Jani-King Opportunity Accessible to a Wide Range of Entrepreneurs

It is essential in this type of franchise offering for the franchisor to secure and own the end user contract. What Jani-King does in securing accounts and handling billing for Franchisees is not unique to the Jani-King franchise system. Franchisors provide those functions in a number of markets where it is feasible and advantageous to do so. In the case of Jani-King, in my expert opinion, these functions provide a substantial benefit to Franchisees, and many Franchisees could not operate their franchise businesses without these services Jani-King provides.

The support services provided by Jani-King do not merge the respective roles and responsibilities of the franchisor and franchisee. The function of the franchisor does not change—it is still to protect the brand, grow the franchise system, and support franchisees. The function of franchisees also remains the same in that they determine how to deliver the products or services to the end users in a manner that meets the franchisor's brand standards and grows their businesses.

Jani-King enters into a Maintenance Agreement with each end user in the Jani-King system. Besides being a distinct function from providing commercial cleaning services, this is a necessity given the profiles of Franchisees and the profiles of the end users. Jani-King, like all other franchisors in the janitorial franchising industry, offers business accounts to its franchise owners.

Since 2001 until recently, the FTC published an extensive information bulletin entitled "Buying a Janitorial Services Franchise" describing the typical practices found in the janitorial franchise business. While the bulletin no longer resides on its

website, the State of California has duplicated the FTC's bulletin in substantially the same format and content.[23] The FTC's current bulletin's format has changed but contains substantially the same information as the previous version.[24]

The State of California is a franchise registration state and requires franchisors to submit their Franchise Disclosure Documents for review to state regulators. After review, the State of California registers those offerings prior to any franchisors offering franchises. The original FTC's bulletin from the State of California's web site appears at Appendix C.

Consistent with the description in the <u>Buying a Janitorial Services Franchise</u> bulletin on the State of California website, Jani-King offers franchise opportunities for different levels of investment. The greater the franchise fee, the higher the amount of initial monthly business that Jani-King will offer to prospective franchisees. A higher guaranteed level of monthly business offerings may lead a Franchisee to purchase a more expensive plan, whereas a lower franchise fee and a commitment to service a smaller number of accounts may lead a franchise owner to purchase a less expensive plan. A Franchisee can then build, if it chooses, additional independently sourced business or request from the franchisor the opportunity to service additional franchisor-generated accounts.

Jani-King, like the typical janitorial franchisor, must have a signed maintenance agreement with an end user before offering that account to a Franchisee. Jani-King solicits and secures cleaning accounts for its Franchisees on a continuous basis.

Per the terms of the Franchise Agreement, Jani-King allows itself a sufficient time period within which it must offer a business opportunity to a Franchisee. This is called an "Initial Offering Period," and it allows Jani-King an appropriate amount of time to secure cleaning contracts for its Franchisees.

---

[23] https://dbo.ca.gov/wp-content/uploads/sites/296/2019/02/janitorial.pdf
[24] https://www.consumer.ftc.gov/articles/0067-buying-janitorial-service-franchise

The Franchisee may choose to accept or reject the cleaning account offered as described in the FTC bulletin. In addition, as a Franchisee becomes more experienced, and if they are so inclined, Franchisees may solicit their own end users and negotiate with them the terms of the cleaning assignment. The Jani-King Franchise Agreement expressly provides for this.

Section 4.19.2 of the Franchise Agreement states that:

> "The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise."

As noted in the material I have reviewed, it is a routine practice for Franchisees to solicit potential clients for their businesses.

Although the same section provides that the contracts solicited by the Franchisees "must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the end user)," the Franchisees are still free to negotiate its terms.

Section 12.1 of the Franchise Agreement specifically states that:

> "Nothing in this agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor."

Should the Franchisee choose not to accept a cleaning account that Jani-King offers, Jani-King must offer that cleaning account to a different Franchisee who can service the end user's account in order for Jani-King to fulfill its obligations under the Maintenance Agreement with the end user.

The methods used by Jani-King and other janitorial franchisors in the United States to secure cleaning accounts and offer them to franchisees is, in my expert opinion, the most sensible and responsible method for the franchisees, the end user, and the franchise system.

It would not be practical for Jani-King, as the franchisor, to bring a Franchisee that *might* be interested in a particular cleaning account into each and every

negotiation with end users. The janitorial service business is competitive, and timing is critical. An end user may be considering several proposals to meet its cleaning needs, and the only way that Jani-King (and other janitorial service franchisors) can offer specific and certain business opportunities to their franchisees is by securing the opportunity through contract before it makes the offer of the business to a Franchisee.

The biggest challenge for janitorial franchisees is securing end users, and for a variety of reasons, they may prefer or even require Jani-King to perform that function. As noted in the material I have reviewed, many janitorial franchisees do not have advanced business education or prior business experience. Many of the end users they wish to approach for business are midsize and large private or public companies. Some are chain operations with multiple locations that may be in a variety of markets. These end users generally issue Requests for Proposal and some may submit their business for bidding amongst providers. The business reality of a single independent franchisee entering into a pricing or service agreement that could impact another independent franchisee in the same system would be troubling if not unworkable. For this reason, franchisors in general, and not limited to janitorial franchise systems, enter into system accounts with pricing and services negotiated by the franchisor and serviced by franchisees.

Jani-King, as do other janitorial franchise system and other franchise systems in general, enable Franchisees to own and operate their businesses without having to respond to complicated RFPs and pitch to companies entertaining bids from sophisticated competitors. The ability to receive opportunities for end user cleaning accounts is a significant benefit for Franchisees and, based on the material I have reviewed, a benefit they appreciate. It is also a benefit provided by many janitorial franchisors throughout the United States.

If Jani-King and other janitorial franchise systems did not execute the cleaning service contract with the end user, there would be no way any janitorial franchisee could remain in business. As noted above, the end user seeks a national brand with national brand capabilities that makes the contracting process easy and provides them with the benefits that come from a branded experience. The structure

of direct contracting with Jani-King or other janitorial franchisors, and of offering opportunities to Franchisees, is the only possible way for this to happen effectively in this kind of business without the other adverse risk of intra-brand competition between franchisees.

### Contracting with the End User is a Common Franchisor Function and is Distinct from Performing the Cleaning Services

Marketing to end users is a typical function of all franchisors, and the methods of doing so and the franchisor's relationship with the end user depend on the nature of the product or service.

Most business-format franchise systems are destination businesses—the customer comes to the franchisee's location, and there is no written contract between the business owner and the customer. In those franchise systems, it is not practical or necessary for the franchisor to contract directly with the customer, and thus those franchisors generally do not. For example, Jack in the Box, as a franchisor, has no need to meet each customer, determine what meal they require, negotiate the price of the meal, when it will be presented to them at the counter, or collect payment from the customer at the franchisee's location. The transactions are small, episodic, and require no contracts. Customers choose Jack in the Box, like other destination businesses because it is convenient to the customer at the time the customer wishes to eat.

This is not what is required in non-destination trade franchise systems, like janitorial services, where the transactions are much larger, sustained, and governed by written contracts. In this type of franchise, the end user generally has to respond to a solicitation and, in most cases, be persuaded to switch from their existing service to the franchisor's brand.

Although Jack in the Box and other destination franchisors do not have contracts with the customers, they nonetheless consider the customers to belong to them and not to their franchisees. After all, the customers are coming to Jack in the Box, not "Joe's Jack in the Box." In most franchise systems, the franchisor owns all the customer information the franchisee obtains. The franchisee only has

transactional use of that information while the franchisee is part of the franchise system. For example, the franchise agreement for CertaPro Painters provides that:

> System Data. Franchisee and Franchisor agree that all data . . . including but not limited to, Customer Data, are deemed to have been derived from the goodwill of the "CertaPro" name and Proprietary Marks and, therefore, such System Data is considered Confidential Information and is owned by CertaPro. Franchisee agrees that CertaPro may use or access such System Data for any purpose without notice to Franchisee. Franchisee agrees to use the System Data only in the operation of and for the benefit of the CertaPro Business.[25]

In addition, many franchisors, as part of their business model, contract directly with end users when it makes business sense to do so. This occurs regularly in the hotel and car rental industries when the franchisor interacts directly with the end users at the point of making reservations and in establishing affinity clubs, reward programs and discount pricing. Brands like Hertz, Avis, Marriott, and Hilton all directly contract with their guests and end users and offer affinity clubs, rewards programs and discount pricing. Each of these programs are beneficial to the system's franchisees as it creates loyalty to the brand and drives additional business to all locations.

In the retail segment, companies like GNC also manage rewards programs where members can join to earn discounts on products they purchase and it is common today for franchisors to enter into system agreements with delivery services like Uber Eats, etc. In most of the trades, handymen, and home care franchises, franchisors have call centers that manage appointments for their franchisees and make sales for the franchisees. Direct contracting like that used by janitorial franchises is also common in franchise systems that have system account programs.

In a system account program, the franchisor enters into an agreement with an end user setting the price and conditions of service. Under those system franchise agreements, the franchisee is obligated to provide those products and services to the system account as negotiated by the franchisor.

---

[25] CertaPro Painters, Ltd. Franchise Agreement, Section 6.10

For example, Hertz has a Corporate Rate Program[26] that provides:

> Franchisor and its Affiliates may enter into contracts throughout the term of this Agreement with commercial entities, membership associations, governmental agencies and departments, and other groups and organizations under which the contracting party or others (e.g., customers of the contracting party) receive contracted rates, discounts or other benefits **("Corporate Rate Programs");** Franchisee agrees to fully and completely participate in, comply with, and adhere to, all such contracted rates, discounts or other benefits as Franchisor may from time to time prescribe in the Manuals or otherwise in writing, except as may otherwise be required by applicable law. Further, Franchisee agrees to comply with all of the terms and conditions of all Corporate Rate Programs as Franchisor may establish and modify them from time to time, including rebates and liability insurance coverages. Franchisee may not enter into any Corporate Rate Program or similar program other than those prescribed by Franchisor except with Franchisor's written consent.

System Accounts and Corporate Rate Accounts such as that included by Hertz in their franchise agreement are common and necessary for franchise systems to compete. These programs are of significant benefit to providing franchisees in those other systems as they are to Jani-King and its Franchisees.

Another reason franchisors choose to contract directly with the end user is to protect its goodwill. Protection of the goodwill of the franchisor attendant to a franchisee's use of a franchisor's service mark and system is a critical component of franchising. A franchisee may use and benefit from the franchisor's brand only so long as the franchise relationship continues. Upon the termination of the franchise relationship, the goodwill attributable to the franchisee's use of the franchisor's mark and system belong exclusively to the franchisor. As noted in the FTC's bulletin on "Buying a Janitorial Service Franchise":

> **Franchisor-owned accounts.** The franchisor may own all the customer accounts, including those that you get on your own. This means that if your franchise agreement ends, you will not be able to service the accounts for which you paid a fee, and you won't be able to service the accounts you got on your own, either.

---

[26] Hertz Franchise Agreement section L.14

Jani-King and other janitorial franchise businesses is the party to the agreement with the end user. In this way the franchisor has an effective method of protecting its goodwill (i.e., the ongoing relationship with the end user) at the expiration or termination of the particular franchise agreement or if the franchisee unilaterally chooses to no longer service the end user. If Jani-King could not immediately secure another Franchisee to fulfill the Jani-King system's obligation to a cleaning account after the existing Franchisee terminated or abandoned the account, it would do considerable damage to the Jani-King system's goodwill and intellectual property.

### Jani-King's Performance of Billing and Accounting Functions is Beneficial to Franchisees and is Distinct from Performing Commercial Cleaning

Billing, collection, and cash flow can be some of the greatest challenges a business owner faces. Jani-King provides billing and accounting support to Franchisees, and this is a material benefit. Without these services, in my expert opinion, most small janitorial franchisees could not function or be sustainable over a long time period. Additionally, as noted above, end users frequently have multiple locations spread out over one or more geographic areas that may hold multiple Franchisees. These end users naturally require a single point of billing that can provide them with consistently accurate accounting and terms. Intrabrand competition may confuse the end user and cause significant difficulty for the system. As provided in the Jani-King Franchise Agreement:

> "Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee."[27]

Few things are more sensitive in these types of businesses than proper billing and collection. Centralizing these critical functions with the franchisor benefits both the franchisee, the end user, and the franchisor by assuring consistency and accuracy in accounting. Billing and collections are critical in business-to-business services where customers make periodic payments, as in the janitorial, staffing or

---

[27] Jani-King Franchise Agreement section 4.7

personnel industry. Janitorial franchisors are not the only franchisors that perform billing and accounting functions for services provided by franchise owners.

By providing these services, janitorial franchisors also relieve the franchisee of the ministerial function of billing and collecting on accounts and allows the franchise owner to focus instead on delivering cleaning services to its end user. Also by providing the franchisee with payments, even where the end user has failed to pay on time, janitorial franchisors enable a franchisee to remain in business, because without a regular cash flow, these franchisees would likely fail.

There is a significant benefit to Franchisees in the way that Jani-King handles collections from end users and makes advance payments to Franchisees. If a Franchisee was not part of a commercial cleaning franchise system, it would not receive any money for the work if the end user did not pay. In the Jani-King system, a Franchisee receives revenue monthly for the services its franchise performed for the end user in the prior month without regard to whether the end user has paid for those services. Per the terms of the contractual relationship, if the customer does not eventually make a payment, it is appropriate for Jani-King to charge back to its Franchisees any advances made on uncollected accounts because the parties are independent businesses.

There are franchisors outside of the janitorial industry that also regularly provide accounting functions for their franchises. Franchisors in the staffing or personnel industry commonly perform billing and accounting in support of their franchise owners. Express Personnel, for example, provides the same accounting services to its franchisees as does Jani-King.

The Express Personnel franchise agreement includes that the franchisor will:

"Administer all accounting and bookkeeping records concerning payrolls, billings, accounts receivable and payroll taxes for associates."[28]

Similarly, the Express Personnel's franchise agreement provides:[29]

---

[28] Express Personnel Franchise Agreement section IV.F.
[29] Express Personnel Franchise Agreement section VII.B

We shall submit all bills to clients for all associates furnished and shall instruct clients to remit payment directly to Us. You shall not render bills or statements to clients but shall use Your best efforts to collect bills in accordance with the policies and procedures in the Manual. If payment of any bill is made payable to You, payment shall be deemed to have been received in trust for Us, and You shall not deposit or convert the funds received and shall immediately forward the same, properly endorsed, to Us.

**Jani-King has lower barriers to entry than most franchise systems and provides opportunities for people of modest means to launch and grow their own business**

Jani-King is among the few franchise systems that requires a modest initial investment, significantly lower than most other franchise systems. The initial franchise fee in other franchise systems often is in the tens of thousands, and the total minimum initial investment required can be several times that, especially in industries that require a significant amount of equipment and a physical plant.

A Jani-King franchise is quite affordable. The minimum initial franchise fee for a Jani-King franchise is $16,250.00, and the total minimum initial investment is $20,662.00.[30] For someone who is looking to start a franchise business but has limited capital, Jani-King is one of the best options available for business ownership.

Franchisees and their family members may be employees of other companies, and they may have careers that have nothing to do with their other investments. Some may have multiple jobs and this is not uncommon in the United States today. Based on my experience in franchising, the majority of franchises today are owned and operated by entities that own and operate multiple locations. Further, it is very common in franchising for franchisees to have other jobs, be executives in multiple businesses, own multiple locations in multiple franchises and independently own other businesses. Based on my review of the material provided, Franchisees own other businesses and have other jobs in addition to their Jani-King businesses and Jani-King has no restrictions on them doing so, so long as they do not compete directly with their Jani-King business or the business of the other Jani-King Franchisees.

---

[30] Jani-King Franchise Disclosure Document

Any franchise can be a good option for a person that is inexperienced in business and without any management experience because a franchise system provides a brand that attracts customers and provides training and on-going support. Franchisors generally provide their franchisees with initial and on-going training, marketing, and support. This includes janitorial franchisors like Jani-King in assisting their franchisees in securing accounts (when they want them) and handling billing and collections.

Based on the material I have reviewed, the experiences of Jani-King franchise owners confirm Jani-King provides an opportunity that is accessible to people of modest means and that enables them to be successful and grow their business. This leads me to conclude that the Jani-King franchise system, with its low entry investment cost and significant support, is one of the most accessible franchise opportunities for people with limited resources and limited business experience.

### Franchisor Liability As An Employer To Its Franchisees Would Be Inconsistent With The Franchise Business Model

The federal government has defined a business format franchise as including "not only the product, service, and trademark, but the entire business format itself—a marketing strategy and plan, operating manuals and standards, quality control, and continuing two-way communication."[31] These are again the sorts of controls and practices that the DOL suggests make Jani-King liable as an employer of its franchisees.

If meeting the FTC definition of a franchise and the requirements of the Lanham Act creates unintended liabilities to franchisors by making them their franchisee's employers, as the DOL is attempting to do, in my expert opinion, it would make franchising impossible. It would also cause extreme damage to the U.S. economy, consumers, licensors, licensees, franchisors, franchisees and those that work in franchising.

When MSA, my consulting firm, designs franchise systems for our emerging franchisor clients, and when we provide advice to our established franchise clients,

---

31 *Franchising in the Economy 1986-1988*, U.S. Department of Commerce (Feb. 1998).

we rely upon the fact that the rules that govern franchising do not create un-intended risks for our clients. It is common knowledge among professionals in franchising that when Congress enacted the Lanham Act, it did so to enable companies to license to independent third parties their intellectual property without risking the loss of their marks or their becoming employers to their licensees.

Without the generally accepted standard and principles and the express written terms contained in detailed lengthy agreements that clearly define each parties' rights and obligations, franchisors would be open to un-intended obligations and claims. These include, but are not limited to, claims by lending institutions, principal agency relationships, vicarious liability, joint-employment and the independent human resource and payroll practices of franchisees, and obligations to government and taxing authorities.

Were the DOL able to sustain such a claim based on the material provided for my review, material that clearly **does not substantiate such claims**, all franchisees would become the employees of their franchisors in the United States. The result would be that franchising as it currently exists, would no longer be a viable model in the United States, and the economic consequences on the overall U.S. economy would be substantial.

In franchising, the mere establishment of mandatory brand standards, recommended best practices, and support does not raise the franchisor to the level of operator of the franchisee's business or create an employment relationship. To suggest otherwise, as the DOL has claimed, would be contrary to the historic concept of the franchise relationship and construing that it does conflicts with the standards and practices found throughout the United States. Moreover, it is understood that, absent some contractual (or extra-contractual) right not present in the Jani-King franchise relationship, Jani-King lacks the ability to compel its Franchisees to lose their independent businesses ownership status and accept a new status, mandated by the DOL, of accepting the obligations of a Jani-King employee.

## Summary of My Expert Opinions

In addition to the opinions expressed above, based on my experience in franchising, the generally accepted standards and practices in franchising, and the factual record I have reviewed, it is my expert opinion that:

- Franchisees own and operate their independent businesses under a license agreement with Jani-King.
- Jani-King lacks the contractual right or ability to exercise any management control over the day-to-day operations of  Franchisees' businesses and has not done so.
- The Documents and other Jani-King policies are similar if not identical to those found throughout franchising, including those franchise systems in the janitorial industry, and establish brand standards and effect the reasonable and necessary controls required under federal law.
- As an independent business owners, Franchisees are entitled to the maximum benefits associated with their control over their investment, and in my expert opinion, the DOL should not require them to become employees of Jani-King.

This report is based upon the information reviewed to date. I welcome the opportunity to review additional information if and when it becomes available, including further discovery, and I reserve my right to change or modify my current opinions should it become necessary. My opinions are to a reasonable degree of probability within the standards of practice within franchising.

Michael H. Seid, CFE
Managing Director
MSA Worldwide
3 November 2019

I am the founder and Managing Director of MSA Worldwide ("MSA"), a provider of domestic and international franchise advisory services.

During my professional career, I have been a senior operations officer, financial executive, consultant or accountant for companies within the franchise, retail, restaurant, personal services, healthcare, education and service industries. The International Franchise Association has published that MSA Worldwide, the firm I founded, is "the leading strategic and tactical advisory firm in franchising."

I have consulted both domestically and internationally for companies on the appropriateness of franchising, licensing and other methods of down-stream distribution of products and services; the design, development and implementation of franchise and licensing systems; and for established franchisors, non-franchisors and other multi-unit operators. MSA Worldwide also provides other professional services including but not limited to manuals; training programs; franchisee recruitment strategies; franchisor expansion strategies; real estate site selection and site development; franchisee advisory councils; franchise relations; joint-employment; crisis management; change strategies; and litigation support and the strategic restructuring of established companies.

Since 1987 through the present, I have primarily been a consultant to the franchise industry. I graduated from Long Island University with a BS in Accounting in 1975 and obtained my CPA in New York State in 1978. During the period 1970 through 1976, I was a member of the US Army Reserve and received an honorable discharge in 1976 with the rank of Staff Sergeant.

I am a frequent speaker at programs for the International Franchise Association, universities, law schools, and retail and professional organizations and have lectured and written for the ABA Franchise Forum and the IFA's Legal Forums. I have lectured at several universities and law schools including St. Thomas University, Georgetown Law School, New York University School of Law, Benjamin N. Cardozo School of Law, Nova University, the University of Arizona, Johnson & Wales University, MIT Sloan School of Management, Harvard Business School,

University of California San Francisco (Berkeley), Howard University and Emory University School of Law. I have spoken at the Doha Economic Conference in Qatar on the use of franchising to create a middle class in the Middle East and on behalf of the International Franchise Association I have testified and presented to Federal, State and Local legislators and regulators on franchising.

I have been appointed as an Adjunct Professor at The Ohio State University's Fisher College of Business and have developed and teach a graduate course of studies on Commercial and Social Franchising.

I have published numerous articles on franchising. I am the author of Franchising for Dummies, published by Wiley Publishing, Inc. My co-author for Franchising for Dummies was the late Dave Thomas, Founder of Wendy's International. I am also the author of Franchise Management for Dummies, published by Wiley Publishing, Inc. My co-author for Franchise Management for Dummies is Joyce Mazero, Esq., partner at Polsinelli. I have presented to the World Franchise Council, The World Bank, Harvard University, OPIC and University of New Hampshire, among other universities and private and public agencies on Social Franchising. I am the first recipient of the Franchise Update Hall of Fame Award.

MSA Worldwide is a member of the International Franchise Association's (IFA) Supplier Forum (SF). I serve on the SF's Board of Directors as a Past Chairman. In February 2018 I stepped down as a member of the IFA's Board of Directors after serving a combined total of over thirteen years and was the first professional ever elected to the IFA's board. During that period I also served as a member of the IFA's Executive Committee (1997 and 1998). I have served, and currently serve, as the chair or member of several committees and task forces and was a trustee of the IFA's Education Foundation.

I have completed the requirements and have been awarded the designation of CFE (Certified Franchise Executive) by the International Franchise Association's Education Foundation ("IFAEF"). I have developed and presented several courses for the IFAEF.

I am a Certified Public Accountant (inactive status) in the State of New York. I

am a member of the American Institute of Certified Public Accountants ("AICPA"), New York State Society of CPAs ("NYSSCPA") and am an associated member of the American Bar Association ("ABA").

I have been qualified as an expert in franchising in Federal and State Courts and in Arbitrations. I have testified in cases involving franchising, licensing and labor for franchisors and franchisees in the United States and internationally.

I am Chief Concept Officer and a member of the Board of Directors and Executive Committee of CFWshops, a Social Sector Franchisor established to provide clinical services and essential medicines in the peri-urban areas of Sub Saharan Africa. I also serve on the board and executive committee of the HealthStore Foundation and One Family Health as part of my commitment to the use of business format franchising as a method for improving the human condition and for having a world-changing impact on poverty, diseases and economic development. CFWShops is a franchisor member of the IFA, and I am the representative of CFWShops at the International Franchise Association.

I am on the Board of Directors of the William Rosenberg International Center of Franchising at the University of New Hampshire. I was appointed to the State of Connecticut Low Wage Employer Advisory Board, as a person with experience in the labor force needs of the large business community. I am a member of the External Advisory Board of The Ohio State University's Global Water Institute and on the Board of Advisors for Woman 360 in Ghana.

During the past five years, I have provided testimony in the following cases, in deposition, trial, or arbitration.

1. *Nestle Middle East, FZE vs. Crest Foods, Inc.* in the International Chamber of Commerce, International Court of Arbitration, ICC Case No. 22328/TO, retained by Mayer Brown LLP, 19 January 2018.

2. *Jos. A. Bank Clothier, Inc. vs. J.A.B – Columbia, Inc. et al.*, in the United States District Court for the Northern District of Maryland, Northern Division, Case Number 1:15-cv-03075 ELH, retained by Tayman Lane Chaverri, LLP, 2 April 2018.

3. *Clifford M. Gonzalez et al. vs. Famiglia-DeBartolo Franchise Systems, LLC et al.*, American Arbitration Association, Case No. 13114Y0054712, retained by The Richard Rosen Law Firm, 27 November 2013.

4. *PuroSystems, Inc. v. Michael Allen*, American Arbitration Association, Case No. 01-16-0003-8352, retained by Kostopoulos Rodriguez, PLLC, 11 November 2016.

5. *Sandra Villatoro et al. vs. CleanNet USA, Inc. et al.*, American Arbitration Association, Case Number 02-15-0005-2115, retained by Bartko Zankel Bunzel and Hahn Law, 25 February 2017.

6. *Barbara Kubiak et al. vs. Massage Envy Spa Uptown at West Village #211 et al.*, in the District Court 193rd Judicial District, Dallas County, Texas, Cause Number DC-15-11559, the Honorable Judge Carl Ginsberg, retained by Thorpe Shwer, 31 March 2017

7. *LMP Enterprises LLC et al. vs. Franchisor International LLC et al., in the* Superior Court of the State of Washington in and for Clark County, Case Number 14-2-00904-0, the Honorable Judge Addo Collier, retained by Faegre Baker Daniels LLP, 7 June 2016.

8. *Dr. Rocco Nelson, et al. vs. Dr. Mark Doyle, et al*, in the Superior Court for the State of Washington in and for King County, Case Numbers 16-2-02143-3 SEA and 16-2-02617-6 SEA, the Honorable Judge Jim Rogers, retained by Foster Pepper PLLC, 4 October 2016

9. *Emily Bruner, et al., v. James John Liautaud, et al.*, in the United States District Court for the Northern District of Illinois, Eastern Division, Case Numbers 14-CV-5509, 14-CV-1681, 15-CV-6010, the Honorable Judge Kocoras, Magistrate Judge Schenkier, retained by Seyfarth Shaw LLP, 11 January 2017.

10. *Lamington Resources, Inc. v. Burger King Corporation, et al.*, International Chamber of Commerce, International Court of Arbitration, Case No. 20786/RD, retained by Genovese Joblove & Battista, 19 October 2016.

11. *New Amsterdam Coffee & Tea Co. et al. v. International Coffee & Tea, LLC et al.,* American Arbitration Association, Action Number 72-Y-114-000138-14-JRL, retained by Bryan Cave LLP, 3 March 2014.

12. *PuroSystems, Inc. v. John Burke*, American Arbitration Association, Southeast Case Management Center, Case No. 01-14-0000-3162, Arbitrators John Barkett, Thomas Schultz, and Michael Nachwalter, retained by Faegre Baker Daniels LLP, 10 March 2015.

My writings and presentations include:

1. Acquisition Fever (Franchising World Magazine)
2. Analysis of Royalty Elimination in Manufacturing Franchisors (Leaders Franchising Business & Law Alert)
3. Are You an Inadvertent Franchisor? (Retailing Update – Publication Of PWC)
4. Best Practices – Royalties That Do More Than Pay the Rent (Leaders Franchising Business & Law Alert)
5. Best Practices: Understanding Why Companies Operate at The Head of The Pack (35th Annual International Franchise Association Convention)
6. Bias in The Media Coverage of Franchising (Franchise Update Magazine)
7. Can You Still Become A Millionaire in Franchising? (Successful Franchising)
8. Cooperation in Franchising (Franchise Update Magazine)
9. Corporate Culture – DuPont Becomes A Franchisor (Leaders Franchising Business & Law Alert)
10. Counseling A Start Up Franchisor (Presentation to The American Bar Association Forum on Franchising)
11. Developing A Proper Franchise Program (Executives Guide to Franchise Opportunities)
12. Developing A Start-Up Franchisor (Entrepreneur Magazine)
13. Elements of Successful Franchising (International Franchise Exposition)
14. Encroachment (Restaurant and Hospitality Group, Dallas, Texas)
15. Fair Franchising Standards - Fair to Whom (Franchise Update Magazine)
16. Financing Expansion Through Franchising (KPMG)
17. Forward to Franchise Buying Book (Entrepreneur Magazine)
18. Forward to Franchise Development Book (Entrepreneur Magazine)
19. Franchise or Business Opportunity? Making the Choice (California Franchise and Business Guide)
20. Franchising – The Engine for Growth (Franchise Update Magazine)
21. Franchising for Dummies, 1st And 2nd Edition (Wiley Publishing)
22. Franchising: Expansion Opportunity for Small Stores (Nat'l Federation Convention and Exposition)
23. Getting the Information for International Expansion (8th IFA International Symposium on Franchising;)
24. Global Expansion (KPMG)
25. Global Expansion – *Pricing Negotiating and Selling* (National Restaurant Association)
26. How Can I Provide Meaningful Support to My Franchisees in Site Selection Without Creating Potential Claims for Cause of Unit Failure at A Later Date? (Franchise Update Magazine)
27. How Do I Get My Franchisee to Move Through Adolescence into Maturity? (Franchise Update Magazine)
28. How to Expand Your System Through Non-Traditional Franchisees and Sites (10th Annual International Franchise Association Marketing Conference)
29. If They Can See It - They Can Do It (Franchise Update Magazine)

30. International Expansion (Franchise Update Magazine)
31. Making the Franchise Decision (Workbook)
32. Managing Your Reputation in Times of Crisis (Leaders Publications – Franchising Business & Law Alert)
33. Market Dynamics V. Legislation.)
34. Is There A Place for Both in Franchising? (Continental Franchise Review)
35. Neighborhood Franchise Project (Local Initiatives Support Corporation)
36. New Markets - Closer to Home (Franchise Update Magazine)
37. No Victors Only Victims (Franchise Update Magazine)
38. Planning for Growth: Creating and Using the Business Plan (International Franchise Association)
39. Pricing of Franchisees: How to Charge for Fees, Area Development Fees, Etc (International Franchise Association)
40. Retail Modeling - The Science Behind Encroachment Avoidance? (Leaders Publications – Franchising Business & Law Alert)
41. Selecting Your Professional Advisor (Directory of Franchise Attorneys)
42. Shared Business Enterprise - Toward A New Franchise Paradigm? (Franchise Update Magazine)
43. Should I Institute Collective Bargaining to Settle Franchise Disputes? (Franchise Update Magazine)
44. Should There Be Mandatory Earnings Claims? (Franchise Update Magazine)
45. Strategic and Long-Range Planning (International Franchise Association)
46. Success in Franchising (Franchise Update Magazine)
47. Symposium Global Retailing (University of Arizona Southwest Retail Center for Education and Research)
48. Tactical Planning (Capital Franchise Association)
49. The Changing Landscape (Franchise World Magazine)
50. The Circus Comes to Town (Franchise Update Publications)
51. The Franchise Media and The McCall's Decorating Den Article (International Franchise Association)
52. The Franchisor Business Plan (Franchise World Magazine)
53. The National Franchise Council – Is This the Proper Forum for Self-Regulation in Franchising? (Franchise Update Magazine)
54. The Power of Franchising - As an Economic Development Strategy (International Franchise Association)
55. The Strategic Process: Developing the Financial Structure of a Franchise (Handbook of Franchise Management)
56. Timothy Bates Two - An Analysis of SBA Franchise Failure Study (Franchise Update)
57. Using Franchising as A Growth Model (Success Magazine)
58. Where It All Began: The Evolution of Franchising (Franchise Update Magazine)
59. The Role of Technology in Tactical Execution (International Franchise Assn.)
60. What Do We Do with Brokers? (North American Securities Administrators Association)
61. Articles As On-Line Expert For Entrepreneur.Com (Entrepreneur.Com)
62. Articles as On-Line Expert for Allbusiness.Com (Allbusiness.Com)

63.	Adding A New Product (Franchise Times Magazine)
64.	Area Representative (Franchise Times Magazine)
65.	Back to Africa (Franchise Times Magazine)
66.	Can't Any Lawyer Do It (Franchise Times Magazine)
67.	Dealing with Real Estate Concerns (Franchise Times Magazine)
68.	Discovery Days (Franchise Times Magazine)
69.	Downturn in The Economy (Franchise Times Magazine)
70.	Encroachment – The Role of The Lawyer and Consultant in Advising Clients (Franchise Times Magazine)
71.	Encroachment Avoidance (Franchise Times Magazine)
72.	Failure Rate (Franchise Times Magazine)
73.	Going International (Franchise Times Magazine)
74.	Grass Roots (Franchise Times Magazine)
75.	Impact Policies (Franchise Times Magazine)
76.	Is Now A Good Time to Franchise My Business (Franchise Times Magazine)
77.	Making Changes to Established Systems (Franchise Times Magazine)
78.	Money Mess (Franchise Times Magazine)
79.	Negotiating Agreements (Franchise Times Magazine)
80.	Patriot Act (Franchise Times Magazine)
81.	Rebates or Kickbacks (Franchise Times Magazine)
82.	The Real Challenge (Franchise Times Magazine)
83.	Trying Times – Standard Solutions (Franchise Times Magazine)
84.	Veterans Transition Franchise Initiative (Franchise Times Magazine)
85.	What to Do About Franchisee Litigation (Franchise Times Magazine)
86.	What Just Happened in America (Franchise Times Magazine)
87.	Go for Brokers (Franchise Update)
88.	How Will Wall Street's Melt Down Affect Small Business (Franchise Update)
89.	Helping Franchise Systems Succeed:
Avoiding the Pitfalls Encountered in The Early Stages of Franchising (International Franchise Association Legal Symposium)
90.	The Respective Roles of The Franchise Consultant and The Franchise Lawyer in Structuring the Franchise System (American Bar Association Forum on Franchising)
91.	Social Sector Franchising (HealthStore Foundation)
92.	Creating a middle class through the development of franchising in the Middle East to deal with the causes of the Arab Spring (Eleventh Annual Doha Economic Conference, Doha, Qatar)
93.	Social-sector franchising for healthcare (Micro-Franchising – How Social Entrepreneurs are Building a New Road to Development – Greenleaf Publishing)
94.	Building a Change Culture (52nd IFA Annual Convention)
95.	Basics of Developing a Franchise System (International Franchise Exposition)
96.	Top Ten Mistakes Every Franchisor Should Avoid (53rd IFA Annual Convention)
97.	Setting Fees and Marketing the Opportunity (ICFE Special Session)
98.	Managing Change (ICFE Special Session)

99. Exit, Succession and Estate Planning for Baby Boomer Franchise Owners (IFA 2014 Annual Convention)
100. Grow Your Business with Franchising & Licensing (Baker Donelson 2014 NOLA)
101. The Father of Franchising (About.com)
102. Negotiating Franchise Agreements (About.com)
103. Advantages and Disadvantages of Buying a Franchise (About.com)
104. Advantages & Disadvantages of Joining a Mature Franchise System (About.com)
105. Advertising Fees and Strategies for Franchisors (About.com)
106. Albert Singer: The Myth about the 'Father of Franchising' (About.com)
107. Are You Ready to Be a Franchisee? (About.com)
108. Are You Ready to Franchise Your Business? The Threshold Analysis, Part One (About.com)
109. The Threshold Analysis, Part Two: Franchisability criteria (About.com)
110. The Threshold Analysis, Part Three: Available franchisees (About.com)
111. The Threshold Analysis, Part Four: The support system and fees (About.com)
112. The Threshold Analysis, Part Five: Your ability to expand (About.com)
113. Basic Forms of Multi-Unit Development (About.com)
114. Benjamin Franklin – Inventor, Statesman, Printer, Franchisor, Philanthropist (About.com)
115. Buying an Existing Franchise (About.com)
116. Failure Rate: Dealing with Failure in a Franchise System (About.com)
117. Finding the Best Advisors in Franchising (About.com)
118. Franchise or Business Opportunity? Making the choice (About.com)
119. Franchise Relationship Structures (About.com)
120. Franchising Definitions (About.com)
121. Franchising Your Business, Part One: Overview (About.com)
122. Franchising Your Business, Part Two (About.com)
123. Franchising Your Business, Part Three (About.com)
124. Franchising Your Business, Part Four (About.com)
125. Franchising Your Business, Part Five (About.com)
126. Going International (About.com)
127. How Do You Spot a Franchise Opportunity to Avoid? (About.com)
128. How Much Does a Franchise Cost? (About.com)
129. How to Determine Your Royalty Fee Structure (About.com)
130. How to Understand a Franchisor's Financial Performance Representation (About.com)
131. If it walks like a duck – You may already be a franchisor (About.com)
132. If You Are Thinking of Franchising Your Business (About.com)
133. Is Every Franchise Going to Be a Success? (About.com)
134. Negotiating a Franchise Agreement (About.com)
135. Requirements to Open a McDonald's Restaurant (About.com)
136. Roles of the Franchise Consultant and Franchise Lawyer (About.com)
137. Start-Up Costs: Determining your initial franchise investment (About.com)
138. The Franchise Disclosure Document (About.com)
139. The History of Franchising (About.com)
140. Top Ten Reasons to Invest in a Franchise (About.com)

141. Understanding the Franchise Agreement vs. the FDD (About.com)
142. What is a Franchise? (About.com)
143. Won't Any Lawyer Do? (About.com)
144. Union Challenges to Franchising in the U.S. (About.com)
145. The NLRB and SEIU – A Joint Enterprise Against Franchising (About.com)
146. Exclusive Territory (About.com)
147. Default and Termination (About.com)
148. The Bar Has Been Raised for Relationship Law Consideration (About.com)
149. Retail Theatre – Successful competing in an etail economy (About.com)
150. Retaining the NLRB Rider (About.com)
151. Franchising Creates over 27% of All Private Sector Jobs (About.com)
152. The Sky is Not Falling – At least not from Browning Ferris (About.com)
153. California 525 – What has been achieved (About.com)
154. Financial Performance Representation (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
155. The Basics of Developing a Franchise System (International Franchise Exposition)
156. Franchise Your Business (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
157. Where Is the Point of No Return in Guiding Franchisees in People Matters? (International Franchise Association)
158. Franchise Training Programs (About.com)
159. How to find a franchise with a good Return on Investment (About.com)
160. The process of buying a franchise (About.com)
161. What support can you expect from a franchisor (About.com)
162. The history of franchising (About.com)
163. Sexual and Reproductive Care (International Franchise Association)
164. Social Sector Franchising (World Franchise Council)
165. Richard Griffin - How a Partisan Lawyer Can Get It So Very Wrong (Franchising World Magazine)
166. An Inventory of Potential Outcomes from Richard Griffin's NLRB opinion on Franchising – White Paper (International Franchise Association)
167. Fight for $15: The Tipping Point for Generational Poverty (About.com)
168. Franchise Management for dummies (Wiley Publishing, Inc.)
169. Social Franchising (International Franchise Association)
170. Joint Employment (International Franchise Association)
171. The Basics of Developing a Franchise System – An Educational Seminar for the International Franchise Association Staff (International Franchise Association)

I have presented at professional and trade associations including, but not limited to, the International Franchise Association, the International Franchise Association Education Foundation, the International Franchise Association's Legal Symposium, the National Restaurant Association, the National Retail Federation, the American Bar Association, Franchise Finance Forum, Franchise Update Multi-Unit Conferences, Australian Franchise Association, British Franchise Association, New

Zealand Franchise Association, Italian Franchise Association, World Franchise Association, U.S. Embassy Rwanda, Global Health Conference, Service Employees International Union, The World Bank, OPIC, and PharmAccess. I have also presented at universities and law schools including, but not limited to, St. Thomas University, Georgetown Law School, New York University School Of Law, Benjamin N. Cardozo School Of Law, Nova University, University Of Arizona, Johnson & Wales University, Harvard, MIT, UCSF (Berkeley), Emory University School of Law, University of New Hampshire, Howard University, and The Ohio State University.

**Jani-King Oklahoma 3322–30019**

1-50: Declarations of Various Franchise Owners
51-83: Form Franchise Agreement
84-326: 2015 FDD
327-556: 2014 FDD
557-1534: Franchise Operations Manual
1535-1954: Partial FDDs
1955-1968: Jani-King Advertisements
1969-1980: Jani-King Job Descriptions
1981-2102: Jani-King Advertisements and Notices
2103: Jani-King Healthcare Services CD
2104: Jani-King Hotel & Resort Housekeeping CD
2105: Jani-King Green Cleaning CD
2106: Outpatient Services CD
2107-2190: Regional Director Training Guide
2191-2193: Jani-King Operating Statement
2194-2238: Policies & Procedures Manual
2239-2240: Balance Sheet, 2016
2241-2289: Safety Manual
2290-2320: Green Cleaning Training Program Manual
2321-2322: Balance Sheet, 2018
2323-2385: Sales Manual
2386-2388: Operating Statement, 2018
2389-2616: 2017 Jani-King of Oklahoma FDD
2617-2619: Operating Statement, 2017
2620-2842: JKO 2019 FDD
2843-3085: JKO 2016 FDD
3086-3089: Jani-King Maintenance Agreement
2090-3319: JKO 2018 FDD
3320-3321: Balance Sheet, 2017
3322 – 19325: Monthly Franchisee Reports
19326, 23958 – 24412, 28404 – 29160: Transaction A Forms
19327 – 19328: Account Inspection Scoring Explanation
19329 – 19353, 19372 – 19379, 23630 – 23652, 23776 – 23794: Franchise Call Log for Charge Back notice.
19354 – 19371: Repurchase Agreements
19380 – 19501: Cancellation Reports
19502 – 23629, 23673 – 23775: Franchise Agreements, Transfer Agreements
23653 – 23672, 23904 – 23956: Default letters
23795: Charge back letter
23796: Inspection Report
23957: Form Delinquency letter
24413 – 25740, 26135 – 28403, 29161 – 29641: Invoices for janitorial supplies
25741 – 26134: Account Acceptance/Finder's Fee Agreement
29642 – 30019: Equipment Lease Agreement

**Department of Labor Production**

1-996: The Department of Labor's Investigative File
997-1018: Standardized Position Description of Wage and Hour Investigation

**Deposition Transcripts and Exhibits**

Anna Castro
Julio De La Sierra
Araceli Duenas
Vonnisha Dawn Freeman
Rosa Fuentas
Paul Gbodi
Christina Whitney Hill
Jill Hill
Rebecca Holmes
John Arthur Mann
Samuel Martinez
MitzyJo Messner
James Myatt
Sunday Nwamarah
Mariel Randon
Vernon C Reed Jr.
Carlos Rios
Gail Robinson
Shayne Tackett
Iris Thompson
Nakita Thompson
Carleen Williams
Vicki Wilson
Ashley Zarate

**Training DVDs**

Healthcare Services
Hotel & Resort Housekeeping
Jani-King Franchise Training
Outpatient Services

# Appendix C – Buying a Janitorial Services Franchise

# Buying a Janitorial Services Franchise



# Contents

How Janitorial Services Franchises Work    2

Problems You May Face    3

The FTC's Franchise Rule    7

Protect Yourself    8

For More Information    10

Glossary of Terms    12

**INTRODUCTION**

I f you're thinking about starting your own business and have only a small amount to invest, you may be considering buying a janitorial services franchise. For a fee, a janitorial service company (the "franchisor") typically provides you (the "franchisee") with customers and marketing, billing and collection services.

Every franchisor has success stories to share. Be cautious. While success in the janitorial service industry is possible, it's not a guarantee.

A glossary of terms commonly used in the franchise industry is included at the end of this brochure.



# HOW JANITORIAL SERVICES FRANCHISES WORK

In a typical janitorial cleaning franchise, you pay the franchisor a fee for a "package" of cleaning accounts. The fee is based on the dollar value of cleaning accounts that the franchisor will make available. The fee usually is about half the gross income the accounts are supposed to generate in a year. For example, for a fee of $10,000, you'll get accounts worth $20,000; for a fee of $15, 000, you'll get accounts worth $30,000. You also may have to pay ongoing royalty or management fees.

The franchisor may offer you financing. This may sound especially attractive if you have trouble getting credit from traditional lenders.

The franchisor is supposed to offer you cleaning accounts that will produce the level of income represented in the package you purchased. However, several factors can affect that level of income. For example, if you don't accept an account, the franchisor may not have to offer you a substitute. Or, if you refuse an account because you feel it's located too far away, you may lose your right to that income. Also, if you lose accounts because you did a poor cleaning job, the franchisor doesn't have to replace those accounts.



PROBLEMS YOU MAY FACE

The Federal Trade Commission and the California Department of Corporations advise you to use caution when thinking about buying a janitorial services franchise, which often appeal to immigrants and others who speak limited English. The franchise agreement you'll receive from the franchisor may be long and complex. It may be difficult to understand your legal rights and obligations, and the obligations of the franchisor. **_Consider getting professional advice._** Ask a lawyer, accountant or business advisor to review the franchise agreement. The money and time you spend on professional help may save you from a bad investment.

Here are some of the problems you may face:

❖ *Accounts offered versus accounts received.* There may be a difference between the accounts the  franchisor **_promises_** to offer you and the accounts you actually receive, as well as the revenue that comes with them. For example, the franchisor may promise to offer you accounts generating $1,000 in monthly billings for the first year. To meet its obligations, the franchisor may offer you more than one cleaning account. But given time conflicts, distance issues or other problems, you may not be able to accept all the accounts the franchisor offers. What's more, the franchisor may offer the

same accounts to several franchisees on a first-come, first-served basis.  If you can't accept an account because you can't get to the location, or if another franchisee accepts the account first, the franchisor may have satisfied its obligation to offer you accounts.  Because the franchisor may not tell you about this policy before you buy the "package" of accounts, you should not count on receiving all the revenue that the franchisor promised at first.

❖ *Rejected accounts*.  The franchisor may not have to replace an account that you reject.

❖ *Franchisor-selected accounts*.  The franchisor usually selects accounts for you.  The size, number and location of the accounts may not be what you expect.  For example, the franchisor may require you to service more than one account at the same time, or the job sites may be far apart.

❖ *Lost accounts*.  Most janitorial franchise agreements specify that if a customer cancels the cleaning contract, the franchisor doesn't have to replace the account for you.  In fact, you may have to pay an extra sales and marketing fee for a new account to make up for the lost income.

❖ *Integration clauses*.  The franchise agreement you sign may contain a clause that limits the terms of your agreement to those specifically detailed in the ***written*** franchise agreement.  This means that any oral claims or promises made by the franchisor are not part of your agreement.  This is one reason why it's so important to ***get all promises in writing in the franchise agreement.***

❖ *First year time lag for receiving accounts*.  The package of accounts you buy will suggest a level of income within a year.  But the franchisor may take several months to supply you with the

promised accounts. That means you may not earn any income until several months **_after_** you've purchased the package, so you may not earn the estimated annual income. Therefore, it's important to have other sources of income during your first few months of operation.

❖ _Ongoing fees._ The franchisor may charge you a monthly management or service fee. You'll have

to pay the fee even if you don't have any income from your cleaning business that month. If you finance the franchise fee, you must make the monthly payment on that debt whether or not you're receiving income from the cleaning business. And although you may find customers without the franchisor's help, any income from a cleaning account you solicit will be included when the franchisor calculates the royalty and management fees you owe.

❖ _Franchisor-owned accounts._ The franchisor may own **_all_** the customer accounts, including those that you get on your own. This means that if your franchise agreement ends, you will not be able to service the accounts for which you paid a fee, and you won't be able to service the accounts you get on your own, either.

❖ _Training._ Get information about the franchisor's training program **_before_** you invest. The franchisor decides the type of training you'll get. It may involve watching videos and reading books; it may not involve classroom or on-site training.

❖ *Contract bidding procedures.* The franchisor may not tell you how it bids for cleaning contracts or what specific services you must provide to the customers. The franchisor may only tell you that  you should be able to earn $12 to $15 an hour doing janitorial work. However, when bidding for cleaning contracts, the franchisor may offer your services at a lower rate, and you may have no say in whether the amount charged is reasonable. So even though the account is represented as being worth a certain amount of money, it may not be worth that much to you, and you may not be able to make a profit once you pay for expenses like supplies and transportation costs.

❖ *Short-term accounts.* People who operate janitorial franchises often find that customers rarely maintain an account for more than a year. That's because customers prefer short-term contracts so they can shop for the best deal. If the franchisor offers you replacement accounts, you may have to pay a new referral or marketing fee.

❖ *Performance obligations.* You may have to meet minimum monthly performance or growth requirements. If you don't, you may lose the franchise. Worse yet, you may not have the right to a refund of your franchise fee.

❖ *Payment for services.* The franchisor collects payment from your customers. If the customer doesn't pay, you don't get paid. The franchisor may not be legally obligated to force the customer

to pay, but if the franchisor sues for payment, you may have to pay the legal costs.

❖ *Personal guarantees.* Many franchisors require franchisees to personally guarantee the obligations of the franchise business. This means that if your business assets don't cover your franchise obligations, you could lose personal assets, like your home or car.

❖ *Anti-competition rules.* You and your immediate family (your spouse and children) may not be allowed to have an ownership interest or perform services in another cleaning business, even if your family members don't have an ownership interest in your janitorial franchise. This restriction may continue even after your franchise ends.

THE FTC's FRANCHISE RULE

By law, a franchisor must give you a detailed disclosure document. The disclosure document should include:

- the total number of franchises, and the number of franchises terminated or not renewed during the previous year;
- the bases and assumptions for any claims about potential earnings or the earnings of existing franchisees;
- the cost of starting and maintaining the business;
- the names, addresses and telephone numbers of at least 10 franchisees who live closest to you (names, addresses and telephone numbers of at least 100 franchisees is required in some states);

- the background and experience of the franchisor's key executives;
- a fully audited financial statement of the franchisor;
- any lawsuits against the franchisor or its directors by franchisees; and
- the responsibilities you and the franchisor have to each other once you've purchased the franchise.

You should receive the disclosure document at least 10 business days *before* you pay any money or legally commit yourself to buying a franchise. Ten business days should give you enough time to review the document, get answers to your questions, talk to franchisees and get advice from an attorney, accountant or business advisor.

PROTECT YOURSELF

Buying a franchise is a big decision. Before you commit, take the following precautions:

- ❖ *Read the company's disclosure document.* Review it carefully to learn more about your obligations, the litigation history of the franchisor and failure rates. This information will help you decide whether franchisees are dissatisfied with the franchise.

- ❖ *Talk to other franchisees.* Don't rely only on the information the franchisor gives you. Talk to current and former franchisees about their experiences with the franchisor. Their names, telephone numbers and addresses should be in the company's disclosure document. The franchisor may refer you directly to franchisees who are known to be successful. Don't rely on references the company selects.

❖ *Contact your state franchise administrator.* If you live in California, Hawaii, Illinois, Indiana, Maryland, Minnesota, New York, North Dakota, Rhode Island, South Dakota or Virginia, your state has an office that regulates the offer and sale of franchises. Contact your state franchise administrator **before** you invest. Ask if the franchise you're considering is registered to offer franchises in your state. If you live in California, call the Department of Corporations at 1-866-275-2677 (866-ASK-CORP), or visit www.corp.ca.gov. If you live outside of California, you can find the name of your state franchise administrator, by calling the North American Securities Administrators Association at (202) 737-0900 or visit www.nasaa.org. You may also contact your state Attorney General (www.naag.org) or Better Business Bureau (www.bbb.org) for more information.

❖ *Get all promises in writing.* If a salesperson tells you that the franchisor will give you accounts near your home, but the written agreement defines the geographic area more broadly, it's what's in the written agreement that counts. If a provision in the agreement is different from anything you discussed with the salesperson, demand that the written agreement be changed. If a salesperson tells you that you should be able to make $12 to $15 an hour, make sure that prediction is included in the disclosure document. If the salesperson or franchisor won't agree, walk away from the deal.

❖ *Review the franchise agreement carefully.* It's important to understand all the conditions of the agreement. It controls your relationship with the franchisor. Make sure the agreement spells out the details so there are not surprises.

❖ *Understand your obligations.* As a franchisee, you may have to pay royalties and other fees. Find out exactly what types of fees you'll have to pay, how much you'll pay and how often.

❖ *Investigate claims about potential earnings.* The estimated value of the package of accounts you buy may not reflect the income you'll earn from servicing those accounts. Find out how the company assigns a value to the accounts. Ask how many franchisees made the represented income and where those franchisees are located.

❖ *Be cautious when financing.* While financing your purchase through the franchisor may seem appealing, the terms of the financing agreement may not be the best deal for you. For example, you may have to sign a note to secure the debt and agree to terms that could make it tough for you to sue the company if you wanted to cancel your agreement. Before you agree to franchisor financing, be sure you understand all the terms of the deal.

❖ *Consider getting professional advice.* Ask a lawyer, accountant or business advisor to review the disclosure document and franchise agreement. The money and time you spend on professional help may save you from a bad investment.

FOR MORE INFORMATION

The FTC also publishes a series of consumer brochures on franchising and business opportunities. For free copies, contact the Consumer Response Center, Federal Trade Commission, Washington, DC 20580, 1-877-FTC-HELP (1-877-382-4357), TDD: (202) 326-2502, www.ftc.gov. The FTC works for the consumer to prevent fraudulent, deceptive and unfair business

practices in the marketplace and to provide information to help consumers spot, stop and avoid them. To file a complaint, or to get free information on any of 150 consumer topics, call toll-free, 1-877-FTC-HELP, or use the complaint form at www.ftc.gov. The FTC enters Internet, telemarketing, identity theft and other fraud-related complaints into Consumer Sentinel, a secure, online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

The Department of Corporations also publishes a consumer brochure, "Look Before You Leap – A Guide to Buying a Franchise." A copy of this brochure is available on the Department's website, www.corp.ca.gov. For more information about California's requirements regarding the sale of franchises, contact the Department of Corporations at 1-866-275-2677 (866-ASK-CORP).

# GLOSSARY OF TERMS

**Disclosure Document** – A written document that outlines the general franchise offering, including background information of the franchisor, a summary of the franchise agreement, and a list of current franchisees.

**Franchise Agreement or Franchise Contract** – The written document that spells out the legally binding obligations between the franchisor and the franchisee.

**Franchise Fee** – The purchase price for the franchise.

**Franchisee** – Any person who buys or invests in a franchise.

**Franchisor** – Any person who sells a franchise.

**Management or Service Fee** – A fee paid the franchisee for extra or ongoing support, such as providing additional or substitute accounts.

**Royalty Fee** – A specific payment made by the franchisee for the right to use the franchisor's trademark. In most instances, the franchisee pays this fee throughout the term of the agreement, regardless of anything else the franchisor may or may not do.