UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAMELA MYERS, *et al*,<br>            *Plaintiffs*,<br><br>v.<br><br>JANI-KING OF PHILADELPHIA, INC.,<br>JANI-KING, INC., and JANI-KING<br>INTERNATIONAL, INC.,<br>            *Defendants*. | Case No. 2:09-cv.01738-RBS<br><br>Hon. R. Barclay Surrick |

Exhibit 3

**DECLARATION OF MICHAEL H. SEID**

I, Michael H. Seid, declare as follows:

**My Background and Qualifications**

1.      I am the founder and Managing Director of Michael H. Seid & Associates, LLC ("MSA"), a provider of domestic and international franchise advisory services.

2.      I graduated from Long Island University with a B.S. degree in Accounting in 1975.  During the period 1970 through 1976, I was a member of the U.S. Army Reserves and was honorably discharged in 1976 with the rank of Staff Sergeant.  During the course of my professional career, I have served at various times as a senior operations officer, financial executive, consultant, and accountant for companies within the franchise, retail, restaurant, hospitality, healthcare, education, and services industries.  From 1987 through the present, I have primarily been a consultant to the franchise industry.

3.      I am a frequent speaker at programs for the International Franchise Association ("IFA") and various other retail and professional organizations.  The IFA is the oldest and largest franchise association in the United States.  Its members include both franchisors and franchisees.

4.      I have lectured and written for the ABA Forum on Franchising and the IFA Legal Symposium.  I have lectured at several universities and law schools, including St. Thomas University, Georgetown Law School, New York University School of Law, Benjamin N.

Cardozo School of Law, Nova University, the University of Arizona, Johnson & Wales University, MIT Sloan School of Management, Harvard Business School, the University of California San Francisco (Berkeley) and Emory University School of Law.

5.      I have spoken at the Doha Economic Conference in Qatar on the use of franchising to create a middle class in the Middle East, focused on dealing with the underlying economic causes of the Arab Spring.  On behalf of the IFA, I have testified and presented to federal and state legislators on the dynamics of franchising.

6.      I have published numerous articles on franchising.  I am the author of *Franchising for Dummies*, 2nd Edition, published by Wiley Publishing, Inc.  My co-author for *Franchising for Dummies*, 1st Edition, was the late Dave Thomas, founder of Wendy's International.

7.      I have consulted, both domestically and internationally, for companies on the appropriateness of franchising, licensing, and other methods of downstream distribution of products and services, as well as the design and development of franchise and licensing systems. MSA and I have provided services in virtually every area of franchising, including franchise sales programs, systems development, manuals, training programs, marketing, expansion strategies, real estate selection, site development, franchisee advisory councils, franchisee relations, crisis management, litigation support, and the strategic restructuring of established companies.

8.      MSA is a member of the IFA Supplier Forum.  I have personally served in the past as the Chairman of the Board of Directors of the Supplier Forum.  As Chair of the Supplier Forum, I was also a member of the Board of Directors of the IFA and a participant on its Executive Committee.  In addition to serving on the IFA Board as Chair of the Supplier Forum, I was the first professional services provider elected directly to the Board in the history of the IFA and served two terms (2002 through 2008). I was reelected to the IFA board in September 2011 and assumed my board responsibilities in February 2012.  I have served as a trustee of the IFA's Educational Foundation, was the Chairman of the IFA's VetFran Committee, and was a member of the IFA's Finance Audit and Budget Committee. After my reelection to the IFA board in

September 2011, I became Chairman of the Social Sector Franchising Committee and again assumed my role as a member of the IFA's Finance Audit and Budget Committee. I have also served as a member of several other IFA committees.

9. I have completed the requirements and have been awarded the designation of CFE (Certified Franchise Executive) by the IFA's Education Foundation.

10. I am a Certified Public Accountant, licensed in the State of New York. I am a member of the American Institute of Certified Public Accountants, New York State Society of CPAs, and an associated member of the American Bar Association.

11. I am the Chief Concept Officer and a member of the Board of Directors and Executive Committee of CFWshops, a Social Sector Franchisor established to provide clinical services and essential medicine in the peri-urban areas of Sub Saharan Africa. I also serve on the Board of Directors and Executive Committee of the HealthStore Foundation and One Family Health as part of my commitment to the use of business format franchising as a method for improving the human condition and for having a world changing impact on poverty, diseases and economic development. CFWshops is a franchisor member of the IFA, and I am the representative of CFWshops at the IFA.

12. I am a member of the Goldman Sachs Special Situation Group's Chambers Street Executive Network. The Special Situations Group ("SSG") is a global investing platform that invests across the corporate capital structure. The Chambers Street Executive Network is comprised of senior industry experts appointed from diverse industries to advise SSG professionals and its portfolio companies. I am on the Board of Directors of the William Rosenberg International Center of Franchising at the University of New Hampshire. I am also on the Board of Directors of Kidville, Inc., a public corporation.

**Scope of My Declaration and Summary of My Opinions**

13. Jani-King of Philadelphia, Inc., Jani-King, Inc., and Jani-King International, Inc. ("Defendants") have asked me to review Plaintiffs' Complaint in this matter. Defendants have asked me to focus in particular on Plaintiffs' contention that Jani-King® franchisees are not

independent businesspeople, but are instead employees of Defendants who received a "low-paying (even sub-minimum wage) job." (Complaint, ¶ 1).

14.     As I read Plaintiffs' allegations, Plaintiffs claim that common controls exercised by Defendants over Jani-King of Philadelphia's franchisees are so pervasive that the Court (or a jury) can conclude that every franchisee is really an employee of all three Defendants. Plaintiffs also claim that Defendants constitute an "integrated enterprise" and that they serve as each other's agents. Plaintiffs make no effort to distinguish between Jani-King of  Philadelphia, Jani-King, Inc., and Jani-King International, Inc., instead characterizing those three separate corporations as a single business. I will address the distinction between Jani-King of Philadelphia, Jani-King, Inc., and Jani-King International, Inc. at the end of this Declaration. In the paragraphs that follow, I will discuss Plaintiffs' contention that Jani-King of Philadelphia exercises sufficient control over its franchisees that those franchisees can be considered its employees.

15.     In my expert opinion, Plaintiffs' Complaint reflects a fundamental misunderstanding of how franchising works in general and how the Jani-King® system works in particular. Based on my experience in the franchise industry, the supposed "common controls" identified by Plaintiffs as establishing an employment relationship are generally typical of those retained by the franchisor and franchisee in any business format franchise. The whole point of franchising is that a franchisor sets its brand standards and controls necessary to produce a uniform product or service such that the customer cannot readily distinguish between services offered from one location to the next or from one franchisee or company-owned operation to the next. The setting of brand standards and the controls retained by Jani-King of Philadelphia are consistent with this objective. Ultimately, the controls retained and the brand standards set by Jani-King of Philadelphia allow its franchisees to use a recognized trademark and established method of doing business to produce a uniform service that enables them to do what they could not otherwise do alone — enter with training, experience, and recognized brand standards so that they can compete with large companies for janitorial business.

4

16.     The Jani-King® franchise opportunity is what we in the business of franchising refer to as a low-entry cost or low investment opportunity.  Under this model, a franchisor gives a franchisee an opportunity for success without the franchisee having to make a significant upfront investment.  This means that individuals who cannot afford high-entry cost franchise opportunities like a McDonald's restaurant or a Marriott Hotel still have an opportunity to pursue the "Great American Dream" of owning their own business.  This type of entry-level investment opportunity draws from a broad spectrum of potential franchisees with many different experiences, capabilities, and expectations, and provides a leg up that can only be provided from a knowledgeable system of conducting business.  It is impossible, in my view, to stereotype Jani-King® franchisees as the Plaintiffs have done in their Complaint.  Critical to me is that the Jani-King® franchise is a legitimate investment and franchise opportunity.  As long as it is a legitimate franchise investment opportunity — and I believe it is — then a Jani-King® franchise cannot be considered just "a job."  Some franchisees will have the desire and talent to take advantage of the opportunity provided; some will not. Some will make significant money from their business; some may net little more than a supposed "minimum wage"; and some will fail altogether.  But they all have the same opportunity to apply their business skills, talents, and hard work to achieving their economic goals.

17.     Plaintiffs contend that Jani-King of Philadelphia is selling no more than a job — a right to clean an account at minimum wage, at best.  It is my opinion that Plaintiffs' contention is wrong and is based on an unfair generalization of the entire Jani-King® franchise system and a misunderstanding of the dynamics of franchising in general.  Again, the fundamental flaw in all of this is that the Jani-King® opportunity is just that — an opportunity.  Ultimately, the franchisee gets out of the opportunity what it puts into it.  Like any franchise system, the Jani-King® model is not a guaranty of success.  All Jani-King of Philadelphia can do is provide its franchisees with the tools to be successful.  How well the franchisee does with these tools is up to the franchisee.

18.     In the paragraphs that follow, I will define the franchise concept and explain how it is that Jani-King of Philadelphia is a bona fide franchisor under the traditional notions of franchising. I will then review the controls that Plaintiffs claim make Jani-King® franchisees actual employees and explain how those controls are commonplace in franchising and how they serve the legitimate interests of Jani-King of Philadelphia as a franchisor.  I will then address other factors that show that the Jani-King® system views its franchisees as independent contractors and that the franchisees operate as independent contractors.

**The Franchise Concept**

19.     In its broadest sense, a "franchise" is a contractual relationship between a "franchisor" and a "franchisee" whereby the former licenses the latter to distribute a specific product or service (or engage in a prescribed method of doing business) using the franchisor's trade or service mark and method of doing business or "system."   From an economics perspective, franchising is "just one of many ways a firm can choose to distribute its product" or service.  Benjamin Klein, "The Economics of Franchise Contracts," *Journal of Corporate Finance* 2 at 10 (1995).  Franchising is, for the economist, an alternative to vertical integration. Rather than own all channels of distribution, a franchisor contracts with independent third parties to distribute a product or service to the end-user.  According to Klein, "the essential economic rationale for franchising is that it permits transactors to achieve whatever benefits of large scale may be available in, for example, brand name and development and organization design, while harnessing the profit incentive and retailing efforts of local owners."  There are, in the process, trade-offs attendant to a company choosing the franchise model (independent third parties distributing a product or service) as opposed to vertical integration (employees distributing the product or service).  When choosing the franchise model, a company loses the opportunity to earn profits from local sales activity, replacing profits with specified fixed fees.  Likewise, the franchisee gives up an opportunity to earn a fixed wage for an opportunity to own his or her own business and profit from it.  As a part of these trade-offs, the franchisor avoids responsibility or liability for employees at the unit level (employment benefits, liability to third parties, and the

like).  Similarly, the franchisor avoids the investment costs of starting a unit operation and is able to harness the entrepreneurial spirit of the individual business owner (the franchisee).  If a legitimate, bona fide franchisor is found to be an employer of its franchisees, the franchisor loses key advantages of franchising.  It then has many of the downsides of vertical integration, but not the upsides.  In fact, it is likely that franchising as we know it today would cease to exist if franchisees are held to be employees of their franchisor.

20.     From a legal perspective, a franchise arises whenever a franchisor (1) licenses a franchisee to use its trade or service mark, (2) the franchisee pays a fee for the right to use the mark, and depending on the applicable law, (3) the franchisor retains significant control over the franchisee, has a marketing plan, or has a community of interest with the franchisee, depending on which law applies.

21.     Franchising is a highly regulated industry.  The federal government and several states have laws, rules, or regulations governing the offer and sale of franchise opportunities.  California was the first state to regulate franchise sales.  It enacted its California Franchise Investment Law (CFIL) on January 1, 1971.  Finding that the franchisee "has not been provided full and complete information" regarding the franchise opportunity, the California legislature identified a number of things that must be in a franchisor's disclosure document or prospectus in order "to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchisees being offered."  See Section 31201 of the CFIL.

22.     The FTC relied on the CFIL when it adopted specified disclosure requirements and prohibitions in the sale of franchise opportunities, which it calls the "Franchise Rule" or simply the "Rule."  The Franchise Rule was first established in 1978 and significantly amended in 2007.  The FTC has determined that the best way to protect franchisees is to require franchisors to make certain specified disclosures to franchisees, as opposed to dictating the terms of the franchise relationship.  As the FTC says in its Statement of Basis and Purpose for the recent amendments to the Rule:

[A] franchise purchase is entirely voluntary.  The Franchise Rule ensures that each prospective franchisee receives disclosures — expanded in key respects by the current amendments — that explain the terms and conditions under which the franchise will operate.  Prospective franchisees can avoid harm by comparison shopping for a franchise system that offers more favorable terms and conditions, or by considering alternatives to franchising as a means of operating a business. Prospective franchisees are also free to discuss the nature of the franchise system with existing and former franchisees, as well as trademark-specific franchisee associations, and the amended Rule facilitates such discussion by providing prospects with contact information.  Under these circumstances, the Commission cannot categorically conclude that prospective franchisees who voluntarily enter into franchise agreements, after receiving full disclosure, nonetheless cannot reasonably avoid harm resulting from a franchisor enforcing the terms of its franchise agreement.

23.     What the FTC requires is that a franchisor disclose to the potential franchisee in a Franchise Disclosure Document ("FDD") certain information regarding the franchise opportunity.   Prior to amending the Rule in 2007, the FTC also accepted as an adequate disclosure a franchisor's compliance with the disclosure guidelines that had been established by NASAA for states that have independent disclosure requirements.   NASAA required that franchisors make disclosures through a document called a Uniform Franchise Offering Circular ("UFOC").   The Revised Rule of the FTC incorporates much of the substantive text and instructions of NASAA's UFOC Guidelines.

24.     The FTC defines a "franchise" in Section 436.1(h) as follows:

*Franchise* means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1)     The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2)     The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3)     As a condition of obtaining or commencing operation of the franchise, the franchisee makes a requirement payment or commits to make a required payment to the franchisor or its affiliate.

Significantly, a company is not a franchisor under the FTC definition unless the company does the sorts of things that Plaintiffs claim make Jani-King of Philadelphia an employer.   To constitute a franchisor under the FTC Rule, the company must retain "a *significant degree of control* over the franchisee's method of operation, *or provide significant assistance* in the franchisee's method of operation."  (Emphasis added.)

25.     As a practical matter, there are essentially two forms of franchising in the United States today.   The first is product distribution or traditional franchising.   This was the most common form of franchising prior to World War II.   Under this model, the franchisor manufactures and sells finished or semi-finished products to dealers or franchisees.   The franchisee, in turn, resells the product to consumers or others in the chain of distribution.   Classic examples of this form of franchising are automobile, service station, and soft drink franchises.

26.     Much less common prior to World War II, but present everywhere today, is the "business format franchise."  The federal government has defined a business format franchise as including "not only the product, service, and trademark, but the entire business format itself — a marketing strategy and plan, operating manuals and standards, quality control, and a continuing process of assistance and guidance."  *Franchising in the Economy 1986-1988*, U.S. Department of Commerce (Feb. 1988).  (Exhibit A at page 3.)  These are again the sorts of controls and practices that Plaintiffs claim make Jani-King of Philadelphia an employer of its franchisees.  On page 12 of my book, *Franchising for Dummies*, I define the concept of business format franchising as follows:

> A franchise occurs when a business (the franchisor) licenses its trade name (the brand, such as Wendy's or Midas) and its operating methods (its system of doing business) to a person or group (the franchisee) who agrees to operate according to the terms of a contract (the franchise agreement).  The franchisor provides the franchisee with support and, in some cases, exercises some control over the way the franchisee operates under the brand.

> In exchange, the franchisee usually pays the franchisor an initial fee (called a franchise fee) and a continuing fee (known as a royalty) for the use of the trade name and operating methods.

27.     A major goal of business format franchising is to assure uniformity from one franchised location to another.   The franchisor does so by utilizing the very controls that Plaintiffs claim make Jani-King of Philadelphia an employer of its franchisees — training, manuals, inspections, and the like.   Blair and Lafontaine describe the principle as follows at pages 119-20 of their text, *The Economics of Franchising*:

> For all these reasons, franchisors care about maintaining uniformity.  To this end, they exercise control over many important aspects of the franchisee's business, including appearance, hours of operation, location, and product quality.  A major function of the franchise agreement under these circumstances is to specify contractual provisions that will remove or at least mitigate the fundamental incentive issue that arises because franchisees care about their own outlets' profits while the franchisor cares about system profits.  Almost all franchise contracts contain specific provisions concerning expected franchisee performance.  In fact, most franchise contracts incorporate by reference the whole set of directives contained in a very thick and detailed operations manual.  Further, the contracts provide for the franchisor's right to monitor the performance of the franchisee through inspections, audits, mystery shopper programs, and so on.  Most contracts also give franchisors the right to terminate the contract unconditionally or for good cause.  Finally, the terms of franchise contracts typically give rise to *ex-post* rent, namely amounts of money that the franchisee can earn within the relationship that are above what he could earn in his next best alternative.

28.     The brand standards or controls established by franchisors are usually those necessary to protect their trademarks and other marks, as required by the Lanham Act.   In this case, Plaintiffs claim that those standards and controls establish an employment relationship between Jani-King of Philadelphia and its franchisees.   But those are the same sorts of controls and elements that form the very definition of a business format franchise, and agreeing with Plaintiffs threatens to destroy franchising as an alternative distribution model.   Were a brand not able to establish and enforce its brand standards, it would be at risk for the loss of its marks as required by the Lanham Act.

**Jani-King of Philadelphia as a Legitimate, Bona Fide Franchisor**

29.     Ultimately, what franchising does is provide individuals with an opportunity — an opportunity to own their own business and meet their own definition of success, whether in

the form of profits or simply the satisfaction of being a business owner.  The United States Department of Commerce has described the concept as follows:

> Franchising, a major force in the U.S. economy, continues its steady growth in sales, employment, units, and international expansion, offering tremendous opportunities to individuals seeking their own businesses and companies looking for wider distribution for their products, systems, and services.  Franchising has become so powerful partly because economic factors have made growth through company-owned units difficult for many businesses.  In addition, franchisees are enjoying a competitive edge over other small business entrepreneurs by the use of trade names, marketing expertise, acquisition of a distinctive business appearance, standardization of products and services, training, and advertising support from the parent organization.
>
> Franchising represents the small entrepreneur's best chance to compete with giant companies that dominate the marketplace.  Without franchising, thousands of businesspersons would never have had the opportunity of owning their own businesses and never have felt the immense satisfaction of being a part of the free enterprise system.

(Exhibit A at page 1.)

30.     Although franchising presents franchisees with an *opportunity* to succeed, it is not a *guarantee* of success.  The FTC has published since at least September 2001 a document entitled, "Buying a Janitorial Services Franchise."  The document is Exhibit B to my declaration.  In it, the FTC says of janitorial franchising opportunities that "every franchisor has success stories to share.  Be cautious.  While success in the janitorial service industry is possible, it's not a guarantee."  This is true of all franchise opportunities.  I describe the notion as follows at pages 18-19 of my book, *Franchising for Dummies*:

> If you buy a franchise, you get rich — or at least financially secure.  Right?  We hate to burst your bubble, but that's a myth.  Not all franchises are successful.  Not all are profitable, and many fail.  But based on the most recent industry studies, including the survey conducted by the Gallup Organization for the IFA's Education Foundation, most franchisees are satisfied with their decision.  A logical assumption has to be that most are profitable — unless you can imagine a businessperson being satisfied with losing money.
>
> Owning a franchise — like owning any small business — is hard work.  Even though you get proven systems and training when you hook up with a solid franchisor, no one guarantees your success.  Often the variable in this equation is you.  Business ownership is not a passive investment.  It requires long hours and

dedication.  Even with the best franchise system and the most popular brand name, the franchisee is often the key ingredient to making the business successful.

Even with hard work, if you make the wrong choice and buy a franchise that you end up hating, chances are good that you won't be successful — or very happy.

31.     The Jani-King® opportunity, like every other franchise opportunity, is no guaranty of success.  But it certainly does provide individuals with an opportunity — an opportunity to operate their own business and achieve their own idea of success.  Entrepreneur's, the publishers of *Entrepreneur Magazine,* also publishes a magazine it calls "*Startups.*"  At page 35 of its issue from the summer of 2008, Entrepreneur's featured a Jani-King® franchisee in Atlanta named Craig Taylor.  (Exhibit C to my declaration is a copy of the article.)  As set forth in the article:

> That was how things were back in 1987, when Taylor, now 46, first started his Jani-King franchise in Atlanta.  But you wouldn't know it now — things have changed dramatically.  Taylor leases office space, has 200 employees who service several hotels, and brought in sales of $3.95 million last year.  Although he's no longer the one doing the actual cleaning, Taylor says that he's still very hands-on.  These days, he concentrates on growing his business, focusing on sales and customer relations.

> But Taylor wouldn't be where he is today if it weren't for his humble beginnings.  He was a part-time college student working as a bartender and waiter back when he began searching for an entrepreneurial opportunity, so cost was an important consideration.  With only one employee and a home office, he was able to open the franchise for less than $15,000.

> He also chose Jani-King because of the training and support the company offered.  Before he opened his franchise, he attended a training program that taught him everything from business management and accounting skills to the latest and most effective cleaning methods.  But Jani-King's involvement didn't end once Taylor's business was up and running.  The company periodically offers seminars to keep its franchisees up-to-date on the latest trends and techniques in the janitorial industry.  For instance, Taylor recently attended a seminar about using green cleaning products and methods — which is something his customers have been requesting.  It's this continuing support from his franchisor — and his own willingness to get his hands dirty — that has helped Taylor grow his once small janitorial operation to its present-day success.

32.     As a part of developing my expert report in this case, I inquired whether Jani-King of Philadelphia and similar Jani-King® franchisors in other major cities around the country have franchisees that believe they are successful, personally or financially.  I have learned that

many Jani-King® franchisees throughout the United States, including in Pennsylvania, consider themselves successful business owners.

33.     Although Jani-King® franchisees, like franchisees in any other system, experience different levels of profitability (or unprofitability), I find nothing that suggests that the Jani-King® franchise opportunity is not a legitimate, bona fide franchise opportunity.  I also believe that it is significant that the federal government itself has said that janitorial franchises are just that — franchises.  The franchise opportunity described by the FTC in its publication, "Buying a Janitorial Services Franchise," identifies as creating a *franchise* opportunity the very elements that Plaintiffs contend create an *employment* relationship.

34.     I have reviewed Jani-King's Uniform Franchise Offering Circulars ("UFOCs") and Franchise Disclosure Documents ("FDDs") for each year including and subsequent to 2000. Based on my experience in franchising, those disclosure documents include all of the information required by the FTC Rule and the NASAA guidelines.  They therefore contain all of the information that the FTC has found necessary to adequately inform prospective franchisees of the Jani-King® franchise opportunity.

35.     Based upon my review of the Jani-King UFOCs and FDDs and my experience and expertise in franchising, it is my expert opinion that the Jani-King UFOCs and FDDs adequately make the disclosure in plain English required by the FTC and UFOC Guidelines.

**Plaintiffs' Mischaracterization of the Controls Retained by Jani-King of Philadelphia**

36.     The only "controls" that can be "common" to everyone in the class are the ones retained by Jani-King of Philadelphia in franchise agreements signed by all members of the supposed class.  But the controls actually exercised by the franchisee and franchisor are quite individualized.

37.     Plaintiffs repeatedly mischaracterize in their Complaint the control that Jani-King of Philadelphia retains over its franchisees.  What I have done is take each of the "controls" that Plaintiffs claim establish an employment relationship and compare it to the controls that Jani-King of Philadelphia actually retains in the franchise agreement.  When the focus is on the

13

franchise agreement itself — as opposed to Plaintiffs' interpretation of it — the controls retained by Jani-King of Philadelphia are limited and entirely consistent with controls typically retained by a franchisor and controls necessary to make the Jani-King® franchise system work.

38.    Plaintiffs cite a number of factors that they claim make Jani-King of Philadelphia an employer rather than a franchisor.  (Complaint, ¶¶ 26-29).  I have reviewed each of those allegations and disagree with Plaintiffs' conclusions.  Many of them misconstrue common requirements that are found in all franchise systems in order to protect the trademark, brand, and goodwill.  And many of them misstate the facts as to how the Jani-King® system operates.  I will address below the most significant issues raised by Plaintiffs in this portion of their Complaint.

39.    Additionally, to help demonstrate how the features of the Jani-King® franchise system are consistent with the features found in the majority of franchise systems, I will reference the franchise agreements used by McDonald's (Exhibit D), H&R Block (Exhibit E), Dunkin' Donuts (Exhibit F), Goddard Systems (Exhibit G), Wyndham Hotels (Exhibit H), Express Services (Exhibit I), Handyman Connection (Exhibit J), Snap-on Tools (Exhibit K), and Wireless Zone (Exhibit L).  Many of these franchisors have a number of franchised locations in Pennsylvania and are generally well-known.

**Control Over Day-to-Day Operations**

40.    Critical to understanding how franchising works from a control perspective is distinguishing between (1) the franchisor's control over the uniformity of the end product or service that makes one franchised location indistinguishable from another (the brand standards) and (2) the franchisee's control over day-to-day operations that ultimately deliver the uniform product or service to the franchisor's brand standards.  A look at how a typical business franchise format works helps illustrate the distinction.

41.    Probably the best-known business format franchise in the United States is the McDonald's franchise system.  To a layperson, the controls that McDonald's retains over its franchisees might appear pervasive.  McDonald's has both franchised and company-owned

restaurants.  The former are run by franchisees and the latter by employees.  Notwithstanding that some McDonald's are operated by the company so that McDonald's has absolute control over its employees and some by its franchisees where its controls are limited, McDonald's wants its company-owned and franchised locations to be indistinguishable to the consumer.  Every McDonald's restaurant, both company-owned and franchised, offers the same menu, offers the same products, and employs the same cooking techniques to produce a uniform product.  In order to achieve this uniformity among its franchisees, McDonald's has an extensive training program, which it calls "Hamburger U," that teaches franchisees on how to operate a McDonald's restaurant.  It also uses extensive and detailed manuals that likewise cover every aspect of running a McDonald's restaurant.  Through its training program and manuals, McDonald's teaches its franchisees how to open the restaurant, run it throughout the day, and close it in the evening.  McDonald's thereafter performs periodic inspections of franchised restaurants to assure ongoing compliance by the franchisee with the McDonald's brand standards.  Finally, if the franchisee does not correct its failure to follow the McDonald's brand standards or otherwise comply with the franchise agreement, McDonald's may terminate the franchise.  In short, McDonald's does essentially the same things that Jani-King of Philadelphia does that Plaintiffs claim make Jani-King of Philadelphia an employer of its franchisees.  Yet no one would seriously contend that all McDonald's franchisees are employees of their franchisor because of these controls.

42.     Contrasted with these controls retained by the typical franchisor are the controls over operations retained by the franchisee.  The controls that the franchisee retains in the McDonald's system and every other business format franchise are those that often mean the difference between a successful and unsuccessful business.  These are the true controls over the day-to-day operations in the business format franchise.  They consist essentially of control over the employees who deliver the services to the end-user, as well as control over most aspects of the business's profit and loss ("P&L") statement.  For example, in the McDonald's system, all employees of every franchisee may prepare hamburgers and French fries in exactly the same

way, all employees may wear the same uniform, and all employees may follow the same practices in greeting customers.  Nevertheless, some McDonald's franchisees succeed and some fail.  The difference between success and failure often depends on how the McDonald's franchisee ultimately executes on the franchise opportunity.  It depends, for example, on the quality of the employees hired by the franchisee.  Are they efficient?  Are they friendly?  Are they trustworthy?  It depends on the ability of the franchisee to manage a business.  Does the franchisee properly motivate her employees?  Does she have the proper level of staffing at any given moment in time?  Does she insist and assure that every employee has a customer-centric attitude?  These, and many other variables, are solely the responsibility of the franchisee. Similarly, if a franchisee's cost structure is out of line, the franchisee will not be successful. Franchisees in a business format franchise typically have control over the critical components of the P&L.  They control salaries, product costs, rent, and the like.

43.     In all of these things, a Jani-King® franchise opportunity is no different than a McDonald's franchise opportunity.  There is nothing unusual about the requirement that franchisees use a cleaning protocol learned during training or that Jani-King of Philadelphia conducts quality control inspections to make sure its franchisees comply with that protocol.  As I said, the whole point of franchising is to provide a uniform product or service.  It is the essence of franchising that the customer will experience the same level and type of service from one franchisee to another. This cannot be done without standardized processes and enforceable brand standards.

44.     Ultimately, the success of the Jani-King® franchisee, like the success of a McDonald's franchise, depends on how well the franchisee runs its operations.  If the Jani-King® franchisee is aggressive in developing business opportunities, exercises care in finding the right employees, controls the expense side of its business operations, and the like, the franchisee will be successful.  In contrast, the franchisee that does not do these things is much less likely to succeed.  Those items are solely within the franchisee's control.  Jani-King of Philadelphia is not responsible for the franchisee's day-to-day performance.

45.     Although the Jani-King® franchise opportunity is no different than McDonald's in terms of success generally turning on the drive and skills of the franchisee, the two investments are obviously different for the franchisee.  Opening and operating a McDonald's franchise involves a significant investment on the part of the franchisee.  Entry into the Jani-King® business, in contrast, requires a relatively low investment.  This does not change, however, the notion that the difference between success and failure in both systems is often the franchisee.  Moreover, there are many, many franchise opportunities that do not require a significant investment on the part of a franchisee to get started in the business.  Roto Rooter, College Pro Painters, the "handy-man" franchises are but a few, well-known examples.  Yet, franchisees in these systems enjoy success commensurate with their skills and work ethics. Finally, the bona fide nature of a franchise opportunity does not turn on the number of franchisees that choose to do the work on their own as opposed to retaining employees.  One of the advantages of the Jani-King® franchise opportunity is that franchisees may elect to run a lean operation, with perhaps just family members doing the actual cleaning.  For many franchisees, the Jani-King® opportunity allows them to work evenings while continuing to work a day job. Whether producing big operators like Craig Taylor of Atlanta or smaller operators with no employees, the elements that make Jani-King a legitimate, bona fide franchise opportunity are ultimately the same.

46.     The experience of Jani-King® franchisees indicates that their ability to control their own expenses, as in most franchise systems, is vital in making their franchise profitable. By hiring their own employees and determining the terms of their compensation, bidding their own work, choosing what equipment and supplies to buy and from whom to buy them, and choosing how to insure their franchise, franchisees have achieved profitable, growing businesses.

47.     As with other franchise systems, it is the Jani-King® franchisee that ultimately controls the elements of the income statement.  As a result, the experiences of Jani-King® franchisees will necessarily vary from one to the other based on the size of their business and the manner in which they operate it.  For instance, some franchisees will have multiple accounts;

some will have a limited number of accounts.  The accounts will vary in revenue, size, number of days serviced, add-on work potential, and type of building (industrial, office).  The costs faced by franchisees within these accounts will not be uniform.  Some will have employees; some will not.  Franchisees who purchase new equipment (for example, a cleaning van or the latest wax buffer) and lease office space will obviously have more expenses than those who use older equipment and do not rent office space.  The variables are numerous.  In the end, the actual revenues and expenses for each Jani-King® franchisee will be markedly different.

**Jani-King Manuals**

48.     I have reviewed all of the manuals used by Jani-King of Philadelphia and find that they are entirely consistent with manuals generally used by franchisors.

49.     It is common in franchising for the franchisor's manuals to identify recommended and required practices for the operation of a franchised location in considerable detail. McDonald's says the following in its franchise agreement regarding its franchisee's use of McDonald's manuals:

> **Manuals.**  McDonald's shall provide Franchisee with the business manuals prepared for use by franchisees of McDonald's restaurants similar to the Restaurant.  The business manuals contain detailed information including: (a) required operations procedures; (b) methods of inventory control; (c) bookkeeping and accounting procedures; (d) business practices and policies; and (e) other management and advertising policies.  Franchisee agrees to promptly adopt and use exclusively the formulas, methods, and policies contained in the business manuals, now and as they may be modified from time to time.

H&R Block uses similar language in its franchise agreement to describe the contents to its manual:

> Franchisee shall establish, manage and conduct the Franchised Business in conformity with all provisions in the Manual which are designated as applicable to Franchisee and all other directions from Block in writing.  Block shall provide the Manual and any revisions thereto to Franchisee on loan by such means as Block may determine, and Franchisee shall have the Internet capability to access such Manual through Block's Intranet system.  The Manual may address, among other subjects, the layout, color schemes, equipment, fixtures, furnishings and décor of, and lease for, an Approved Location; the policies and procedures which Franchisee must follow in dealing with customers; the manner in which the

Franchised Business and the services and products which it offers is to be conducted; revisions of the designations of products and services as Required Services and Optional Services; training, advertising and marketing programs; requirements for maintaining records and submitting reports and information to Block; and the qualifications of Franchisee's employees. The Manual may require Franchisee to purchase for each Approved Location through a supplier approved by Block an office module system consisting of uniform components of equipment, furniture and fixtures, all of which shall be installed, maintained and updated by Franchisee in accordance with the standards specified by Block in the Manual.

50. Some franchisors are even more explicit. The Goddard Systems franchise agreement requires extensive training for franchisees before they may operate their facilities. Article 6(D) of that franchise agreement provides:

Before the opening of the School, the franchisee you have designated, and we have approved, to conduct the day-to-day management and operation of the School (the "designated on-site operator"), shall attend and must complete to our satisfaction an initial training program we prescribe at the time you must complete training. The designated on-site operator must have at least a 10% direct or indirect ownership interest in the School. You may not change the designated on-site operator during the term of this Agreement without our prior written approval. Only individuals who have satisfactorily completed our initial training program or our Director Training Program described in Section 6F may lead tours of the School with respect to overseeing the relationship with parents of the School's students or School employees.

51. Wyndham requires its franchisees to operate their hotels according to a myriad of system standards. Article 6 of the Wyndham franchise agreement provides that "Franchisee shall operate and maintain the Hotel in strict conformity with the standards, specifications, policies and procedures set forth in the Manual or otherwise in writing (the "System Standards")." Wyndham advises its franchisees that it will police their compliance with those standards through a quality assurance program that includes periodic inspections of the Hotel, mystery shopping, and guest satisfaction audits. (Exhibit H).

52. Some franchisors even play a direct role in the prices charged by their franchisees. A recent example is the decision by Burger King Corporation to require its franchisees to offer a value menu with items priced at $1.00. Burger King Corporation amended its operations manual to include that requirement, complete with the maximum price to be charged. When franchisees

challenged the franchisor's ability to require participation in that program, a court found that Burger King Corporation had the right to compel its franchisees to participate, including the right to set the prices for the menu items at issue.  It is not unusual for a franchisor to use its operations manuals to provide detailed instructions about how a franchisee must operate its business.

53.     Nor is it at all unusual for the manuals of a franchisor to run into the hundreds of pages.  Franchisors consider their manuals confidential.  Some franchisors, like McDonald's and H&R Block, identify generally the contents of their manuals in their franchise agreement. Others include the table of contents of their manuals in the FDD or UFOC they present to franchisees.  The tables of contents for the Dunkin' Donuts manuals as contained in their franchise disclosure document is Exhibit M to my declaration.  The Dunkin' Donuts manual is hundreds of pages in length.  Attached as Exhibit N is the table of contents for the manual for Express Services, which is more extensive than the Jani-King table of contents.  I can attest, based on my experience, that the level of detail in the Jani-King manuals is consistent with the customary practice in the franchise industry.

54.     In Section 4.24 of the Jani-King franchise agreement, the franchisee "agrees to be bound by the policies and/or procedures" as reflected in Jani-King's "corporate office manual." This language is ubiquitous in franchise agreements.  The McDonald's franchise agreement, for example, states that the franchisee will operate its restaurant "in conformance with the McDonald's System through strict adherence to McDonald's standards and policies as they exist now and as they may be from time to time modified."  The Express Services franchise agreement requires that franchisees "adhere to and follow strictly Our rules, regulations, methods, procedures, programs, policies, standards and business ethics as established in Our training course and manuals, or as they are amended or modified."  The Dunkin' Donuts franchise agreement states that its franchisee "agrees to operate the Unit in strict accordance with all of Franchisor's standards as they may be communicated to Franchisee from time to time."  I could identify countless examples of this same language in non-Jani-King® franchise agreements.

Virtually every franchise agreement I have read also gives the franchisor the right to modify its policies and procedures through its manuals from time to time.  This language is contained in the McDonald's and Dunkin' Donuts agreements as noted above.  H&R Block says that its manual "may be revised by Block from time to time to modify or supplement the H&R Block System and procedures or to adapt the System to new conditions or technology."   The Jani-King® Franchise Agreement sets forth at Section 4.25 the reason why franchisors retain this right:

> The Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System.  Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified trademarks, products, services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies.  Franchisee agrees to promptly accept, implement, use, and display in the operation of the franchise business all such additions, modifications and changes at its sole cost and expense.

This is consistent with the following statement from a publication of the ABA Forum on Franchising called *Fundamentals of Franchising*:

> Franchise systems, like any business organization, must evolve to remain competitive.  Things change over time — technology, competition, consumer preferences, regulation.  A system that cannot evolve cannot survive.  All franchisors, therefore, should reserve the authority to modify the franchise system's image, market position, format, product mix, and services.  Some modifications require franchisees to provide significant capital investment in the business.

(Rupert M. Balkoff & Andrew C. Selden eds., 2004.)

55.     Franchisor manuals customarily contain operating procedures that are mandatory and those that are recommendations.  The Jani-King manuals are consistent with this practice.

56.     As with any franchise system, the Jani-King manuals must be read as a whole, not in isolation.  Additionally, they should be read in context with the franchisee's training.  The manuals are written for the franchisee — not third parties.  They provide guidance and

recommended practices in connection with supporting the franchisee as it operates its business and controls day-to-day operations.

57.     It is standard practice for franchisors to require franchisees to comply with policies and procedures set forth in manuals.  *Fundamentals of Franchising* explains the reason for this as follows:

> One of the hallmarks of most franchise systems is a consistent appearance, operation, and array of products and services across numerous independently owned and operated businesses.  To achieve this consistency, the franchise agreement will describe the specifications, standards, and operating procedures that the franchisee must follow in operating its business.  While it might be desirable to articulate in detail the most significant specifications, standards, and operating procedures in the franchise agreement, it would be too cumbersome and inflexible to enunciate all of them.  For that reason, many franchisors reserve the right to establish and periodically modify and augment the governing specifications, standards, and operating procedures.  The franchisor will categorize these areas in the franchise agreement for reference purposes and articulate the general parameters of its discretion rather than detail the specific specifications, standards, and operating procedures.  The covered areas generally include the business facility's equipment, fixtures, and condition and appearance and periodic maintenance and repair; authorized and required products and services and product and service categories; designated or approved suppliers from which the franchisee may procure operating assets and supplies; standards of service; appearance of employees; use and display of trademarks and service marks; terms and conditions of the sale and delivery of, and terms and methods of payment for, goods and services that the franchisee obtains from the franchisor or affiliated suppliers; insurance requirements; production, presentation, packaging, and delivery of products and services; sales, marketing, advertising, and promotional programs and materials and media used in these programs; authorized warranties and obligations to honor warranties issued by other franchisees; the franchisee's operational control and management; business hours; forms and reports; signs, posters, and displays; staffing levels, management issues, and employee performance; credit practices and acceptance of credit and debit cards; and compliance with specific laws and regulations.

> Standards, specifications, and operating procedures are communicated in the operations manual and other written communications, through proprietary computer networks, at national and regional meetings of franchisees, and during field inspections and refresher training programs.

(The excerpt is Exhibit O my declaration at pages 78-79.)

**Jani-King Training**

58.     Training programs are typical of franchise opportunities in general and are expected by franchisees.  According to pages 73-74 of *Fundamentals of Franchising*:

> The franchise documents should address the training program's content, duration, and location.  The franchisor's training program for new franchisees not only teaches skills, knowledge, and management know-how but also can help align expectations, correct attitudes, create a desire and confidence in the franchisee to succeed, teach entrepreneurial skills, develop a willingness to cooperate for mutual benefit, and create enthusiasm for the franchise program. One of the training program's purposes, therefore, is to create in the franchisee a strong allegiance to the franchise system and lay the groundwork for a successful future relationship. To maximize its value to both the franchisee and the franchisor, the training program must be highly structured and appropriately systematized. The content typically consists of a training school (e.g., classroom instruction on operating the business), field experience (e.g., training and working in a franchisor or franchisee outlet), and training manuals and materials. The duration typically will be fixed but could be flexible depending on the franchisee's aptitude, experience, and facility in learning the business. Training usually is conducted at the franchisor's principal office, regional training facilities, or operating outlets. The people to whom training is furnished varies among systems but typically includes the franchisee (or a principal or managing owner), outlet managers and assistant managers, subsequently hired managers, and other employees.

> The franchisee (or its principal or managing owner) or its managers usually must complete the training program satisfactorily. The franchisor should develop objective criteria for determining satisfactory participation in training in the form of examinations and on-the-job evaluations. A franchisor often will reserve the right to terminate the franchise agreement if the franchisee (or its principal or managing owner) fails to complete the training program satisfactorily. In many cases, it will refund the initial fees to the franchisee and assist in disposing of the franchisee's business facility and operating assets. The franchisor usually will not terminate the franchisee if a non-owner manager fails to complete the training program satisfactorily. Instead, the franchisee must replace the manager with another person who can satisfactorily complete training.

> Franchisors frequently offer refresher training programs for the franchisee and its personnel. These may be optional or mandatory, depending on their content and location. Franchisors usually will not charge separately for the training they offer to new franchisees and a minimum number of personnel. These fees normally are encompassed within the initial franchise fee, although franchisors often reserve the right to charge separately for additional employees who attend the training program. In virtually all cases, however, the franchisee is responsible for the travel and living expenses that its personnel incur while attending the training program. Breaking out training fees may help the franchisee by allowing him to

expense them as a current business expense rather than having to amortize a larger initial franchise fee over a very long period.

(The excerpt is Exhibit O to my declaration at pages 73-74.)

**Franchisors Typically Have Some Direct Relationship With the Customer**

59.     Plaintiffs may argue that Jani-King of Philadelphia's "control" over contracts with customers is an indication of an employment relationship with its franchisees.  In my expert opinion, control over customer contracts does not convert Jani-King of Philadelphia from a legitimate franchisor to an employer of its franchisees.  Additionally, other well-recognized franchise systems also have direct relationships (contractual and otherwise) with their customers.

60.     To begin with, the basic franchise model used in the janitorial franchising business would not work if the franchisor were not a party to contracts with the end-user.  Jani-King of Philadelphia, like all other franchisors in the janitorial franchising business, offers business opportunities to its franchisees.  The FTC describes the typical practice in the janitorial franchise business as follows (see Exhibit B):

> If you're thinking about starting your own business and have only a small amount to invest, you may be considering buying a janitorial services franchise.  For a fee, a janitorial service company (the "franchisor") typically provides you (the "franchisee") with customers and marketing, billing and collection services.
>
> Every franchisor has success stories to share.  Be cautious.  While success in the janitorial service industry is possible, it's not a guarantee.
>
> A glossary of terms commonly used in the franchise industry is included at the end of this brochure.
>
> **How Janitorial Services Franchises Work**
>
> In a typical janitorial cleaning franchise, you pay the franchisor a fee for a "package" of cleaning accounts.  The fee is based on the dollar value of cleaning accounts that the franchisor will make available.  The fee usually is about half the gross income the accounts are supposed to generate in a year.  For example, for a fee of $10,000, you'll get accounts worth $20,000; for a fee of $15,000, you'll get accounts worth $30,000. You also may have to pay ongoing royalty or management fees.
>
> The franchisor may offer you financing.  This may sound especially attractive if you have trouble getting credit from traditional lenders.

> The franchisor is supposed to offer you cleaning accounts that will produce the level of income represented in the package you purchased. However, several factors can affect that level of income. For example, if you don't accept an account, the franchisor may not have to offer you a substitute. Or, if you refuse an account because you feel it's located too far away, you may lose your right to that income. Also, if you lose accounts because you did a poor cleaning job, the franchisor doesn't have to replace those accounts.

61.     Consistent with this framework, Jani-King of Philadelphia offers franchise opportunities for different levels of investment. The greater the franchise fee, the higher level of monthly business that Jani-King of Philadelphia will offer to the franchisee. The expected level of monthly business offerings may lead a franchisee to purchase a more expensive plan, and the lower franchise fees and lesser time commitment may lead a franchisee to purchase a less expensive plan.

62.     As a practical matter, Jani-King of Philadelphia, like the typical franchisor in the janitorial franchising business, must have contracts in hand before it may offer business opportunities to its franchisees in an effective manner. Jani-King of Philadelphia obtains contracts on a continuous basis. It allows itself a period of time within which it must offer a business opportunity to a franchisee, called the "Initial Offering Period," so that it has time to secure contracts from customers. The franchisee need not, however, accept the business opportunity. As the FTC notes in its advisory to potential franchisees, a franchisee may or may not choose to accept the opportunity offered by Jani-King of Philadelphia and similar franchisors for any variety of reasons. In that event, franchisors like Jani-King of Philadelphia will offer the opportunity to a different franchisee. Obviously, a janitorial services franchisor could not offer an opportunity to more than one franchisee in the brief period of time that it takes to meet the demands of the customer if it had not already secured the contract. If Jani-King of Philadelphia, as the franchisor, had to bring the franchisee that *might* be interested in a particular business opportunity into the negotiation of every contract that it may sign with the end-user, the Jani-King franchise model of offering business opportunities simply would not work. The janitorial business is competitive. Timing is critical. A customer may be considering several proposals to

meet its cleaning needs and many from non-franchised competitors.  The only way that Jani-King of Philadelphia and other janitorial service franchisors can offer specific and certain business opportunities to its franchisees is if it has secured the opportunity before it makes the offer.  Moreover, the concept that a business-to-business franchisor assists its franchisee in securing business through means other than generalized advertising and the like is good for the franchisor and franchisee alike.  One of the biggest challenges for any franchisee in a business-to-business franchise opportunity is getting business.  That the janitorial franchise business assists in securing these opportunities is a significant benefit to franchisees.  Labeling franchisees as employees just because the franchisor provides them with legitimate business opportunities would only destroy the model used by Jani-King of Philadelphia and every other janitorial services franchisor.  No such franchisor will continue to provide these important business opportunities if by, by doing so, the independent franchise business owner is re-defined as a franchisor's employee.

63.     Also significant to me is that a Jani-King® franchisee has no obligation to accept a business opportunity offered by its franchisor.  The franchisee is free to negotiate the terms of a contract with the end-user if it wants to secure business on its own.  Section 4.19.2 of the Jani-King Franchise Agreement states that "the Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise."  Although the same section provides that contracts solicited by the franchisee "must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the client)," the franchisee is still free to negotiate its terms.  Section 12.1 of the Franchise Agreement specifically states that "nothing in this agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor."

64.     Although some franchisors are not parties to contracts with the franchisee's customers, this is because the nature of their franchise system does not give them the ability to directly contract with the end user.  For example, McDonald's does not have "contracts" with its

26

customers.  And even if there were, a franchisor could not reasonably collect monies that a consumer pays for food at a franchise location given the transient nature of the fast-food restaurant customer.  However, McDonald's, like other franchisors, generally considers the customers as its own, with the franchise owner servicing the customer during the term of the franchise relationship. Additionally, McDonald's has several programs that show a direct link between the franchisor and customer.  McDonald's has established a national charity program in which its franchisees and their customers participate.  Each franchise location is able to accept donations from customers, which are then sent to the national program administered by the franchisor.  Franchisees process customers' orders on point of sale systems designed by the franchisor.  If a customer has a complaint, the franchisor has established a toll free number where that customer can speak with an employee of the franchisor (not the franchisee) to report the complaint.  Nearly every franchisor offers that same type of centralized customer service.

65.     Where franchisors do have the ability to contract with the end-user, franchisors do it. We often see this in the context of "national accounts."  A paper published for the ABA Annual Forum on Franchising entitled, "National Customer Account Management Issues," by Shelley Weatherbie and Gerald Wells, describes a national account customer as follows:

> Due to the variety of industries and business models utilized by franchise systems, it is essential to begin with a clear understanding of what we mean by the term "national account customer."  For purposes of this paper, we define a "national account customer" as any customer who 1) has on-going demands for products or services that exceed the capabilities of any single franchised business; 2) has multiple locations in diverse geographic areas that fall within multiple territories in the franchise system; 3) prefers a single contact in order to control pricing, billing and customer satisfaction; or 4) requires a single contact due to centralized buying authority or in order to comply with regulatory issues.

(Excerpts from the Forum paper are Exhibit P to my declaration.)

66.     For national account customers, the franchisor enters the contract directly with the national account.  The contract typically identifies the price for the product or service, calls for centralized invoicing, and the like.  The Forum paper by Weatherbie and Wells identifies the benefits of a national accounts program for franchisees as follows:

27

Many of the benefits for the franchisor also apply to a franchisee. Like every other business owner, a franchisee wants to make money and increase its own business revenues. A properly structured national account program delivers products and services to customers at attractive prices or on beneficial business terms, resulting in sales and revenue for a franchisee. A national account program can provide additional customers, increased sales volume and lower costs for franchise owners.

A national account program often reduces selling costs by allowing a franchisee to obtain a customer without expending its own time, money and effort to acquire the customer. It is obviously more cost-effective when a single salesperson can approach the buyer at a company to negotiate a contract for services to be provided at all of the company's locations, rather than have every franchisee approach the manager of the local unit of the company.

A national account program may substantially reduce or eliminate administrative costs for franchisees. For example, a franchisor might establish a call center to handle the requests for services from national account customers and take responsibility for dispatching calls. In other systems, the franchisor may handle invoicing and collecting payment from the customer for the products or services being provided by franchisees. If the franchisor is responsible for invoicing and collecting, the process may also reduce or eliminate the risk to the franchisee of bad debt.

A national account program may bring more predictability and stability to sales volumes. A franchisee may be better able to plan its operations, including the need for staff and the quantity of supplies to have on hand, resulting in the reduction of waste and better cost control. With a better idea as to the quantity of supplies needed, a franchisee may also be better able to negotiate with its key suppliers.

Many of these advantages to franchisor and franchisee alike from franchisors contracting directly with national accounts apply generally to Jani-King of Philadelphia and its franchisees.

67.     Another reason that a franchisor may choose to contract directly with the end-user is to protect its goodwill. Protection of the goodwill of the franchisor attendant to a franchisee's use of a franchisor's service mark and system is a critical component of franchising. Goodwill is, of course, the value of a business over and above its hard assets, which is attributable to the willingness of customers to patronize the business and the ability of the business to draw new customers in the future based on such things as reputation, customer relations, expertise, and the like. In the context of a business format franchise, goodwill is generated by the franchisee's use of both the franchisor's marks and its system. Franchisors like Jani-King of Philadelphia license

franchisees to use not only its trademarks in the business, but it also licenses the franchisee to use its entire method of doing business, which we typically refer to as the franchisor's "system." The franchisee uses the franchisor's marks, method of doing business (system), training, and support to attract and retain customers (essentially building goodwill in its own business by using the goodwill of the franchisor).  But the franchisee enjoys the fruits of this goodwill (existing and potential customer relationships) only so long as the franchise relationship continues.  Upon the termination of the franchise relationship, the goodwill attributable to the franchisee's use of the franchisor's mark and system belong exclusively to the franchisor.  A famous case out of New Jersey, involving Jiffy Lube International, describes the concept as follows:  "[O]ne can view a franchise agreement, in part, as a conveyance of the franchisor's good will to the franchisee for the length of the franchise.  When the franchise terminates, the good will is, metaphysically, reconveyed to the franchisor."  (The decision is reported at 834 F. Supp. 683.)

68.     Where, as with Jani-King of Philadelphia and similar janitorial franchise businesses, the franchisor is the only party to the agreement with the customer, the franchisor has an effective method of protecting its goodwill (the ongoing relationship with the customer) at the end of the franchise.  For example, if a Jani-King® franchisee is terminated because it is not living up to the terms of its franchise agreement, it has no right to continue to service a customer because the typical post-term noncompete protects the franchisor's goodwill, i.e., its interest in the continuing customer relationship.  If properly terminated, the franchisee has no right to continue to perform janitorial services that compete with Jani-King of Philadelphia's system for a period of time under the noncompete.  Because Jani-King of Philadelphia is the owner of the contract with the end-user, Jani-King of Philadelphia can then readily offer the opportunity to service the account to another franchisee without having to resort to the courts to enforce the post-term noncompete against a recalcitrant former franchisee.  In that way, the post-term noncompete and the customer contract serve the same function.  As the FTC observes in its "Buying a Janitorial Service Franchise":

> **Franchisor-owned accounts.** The franchisor may own all the customer accounts, including those that you get on your own. This means that if your franchise agreement ends, you will not be able to service the accounts for which you paid a fee, and you won't be able to service the accounts you got on your own, either.

Thus, by contracting directly with the end-user, Jani-King of Philadelphia and similarly situated franchisors have an effective means of protecting their goodwill upon termination of a particular franchisee for cause, and this benefits not only Jani-King of Philadelphia as the franchisor, but also its franchisees who continue to service customers even when franchisees leave the system.

69.    Jani-King of Philadelphia is hardly alone in contracting directly with customers. Express Services, Inc. is a franchise system that provides flexible staffing services. Its franchisees provide temporary workers to customers who contact the franchisor directly. (Exhibit I).

70.    Another example is the Handyman Connection franchise system. The franchisor of that system retains the right in its franchise agreement to enter into contracts directly with national or regional accounts, even if the work to be performed is located in a particular franchisee's territory. (Exhibit J).

71.    Snap-On Tools' franchise agreement provides that franchisees shall receive a "brokerage fee" on sales made to national or regional accounts managed by the franchisor. (Exhibit K).

72.    Similarly, the franchise agreement for Wireless Zone provides that certain payments by a franchisee's customers will be made directly to the provider of wireless services, which then remits a portion of those fees to the franchisor. The franchisor in turn passes along some of those fees to the franchisee, after deducting amounts owed under the franchise agreement. (Exhibit L).

73.    Hotel and car rental franchisors also interact directly with their customers. Such direct contact occurs at the point of reservation making, promotions, and affinity clubs. For instance, Marriott has an affinity program that allows the franchisor to offer directly to its customers certain perks. As a Marriott Platinum member, a customer is provided with a number

of benefits directly from Marriott including an elite telephone number exclusive to platinum members from which he can obtain benefits from the Marriott system's group of hotels including: the ability to book hotel rooms at any of the Marriott franchisee owned and operated locations worldwide from a central reservation desk; the ability to book rooms on line and pay for those rooms; guaranteed room availability at Marriott branded properties; discount pricing at hotels; bonus points; late room check out at Marriott hotels; gift shop discounts; rate discounts on weekends; free internet services; automatic room upgrades; extra towels; a refrigerator in my room; preferences on room location; access to feather free rooms; robes; free access to the hotels concierge lounge; free breakfast; drinks; snacks in the evening; free local phone and fax services; discounts on long distance calls; Hertz Gold Membership; and a free gift upon check-in at any Marriott hotel franchise (or corporate-owned) property.  These types of membership benefits are not available to other guests or if available the local hotel charges their customers additional fees. Additionally, Marriott (as the franchisor) issues customer service surveys to its affinity members, and those survey responses are remitted directly to the franchisor. Similar direct customer relationship and benefits are provided by many other hotels including but not limited to Intercontinental; Crowne Plaza; Holiday Inn; Hyatt; Fairmont; Wyndham; Radisson; and Hilton. Automobile rental companies also provide direct benefits to their system's customers including central reservations for cars and program benefits honored by the local franchisee including car upgrades; special pricing; and car availability.

74.    There are many other examples of franchisors who contract directly with customers.  Those customers then receive services from an individual franchised location. The existence of contracts between a franchisor and a customer does not in any way change the nature of the relationship between the franchisor and franchisee.  The franchisor does not exercise any additional control over the day-to-day operation of a franchisee's business simply by virtue of entering into a contract with the customer.  It is still the franchisee who must provide the service for which the customer is paying, and who must take responsibility for performing that service correctly.  Allowing the franchisor to enter into contracts with customers who are

then serviced by a franchisee is perfectly consistent with the concept of business format franchising.

**Jani-King of Philadelphia's Right to Perform Billing and Accounting Functions**

75.     Plaintiffs may cite to Jani-King of Philadelphia's billing and accounting functions as indicia that its franchisees are employees.  Section 4.7 of the Franchise Agreement states that "Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee."  Janitorial franchisors are not the only franchisors that perform billing and accounting functions for services provided by franchisees.  The providing of this service is not, in my view, control over the day-to-day operations of the franchisee.  Billing and collections are critical in business-to-business services where payments are made on a periodic basis, as in the janitorial and staffing or personnel industry.  Few things are more sensitive in these types of businesses than proper billing and collection, and centralizing this function with the franchisor benefits both the franchisee and franchisor by assuring consistency among accounts.  In addition, it relieves the franchisee of the ministerial function of billing and collecting on accounts and allows the franchisee to focus instead on delivering cleaning services to its customer.

76.     From the franchisee's perspective, it matters little whether the monies paid by the customer are the property of the franchisor or the property of the franchisee.  The important thing for the franchisee is that she receives the revenues to which she is entitled under the franchise agreement.  The way it works in the Jani-King® system, as well as all other janitorial franchise systems, national accounts programs, and systems like Express Services is that monies are collected in the first instance by the franchisor, the franchisor takes from the monies it receives the fees owing to it under the franchise agreement, and the remainder goes to the franchisee.  According to page 20 of Express Services' franchise agreement:

> We shall submit all bills to clients for all associates furnished and shall instruct clients to remit payment directly to Us.  You shall not render bills or statements to clients, but shall use Your best efforts to collect bills in accordance with the policies and procedures in the Express Procedures Manual.  If payment of any bill

is made payable to You, payment shall be deemed to have been received in trust for Us, and You shall not deposit or convert the funds received and shall immediately forward the same, properly endorsed, to us.

The result is the franchisee and the franchisor each obtain the fees spelled out in the franchise agreement, and the franchisee, in the process, is relieved of the burden of collecting on accounts.

**Franchisee's Use of Jani-King® Uniforms**

77.    It is common practice among business format franchisors to require franchisees and their employees who have contact with the customer to wear uniforms.  I believe the value of this to any franchise system is self-evident.  One need only walk into the many franchised locations in any large city to find that employees of the franchisee wear common uniforms and name tags.  This requirement is entirely consistent with the objective of franchisors that their franchisees present a uniform product or service to customers.  Again, the objective for franchisors is that each franchised business be indistinguishable from all others in the eyes of the consumer.  The uniform is important to a customer from a safety perspective, particularly when a franchisee is providing services that require the franchisee to enter the premises of a customer's building or residence.  The uniform re-assures the customer that the person calling upon the customer is a bona fide franchisee.  Requiring uniforms does not relate to controlling the day-to-day operations of a franchisee.

**Franchisees Control Their Own Daily Schedule**

78.    Plaintiffs claim that Jani-King of Philadelphia controls the manner in which they clean their customers' accounts.  While Jani-King of Philadelphia retains the right to ensure that the results of franchisees' work meet its standards, it does not purport to exercise any control over the manner in which franchisees perform that work.  Jani-King of Philadelphia does not dictate the specific steps that a franchisee must take to clean a given account.  Nor does it require a franchisee to have a certain number of cleaners at a certain account at a certain time.  Nor does it dictate where the supplies or equipment that a franchisee uses to clean the accounts must be purchased.

79.     It is the franchisee's responsibility to determine how best to clean a given account, and how many employees to assign to it.   A franchisee must work with a given customer to determine an arrangement that meets the customer's needs and still makes the account profitable for the franchisee.   Jani-King of Philadelphia does not play any role in that process.

**The Skill Required to Be a Franchisee**

80.     Plaintiffs suggest that they are unskilled or low-skilled workers.   But such an argument not only dismisses the technical skills needed to perform several commercial cleaning services (such as strip and wax), but also wholly ignores the skills needed to own and operate a franchised Jani-King® business.   Jani-King® franchisees do much more than just clean customers' accounts.   They are responsible for all aspects of running a small business.   A franchisee must take responsibility for marketing, customer service, human resources, payroll, financial management, and all the other functions inherent in the operation of a small business. To be successful, a Jani-King® franchisee must be as skilled as any other small business owner. Jani-King of Philadelphia's franchise system does not require its franchisees to be any more or less skilled than franchisees of other systems.

**In-Term Non-Compete Agreements**

81.     Nor is there anything unusual about requiring a franchisee to agree not to operate a competing business during the term of its franchise agreement.   Plaintiffs claim that the in-term noncompete in the Jani-King® Franchise Agreement means that Jani-King® franchisees cannot be independent contractors because such an agreement necessarily requires that the plaintiff is not customarily engaged in an independently established business.   If this is true, then no franchisee can ever be an independent contractor because "virtually all" franchise agreements have in-term noncompetes.   According to *Fundamentals of Franchising*:

> Virtually all franchise agreements have in-term covenants prohibiting the franchisee's or its owners' association with or interest in a competitive business during the franchise term.   The definition of a "competitive business" varies among franchise systems.   Ideally, it is broad enough to protect the franchisor and

its proprietary information from possible leakage into related businesses yet sufficiently narrow to be enforceable in most states.  In-term covenants (i.e., those that apply only during the term of the franchise agreement) are enforced more universally than are post-term covenants.

82.    Nearly all franchisors require a franchisee to refrain from operating a business that competes with its franchised business during the term of the franchise agreement.  A franchisor has the right to expect that a franchisee will devote his or her best efforts to running the franchised business and not take the training and confidential information provided by the franchisor and use it to compete against the franchised business.  The same is true once the franchise agreement expires.  Many franchisors require franchisees to agree not to operate a competing business within a defined territory for a certain period of time after the end of the franchise relationship.  Such post-expiration covenants against competition are necessary to preserve the customer goodwill generated through the use of the franchisor's trademarks and business system.  Restrictive covenants of that type are perfectly consistent with a franchise relationship.

83.    Most franchisors include in-term noncompete provisions in their franchise agreements.  Thus, the McDonald's agreement states at paragraph 11(a) that:

> During the term of this Franchise, Franchisee shall not, without the prior written consent of McDonald's, directly or indirectly, engage in, acquire any financial or beneficial interest (including interests in corporations, partnerships, trusts, unincorporated associations, or joint ventures) in, or become a landlord for any restaurant business, which is similar to the Restaurant.

The H&R Block agreement states at paragraph 12(a) as follows:

> During the term of this Agreement (or, for each of Franchisee's Associates, during the term of this Agreement for so long as such Associate satisfies the definition of "Franchisee's Associate" as set forth in this Agreement), neither Franchisee nor any of Franchisee's Associates shall, without Block's prior written consent, engage directly or indirectly (whether as owner, stockholder, partner, officer, director, employee, consultant, franchisor or otherwise) in any business which offers any product or service the same as or similar to any Authorized Service (1) in or within 45 miles of the Franchise Territory, (2) in the franchise territory granted to any other Block franchisee, or (3) within 45 miles of any H&R Block tax office operated by Block or its affiliates.

The Dunkin' Donuts agreement states at paragraphs 8.0 and 8.0.1 that "[d]uring the term of this Agreement," franchisee will not:

> [d]ivert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR'S Proprietary Marks and System(s).

The Express Services agreement states as follows at paragraph X.A.1 that the franchisee will not:

> During the term of this Agreement, and any extension or renewal, associate directly or indirectly as an employee, proprietor, stockholder, member, partner, agent, consultant or any other form of association of any kind, or serve as an officer of any business competitive to Us or Our franchisees.  This shall include, but is not limited to, the operation of any type of business offering the services of flexible staffing — temporary/contract staffing, or direct hire — professional search.

The Goddard Systems agreement prohibits franchisees from operating a competing business within ten miles of their formerly franchised location for a period of three years.

**A Partial List of Franchisee-Retained Controls**

84.    As noted above, the Jani-King® franchisee has control over day-to-day operations.  It also retains control of many other aspects of the franchised business.  The following is a partial list of relative controls:

- Jani-King of Philadelphia does not require franchisees to make sales calls.

- Jani-King of Philadelphia does not specify the time or days when any specific account will be serviced as the time and days are set by each individual customer, as is common in the janitorial business.

- Jani-King of Philadelphia does not specify the order in which the franchisees may schedule the servicing of any account as the order of service is left solely to the franchisee and the requirements of the individual customer.

- Jani-King of Philadelphia does not specify any human resource requirements including whether the franchisee hires employed staff or uses the services of outside contractors.

- Jani-King of Philadelphia does not set the standards for selection of outside contractors by the Plaintiffs.

- Jani-King of Philadelphia does not specify any hiring or termination requirements governing how the franchisees manage their human resources including pay scale, bonuses, vacations, sick pay, sick leave, transportation, and so forth.

- Franchisees supervise their own staff and determine the level of staff and outside contractor training necessary to meet their obligations to the customer and under the Franchise Agreement.

- Franchisees are free to determine how or whether they will finance all or a portion of their investment into their business.

- Franchisees are free to select a financing institution, provide that institution with collateral as that institution may require and negotiate the terms of the loan, including interest rate and payment period.

- Franchisees are free to deduct the interest on any business loan from their income tax returns.

- Franchisees are free to select their financial, tax, legal, or other advisors.

- Jani-King of Philadelphia does not specify the brand of the equipment franchisees use in their business.

- Jani-King of Philadelphia does not specify the brand of the cleaning materials franchisees use in their business.

- Jani-King of Philadelphia does not specify a required source of cleaning supplies or equipment to be used in the franchisees' businesses, although franchisees may, at their own choosing purchase equipment and supplies directly from the franchisor and its affiliates.

- Franchisees are not required to work out of Jani-King of Philadelphia's offices and are free to maintain their own independent places of business, selected by them and at their own expense.

- Franchisees account for their own income and expenses and are responsible for filing their own income tax returns.

- Franchisees may choose the type of corporate or other entity they wish for conducting their business.

- Franchisees may depreciate and amortize their assets, independently deciding on the methods of destruction available to them under the law and obtain the benefit of deducting depreciation, amortization, or other expenses in offsetting their revenue for financial statement and tax purposes.

- Franchisees are responsible for providing their own employees with W-2 forms.

- Franchisees are responsible for providing their independent contractors with 1099s.

- Franchisees receive and accept from Jani-King of Philadelphia annually a 1099 indicating the revenue they had been paid and use the 1099s in filing their tax returns.

- Franchisees are responsible for making their own federal, state, and local employee tax depositories and filing the required quarterly and annual returns.

- Franchisees are responsible for filing worker's compensation claims for their employees, meeting the requirements for unemployment insurance, and responding to communications with outside government and regulatory authorities in the conduct of their businesses.

- Franchisees are responsible for filing fictitious name filings with the appropriate government authorities.

- Franchisees are able to resign from any customer's account, at their choosing, upon prescribed written notice to the franchisor.  Franchisees may resign from accounts regardless of how resignation impacts Jani-King of Philadelphia's relationship with the customer.

- Franchisees may reject accounts offered to them by the franchisor.

- Franchisees may up-sell customers on additional work and accept or reject additional work offered to them by customers.

- Franchisees are not reimbursed for their travel or related expenses and are able to claim those expenses on their tax returns.

- Franchisees may not be terminated at will.

- Franchisees may select their own risk advisors and select insurance coverage at limits higher than specified by their franchise agreements.

- Franchisees are able to sell their businesses and retain any profits or incur any losses on those transactions.

I have reviewed declarations submitted by several existing Jani-King of Philadelphia franchise owners, which are attached to my declaration as Exhibit Q.  Those franchisee declarations confirm that Jani-King of Philadelphia's franchisees retain control over the day-to-day operation of their franchised businesses.

**Jani-King Franchisees Operate Businesses Independent of Jani-King of Philadelphia's Business**

85.     Throughout their Complaint, Plaintiffs allege that the businesses they operate provide the same services provided by Jani-King of Philadelphia.  That is not true.  Plaintiffs operate businesses that provide commercial cleaning services to customers.  Jani-King of Philadelphia does not provide cleaning services as part of its normal day-to-day business. Instead, Jani-King of Philadelphia's business is to sell and support franchises.

86.     The primary business of Jani-King of Philadelphia is to offer individuals and entities who wish to operate independent franchised businesses the opportunity to become a Jani-King of Philadelphia franchisee, and to support the franchisees in the operation of their businesses.  Jani-King of Philadelphia's day-to-day business operation is much different than the operation of its franchisees' businesses.

87.     The Jani-King franchisor's business is to develop the franchise system and brand, license it, protect it, and support the franchise owners in the marketing of their janitorial services

and their delivery of those services to the end-user.  In contrast, the business operations of Jani-King® franchise owners relate to the running of its own business, which includes the performance of janitorial services for end-users, while following brand standards that signify to the public the consistency of services expected from a branded operation.  This consistency is essential to the successful marketing of a branded operation.

88.      In a broad sense, franchisors license franchise owners to use the franchisor's trade or service marks and its business model to offer goods and services to the end-user that comply with the system's required brand standards.  Functionally, franchisors typically break down their daily activities into these categories: franchisee recruitment, sales and development; training; franchise support; contract administration; organizational administration; research and development; marketing; and operations.  All of these functions have as their ultimate objective the enhancement and protection of the franchisor's system and brand by assisting each franchisee and assuring that each franchise owner is equipped and does in fact deliver a product or service to the public in a way that is consistent with the franchisor's brand standards.  This is the franchisor's usual course of business and is standard across the thousands of different franchise brands operating in over 120 industries today.  In contrast to the business of being a franchisor, the role of the franchise owner is the actual delivery of the product or service to the end-user.  While the franchisor licenses its brand and system, the franchisee is in a different industry from the franchisor.  One is a franchisor and the other is the purveyor of a product or service such as those offered by McDonald's franchisees, Marriott franchisees, Supercuts franchisees, Two Men and a Truck franchisees, and Jani-King franchisees.  Regardless of the brand or the industry, each franchisee must perform in a way that is consistent with the franchisor's brand standards, but the details of how it does so are matters within each individual franchisee's control.  In a fast-food franchise system, for example, the franchise owner prepares and delivers the food to the customer.  As a part of this delivery, the franchise owner controls the day-to-day operation of its business and ensures that its personnel do the important things like smiling at the customer and ensuring that each order is delivered hot and fresh and that the order is filled accurately.  In

the janitorial services franchise business, it is the franchise owner and/or his employees that perform the actual cleaning of the premises, working with its customers on the timing of the services, the completeness of the services to meet the customer's expectations, and the selling to the customer of additional services the customer may need.

89.     There is a difference between "sharing a brand" and a company's business operations.  The franchisor and its franchise owners in all franchise systems share a common brand; because of that, the incorrect assumption may be that they operate in the same "business." McDonald's as a franchisor and its franchisees, for example, share the same brand, but only the franchisees operates in the day-to-day business of fast-food sales. Likewise, Jani-King of Philadelphia and its franchisees share the same brand, but only its franchisees (except for the limited exception of a subcontractor hired by Jani-King of Philadelphia to temporarily clean a customer account) operate in the day-to-day business of janitorial cleaning services. What each party to the relationship does as part of its business in bringing the product or service to market is dramatically different.  While they are symbiotic (as any national brand is with its downstream delivery system), it is the role of the franchisor to manage the system, but it is the role of the franchisee to deliver to the end-user customer the services marketed by the brand.

90.     Franchisors perform a number of functions that are distinct from the services provided by franchisees to customers.  For example, a major fast-food franchisor will typically have a research department devoted to developing new products to roll out to the consumer. Some franchisors like Midas Muffler, Hertz and Marriot, rely on national accounts to support their system and have a department devoted just to national accounts. Some, like Quiznos, the personnel franchisors, and the janitorial cleaning franchisors, provide significant accounting services to franchise owners and have departments that do nothing but this.

91.     Organizationally, franchisors typically group their business activities as a franchisor into a number of different functions—franchisee recruitment, sales, and development; training; franchise support; contract administration; organizational administration; research and development; marketing; and operations.

92.     Franchisee recruitment, sales, and development is the process of recruiting, selecting, and selling franchise opportunities to franchise owners that meet the system's requirements.

93.     Training is the process of teaching new franchise owners how to use the franchisor's business model or system of doing business.  Its objective is to assure the uniformity that is the essence of franchising.

94.     Franchise support is the field support provided to franchisees, including the periodic inspection of their services to customers necessary to protect the brand and the other franchisees that use the franchisor's brand.  It refers to the group within the franchisor organization that is responsible for interfacing with the franchise owners.  This department serves as a carrot-and-a-stick.  It is responsible for helping the franchise owner operate a successful business by providing it advice and training, but it is also responsible for monitoring whether the franchise owner is following brand standards.  Field staff within the operations department makes regular or irregular, announced and unannounced, visits to the franchise owner to share "best practices" among franchise owners, identify issues standing in the way of the franchise owner's success, and identify deficiencies in their operations that may result in "defaults" under the franchise agreement.

95.     Contract administration involves the signing, transferring, renewing, and terminating of franchise agreements. Contract administration also encompasses "compliance," the process of ensuring that the franchisor is complying with the regulations set forth by the Federal Trade Commission and various state laws and regulations.  This encompasses compliance with the disclosure requirements of the FTC Franchise Rule and various state laws and regulations (the preparation and updating of the Franchise Disclosure Document) as well as the requirement in some states that the franchisor register the franchise opportunity prior to sale. This department may also train franchise sales personnel to conduct the offer and sale of franchise opportunities in compliance with these laws and regulations.

96.     Organizational administration refers to the personnel attending to the human resource, financial, and operational requirements of the franchisor.

97.     Marketing involves advertising the franchise "brand," including supporting the growth of the franchisees' businesses by marketing brand services to end-user customers. Marketing may also include an array of other activities (product promotions are a good example).  It is not unusual for a bigger franchisor to have an entire marketing department devoted to developing creative materials and marketing plans.  Franchise owners typically contribute a percentage of their sales to marketing, and the franchisor typically controls the marketing programs with the aid of franchise owner and outside agency input.

98.     In addition to these typical functions, franchisors may engage in a broad range of other activities that are part and parcel of its usual course of business of serving franchise owners in the delivery of a uniform product or service to an end-user.  A product distribution franchisor like an automobile manufacturer may manufacture the product that its franchise owner sells to the end-user.  For example, in the Chem-Dry franchise system each franchisee purchases the chemicals they use to clean carpets from the licensor that owns the license to produce the chemicals sold to the franchisee.  Similarly in the Little Caesars pizza system, franchisees purchase their ingredients from Blue Line, the distribution company owned by an affiliate of the franchisor.  As noted earlier, a big "player" in the fast-food business will have a research and development department devoted to developing new products or services for sale to its franchise owners.  A number of franchisors offer accounting services to their franchise owner, as I discuss more fully below.  And many franchise owners play an active role in securing customers for the franchise owner and even enter the actual contract with the customer.  But these activities do not alter the respective roles of the franchisor and franchise owner.  The function of the franchisor remains supporting the franchise owner and protecting the brand, and the function of the franchise owner remains delivering the product or service to the end-user consistent with the system's brand standards and to the satisfaction of the end-user customer.

99.     Franchisors have as their ultimate objective growing the franchise system and assisting franchise owners in being successful in their delivery of a uniform product or service to the end-user.  One of the franchisor's responsibilities is to make sure that franchise owners comply with the franchisor's brand standards.  Brand standards are also called "system standards" and consist of the rules and regulations that a franchisor prescribes (typically in an "operations" manual) in an attempt to ensure that the product or service experienced by a customer is consistent from one franchise owner to the next.  Brand or system standards do not control the details of how a franchisee operates its business, but set forth requirements designed to fulfill the franchisor's responsibility to assure uniformity and meet the brand expectations of the end-user customer.  For McDonald's and Burger King, that includes ensuring that French fries taste the same each time a customer orders them.  In Jani-King, it includes each cleaning service meeting the unique requirements of the end-user customer.

100.     The functions performed by Jani-King of Philadelphia ultimately do not make it any different than any other franchisor in the United States. Each of the things it does as a franchisor are things done by franchisors generally, including franchisors that operate under a similar or dissimilar business model. If what Jani-King of Philadelphia does means that it is in the same usual course of business as its franchise owners, then every franchisor and franchise owner in the United States operates in the same usual course of business as its franchisor.  That is clearly not the case and is not supported by the over seventy years of modern franchising since the end of World War II, or even from the origins of franchising in the United States, which dates back to 1732 when Benjamin Franklin entered into his first franchise agreement with his first franchisee, Thomas Whitmarsh, for a printing store in North Carolina.

101.     In connection with this declaration, I have had several discussions with Jani-King management about the role of Jani-King of Philadelphia in the franchise system vis-à-vis the role of Jani-King® franchise owners.  These discussions support my finding that Jani-King of Philadelphia operates its business as a traditional franchisor.

102.    My investigation and research show that day-to-day business operations of Jani-King of Philadelphia do not include performing commercial cleaning services for end-user customers on a regular or consistent basis.  The only time a Jani-King of Philadelphia employee (from the operations team) cleans an account is in the rare instance where a franchise owner failed to show up at an account and the customer has threatened cancellation of the contract unless the premises is cleaned immediately (and before the franchise owner or another franchise owner can be reached).

**The Role of Franchise Owners in General and Jani-King Franchise Owners in Particular**

103.    As stated above, the role of franchise owners in a franchise model is to deliver the product or service to the end-user.  Although the franchise owner must do so in a way that complies with the franchisor's business model, the franchise owner and not the franchisor controls the details of its delivery of the product or service.  The usual course of business of the franchise owner is managing the delivery process of the good or service, including the supervision of its own employees, controlling the time it takes to deliver its products to end-user customers, managing the staffing that it utilizes to provide those services, and so forth.  In fact, the success of a franchise owner depends on how well the franchise owner manages its delivery of the product or service to the end-user customer.  If the franchise owner is aggressive in developing business opportunities, exercises care in finding the right employees, controls the expense side of its business operations, up-sells or expands its services to existing customers, and the like, the franchise owner will be successful.  In contrast, the franchise owner that does not do these things is much less likely to succeed.

104.    With respect to the Jani-King® franchise system, Jani-King® franchise owners operate franchise businesses that perform commercial cleaning work at one or more commercial cleaning accounts. Franchise owners are responsible for the management of their business, which centers around the cleaning of accounts provided by the franchisor or sourced independently by franchisees.  This is identical to McDonald's, which uses extensive consumer

brand advertising to attract customers, or companies like Battery Plus or Handyman Connection, which operate call centers for the benefit of their franchisees.

105.    Specifically, Jani-King® franchise owners decide what accounts to clean–either generating accounts for their own business or accepting accounts offered to them by Jani-King of Philadelphia.  Franchise owners decide the details about the manner in which the services will be performed for the account, taking into account the customer's requirements, the franchise owner's schedule, and the schedules of any other commercial cleaning account which the franchise owner services.  Franchise owners also are able to decide how long they clean an account–they may resign from any customer account at their choosing, regardless of how the resignation impacts the Jani-King® brand or goodwill.

106.    Franchise owners control which individuals clean the accounts.  Franchise owners may clean the accounts themselves, or hire workers or engage independent contractors to clean for them, or both.  If the franchise owner hires workers, the franchise owner has total control over their hiring, training, and termination, and dictates the terms of their employment (schedule, hours worked, pay, vacation, etc.).  At times, the franchise owner will have a manager that has the day-to-day contact with the workers.  Jani-King of Philadelphia has no direct supervisory contact with any of the employees or subcontractors of its franchisees, nor does Jani-King of Philadelphia have any contractual right to do so.

107.    Other aspects of a franchise owner's regular business operations include: purchasing equipment and supplies; communicating directly with commercial cleaning customers about the franchise owner's performance or potential additional services that the franchise owner could provide; managing cash flow; and various business administration tasks, such as paying taxes based on their business's revenues and taking deductions based on business expenses, incorporating their business, filing appropriate business license filings, selecting insurance coverage, depreciating and amortizing assets, and hiring appropriate legal and financial advisors.

108.     In my expert opinion, this collection of functions provides a distinct role for the franchise owner in the franchise distribution model.  The franchise owner's business operations are substantial, and often require a franchise owner to dedicate all of its efforts towards managing its operations. There are some franchise owners who have generated hundreds of thousands of dollars in performing commercial cleaning while a Jani-King® franchise owner. Since every franchise owner has the opportunity to operate his or her franchise in the manner described above, it is justifiable to consider the Jani-King franchisees as independent, stand-alone businesses.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  22 August 2013

_____

Michael H. Seid

dms.us.52620613.05