UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINCENT DE GIOVANNI, )<br>MARIETTE BARROS, DIAMANTINO )<br>FERNANDES, MARIA PINTO, and )<br>all others similarly situated, )<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>JANI-KING INTERNATIONAL, INC., )<br>JANI-KING, INC., and )<br>JANI-KING OF BOSTON, INC., )<br>    Defendants. ) | Exhibit 5<br><br>C.A. No. 07-10066-MLW |

## ORDER

WOLF, D.J.                                                                 June 8, 2012

For the reasons described in detail in court on June 6, 2012, it is hereby ORDERED that:

1. The plaintiffs' Motion for Summary Judgement regarding prong two of the misclassification test, Mass. Gen. Laws ch. 149, §148B(a)(2) (Docket No. 184) is ALLOWED.

2. The defendants' Motion for Summary Judgment regarding prong two of the misclassification test (Docket No. 189) is DENIED.

3. The defendants' Motion to Decertify Class (Docket No. 187) is DENIED.

4. By July 20, 2012:

(a) The parties shall confer and report whether any agreement has been reached to resolve this case.

(b) If the case is not settled, the parties shall report whether they wish to participate in mediation to be conducted by a magistrate judge, by this court, or by a private mediator.

(c) If the case is not settled and the parties do not wish to engage in mediation, they shall submit, jointly if possible and separately if necessary, a proposed schedule for future proceedings in this case.

6. If necessary, a scheduling conference shall be held on August 6, 2012 at 4:00 p.m. Representatives of each party with full settlement authority shall attend.

                                                /s/ Mark L. Wolf
                                      UNITED STATES DISTRICT JUDGE

```
 1                  UNITED STATES DISTRICT COURT
 2                   DISTRICT OF MASSACHUSETTS
 3
                           No. 1:07-cv-10066-MLW
 4
 5
 6   VINCENT DeGIOVANNI, on behalf of himself and all other
     similarly-situated individuals,
 7            Plaintiffs
 8   vs.
 9   JANI-KING INTERNATIONAL, INC., et al,
              Defendants
10
11
12                         *********
13
                      For Hearing Before:
14                 Chief Judge Mark L. Wolf
15
                      Summary Judgment
16
17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Wednesday, June 6, 2012
20
                          ********
21
22          REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23                United States District Court
       One Courthouse Way, Room 5200, Boston, MA 02210
24                 bulldog@richromanow.com
25
```

```
 1                    A P P E A R A N C E S
 2
 3    SHANNON E. LISS-RIORDAN, ESQ
      HILLARY A. SCHWAB, ESQ.
 4    STEPHEN S. CHURCHILL, ESQ.
        Lichten & Liss-Riordan, P.C.
 5      100 Cambridge Street, 20th Floor
        Boston, Massachusetts 02114
 6      (617) 994-5800
        Email: Sliss@llrlaw.com
 7      For plaintiffs
 8
      AARON D. Van OORT, ESQ.
 9    KERRY L. BUNDY, ESQ.
        Faegre Baker Daniels, LLP
10      2200 Wells Fargo Center
        90 South Seventh Street
11      Minneapolis, Minnesota 55402-3901
        (612) 766-7000
12      Email: Aaron.vanoort@faegrebd.com
     and
13    GREGG A. RUBENSTEIN, ESQ.
        Nixon Peabody, LLP
14      100 Summer Street
        Boston, Massachusetts 02110-2131
15      (617) 345-6184
        Email: Grubenstein@nixonpeabody.com
16      For Defendants
```

```
 1          P R O C E E D I N G S
 2          (Begins, 3:00 p.m.)
 3          THE CLERK:  Civil Action 07-10066, Vincent
 4   DeGiovanni versus Jani-King International, Inc.  The
 5   Court is in session.  You may be seated.
 6          THE COURT:  Good afternoon.  Would counsel
 7   please identify themselves for the Court and for the
 8   record.
 9          MS. LISS-RIORDAN:  Good afternoon, your Honor.
10   For the plaintiffs, I'm Shannon Liss-Riordan.
11          MR. CHURCHILL:  And Stephen Churchill, your
12   Honor.
13          MS. SCHWAB:  And Hillary Schwab.  Good
14   afternoon.
15          MR. RUBENSTEIN:  Good afternoon, your Honor.
16   For the defendants, Greg Rubenstein of Nixon Peabody,
17   local counsel.
18          MS. BUNDY:  And Kerry Bundy and Aaron Van
19   Oort, from Faegre Baker and Daniels.
20          THE COURT:  Okay.  We're here today for
21   argument and, I expect, decision on the pending
22   motions.  There are cross-motions for summary judgment
23   with regard to whether the plaintiffs were misclassified
24   as independent contractors rather than employees under
25   Mass. General Law, Chapter 149, Section 148B, and
```

```
 1   Coverall, North America.
 2          THE COURT:  So this is on the damages question
 3   Judge Young certified?
 4          MS. LISS-RIORDAN:  This is on the damages
 5   question.  And based on this decision, even the damages
 6   are now determinable on a class-wide basis without the
 7   need for individualized inquiry because the data comes
 8   straight out of the company's computer, how much were
 9   charged in franchise fees, how much were charged in
10   additional business fees, and how much were charged in
11   insurance payments.
12          THE COURT:  All right.  I'm going to take a
13   recess.  Unless I get diverted, I'll be back in about 10
14   minutes or so and let you know where we are and where
15   we're going.  Either I'll rule or I'll take the matter
16   under advisement.  We'll see.
17          The Court is in recess.
18          (Recess, 4:45 p.m.)
19          (Resumed, 5:15 p.m.)
20          THE COURT:  Sometimes arguments make things
21   more clear, but as has happened in this case before, the
22   elegant arguments today have made them more complicated,
23   um, but if we had to wait until I was positive about
24   some of these issues, the case wouldn't progress.  So I
25   have studied this intensively in advance of the
```

hearing. I'm going to give you my decision orally. I hope that the level of detail, among other things, will indicate it has not been reached casually. And I'm going to decide the issues essentially as they were defined by the parties in this motion for summary judgment which make no serious effort to distinguish between the three defendants who are collectively referred to as "Jani-King."

For the reasons I'll describe, I find there are no material facts in dispute with regard to the issue under Chapter 148B and that a reasonable factfinder could not find that the members of the plaintiff class were independent contractors -- and I'm talking shorthand, so they're entitled to be treated as employees for the purpose of 148B.

I'm not going to decertify the class that Judge Young certified and I believe I clarified the definition of the class. However, as the parties recognize and as Rule 23 provides, the class can be altered or the order certifying the class can be amended at any point. And I think some of the issues raised today go at a minimum to the typicality of the named plaintiffs, although I think that's an issue that Judge Young addressed in his decision certifying the class, which is the law of the case. So I'm deciding the matters that have been put to

me today based on the record I have before me, but there may be further evolution.

The transcript will be a record of the decision. It's possible that at some point I'll convert the transcript into a more formal memorandum and order. But you should assume that once it's corrected, um, to assure the Court Reporter hasn't misunderstood anything I'm saying, um, it will the record of the decision for the foreseeable future.

By way of summary, this case is brought by janitorial workers characterized as franchise workers who, among other things, alleged that the defendants misclassified them as independent contractors, although they were in fact employees under Massachusetts General Law Chapter 149, Section 148B. The plaintiffs claim that the defendants, collectively referred to as "Jani-King" throughout these summary judgment papers, by both sides, perpetuated abuses that are typical of commercial cleaning franchise systems. Specifically it is alleged that the defendants targeted immigrants, having limited ability to speak English, lured them with the false promise that they would achieve the American dream through ownership of a small business, and then collected excessive fees in return for providing them nothing more than a low-paying janitorial job.

The parties, after discovery, are limited to the pertinent issue, but relevant, I'm sure, to related issues, have each filed cross-motions for summary judgment on the second prong of the three-prong test that a putative employer must satisfy in order to demonstrate that a worker is an independent contractor and not an employee. That prong requires the defendants to show that the plaintiffs are performing a service, quote, "outside the usual course of the business of the employer." That's Mass. General Law, Chapter 149, Section 148B(a)(2). Defendants have also moved to decertify the class that was certified earlier in this litigation.

Plaintiffs, in essence, argue that this case represents a straightforward application of the misclassification test. They claim the defendants created and operated a commercial cleaning franchise system, but are in the business of commercial cleaning, and plaintiffs' work is performed within the usual course of that business. This is the conclusion that my colleague, Judge William Young, reached in another case involving commercial cleaning franchises, **Awuah vs. Coverall**, 707 F. Supp. 2d 80, at 84. The defendants, however, argue that Jani-King's course of business is different than that of the franchise owners because

they're at different levels of the distribution system for cleaning services. Specifically they argue that Jani-King develops a cleaning system and promotes and maintains the Jani-King brand, whereas the plaintiffs provide cleaning services. Moreover, the defendants argue that interpreting Section 148B(a)(2) in a manner that places a franchisor and a franchisee in the same "course of business" would altogether abolish franchising in Massachusetts.

As I will explain, I find that the plaintiffs are entitled to summary judgment because the undisputed facts show that the plaintiffs provide commercial cleaning services within the usual course of the business of the defendants, particularly Jani-King of Boston. In addition, I find that the defendants have not shown that decertification of the class is warranted at this time.

The standard for determining whether a grant of summary judgment is appropriate is familiar. The Court must look at the admissible evidence and view the facts in the light most favorable to the nonmoving party. Where as here there are cross-motions for summary judgment, it's possible that neither party would be entitled to summary judgment. I've considered that, but I find that the plaintiffs are entitled to summary

[Page 82]

judgment.

When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

In determining the merits of a motion for summary judgment, the court is compelled to undertake two inquiries, one, whether the factual disputes are genuine, that is, whether admissible evidence puts one into dispute, and whether any fact genuinely in dispute is material. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. To determine if a dispute about a material fact is genuine, the court must decide whether the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party and the evidence must be admissible evidence.

With regard to the applicable law of this case, the Massachusetts independent contractor statute provides that an individual performing a service shall be considered an employee unless the three statutory

[Page 83]

criteria of Section 148B are satisfied, as explained by the Supreme Judicial Court in *Somers*, 454 Mass. 582, at 589. With regard to the statute specifically, it provides that: "An individual performing any service, except as authorized under this section, shall be considered an employee unless," and then there are three provisions. In the second provision, which is the issue here, it states that "The service is performed outside the usual course of the business of the employer."

The SJC explained in *Somers* that "A legislative purpose behind the independent contractor statute is to protect employees from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." In *Somers*, the SJC acknowledged that the legislature might have written the independent contractor statute to provide greater protection for employers, but it did not do so. That's 454 Mass. at 592. As the SJC said in *Somers* as well, Section 148B places the burden on the employer to prove the three prongs of the test by a preponderance of the evidence. "The failure of the employer to prove all three criteria set forth suffices to establish that the individual in question is an employee."

In 2008, the Attorney General of the Commonwealth of Massachusetts issued an advisory from her Fair Labor

[Page 84]

Division on Mass. General Law, Chapter 149, Section 148B. The Supreme Judicial Court, in a series of decisions, has held that the Attorney General's interpretation of the statute is entitled to substantial deference. It said that in *Electronic Data Systems*, 454 Mass. 63 at 64 and 69, and significantly also in *Smith vs. Winter Place*, 447 Mass. 363 at 367 to 368. There the SJC stated, quote: "Insofar as the Attorney General's Office is the department charged with enforcing the wage and hour laws, its interpretations of the protections provided thereunder is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions."

The Attorney General's Office has stated that in interpreting the second prong of the Section 148B test, that it will consider whether the service provided is "necessary to the business" or "merely incidental to it." That's at Page 6 of the advisory citing the Illinois decision in *Carpetland*, 201 Ill. 2d 351 at 386. Of course, many services are clearly necessary to a business but might still be incidental to it, such as repairing an electrical system for a law office that is without power. However, the examples provided by the Attorney General are illustrative.

[Page 85]

The Attorney General's advisory states that it would violate Prong 2 if "a drywall company classifies an individual who is installing drywall as an independent contractor" or if "a company in the business of providing motor vehicle appraisals classifies an individual appraiser as an independent contractor." In each of these cases, the individual, quote, "is performing an essential part of the employer's business," end quote.

However, an accounting firm may classify an individual who was hired to move office furniture as an independent contractor without running afoul of Prong 2, because "the moving of furniture," the Attorney General says, "is incidental and not necessary to the accounting firm's business."

It's been argued today and I've considered the argument that in the same advisory, on Page 5, um, that the Attorney General indicates it would not be a violation of the statute for the following to occur. "If Painting Company X cannot finish a painting job and hires Painting Company Y as a subcontractor to finish the painting job, provided that all of the individuals performing the painting are employees of Company Y, then the law does not apply. However, if Painting Company X hires individuals as independent contractors to finish

the painting job, then this would be a violation of Prong 2 and a misclassification under the law."

I think read together with the examples of the drywall company and the motor vehicle appraisals is, um, the requirement to look at the way an organization usually or ordinarily does business. With regard to the painting company, ordinarily Company X has employees that do all the necessary painting that it is undertaking to do, but if it finds it cannot finish a job with its own employees, it might occasionally and properly hire somebody who can accurately be characterized as an independent contractor to finish the work.

On the other hand, the examples of misclassification under Prong 2 guidelines, on Page 6 of the advisory, has referred to, as I understand it, a drywall company that regularly characterizes the people installing drywall as independent contractors or a company in the business of providing motor vehicle appraisals regularly classifying individuals who do those appraisals, the heart of its business, as independent contractors.

In this case, there are several legal entities each with Jani-King in its name that are defendants. The way the motion for summary judgment has been -- the motions for summary judgment were presented and argued, this time, treats them essentially as a single entity. As I said at the outset today, it's conceivable in some cases there could be distinctions between different related organizations as to whether they're employers with employees for the purpose of this wage statute. In fact, I believe I have a case raising that issue called *Jan-Pro* that I have to get back to. It's another one of Ms. Liss-Riordan's cases. But I'm going to decide this as the parties have argued it, essentially as an all-or-nothing proposition, and I find that the material undisputed facts making the members of the plaintiff class employees for the purpose of the misclassification statute include the following.

The Jani-King franchise system allows franchise owners to obtain a license to use Jani-King's brand, trademarks, and proprietary methods to operate commercial cleaning businesses. And these essentially come from the parties' statements of facts, undisputed facts.

I will refer to Jani-King International as "JKI" and Jani-King of Boston at times as "Jani-King, Boston," and "JKB."

But JKI is the architect of the Jani-King franchising system. It is involved in franchising only one type of business, commercial cleaning. JKI is the parent company of its wholly-owned subsidiary, Jani-King, Inc. Jani-King, Inc. wholly owns 18 regional subsidiaries, also called "corporate regional offices," one of which is Jani-King, Boston, or JKB. Neither JKI nor Jani-King, Inc. directly sells franchises.

JKI develops proprietary methods and materials and provides oversight and support to the regional offices. JKI maintains and protects the company's trademarks and trade names. It owns the intellectual property that is derived from its development of proprietary methods and materials. JKI's trademarks and proprietary information are licensed to franchise owners.

JKI engages in nationwide and regional marketing to promote the Jani-King brand and franchise system. It also maintains a website to promote the Jani-King franchise system and brand to prospective owners and clients, and publishes a monthly newsletter for use by corporate regional offices and franchise owners. As part of its marketing, Jani-King promotes the Jani-King brand as the, quote, "King of Clean," end quote.

Part of JKI's role as architect of the Jani-King franchise system is to continue developing and refining the Jani-King methods and materials that form the foundation of the Jani-King franchise system. All of JKI's departments are involved in preparing training materials for cleaners, including materials about training techniques. JKI has two specialty departments, healthcare and hospitality, both of which develop training materials about proper cleaning procedures. JKI regularly develops cleaning methods, procedures, marketing materials, and training materials that are summarized in various manuals, DVDs, and brochures. These are used by the regional offices to provide initial and ongoing training to franchise owners and are used by franchise owners in the course of their work.

JKI oversees the management and operation of the JKB, the Jani-King Boston, office. As part of its oversight of the corporate regional offices, JKI employs directors of corporate development who take the lead role in hiring regional directors for each regional office and maintaining regular contact with these directors to ensure that the regional offices are operated in accordance with the guidelines established by JKI.

JKI provides policies, procedures, forms, training materials, marketing materials, reporting requirements, and other guidelines for JKB's operations. It sends employees to regional offices to provide advice on new cleaning methods, among other subjects. JKI also sends

employees with operations experience to corporate regional offices to assist with various management issues. JKI holds annual conferences for regional directors. In addition, JKB staff receives training in conferences held either at JKB or at JKI.

JKI trains regional office staff in its proprietary bidding methods, which are developed and maintained by a full-time bidding expert employed by JKI. This expert also assists regional offices with large bids and bids national accounts. In addition, JKI maintains a proprietary accounting software system which is used to provide accounting services to franchise owners. JKI uses this software to generate monthly franchise reports which are distributed to franchise owners by the corporate regional offices each month.

JKI prepares all franchise agreement forms. In addition, one of JKI's central obligations is to draft and file, on an annual basis for each state with a corporate regional office, a franchise disclosure statement which is mandated by the Federal Trade Commission.

Importantly, JKB implements the franchising system developed by JKI. According to the estimate of its regional director in January of 2011, JKB served about 550 to 570 cleaning accounts and has about 120 of what

it calls "franchisees."

JKB provides advertising, accounting, and periodic operational support to franchise owners. As a normal part of JKB's day-to-day operations, JKB employees regularly interact with franchise owners to assist them in the operation of their franchise business, which may include offering suggestions regarding how to address a disagreement with a client, how to address a unique cleaning issue, and how to solicit and bid accounts.

JKB works to obtain commercial cleaning contracts to be serviced by so-called "franchise owners." JKB is a contracting party to the cleaning contracts. JKB personnel maintain customer account information and are responsible for billing and collecting money from clients. Clients send payments directly to JKB. Clients may contact a Jani-King representative to discuss any issue that arises. On occasion, operation managers have arranged for a subcontractor to provide cleaning services to an account, such as where no franchise owner was willing to accommodate the client's schedule.

As of 2011, JKB had 10 employees, three operations personnel, three sales staff, called "account executives," three administrative staff, and a regional director. Sales staff seek to develop cleaning accounts

and may also work with existing clients to revise bids if the scope of work changes. The administrative staff field calls from cleaning clients and handle client accounting and billing. Operations personnel spend much of their time in the field inspecting accounts, dealing with issues relating to customer accounts, and meeting with customers and franchise owners. They provide franchise owners with start-up help and may provide ongoing advice about cleaning tasks. They arrange for newly-acquired accounts to be serviced by franchise owners and also oversee the transition of existing accounts from one franchise owner to another in the event an account is transferred. JKB operations managers also work with clients and franchise owners on an ongoing basis to provide quality control and "to assure that the client is receiving the promised benefits of the Jani-King franchising system."

JKB provides the Massachusetts Franchise Disclosure Document, prepared by JKI, to all prospective owners who inquire about purchasing a franchise, and uses other materials prepared by JKI, including a promotional video and brochure. JKB places ads in local periodicals aimed at prospective franchise owners.

When a person buys a franchise in the JKB region, a franchise agreement is executed by the purchaser.

Actually, let me take a step back. I said earlier that JKB signs or enters into all the maintenance agreements. Exhibit U to the Churchill affidavit is a representative Jani-King maintenance agreement. It is between Jani-King of Boston and a client called Over The Rainbow. It starts by saying: "Whereas Jani-King is in the business of providing commercial cleaning and maintenance services," and then it goes on to describe the services and the terms of which it will be provided.

As I said, when a person buys a franchise in the JKB region, a franchise agreement is executed by the purchaser and JKB. Exhibit S to the Churchill affidavit is an example of such an agreement. Jani-King does not negotiate the terms of written agreements with franchise owners in Massachusetts. JKB provides paperwork to interested franchise owners in advance of a sale and then meets with the interested franchisee in order to answer questions, execute the paperwork, and complete the sale. When JKB sells a franchise, it submits all completed paperwork to JKI for review.

Franchise owners are required to comply with Jani-King policies and procedures. However, franchise owners decide, among other things, what accounts to accept, how to staff them, whether to hire employees and whom to hire, whether to treat their employees as independent

contractors, whether to solicit new accounts, what equipment to purchase or when to service accounts and in what order, um, subject to parameters set by the client.

Jani-King provides franchise owners with training regarding Jani-King's proprietary cleaning system and procedures. This training is provided by several JKB employees. In addition, Jani-King provides franchise owners with written materials, including information about cleaning methods and techniques.

Franchise owners must pay fees to Jani-King on all commercial cleaning they service. Jani-King also obtains revenue by leasing cleaning equipment to franchise owners and receives some payment in connection with the purchase of equipment by franchise owners through Jani-King. New franchise owners typically obtain required cleaning equipment by leasing it from Jani-King.

For a fee, corporate regional offices provide billing and accounting functions for each franchise owner. The revenue generated from the cleaning services provided by each franchise is distributed to each owner with the monthly franchisee report after royalties and fees due to the corporate office had been taken out. Franchise owners are invited to the regional office to

pick up their monthly franchisee reports and franchise revenue in a monthly "franchisee day."

The Jani-King website offers, quote, "commercial cleaning services," end quote, and states that, quote, "Jani-King understands the world of commercial cleaning," end quote, and that, quote, "Jani-King is the global leader in commercial cleaning services," end quote, and that Jani-King is, quote, "ranked the world's No. 1 commercial cleaning franchise company year after year," end quote.

A job opening for "JKI Director of Operations" stated that the "applicant must have extensive commercial cleaning experience." Prior to working for JKB, Operations Manager Joe Mota worked for over 18 years as a cleaning supervisor and had "a lot of knowledge" about the cleaning industry. Mota hired an assistant with a background in cleaning and the background is important to Mota because the assistant "had the experience in order to properly train and advise the franchisee owners."

In addition, Jani-King's franchise agreement states that JKB, quote, "is in the business of operating and franchising professional cleaning and maintenance businesses," end quote. In its cleaning contracts with clients, Jani-King states -- and that's actually Jani-

King of Boston specifically, as I said earlier, that JKB, quote, "is in the business of providing commercial cleaning and maintenance services."

On these undisputed facts, a reasonable factfinder would have to conclude that the defendants have not proven, under the Attorney General's interpretation of 145B(a)(2), that Jani-King Boston and indeed all the defendants -- well, let me restate this.

Under the Attorney General's interpretation of Section 145B(a)(2), a reasonable factfinder would have to conclude that the business of Jani-King, Boston and the defendants generally is as stated in its standard maintenance agreement, that is, "to provide cleaning services." People who clean and/or get others to clean are essential to this business. Therefore, like the drywallers or people in the motor vehicle appraisal business, the people who do cleaning would be employees rather than independent contractors. This is the way the undisputed facts show Jani-King regularly does the cleaning business it regularly asserts it is in. It is not an exception when it goes to somebody who's called an "independent contractor." It is the usual way of providing cleaning services and the cleaners are essential to the business of Jani-King, Boston and all of the Jani-King entities.

This is the conclusion that Judge Young reached in *Awuah*, 707 F. Supp. 2d at 84, a comparable case with similar facts regarding cleaners. It is also analogous to a series of Massachusetts cases involving exotic dancers -- strippers, to be more direct. In those cases clubs have argued that they're in the business of serving food and alcohol from which they derive most of the revenue and they merely provide a stage for independent performers who are compensated by customers. Massachusetts courts have regularly rejected this argument and found misclassification and granted summary judgment to the dancers in cases such as *Monteiro*, 2011 Westlaw 7090703, *Jenks*, 2011 Westlaw 3930190, and *Sandoval*, 2011 Westlaw 5517331.

These courts reason that although the clubs derive their revenue largely from the sale of alcohol, the presence of the dancers is designed to bring in customers and to further the sale of alcoholic beverages. Therefore, as said in *Sandoval*, "the dancers are an integral part of the club's business." Alcohol and exotic dancing in these cases are "together and intertwined" and "both clearly comprise the adult entertainment portfolio," of the establishment, as said in *Jenks*. Indeed, as the Court wrote in *Jenks*, "It is incredulous to conceive that the plaintiffs perform

their services -- nude dancing -- outside the Golden Banana's usual course of business, when the club's website advertises as 'gorgeous, totally nude dancers'."

This case is also analogous to cases arising from other industries, including *Rainbow Development*, 2005 Westlaw 3543770. There the Court explained that "The workers are engaged in the exact business Auto Shine is engaged in. Auto Shine merely provides the administration. Without the services of the workers," who did all of the detailing, "Auto Shine would cease to operate." Similarly, in *Oliveira*, 2010 Westlaw 4071360, the Court rejected an employer's attempt to claim that it was merely -- that it merely managed the delivery of furniture for retailers while independent owner-operators performed the actual deliveries. The Court found that summary judgment was justified for the plaintiff on the second prong where, quote, "without providing physical delivery of furniture, which is essential to its business, the defendant's business would not exist."

The analysis used in the Attorney General's advisory and existing case law as well as the plain language of Section 148B indicates that the plaintiffs are entitled to summary judgment on Prong 2. As discussed a moment ago, those authorities focus the

inquiry on the core of the service provided by the business. Jani-King develops proprietary cleaning methods, holds itself out as a leader in commercial cleaning, and contracts directly with customers to provide commercial cleaning services.

Indeed, Jani-King does not attempt to really argue, if I understand it right, that it's not in the commercial cleaning business. Rather it attempts to create a distinction between different levels in the distribution of the service arguing that the function it performs is not cleaning but developing a cleaning system and promoting the brand. To this end, the defendants point out that franchise owners do not perform the same tasks that they perform because they do not sell franchises, bill clients, or develop proprietary materials. However, this contention is inconsistent with the statutory test's focus on the nature of the service provided by the business. If the separation of executive and managerial functions were sufficient to take the service provided by workers outside the course of a business, Prong 2 would easily be evaded precisely after the legislature, in 2004, has made it -- had sought to make it harder to circumvent. This type of argument was rightly rejected in *Rainbow* and in *Oliveira*. As was true in those cases, the

plaintiffs in this case provide the core service that Jani-King offers and "without the services of the workers, Jani-King would cease to operate," were the words of *Rainbow*.

The defendants ardently argue that this analysis of the statute would be fatal to franchising in Massachusetts. To that I would say two things. First, under this analysis, it's not sufficient to show that Jani-King and the people who do the cleaning are in the same business. The issue is what is the usual course of the business of the defendant.

It is possible that some case -- although not in this case as it's been presented to me on the undisputed facts I've just cited, but I note that the statute does not ask about whether a service is performed in Jani-King's, quote, "usual course of business," it asks whether the service is performed in "the usual course of the business" of Jani-King. This wording is unusual. Arguably it would be more natural to speak "of the course of business of the employer" than "the course of the business of the employer." Arguably this difference signals something about the level of specificity to the inquiry, which could mean that the test does not ask about Jani-King's business in the general sense, as in the usual course of the business that it regularly

conducts, but instead in the very specific sense as in the specific dealings and transactions that make up its business.

In the case of Jani-King, the service provided by the franchisees is certainly the business of the regional office, Jani-King, Boston. The clients of the franchisees are the clients of Jani-King, Boston. The regional office contracts with them and collects payments from them, the regional office monitors and inspects the service that they are getting because that is its business. And when a franchisee provides a cleaning, it is acting in the course of the business of Jani-King, Boston.

In contrast, arguably, in the case of a franchise such as Burger King, the connection is more remote. For both Burger King and its franchisees the usual course of business involves the sale of fast food, yet the transactions of the franchisee share no specific connection to the franchisor. Thus, when individual franchisees sell a Whopper to a customer, he's not doing the specific business of any other Burger King entity even if he's doing the business of Burger King in the general sense. That may be a distinction that would make a difference in some case, though not in this case.

It may be that the statute, as it was amended in 2004, makes it difficult for the franchisor/franchisee model to operate in Massachusetts. However, it's the duty of the Court to interpret the statute as it's been written, as it's been authoritatively interpreted by the Attorney General, and to apply that meaning. If there are arguably unfortunate practical and policy implications to the way the statute, properly interpreted, operates, it's the duty of the legislature, not the Court, to create exemptions and exceptions.

So for those reasons, summary judgment for the plaintiffs is allowed.

In addition, I've decided it's not appropriate to decertify the class originally certified by Judge Young and as subsequently clarified when the case was transferred to me. Rule 23(c)(1)(C) permits the Court to amend the class certification or alter the order. However, law-of-the-case principles generally apply. Ordinarily getting a new judge is not an adequate reason for an earlier decision in a case to be reconsidered. However, as held in *Negron-Almeda*, 579 F.3d at 51 to 52, if controlling legal authority has changed in a material way, that would be a proper basis to revise or reconsider and revise a prior ruling.

The defendants argue that the Supreme Court's

decision in *Wal-Mart* is such a change in controlling legal authority. I find that is not correct. *Wal-Mart* really only applies the Supreme Court's standard for commonality created or recognized in the Supreme Court's *Falcon* decision. In *Wal-Mart,* the Supreme Court said the claims of class members "must depend upon a common contention capable of class-wide resolution, which means that determination of its truth or falsity would resolve an issue that is central to the validity of each one of the claims in one stroke."

In this case, that common issue is whether the cleaners are employees or independent contractors. The plaintiffs in this case have done what the *Wal-Mart* plaintiffs did not. They challenge a general policy of classifying cleaning workers as independent contractors implemented through a standard franchise agreement that was used by Jani-King to define its relationship to all of the class members in this case. In *Wal-Mart,* the discrimination, the employment discrimination was alleged on a nationwide basis. If it existed, it would have resulted from the decisions of numerous decision-makers. This case, however, on its undisputed facts, involves a uniform practice.

The deposition testimony that's been brought to my attention I find does not alter this fundamental

conclusion or doesn't alter the conclusions I've reached with regard to Prong 2 of Section 148. However, I've begun to get educated to understand that the claims of some of the class plaintiffs arguably may not be typical of the class as a whole. Judge Young addressed this in his original class certification decision, but it's possible, as this comes into clearer focus, a narrowing of the class or the elimination of some of the present four-named class representatives would be appropriate. But I'm not deciding any such thing now.

So those are my rulings and the question is where do we go from here? I think, um -- and not just because it's 5 minutes after 6:00, that I'm going to order that you absorb this. I'd like to give you a couple of weeks to confer and ideally propose jointly how we would proceed, but if that proves to be impossible, since you haven't agreed on much yet, um, then separately how we should proceed, to make a submission to me, and then I'll see you all again.

What would be, you know, a reasonable time to give you to talk about the practical implications of this and the plaintiff has said that the plaintiffs may want to drop certain claims, for example? You know, you want to figure out what's -- you need to talk about what's going to remain in the case and that would affect what needs

to be done. I mean, I -- my goal's to put this on the schedule so I can see you in early August, knowing what my schedule is.

So how much time do you want to absorb this, to have serious discussions, also about whether you can settle the case?

MR. van OORT: Your Honor, you can tell us how much in advance you'd like the papers to you so that you can prepare for us in August?

THE COURT: Yeah, early August, but I don't want to foul up any -- well, I'd say I could give you say till -- I could give you until July 20th maybe or even a little longer and I'll see you on the afternoon of maybe August 6th, unless somebody has a foreseeable conflict.

MR. van OORT: Let me check, your Honor.

MS. LISS-RIORDAN: That's fine on our end.

(Pause.)

MR. van OORT: Your Honor, we don't have any conflict on August 6th. That will work.

THE COURT: Okay.

Here, I'm going to order that you catch your breath -- well, that's not an order. But catch your breath, but really work on this, you know, talk about what's going to stay in the case. I think the plaintiff

-- you know, certain claims are going to be dismissed, what are you looking for in terms of damages if you ultimately -- well, what are you looking for in terms of damages or payments? And from the defendants' perspective, you know, do you want to do something to settle this case and if not, you know, what remains to be done and what's kind of the minimum reasonable period of time to do it? And the case started before Judge Lindsay, it went to Judge Young, and now it's mine. It's quite an old case. So it's complicated. And it's always my goal to decide matters orally, um, but it takes a while to get to it. But now you're on my radar screen.

And as I said frequently after studying the briefing and until you've educated me, um, I know what I should do and the argument tests it and makes things clearer, but this time, um, maybe it got harder. But I think the briefing was good, although it didn't distinguish between the defendants, um, and I think there were good reasons for it given all the facts I described.

But you should really now make a serious effort to determine -- well, and as part of my order, when you report on July 20th, if you're having settlement discussions and you'd like to go to mediation, tell me

that. You can go before one of our magistrate judges. It won't cost anything. Or you could go to somebody else. You might even go to me if you don't claim I'll be disqualified as a result of doing that. So you'll see it in the order. That's going to be the range of options. All right?

Anything further for today -- or tonight?

(Silence.)

THE COURT: All right. The Court is in recess.

(Ends, 6:15 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the foregoing record is a true and accurate transcription of my stenographic notes, before Chief Judge Mark L. Wolf, on Wednesday, June 6, 2012, to the best of my skill and ability.

/s/ Richard H. Romanow 06-13-12
_____
RICHARD H. ROMANOW   Date