# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| EUGENE SCALIA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>     PLAINTIFF,<br>v.<br><br>JANI-KING OF OKLAHOMA, INC., a foreign corporation,<br><br>     DEFENDANT. | Civil Action No.  CIV-16-1133<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** |

Pursuant to Federal Rule of Civil Procedure 56 and LCvR56.1, the Secretary of Labor and the United States Department of Labor (hereinafter the "Secretary"), moves for summary judgment against Jani-King of Oklahoma, Inc. ("JKO") because there are no genuine issues of material fact to warrant a trial.[1] The undisputed material facts establish that the individuals who own JKO franchises and perform cleaning services for JKO's customers are JKO's employees under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201-219 ("FLSA"), and that JKO has failed to comply with the FLSA's record keeping requirements. See 29 U.S.C. § 211(c) and 29 C.F.R. Part 516.

The Secretary respectfully requests that the Court enter summary judgment in his favor and against JKO and enter an injunction permanently restraining JKO from violating the record keeping provision of the FLSA.

---

[1]This action is for equitable relief under Section 17 of the FLSA and a trial would be to the Court. As a result, there is no right to a jury trial.

# TABLE OF CONTENTS

I.     BACKGROUND ....................................................................................... 1

II.    STATEMENT OF UNDISPUTED FACTS ........................................... 4

    A.   JKO is an enterprise engaged in commerce (29 U.S.C. § 203(s)) ............... 4

    B.   Individual franchise owners perform cleaning services for JKO's
         customers ................................................................................................ 5

    C.   Individual franchise owners are JKO's employees under the FLSA........... 6

        1.   *The extent of control JKO exercises indicates its individual franchise*
            *owners are its employees under the FLSA* ............................................. 6

            (a)   *Hiring and Firing – JKO controls admission into and termination*
                *from the franchise system and assignments to and removal from*
                *customer accounts* .................................................................... 6

            (b)   *Franchise owners cannot perform cleaning services for non-JKO*
                *customers* ................................................................................ 10

            (c)   *JKO controls the cleaning schedule, work performance, and*
                *customer service* ..................................................................... 10

            (d)   *JKO determines the rate and method of payment for franchise*
                *owners* .................................................................................... 13

            (e)   *JKO controls other working conditions* ......................................... 15

        2.   *Franchise owners have little opportunity to affect profit and loss* ........ 16

        3.   *Individual franchisees' investment is minimal compared to JKO's*
             *investment* .............................................................................. 17

        4.   *Permanence of the working relationship* ............................................. 18

        5.   *Janitorial cleaning does not require sufficient specialized skill* ........... 19

        6.   *Franchise owners' work is an integral part of JKO's business* ............. 19

    D.   JKO denies an employment relationship with its individual franchise
         owners and does not maintain records of wages, hours, and other
         conditions and practices of employment.......................................... 20

III.   ARGUMENT ............................................................................................ 20

    A.   Summary Judgment Standard of Review................................................ 20

    B.   JKO is a Covered Enterprise Under the FLSA ..................................... 21

    C.   Individual Franchise Owners Perform Cleaning Services Themselves for
         JKO's Customers ................................................................................... 21

    D.   Individual Franchise Owners Are JKO's Employees Under the FLSA.... 22

1. ***The extent of control JKO exercises indicates its individual franchise owners are its employees under the FLSA*** ..............................................23

    (a) *JKO hires and fires individual franchise owners – it has the power to admit them into and terminate them from the franchise system and to assign or remove them from accounts* ..............................24

    (b) *Franchisees cannot perform cleaning services for non-JKO customers* ..............................29

    (c) *JKO controls the cleaning schedule, work performance, and customer service* ..............................31

    (d) *JKO determines rate and method of payment for franchise owners* 36

    (e) *JKO controls other working conditions* ..............................38

2. ***Franchisees have little opportunity to affect profit and loss*** ..............................39

3. ***Individual Franchisees' Investment is Minimal Compared to JKO's Investment*** ..............................44

4. ***Permanence of the Working Relationship*** ..............................46

5. ***Janitorial cleaning does not require sufficient specialized skill*** ..............................47

6. ***Franchise Owners' Work is an Integral Part of JKO's Business*** ..............................47

**E.** **A Permanent Injunction Barring JKO from Violating the Record Keeping Provisions of the FLSA is Appropriate** ..............................49

**IV. CONCLUSION** ..............................50

# TABLE OF AUTHORITIES

**Cases**

Acosta v. Jani-King of Oklahoma, Inc., 905 F.3d 1156, 1160 (10th Cir. 2018)............. 23

Acosta v. Paragon Contractors Corp., 884 F.3d 1225, 1235 (10th Cir. 2018)................. 22

Acosta v. Senvoy, LLC, Case No. 3:16-cv-2293, 2018 WL 3722210 at *8 (D. Or. July 31, 2018).................................................................................................................... 43

Alexander v. FedEx Ground Package System, Inc., 765 F.3d 981, 993 (9th Cir. 2014) ..42

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ........................................... 20

Atchison, Topeka and Santa Fe Ry. Co. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981) 49

Awuah v. Coverall North America, Inc., 707 F. Supp. 2d 80 (D. Mass. 2010)............... 49

Bachus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)............... 20

Baker v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1440 (10th Cir. 1998) ................... 23

Baker, 137 F.3d at 1441................................................................................................ 23, 44

Barlow v. C.R. England, Inc., 703 F.3d 497, 506 (10th Cir. 2012) ................................. 22

Brennan v. Dillion, 483 F.2d 1334, 1335 (10th Cir. 1973) ............................................. 21

Brock v. Superior Care, Inc., 840 F.2d 1054, 1060 (2nd Cir. 1988)............................... 31

Collinge v. IntelliQuick Delivery, Inc., Case No. 2:12-cv-00824, 2015 WL 1299369, at *4 (D. Ariz. Mar. 23, 2015)...................................................................................... 41

Craig v. FedEx Ground Package Sys., Inc., 335 P.3d 66, 85 (Kan. 2014)...................... 32

De Giovanni et al. v. Jani-King Intern., Inc. and Jani-King of Boston, Inc., 968 F. Supp. 2d 447 (D.Mass. 2013) .............................................................................................. 3

DeGiovanni v. Jani-King Int'l, Inc. et al., Case No. 07-10066-MLW (D. Mass. June 6, 2012)........................................................................................................................ 48

Dole v. Snell, 875 F.2d 802, 809-810 (10th Cir. 1989).................................................... 40

Dole v. Snell, 875 F.2d at 811 ......................................................................................... 46

Dole, 875 F.2d at 1236 .................................................................................................... 44

Donovan v. Dial America Marketing, Inc., 757 F.2d 1376, 1384 (3d Cir 1985).............. 31

Donovan v. Pointon, 717 F.2d 1320, 1322 (10th Cir. 1983)............................................ 21

Doty v. Elias, 733 F.2d 720, 723 (10th Cir. 1984) .......................................................... 31

Fernandez v. Jani-King of Houston, Inc., et al., Case No. 4:17-cv-01401, (S.D. Texas) ... 3

Goodly v. Check-6 et al., Case No. 16-cv-344, 2018 WL 5091901at *2 (N.D. Okla. Oct. 18, 2018)................................................................................................................... 22

Harris v. Skokie Maid and Cleaning Service, Ltd., Case No. 11-C-8688, 2013 WL 3506149 at *9 (N.D. Ill. July 11, 2013) ..................................................................... 30

Harris v. Universal Contracting, LLC, Case No. 2:13-cv-00253, 2014 WL 2639363 at *3 (D. Utah June 12, 2014) ............................................................................................ 29

Herr v. Heiman, 75 F.3d 1509, 1513 (10th Cir. 1996).................................................... 23

Hughes v. Family Life Care, Inc., 117 F. Supp.3d 1365 (N.D. Fla. 2015)...................... 30

Johnson v. Unified Gov't of Wyandotte Cnty., 371 F.3d 723, 729 (10th Cir. 2004) ....... 22

Juarez v. Jani-King of California, Inc.,728 Fed. Appx. 755 (9th Cir. 2018) .................... 3

Lauritzen, 835 F.2d at 1537........................................................................................... 47

Martin v. Funtime, Inc., 963 F.2d 110, 114 (6th Cir. 1992)................................................50

Metzler v. IBP, Inc., 127 F.3d 959, 963 (10th Cir. 1997) ...................................................50

Metzler, 127 F.3d at 963.......................................................................................................50

Mujo v. Jani-King of Hartford, Inc., et al., Case No. 3:16-cv-1990, 2019 WL 7037794
 (D. Conn. Dec. 21, 2019) ...................................................................................................3

Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992).........................................22

Paragon Contractors Corp., 884 F.3d at 1236 ....................................................................44

Perez v. Super Maid, LLC, 55 F. Supp. 3d 1065, 1078 (N.D. Ill. 2014) ............................30

Pilgrim Equip., 527 F.2d at 1312 ........................................................................................30

Saleem v. Corp. Trans. Grp., Ltd., 854 F.3d 131, 139 (2d Cir. 2017) ................................23

Saleem, 854 F.3d at 141-42 .................................................................................................30

Saleem, 854 F.3d at 148 .......................................................................................................24

Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1313 (11th Cir. 2013).............................23

Scantland, 721 F.3d at 1312 ................................................................................................24

Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 309 (4th Cir. 2006)................................46

Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1542 (7th Cir. 1987)......................................30

Snell, 875 F.2d at 810-11......................................................................................................44

Snell, 875 F.2d at 811 ...........................................................................................................47

Solis v. Cascom, Inc., 2011 WL 10501391, at *6 (W.D. Ohio Sept. 21, 2011) ..................43

Super Maid, 55 F. Supp. 3d at 1077-78................................................................................47

Super Maid, 55 F. Supp. 3d at 1078 .....................................................................................40

Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994)
 ............................................................................................................................................20

Usery v. Pilgrim Equip. Co., Inc., 527 F.2d 1308, 1311-12 (5th Cir. 1976).....................24

Williams v. Jani-King of Philadelphia, Inc., 837 F.3d 314 (3rd Cir. 2016).......................3

**Statutes**

29 U.S.C. § 203(e)(1) ...........................................................................................................22

29 U.S.C. § 203(s)...........................................................................................................4, 21

29 U.S.C. § 211(c) .................................................................................................................1

29 U.S.C. § 217 ....................................................................................................................49

29 U.S.C. §§ 201-219 ("FLSA").............................................................................................1

29 U.S.C. §§ 211(c) and 215(a)(5) ......................................................................................49

Fair Labor Standards Act of 1938 .........................................................................................1

**Rules**

Fed.R.Civ.P. 56(a) ...............................................................................................................20

Federal Rule of Civil Procedure 56 and LCvR56.1 ..............................................................1

**Regulations**

29 C.F.R § 436.5(k)(4)(iii) and (iv)......................................................................................41

29 C.F.R. §§ 779.203-04 ......................................................................................................21

29 C.F.R. Part 516 .................................................................................................................1

# I.    BACKGROUND

JKO is a Texas corporation and an affiliate within the Jani-King[2] corporate system identified as a "Corporate Region Sub."[3] JKO provides commercial janitorial cleaning services to its customers in a defined territory that encompasses the Oklahoma City metropolitan area ("Territory").[4] With assistance from its affiliates in Dallas, Texas, JKO sells commercial cleaning services and performs most non-cleaning business functions related to its cleaning business. JKO personnel directly manage cleaning services for college football stadiums and a school district, and its "In House" crew performs janitorial cleaning services for its customers as needed.

Instead of hiring employees to clean for all of its customers, however, JKO sells franchises to individuals who perform the janitorial cleaning services.[5] The relationship

---

[2] "Jani-King" as used herein refers generally to the Jani-King janitorial business and brand, and is not limited to JKO, a specific entity, or franchisor in the Jani-King corporate system.

[3] **Ex. 1** – JKO Franchise Disclosure Document ("FDD"), Item 1, p. 2.

[4] **Ex. 2** – Franchise Agreement ("FA"), p. 1 (defining the Territory).

[5] The Amended Complaint alleges and evidence establishes that *individuals* own JKO franchises and perform the cleaning services. In addition, there is Global Gaming Solutions, Inc. ("GGS"), which is the commercial business of the Chickasaw Nation. See http://www.globalgamingsol.com/. GGS formed Global Gaming JK, LLC ("GG JK") and in March 2018, GG JK executed a JKO Franchise Agreement (**Ex. 3**) and a Management and Operation Agreement (**Ex. 4**) with JKO's affiliate, KOC Franchise Management, LLC ("KOC"). ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ **Ex. 5** – Harper A Tr. 129:5-11). Because GG JK is not owned by an individual or individuals (directly or indirectly through a corporate form) who perform cleaning services, it is not included within the scope of the Amended Complaint. However, this arrangement demonstrates the control JKO has over its commercial cleaning business within the Territory, including the ability to service and profit from large accounts.

between JKO and its franchisees[6] is that of employer and employee under the FLSA's economic realities test. JKO recruits franchisees into its non-exclusive Territory, determines the number of franchisees to admit into the Territory, and designates them to and removes them from customer accounts. Because JKO owns and controls all customer contracts and prohibits franchisees from cleaning for non-JKO customers, franchisees cannot independently transact business. JKO negotiates pricing and cleaning schedules with its customers; performs customer invoicing, billing, and collections; determines the method and timing of payment to franchisees; inspects and grades franchisees' work, directs them to correct deficiencies, and imposes consequences for work it deems substandard; and performs marketing, advertising, and sales functions, including maintaining a website.

Franchisees perform cleaning services and do not exercise business judgment that affects their potential for profit and loss; rather, franchisees act as laborers and sometimes supervise other laborers. The franchisees' investment is nominal compared to JKO's investment in its regional cleaning business. Many franchisees must borrow money from JKO to operate. Franchisees have no assets other than basic cleaning equipment and supplies – they have no ownership in or control over customer accounts. Franchisees' ability to work and earn revenue is controlled by JKO management personnel who pick which franchisee will get what, if any, customer accounts.

---

[6] The terms "individual franchise owner," "franchise owner," and "franchisee" used throughout the brief refer to an individual who owns a franchise in his or her individual capacity or through a corporate form and who performs the janitorial cleaning services.

The Secretary recognizes that franchising is an entirely legitimate business model that employers can and do pursue, and no franchise arrangement in and of itself violates the FLSA. Here, JKO engages individual workers to perform janitorial work for it through franchise arrangements, and applying the six-factor economic realities test to the particular facts of these workers' relationship with JKO, they are JKO's employees under the FLSA whether or not they are also its franchisees. An injunction is necessary because JKO and its affiliates repeatedly deny an employment relationship with its individual franchise owners as reflected in this and other litigation cases brought by franchise owners under state wage laws and the FLSA.[7]

The following fact and argument sections of the brief reference JKO franchise and business records, sworn interviews of three JKO personnel taken in March 2016 during the Department of Labor's investigation[8] (Jill Harper (formerly Hill), Regional Director; Iris

---

[7] FDD Item 2 identifies such cases, which are ongoing, or JKO has settled or obtained an adverse ruling (see, *e.g.*, Mujo v. Jani-King of Hartford, Inc., et al., Case No. 3:16-cv-1990, 2019 WL 7037794 (D. Conn. Dec. 21, 2019) (denying Jani-King's summary judgment motion on franchisees' state employment relationship claim, but granting motion as to unjust enrichment claims); Williams v. Jani-King of Philadelphia, Inc., 837 F.3d 314 (3rd Cir. 2016) (allowing class certification on franchisees' claims they were misclassified as independent contractors under state wage payment law; settlement on remand approved by District Court, Case No. 9-1738, 2019 WL 4034736 (E.D. Penn. Aug. 26, 2019)); Juarez v. Jani-King of California, Inc., 728 Fed. Appx. 755 (9th Cir. 2018) (remanding to district court for proceedings on whether franchisees are employees under California law; summary judgment motions pending); Fernandez v. Jani-King of Houston, Inc., et al., Case No. 4:17-cv-01401, (S.D. Texas) (FLSA violations asserted by franchisees); De Giovanni et al. v. Jani-King Intern., Inc. and Jani-King of Boston, Inc., 968 F. Supp. 2d 447 (D.Mass. 2013) (denying Jani-King's motion to reconsider summary judgment entered in favor of franchisees who were misclassified as independent contractors under state law)).

[8] A detailed account of the investigation is included in the Aff. of Christina Yarnall, the DOL's Enforcement Coordinator during the investigation. See Doc. No. 35-1.

Thompson, Operations Manager; and Anna Castro,[9] Assistant Operations Manager and former Account Executive), the January 22, 2020 testimony of Ms. Harper, and the testimony of 18 current and former franchise owners. Franchise owners' testimony cited in the argument section illustrates the employment relationship, including JKO's broad authority and control over the relationship, regardless of whether JKO disputes their testimony. JKO's authority and control is inherent in its corporate system and the way in which it structures its particular franchise relationships.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   JKO is an enterprise engaged in commerce (29 U.S.C. § 203(s)).

1.     JKO is a Texas corporation and the regional franchisor or "Corporate Region Sub" of the national corporate system. (FDD Item 1, pp. 1-2). JKO maintains a local office in Oklahoma City, Oklahoma, and offers janitorial cleaning services to the public in the metropolitan area and sells franchises for the performance of those services.  (Id., p. 1; Stip. 3a (Doc. No. 46)).

2.     JKO's annual gross revenue exceeds $500,000. (Id. Stip. 3c; **Ex. 6**).

3.     Franchisees and JKO's office personnel handle cleaning supplies and equipment and other goods and materials that have moved in interstate commerce. (**Ex. 7**; Harper A Tr. 33:13-34:14, 35:17-36:3, 38:11-39:15,[10] Exs. Harper 5 and 6; **Ex. 8**).

---

[9] Ms. Castro is no longer employed by JKO.
[10] The January 22, 2020 transcript of Jill Harper (Ex. 5) is referenced "Harper A" and the March 22, 2016 transcript of Jill Harper (Ex. 22) is referenced as "Harper B."

**B.** **Individual franchise owners perform cleaning services for JKO's customers.**

4.     Franchise Agreements produced by JKO show ownership as follows: ▮ by one individual (▮ in their individual capacities and ▮ indirectly through a corporate entity); ▮ by two individuals (▮ in their individual capacities; ▮ indirectly through corporate entities); and ▮ by three individuals (▮ in their individual capacities and ▮ indirectly through a corporate entity). (**Ex. 9**, Att. A; **Ex. 10**).[11]

5.     Individual franchise owners must participate in and direct cleaning operations: "The direct, onsite supervision must be done by a person who owns at least 1/3 of the [franchise]." (FDD Item 15 p. 54; FA § 4.2.1; ▮▮▮▮▮▮ ▮▮▮▮▮▮).[12] Franchisees individually guaranty "complete and timely performance . . . of all terms of the Franchise Agreement," including performing the cleaning services for JKO customers. (FDD Ex. II (Guaranty), ¶ 1).

6.     Many franchise owners perform the cleaning services on their own or seek assistance from family members. (**Ex. 12** - I. Thompson Tr. 52:16-53:11 (some do not hire cleaners); **Ex. 13** - Holmes Tr. 17:22-25 (no cleaners); **Ex. 14** - Reed Tr. 33:25-34:1-7 (no cleaners); **Ex. 15** - Mann Tr. 23:4-7 (no cleaners); **Ex. 16** - Wilson Tr. 10:12-11:1 (two relatives); **Ex. 17** - Martinez Tr. 23:24-24:11 (family only, non-family for college football stadiums)). Those that hire cleaners perform cleaning services and supervise cleaners. (**Ex. 18** - Messner Tr. 18:12-22; **Ex. 19** - Gbodi Tr. 21:19-22:8; **Ex. 20** - Nwamara Tr. 53:14-

---

[11] A list of current franchisees is included in Exhibit VIII to the FDD.

[12] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23; **Ex. 21** - Myatt Tr. 14:19-15:15; 30:2-14; 83:23-84:5).

>   **C.    Individual franchise owners are JKO's employees under the FLSA.**
>
>   **1.    *The extent of control JKO exercises indicates its individual franchise owners are its employees under the FLSA.***
>
>   (a)    *Hiring and Firing – JKO controls admission into and termination from the franchise system and assignments to and removal from customer accounts.*

<u>JKO admits franchisees into the system and designates them to customer accounts.</u>

7.      JKO sets the terms and conditions for admitting new franchisees into its non-exclusive Territory, ████████████████████████████████████████████
████████████████████████ Franchisees must complete "to Jani-King's satisfaction" all segments of the training program and score passing test grades (████████ FA § 4.2.3; **Ex. 22** - Harper B Tr. 20:15-17); pass a criminal background check (**Ex. 23**, Int. Resp. No. 17; Harper B Tr. 68:22-69:19); and sign a Franchise Agreement that includes non-compete and confidentiality provisions (FA §§ 4.20.1, 5.2.2-3) and a Guaranty to assure performance of all obligations under the Franchise Agreement. (FDD, Ex. II).

8.      To continue cleaning after the Franchise Agreement expires, franchisees must sign a general release and JKO's current Franchise Agreement. (FA §§ 9.3-4; FDD Ex. XI).

9.      JKO contracts with its customers and retains exclusive ownership of all customer accounts. (Harper B Tr. 115:3-12). JKO's contracts, policies, and disclosures state: (a) the contracts that franchisees service "are and will remain the property of Jani-King." (FA § 6.1.1); (b) "All contracts and agreements for services must be on our approved forms, in our name only and signed by one of our employees. You are not allowed

to enter into contracts for services." (FDD Item 16, p. 56; Item 12 p. 51); (c) "The Maintenance Agreement relating to this Account is and shall at all times remain the property of Jani-King and be subject to the policies, procedures and performance standards of Jani-King." (**Ex. 24** - Acct. Accept. Find. Fee Agmt. ¶ 5); (d) ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████; and (e) customer contracts solicited by franchisees "must be drafted and/or approved by [JKO]," remain the property of JKO, and JKO retains the right to suspend or cancel the account. (FA § 4.21.2; ████████████).

10.    JKO actively markets and sells commercial cleaning services in its Territory. (Harper B Tr. 187:20-188:11; **Ex. 25** – Castro Tr. 6:19-7:4; Stip. 3b (Doc. No. 46)). Such efforts include purchasing sales leads, market research, and outbound and inbound sales inquiries. (**Ex. 26**, Int. Resp. 16; Harper A Tr. 17:6-18:25, 64:8-65:14, Ex. 2).

11.    JKO's sales department consists of Ms. Harper, two Account Executives, and a telemarketer (Harper A Tr. 15:18-25, 17:16-25, Ex. 2). JKO's Dallas affiliates assist to target and bid prospects in specialty areas such as hotels, golf courses, casinos, resorts, hospitals, clinics, and doctor offices. (Harper A Tr. 20:6-21; B Tr. 12:8-13:17).

12.    JKO and its affiliates advertise to prospective franchisees that:

Jani-King has teams of professionals at the regional office level that make it their business to sign new business for franchisees to service. So if you're not comfortable with soliciting new business, you can partner with the regional office to have new business offered to you." (**Ex. 27**, p.2).

13.    JKO has ███ customer accounts of which ███ JKO obtained and ██

franchisees obtained. (**Ex. 28**, Int. Resp. No. 5).

14. Ms. Harper, Ms. Thompson, or the Assistant Operations Manager offer available accounts to franchisees. (Harper B Tr. 7:17-22; I. Thompson Tr. 18:11-25; Castro Tr. 57:13-16).

15. Franchisees must sign an Account Acceptance/Finder's Fee Agreement (Ex. 24) and attend a walk-through where the JKO representative introduces them to the customer. (███████████████████ I. Thompson, Tr. 84:3-14; Castro Tr. 21:23-22:16). ████████████████████████████████████████

████████████████████ and franchisees report having to accept accounts in advance (**Ex. 30** - N. Thompson 86:1-87:11; **Ex. 31** - Rendon Tr. 26:21-27:14).

16. If a franchisee does not wish to perform additional work requested by a customer (*e.g.*, floor waxing), JKO arranges for another franchisee to perform the work. (I. Thompson Tr. 81:18-82:9). If JKO sells additional services to a customer serviced by a franchisee, it can designate another franchisee to perform the services. (FDD Item 12, p. 51).

JKO terminates franchisees from customer accounts.

17. Franchisees must perform work in ██████ accordance with the performance standards of Jani-King, ████████████████████████; Ex. 24 ¶ 5).

18. JKO is authorized to suspend or remove a franchisee from an account if a customer requests or JKO determines the franchisee failed to comply with the Franchise Agreement, the Policy and Procedures Manual ("P&P Manual"), or meet performance standards. (FA §§ 4.19(1), 4.19.2, 4.19.6-7; ████████████████████████

19.     JKO in fact removes franchisees from accounts if inspection scores are low, customers complain or cancel, the Cleaning Schedule or Maintenance Agreement are not followed, or franchisees do not comply with the Franchise Agreement. (Harper B Tr. 61:2-62:25, 207:22-208:12; I. Thompson Tr. 39:8-40:10; **Ex. 32**, Resp. Int. Nos. 4-5).

20.     The Maintenance Agreement attached to the FDD contemplates the removal of franchisees (FDD Ex. XIII, §§ 3.2 and 6.2) and includes an Addendum To Designate Replacement Franchisee to record the removal and replacement. (Id., p. 5).

21.     JKO advertises to prospective customers: "If for some legitimate reason you request an individual to be replaced, just notify Jani-King in writing and we will make the necessary adjustment." (**Ex. 33**, p.2).

22.     A "Trouble Transfer" occurs when JKO removes a franchisee from an account for poor performance, customer complaints, or policy violations and charges the franchisee $50. (██████████ Castro Tr. 32:22-33:9; Ex. 32, pp. 7-33, 37-42, 46-48, 56-59). JKO will replace the current franchisee with another franchisee in an effort to keep an account wishing to cancel. (I. Thompson Tr. 71:10-73:16; Castro Tr. 50:3-51:14), even if the franchisee does not agree. (Castro Tr. 51:23-52:12).

23.     ████████████████████████████████████████████████████████
████████████████████████████████████████████████

24.     A franchisee wishing to quit an account for any reason must ask JKO in writing within specified notice periods. (FA § 4.21.1; Harper B Tr. 62:25-63:7).

JKO Terminates individual franchise owners from its franchise system.

25.     JKO may terminate the Franchise Agreement on several grounds, including

when it deems a franchisee "abandons" its business or fails to cure any violation of the Franchise Agreement or manuals such as failure to maintain required standards or "engag[ing] in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System." (FA § 8.1(a)-(g)).

26.     JKO decides when it will initiate the termination process for a franchisee's failure to pay minimum monthly royalty fees (sometimes after thousands of dollars have accrued), and whether it will offer relief from the debt owed. (Harper A Tr. 75:18-77:23, Exs. 12 and 13).

   *(b)     Franchise owners cannot perform cleaning services for non-JKO customers.*

27.     Franchisees are subject to non-compete clauses and cannot clean for non-JKO customers during the term of their Franchise Agreements and two years after they expire or are terminated. (FA §§ 4.15.1-2, 5.2.3; FDD Ex. II Guaranty, ¶ 1; Harper B Tr. 77:22-78:14). [13]

   *(c)     JKO controls the cleaning schedule, work performance, and customer service.*

28.     The Cleaning Schedule specifies what areas to clean and the frequency. (**Ex. 34** p. 3 – Maintenance Agreement ("MA") and Cleaning Schedule; Harper A Tr. 79:20-80:15, Ex. 14, pp. 3-4). JKO negotiates the Cleaning Schedule based on its assessment of the cleaning work and price (Harper B Tr. 18:12-19:13, 36:16-24).

---

[13] Section 5.2.3 of the Franchise Agreement states, among other things, that franchisees shall not, during the term of the agreement and for a period of two years thereafter, operate, engage in, or have any interest in another commercial cleaning business, including within any territory in which Jani-King operates.

29.     Franchisees must perform cleaning services "in accordance with the cleaning schedule" and "to the performance standards of Jani-King." (FA § 4.19; ███████████). The cleaning services performed by franchisees are "governed by . . . [the franchise agreement and JKO's] Policy and Procedures Manual," (FA § 1.4). Franchisees must follow JKO's "policies, practices, and procedures . . . as they may be amended from time to time, and agree not to deviate therefrom without prior written consent" of JKO. (FA §§ 4.2.2, 8.1(g)(ii)).

30.     Franchisees attend mandatory training to learn Jani-King's "methods and practices of professional cleaning services." (FDD Item 11; ███████████).

31.     JKO provides special training for franchisees who service specialty accounts or perform special services, including ████████████████████ ████████████████████████ ████████████████ Harper A Tr. 141:3-143:8, Rendon Tr. 38:17-39:24).

32.     JKO's advertisements highlight the special training and certifications that JKO provides to its franchisees and its oversight practices that includes inspections by JKO and its corporate headquarters. (**Exs. 35 and 36**).

33.     JKO personnel accompany franchisees on initial cleanings for customers. (I. Thompson Tr. 82:10-83:15; Harper B Tr. 202:4-13).

34.     JKO is authorized to review the cleaning services to ensure they are performed to its standards. (FA § 4.19.3; FDD Item 12 p. 50). JKO personnel perform daily inspections to ensure customer accounts are cleaned in compliance with the Maintenance Agreement and Cleaning Schedule and to evaluate work performance. (I. Thompson Tr.

8:14-9:25, 11:14-21, 41:6-19, 44:11-25; 46:19-20; Harper B Tr. 34:23-35:10).

35.     Per JKO's scoring system, an inspection of 80% or lower is failing and a complaint is generated by Jani-King's customer service that directs the franchisee to make corrections. ████████  JKO personnel direct franchisees to make corrections. (██████

████ **Ex. 39** – Zarate Tr. 90:2-93:23; Messner Tr. 58:9-59:6; Martinez Tr. 43:16-21, 75:1-19).

36.     ████████████████████████████████

████████████████████████████████████████

████████████████████ [14] If a franchisee cannot respond to a complaint submitted to JKO within 4 hours, JKO will assess a "fifty ($50.00) per hour Service Fee, plus expenses, for a [JKO] representative to satisfy the client," and assess a complaint fee. (FA §§ 4.19.4, 4.25; ████████████████████ FDD Item 6, p. 25). If a franchisee does not timely comply to JKO's satisfaction JKO can suspend the franchisee from all accounts and transfer them to other franchisees. (FA §§ 4.19.2, 4.19.6).

37.     JKO can require a franchisee to undergo retraining if a customer cancels its contract or requests a new franchisee. (FA § 6.1.2; ██████).

38.     For large event facilities such as college football stadiums, JKO personnel direct and supervise franchisees performing maintenance and cleaning work before, during, and after the game. (I. Thompson Tr. 53:19-60:6).

39.     JKO tracks customer account activity on Transaction Form A and maintains

---

[14] ████████████████████████████████████████
████████████████████████████████████

these records in addition to customer call logs and cancellation reports. (**Exs. 41 and 42**; Ex. 38; Harper A Tr. 70:7-72:5, Ex. 11).

40.     Customers call JKO or the customer service representative in Dallas to report complaints about franchisees. (Harper A Tr. 18:6-15, 81:3-17, 82:16-24, Ex. 16; Castro Tr. 53:3-54:10; Ex. 38; ████████████). JKO receives and records customer complaints in a complaint log and the customer page on its website application. (Harper A Tr. 81:3-17; Castro Tr.  22:21-23:19; Harper B Tr. 93:2-15; I. Thompson Tr. 67:21-68:9).

41.     ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████

42.     Customers send written notice to JKO to cancel services. (Harper B Tr. 190:16-24; **Ex. 44**). JKO in turn corresponds with the customer to conclude the business relationship. (Ex. 44).

*(d)     JKO determines the rate and method of payment for franchise owners.*

43.     JKO negotiates the monthly rate with its customers, which JKO includes in the Maintenance Agreement.  (Harper B Tr. 36:9-24; ████████████).

44.     JKO's contracts, disclosures, and policies give it control over the pricing of any accounts obtained by franchisee: "all contracts for the provision of services by Franchisee must be drafted and/or approved by Franchisor" (FA § 4.21.2); ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

created on its own) reviewed and approved by Franchisor's Regional Director" (P&P Man. § 4.33); JKO's "staff must approve all proposals and contracts for services" (FDD Item 12, p. 51); ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

45.     JKO performs all customer billing and accounting functions. (FA § 4.8; ████ ████████ Customers pay JKO and JKO in turn pays the franchisees any amounts remaining after deducting fees and costs. (FA § 4.8.1; ██████ FDD Item 11, p. 45 n. 3).

46.     JKO prepares a monthly "Franchisee Report" for each franchisee showing gross revenue and the amount due to the franchisee, if any, after all deductions (*e.g.*, fees, costs, charge backs). (Id.; ████████████████ **Ex. 45**). ████████████████████████

████████████████████████████████████████

47.     The fifth day of each month is "Franchisee Day" (Harper A Tr. 68:2-5; Nwamarah Tr. 55:18-56:2; Zarate Tr. 82:12-24) and franchisees owed money pick up their monthly paychecks and Franchisee Reports at JKO's office.  (FA § 4.8.1; ██████).

48.     JKO advances to the franchisee the customer payment for the first month of service. ████████████). If the customer does not pay within a month JKO will "charge back" any advanced sums (████████████ Harper B Tr. 90:3-13), which regularly occurs. (████████████ Harper A Tr. 81:3-24, ████; ████). Payment terms and invoice timing varies depending on JKO's contract. ████████████

49.     JKO will try to persuade its customer to pay when delinquent. (**Ex. 46**; Harper B Tr. 90:18-92:11; ████████). Only JKO can suspend or cancel cleaning services

14

to the customer for nonpayment. (Harper B Tr. 166:13-167:4; ███████████).

50.    JKO loans or advances money to franchisees who need funds to perform the cleaning work. (Harper A Tr. 39:16-42:25; Rendon Tr. 115:1-17; **Ex. 47** - Hill Tr. 56:7-57:2; Zarate Tr. 102:19-103:15, 105:9-12; **Ex. 48** – Williams Tr. 93:20-94:1; **Ex. 49** – Fuentes Tr. 107:9-109:13, 113:14-25).

*(e)    JKO controls other working conditions.*

51.    Franchisees must wear "an approved, neat, and clean uniform" and name tag while cleaning for JKO's customers. (FA § 4.19.1; ███████████).

52.    Each month franchisees are responsible for turning in paperwork (*e.g.*, customer sign-off sheets, extra work forms) so JKO can create an invoice for each job and issue paychecks.  (Harper A Tr. 26:8-22; B Tr. 41:20-42:25).

53.    JKO requires franchisees to have an email address and other means for JKO to contact them. (FA § 4.29; ███████████ FDD Item 7 n.4; ███████████).

54.    The Franchise Agreement provides that franchisees must hire at least one employee other than the franchise owners. (FA § 4.30; FDD Item 15).

55.    JKO reserves the right to modify its policies, procedures, and the franchise relationship at any time, including policies "pertaining to the operation of Franchisee's franchised business." (FA § 4.26; ███████████).

56.    ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

57.     ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

58.     JKO issued a March 2017 revision of the P&P Manual ███████████████

███████████████████████████████████████████████

**2.     *Franchise owners have little opportunity to affect profit and loss.***

59.     Franchisees service customer accounts within the pricing terms negotiated by JKO. (████████; Rendon Tr. 68:8-12; Gbodi Tr. 65:13-16; Holmes Tr. 39:1-3).

60.     JKO's sales team bids prospective customer accounts ███████████████

████████████████████████████████  ████████████

███████████████████████████████████████████████

██████████████████████████████

61.     All franchisees perform cleaning services in the same non-exclusive Territory and, therefore, must compete against JKO and its affiliates and each other if they choose to solicit potential customers. (FA p. 1, § 2.1; FDD Item 12, p. 50).

62.     JKO controls how many franchisees to admit into the Territory. (████████ ██████████████████████; Harper B Tr. 97:18-21).

63.     In addition to setting the price on customer accounts, JKO charges franchisees a fixed percentage of revenue or price for the following business functions that JKO performs:

(a)  For 3% of gross monthly revenue, JKO retains the "exclusive right to perform

16

all billing and accounting functions" for services and supplies that franchisees provide to customers; and prepares monthly Franchisee Reports summarizing business during the previous month. (FDD Item 6(3), p. 23; FA §§ 4.8, 4.8.1; ███████████);

(b)  For 1.5% to 2% of gross monthly revenue, JKO retains the right to direct all advertising and marketing activities, including online advertising and maintenance of its website and social media. (FDD Items 6(4), p. 23, 11; FA § 4.5.2; ███████████);

(c)  JKO charges a finder's fee equal to approximately three months' of the contract proceeds when a franchisee accepts a customer account. (FDD Item 6(9); FA § 4.6);

(d)  For 2.5 to 5% gross monthly revenue, JKO may purchase and use "hardware, proprietary or third party software, and other equipment utilized in the Jani-King system" (FDD Item 6(5), p. 24; FA § 4.7); and

(e)  For up to $50 per hour, JKO will provide additional training. (FDD Item 6(6)).

64.   In addition to the above charges and fees, JKO requires franchisees to purchase equipment and supplies specified in the "Supply and Equipment Package" and "Additional Electric Equipment." (FA § 4.4, Schedule One; FDD Item 8, p. 35).

### 3.   *Individual franchisees' investment is minimal compared to JKO's investment*.

65.   JKO sells franchises on a continuum pricing scale that presently ranges from $16,250 at the bottom (level E-4) to $142,750 at the higher end (level E-50). (FDD Item 5 pp. 15-19). The second lowest level is E-10 for $32,750. (Id.) The lower the Plan level purchased the lower are JKO's monetary "offered business" obligations and the duration of the "offering period." (Id.) For example, if a franchise purchases the E-4 Plan for

$16,250, JKO must offer business of $4,000 per month for 150 days (five months). (Id.)

66.     Franchisees with older Franchise Agreements purchased Plans on a scale beginning with A as the lowest ($8,000 fee for $500 monthly business for 120 days), B the next lowest ($9,500 fee for $1,000 monthly business for 120 days), and scaling up. (Rendon Tr. Ex. 1; Messner Tr. Ex. 1).

67.     The Franchise Agreements JKO produced include 61 that identify the Plan purchased. (Ex. 9 Att. A). ███████████████████████████████████

████████████████████████████████████

68.     JKO's most recent FDD states that "[t]he total investment necessary to begin operation of a Jani-King franchise ranges from $23,239 to $169,409," which includes a range of $2,839 to $7,659, for certain supplies and equipment. (FDD, cover page).

69.     JKO advertises its "Low Cost Franchise Opportunity" and that its "investment plans" are "considered to be among the lowest cost opportunities." (Ex. 27).

70.     Franchisees can pay a percentage of the initial franchise fee in 24 installments deducted from monthly revenue, interest free (FA § 4.3; FDD Item 5, p. 15) and JKO loans money to franchisees to perform cleaning services (Fact 50).

71.     JKO financial statements show annual operating expenses and costs of goods sold ████████████████████████████████████████

### 4.     Permanence of the working relationship.

72.     The term of JKO's Franchise Agreement is historically 20 years and more recently 10 years. (Ex. 9, Att. A). A franchisee may renew a Franchise Agreement upon its expiration. (FA § 9.2).

73.    Franchisees service JKO's customers subject to removal by JKO or the customer. (Facts 18 to 19).

74.    JKO prohibits franchisees from providing cleaning services for non-JKO customers. (Fact 27).

### 5.    *Janitorial cleaning does not require sufficient specialized skill*.

75.    Franchisees come from all work backgrounds and do not need any specific expertise. (Harper B Tr. 57:11-19, 71:16-18).

76.    Cleaning work includes mopping, vacuuming, sweeping, dusting, trash disposal, and cleaning windows, walls, bathrooms and other areas. (FDD Item I, p. 3; I Thompson Tr. 44:15-46:5, 48:22-24). Franchisees can quickly learn how to clean. (Id. at 50:11-19).

77.    JKO performs non-cleaning business functions on behalf of franchisees and charges them for its services. (Fact 63).

### 6.    *Franchise owners' work is an integral part of JKO's business*.

78.    JKO advertises on its website that it cleans "schools, hospitals, car dealerships, office buildings, movie theaters and the list goes on and on. . . . We keep the entire [University of Oklahoma] stadium clean and we're proud to be the Official Cleaning Company of Oklahoma Sooner Football." (https://www.janiking.com/jani-king-of-oklahoma-city-commercial-cleaning/; **Ex. 51**). The viewer can click a link to "Get A Cleaning Quote" directly from JKO. (Id.).

79.    JKO owns a franchise Outlet (FDD Item 20, p. 76; **Ex. 52** – Int. Resp. No. 3), reserves the right to clean for its customers (FA §§ 4.19.4-5, 4.24), and uses its In House

cleaners when needed. (Exs. 26 and 52 Int. Resp. Nos. 2, 3; Harper A Tr. 22:1-23, Ex. 4).

    **D.**    **JKO denies an employment relationship with its individual franchise owners and does not maintain records of wages, hours, and other conditions and practices of employment.**

    80.    JKO and its affiliates have denied an employment relationship with its franchisees under the FLSA and state laws in this and other actions brought in federal courts in California, Connecticut, Kentucky, Massachusetts, Minnesota, Pennsylvania, Rhode Island, and Texas.  (FDD Item 2; fn. 7, supra).

    81.    JKO does not keep records of hours worked by individual franchise owners performing the cleaning services or net wages for such work. (Ex. 28, RFA Resp. No. 3).

## III.   ARGUMENT

**A.**    **Summary Judgment Standard of Review.**

    Summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it could influence the determination of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial responsibility of showing the absence of evidence to support the nonmoving party's case. Bachus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). When the moving party meets its burden, the burden shifts to the nonmovant to designate specific facts showing there is a genuine issue for trial. Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994). In essence, the inquiry for the Court is whether the evidence presents a sufficient disagreement to require a trial or whether it is so one-sided that one party must prevail as a matter of law.  Id. at 250.

**B.      JKO is a Covered Enterprise Under the FLSA.  (Facts 1 to 3)**

FLSA enterprise coverage applies when an employer "has employees handling, selling, or otherwise working on goods or materials that have been moved in . . . commerce by any person" and has an annual gross volume of sales made or business done of not less than $500,000. 29 U.S.C. § 203(s). An enterprise may be a single business operated by one or more employer. 29 C.F.R. §§ 779.203-04. Enterprise coverage exists because JKO has annual gross volume of sales made or business done in excess of $500,000, and its employees and franchisees (alleged employees) handle materials and equipment that have moved in commerce. See, *e.g.*, Brennan v. Dillion, 483 F.2d 1334, 1335 (10th Cir. 1973) (holding apartment complex employees handling of materials such as light bulbs, cleansers, paint, and grass seed made them engaged in the production of goods for commerce); Donovan v. Pointon, 717 F.2d 1320, 1322 (10th Cir. 1983) (handling construction equipment and parts that moved in commerce satisfied enterprise coverage).

**C.      Individual Franchise Owners Perform Cleaning Services Themselves for JKO's Customers. (Facts 4 to 6)**

JKO historically sold franchises to individuals in their individual capacities as reflected by many unexpired Franchise Agreements. ██████████ JKO now requires individuals (whether they are obtaining new franchises or renewing franchises) to purchase franchises through corporate entities that they establish. JKO acknowledges that it made this change in part to cast their franchises as independent businesses. Ex. 28 Resp. Int. 10. The facts, however, did not change. Individuals own the franchises either directly or

indirectly through corporate forms and must participate in providing cleaning services pursuant to JKO's policies and "owner-management" business concept.[15] Many individual franchisees have smaller accounts and perform cleaning work or seek assistance from family. Franchisees who have cleaners still perform cleaning themselves in addition to supervising others.

### D.    Individual Franchise Owners Are JKO's Employees Under the FLSA.

The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1).  "Employ" means to "suffer or permit to work." Id. at § 203(g). See also, Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326 (1992) ("employ" is defined with "striking breadth"); Johnson v. Unified Gov't of Wyandotte Cnty., 371 F.3d 723, 729 (10th Cir. 2004) (noting the FLSA's broad definition covers parties who might not qualify as employees under traditional common law agency principles).

The "economic realities" test controls the determination of whether an individual is an independent contractor or employee. See Goodly v. Check-6 et al., Case No. 16-cv-344, 2018 WL 5091901at *2 (N.D. Okla. Oct. 18, 2018) (citing Acosta v. Paragon Contractors Corp., 884 F.3d 1225, 1235 (10th Cir. 2018)). "The test focuses on 'whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself.'" Id. (citing Barlow v. C.R. England, Inc., 703 F.3d 497, 506 (10th Cir. 2012)) (Emphasis in original). The six-factor economic realities test considers: (1) the degree of control exercised by the employer over the worker; (2) the

---

[15] "[W]e have built our reputation on the 'owner-management' concept and believe it is mandatory for continued success. (FDD Item 15, p. 55).

worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the

permanence of the working relationship; (5) the degree of skill required to perform the

work; and (6) the extent to which the work is an integral part of the employer's business.

Acosta v. Jani-King of Oklahoma, Inc., 905 F.3d 1156, 1160 (10th Cir. 2018).

That the alleged employees entered into franchise arrangements is not

determinative. As the Tenth Circuit Court of Appeals recently explained in this case:

> [i]t is well settled that the economic realities of an individual's working
> relationship with the employer—not necessarily the label or structure
> overlaying the relationship—determine whether the individual is an
> employee under the FLSA. [Citations omitted]. In determining whether an
> individual is an employee under the FLSA, the inquiry is not limited to the
> contractual terminology between the parties or the way they choose to
> describe the working relationship. [Citations omitted].

Id. at 1159-60. (Emphasis added).

Each factor is a question of fact for the Court. Herr v. Heiman, 75 F.3d 1509, 1513

(10th Cir. 1996). The Court employs a totality-of-the-circumstances approach to determine

whether the individual is economically dependent on the business to which he or she

renders service, or is in business for himself or herself as a matter of economic fact. Baker

v. Flint Eng'g & Constr. Co., 137 F.3d 1436, 1440 (10th Cir. 1998).

### 1. The extent of control JKO exercises indicates its individual franchise owners are its employees under the FLSA.

A worker's ability to act independently or autonomously as if conducting his or her

own business shows independent contractor status. See Baker, 137 F.3d at 1441; Saleem

v. Corp. Trans. Grp., Ltd., 854 F.3d 131, 139 (2d Cir. 2017). See also, Scantland v. Jeffry

Knight, Inc., 721 F.3d 1308, 1313 (11th Cir. 2013) ("Control is only significant when it

shows an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity."). The inability of the worker to work on his or her own terms often suggests dependence. See, *e.g.*, Saleem, 854 F.3d at 148; Scantland, 721 F.3d at 1312; Usery v. Pilgrim Equip. Co., Inc., 527 F.2d 1308, 1311-12 (5th Cir. 1976)).

Accordingly, independent contractors are often characterized by their ability to, for example, regularly negotiate working conditions or simultaneously work for another business. See Saleem, 854 F.3d at 141-43 (holding that the ability to simultaneously "draw income through work for others," such as by working for a competitor, indicates "considerable independence"). Considerations of control include authority to hire and fire; ability to work for other employers; the extent of supervision; independence in setting own work schedules and other conditions of their work; and determining the rate and method of payment. Baker 137 F.3d at 1440; Goodly, 2018 WL 5091901 at *4 (citing Paragon, 884 F.3d at 1235).

> (a)    *JKO hires and fires individual franchise owners – it has the power to admit them into and terminate them from the franchise system and to assign or remove them from accounts. (Facts 7 to 26).*

JKO hires franchise owners. JKO determines when it will sell a franchise, to whom, and how many it will include in its Territory. JKO's preconditions for admission resemble typical employment criteria, such as completion of training and testing to meet its cleaning standards, passing a background check, and signing a non-compete agreement. If an individual who has been a franchisee wishes to continue in the system after expiration of the Franchise Agreement, he or she must sign a general release, execute the current Franchise Agreement, and meet any other conditions such as forming a corporate entity.

Like an employer, JKO decides when to hire more cleaners to service its customers.[16]

  JKO designates franchise owners to its customer accounts. JKO obtains most customer accounts, retains ownership of them all, and controls which franchisees will have the opportunity to service customers, how many customers, and which customers the franchisee will service. JKO's sales team and its corporate headquarters actively seek customers using specialized methods and software tools. JKO advertises that it will obtain the business for franchisees and most, if not all, rely on JKO's account offerings rather than independently seek business.[17] In the event a franchisee does not wish to perform services outside the scope of work (*e.g.*, buffing floors, carpet cleaning), JKO designates another franchisee to perform the work further illustrating its control over work assignments.[18] Even in the rare circumstances where franchisees obtain their own customers, JKO is involved in or often handles the bidding process and pricing,[19] and retains ownership of the account. Franchisees must sign an account acceptance agreement that imposes conditions upon them and confirms JKO's exclusive property right to the account allowing JKO to reassign the account to another franchisee in its discretion. Ex. 24, ¶¶ 1 and 5.

  A comparison of Franchisee Yearly Reports summarizing gross revenue and

---

[16] JKO act          chisees "if we're in need of signing franchises." Harper B Tr. 97:18-21. ████████

[17] Fact 13. See also, franchisee testimony cited in fn 25 and Holmes Tr. 30:7-31:7; Mann Tr. 23:4-7; Martinez Tr. 82:20-83:4; Williams Tr. 15:11-13; Myatt Tr. 21:11-15, 93:11-19; **Ex. 53** – Robinson Tr. 21:7-11.

[18] JKO also finds substitute franchisees to fill in for franchisee who take leave and pays the substitute. Messner Tr. 137:7-140:15.

[19] I. Thompson Tr. 78:2-15; Holmes Tr. 40:8-23; Rendon Tr. 30:12-31:6, 105:13-22; Myatt Tr. 22:9-23:1.

deductions for 2016 to 2018 shows the disparity in customer assignments and, thus, revenue. ███████████████████████████████████

███████████████████████████████████

██████████████████████ JKO controls this allocation of business. The top revenue generators identified by JKO testified that they received all of their accounts from JKO.[20] Thus, franchisees do not independently grow their own businesses, but instead depend upon JKO's preferences as to which franchisee will be awarded the most lucrative accounts.

JKO terminates franchisees from its customer accounts. JKO terminates franchisees by removing them from accounts or withholding work assignments. JKO's various agreements and manuals (Facts 17-20) give it broad authority and discretion to remove a franchisee based upon a customer complaint or request, or JKO's subjective determination of poor performance or failure to meet or comply with standards and policies. JKO specifically advertises that it "will make the necessary adjustment" if customers want to replace a franchisee. JKO removes franchisees from accounts so frequently that it included an Addendum to Designate Replacement Franchisee in its form Maintenance Agreement to easily document the replacement.[21] JKO tracks account activity on Transaction Form A,

---

[20] See Nwamarah Tr. 17:2-10; Rendon Tr. 24:15-18; Gbodi Tr. 24:18-25:2; Zarate Tr. 51:3-9; Hill Tr. 42:7-16.

[21] The form Maintenance Agreement is Exhibit XIII to the FDD and includes the franchisee as a signatory in addition to the customer and JKO. JKO, however, uses an older version that only JKO and its customer sign. Harper A Tr. 79:20-81:1, Exs. 14 and 15. The FDD form does not afford the franchisee any meaningful rights other than to clean subject to removal. JKO included the franchisee as a signatory to cast the appearance that franchisees are independent business owners. Ex. 28, Int. Resp. No. 12.

which records all transfers, including "trouble transfers" (**Ex. 54**) and imposes fines resulting from performance or complaint violations. JKO's response to Interrogatory Nos. 4 and 5 includes a ▉▉▉▉ chart showing the frequency and number of transfers from January 2016 to May 2019, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

This broad authority to control work assignments lends itself to potential abusive situations such as removing a franchisee from an account to meet an "Initial Offering" obligation to a new franchisee (FA § 4.3.3), or to start a finder's fee period with another franchisee (FA § 4.6). Franchisees have no process or method to confirm the reason for their removal, even for accounts they obtained. Franchisees testified that they knew or believed that JKO provided false reasons for removing them from accounts (*e.g.*, the customer did not complain as JKO reported).[22] These claims, even if disputed, illustrate JKO's unilateral control over franchisees' ability to work and earn income. Customers with a valid complaint do not terminate franchisees; rather, JKO fields the complaint, removes the franchisee, and designates a replacement.[23] The franchisee – a purported independent business owner – has no power and cannot avoid termination by JKO.

Because franchisees lack ownership and control over accounts they are often surprised when they lose them. For example, Samuel and Maria Martinez were surprised when JKO told them to turn in the keys because it lost the medical facility accounts they had cleaned for years to a competitor. The Martinezes had no communications with the

---

[22] See Messner Tr. 15:19-17:20; **Ex. 55** - Freeman Tr. 31:7-32:10, 37:16-38:12.
[23] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ I'm taking you out since you haven't shown in two weeks." Rebecca Holmes testified that JKO let a customer out of the contract she was servicing even though there was no problem. (Holmes Tr. 36:23-37:5).

customer "because the contracts are owned by Jani-King, not by us."[24] Franchisees know JKO can fire them at any time. Ashley Zarate, a top revenue generator, acknowledges that JKO can "pull" her accounts at any time.[25] When JKO finds problems with her work she takes care of it "because they could get another franchise owner to take over the accounts if they – like, they feel that we're not taking care of it," they can take accounts at any time.[26] JKO also controls resignations. If a franchisee wants to quit an account he or she must notify JKO and it handles the customer relations and designates a new franchisee. The franchisee, however, must continue to clean until JKO designates the replacement.[27]

JKO terminates franchisees from its system. JKO can terminate Franchise Agreements pursuant to ambiguous provisions that allow for subjective decision-making. For example, JKO may determine that a franchisee engaged in "conduct which reflects unfavorably upon the operation or reputation of the Jani-King business or System;" or "fail[ed] to maintain any standard set forth anywhere in the contract or any Jani-King manuals;" or "abandonment." Because unfavorable conduct and abandonment are not defined terms, JKO has unfettered discretion in determining if a violation occurred.[28]

JKO controls the termination process. In January 2019, JKO issued letters entitled

---

[24] Martinez Tr. 18:25-19:1.

[25] Zarate Tr. 71:7-13

[26] Id. 93:17-23. Whitney Hill testified that JKO used the existence of other franchisees as a way to make them do work or else be replaced. Hill Tr. 69:3-21.

[27] At times, franchisees continue to clean beyond the notice period until JKO can find a replacement franchisee. N. Thompson Tr. 105:9-14; Zarate Tr. 70:15-20.

[28] JKO recently issued default notices to franchisees for failure to pay minimum royalty fees. However, without explanation, the subsequent termination notices state "abandonment" as the reason for termination. Harper A Tr. 75:18-77:23, Exs. 12 to 13.

"Notice of Default for Failure to Pay all Minimum Royalty Fees Due" to 27 franchisees

who no longer generated any revenue.[29] 

JKO controlled the timing for issuing

these default notices.

[30] or to approve the transfer

or sale of the franchise. [31]

JKO's broad authority to admit and terminate franchisees into and from its system

and offer jobs and take them away establishes that it "hires and fires" franchisees like an

employer hires and fires employees. Compare Harris v. Universal Contracting, LLC, Case

No. 2:13-cv-00253, 2014 WL 2639363 at *3 (D. Utah June 12, 2014) (finding manager's

authority to "admit" members into limited liability company and "redeem" ownership

constituted "hiring and firing" authority under FLSA employment relationship criteria).

    (b)    <u>Franchisees cannot perform cleaning services for non-JKO customers</u>.

Franchisees cannot compete during the term of their franchise and for 2 years

thereafter.[32] Thus, unlike a typical independent contractor who is free to work for various

---

[29] <u>Id</u>.

[30] <u>Id</u>.

[31] JKO must consent to any sale or transfer of a franchise. (FA § 10.1).

[32] All Franchise Agreements identified in Ex. 9A include the two-year post-termination non-compete period.

customers, JKO expressly forbids franchisees to perform commercial cleaning services for non-JKO customers. The non-compete requirement is tantamount to an exclusive employment agreement and prevents franchisees from being separate economic entities.

The restriction against competition is indicative of an employment relationship and refutes any claim that the franchisees are independent businesses. See Perez v. Super Maid, LLC, 55 F. Supp. 3d 1065, 1078 (N.D. Ill. 2014) and Harris v. Skokie Maid and Cleaning Service, Ltd., Case No. 11-C-8688, 2013 WL 3506149 at *9 (N.D. Ill. July 11, 2013) (finding non-compete agreements prohibiting competition in open market, in particular post-termination, as evidence of employment relationship); Hughes v. Family Life Care, Inc., 117 F. Supp.3d 1365 (N.D. Fla. 2015) (although nurse could refuse offered work and was not required to perform minimum hours or days, she was an FLSA employee where registry subjected her to a non-compete, oversight via customer surveys, supervisory visits, incident reports, and a discipline system). See also, Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1542 (7th Cir. 1987) ("The usual argument that workers are 'dependent' on employers . . . is that they are immobile.") (Easterbrook, J., concurring); Saleem, 854 F.3d at 141-42 (collecting cases finding that a business "relinquishes control" over a worker and thereby makes the worker "less economically dependent" when it allows the worker "to work for its competitors"); Pilgrim Equip., 527 F.2d at 1312 (noting control that causes a worker to have "no viable economic status that can be traded to other . . . companies," such that the worker cannot operate as "a separate economic entity").

     *(c)*    *JKO controls the cleaning schedule, work performance, and customer service. (Facts 28 to 42).*

    <u>JKO controls the cleaning schedule</u>. Based on its assessment of an account, JKO sets the terms of the Maintenance Agreement and Cleaning Schedule with its customer, including the scope of work and cleaning frequency. Some accounts have mandated schedules (*e.g.*, clean during school hours). That franchisees at times modify working hours after accepting an account or are not directly supervised onsite does not show lack of control. Context matters. An employer's lower degree of supervisory and scheduling control may be inherent in certain offsite jobs, but the employer may still exert sufficient control resulting in an employment relationship. <u>See</u> <u>Doty v. Elias</u>, 733 F.2d 720, 723 (10th Cir. 1984) ("A relatively flexible work schedule alone, however, does not make an individual an independent contractor rather than an employee."); <u>Donovan v. Dial America Marketing, Inc.</u>, 757 F.2d 1376, 1384 (3d Cir 1985) (that homeworkers could control their own hours and were subject to little direct supervision was not significant in control analysis); <u>Brock v. Superior Care, Inc.</u>, 840 F.2d 1054, 1060 (2nd Cir. 1988) ("An employer does not need to look over his workers' shoulders every day in order to exercise control.").

    <u>JKO retains control over work performance</u>. JKO asserts control over the manner and means of the cleaning work through its training, inspections, policies, and procedures. JKO can discipline franchisees up to removal from an account or termination of their franchise for failure to comply with JKO-imposed constraints. Franchise owners must attend initial training to learn how to clean to JKO's standards. Franchisees interested in better paying specialty accounts such as health care facilities receive JKO training and

certifications.[33] It is not sufficient for franchisees to perform cleaning services in a "good and workmanlike manner" – the typical independent contractor standard. 

Ex. 24 ¶¶ 1 and 5; FDD Ex. XIII § 2.3. JKO can impose discipline up to termination for failure to abide by its standards and policies.

JKO emphasizes its oversight in marketing materials and its team of inspectors regularly inspect and grade work performance.[34] JKO directs franchisees to correct deficiencies that it finds or customers report. For example, ▮▮▮▮▮▮ JKO's Ashley Richardson directing a franchisee to perform dusting and clean floors while she obtains a quote to repair his equipment. ▮▮▮▮▮ JKO's Lindsey Rudichuk fielded a complaint and directed the franchisee "to dust the blinds this coming weekend and once a week after." ▮▮▮▮ Ms. Thompson directed a franchisee "to use [a] tennis ball to remove scuff marks in lab floor." ▮▮▮▮ Franchisees who do not respond to a complaint in a manner that JKO considers timely and sufficient or receive poor inspection grades are subject to discipline (suspension or removal and fines) up to termination.

JKO at times manages both the designated franchisees and the account. Former JKO employee (and franchise owner), Whitney Hill, testified that JKO recruited cleaners and

---

[33]Compare Craig v. FedEx Ground Package Sys., Inc., 335 P.3d 66, 85 (Kan. 2014) ("[O]rdinarily one does not hire an independent contractor that requires training").
[34] Castro Tr. 38:24-43:19 (inspection process); Gbodi Tr. 92:10-93:2; Freeman Tr. 50:19-52:6; Rendon Tr. 113:5-24; **Ex. 56** - Duenas Tr. 19:16-20:2; Martinez Tr. 45:16-22.

managed them for franchisees on a variety of customer accounts.[35] She also described how she staffed and managed cleaners at the Oklahoma State University ("OSU") and University of Oklahoma ("OU") football stadiums on behalf of franchisees, including recording hours worked and running payroll.[36] JKO may dispute Ms. Hill's testimony or claim such practices no longer occur; however, the undisputed material facts demonstrate that JKO's authority and control over customer accounts is significant and franchisees who do not comply will not receive good accounts or may not work at all.

JKO personnel directed and supervised franchisees at the OSU football stadium. Ms. Thompson testified that she "commands" the work of franchisees at the football stadium.[37] JKO designates franchisees to clean the stadium and Ms. Thompson, like a manager or supervisor, sits in a "command booth" during the game, communicates with the customer about cleaning needs, transmits directions to the franchisees stationed throughout the stadium, and inspects their work.[38] Franchisees testified about similar recent and past experiences. Vernon Reed explained that in 2018 all JKO corporate personnel were at the OU football stadium and "when [franchisees and their cleaners] first get there at the stadium . . . they check them off with a shirt to put on, assign position, what they're going to be doing . . . they manage their time sheet."[39] JKO assigned him to clean a

---

[35] Hill Tr. 10:13-12:23.
[36] Id.  14:14-17:6.

[37] I. Thompson Tr. 53:19-60:6.
[38] Id. 54:6-55:15, 57:1-12, 59:22-60:6
[39] Reed Tr. 58:22-59:1.

designated area and to manage his crew and other cleaners JKO assigned to him.[40] Ashley Zarate's crew cleaned the OSU football stadium and she confirmed that Ms. Thompson supervised franchisees.[41] Ms. Zarate also performed cleaning work at the OU football stadium where JKO assigned franchisees to clean specific stadium sections and directed their work "like, what Iris did at OSU."[42] Vonnisha Freeman explained that JKO asked her to bring workers to the OU football stadium and paid her an hourly rate for each worker.[43] She reported to JKO personnel at "a table set up" and they recorded hours worked by her and her crew.[44]

In September 2019, Ms. Thompson asked Samuel Martinez to bring a crew to the OU football stadium and paid an hourly rate for each cleaner.[45] Ms. Thompson gave him sign-in sheets to track hours for him and his crew that he turned in to JKO.[46] A person in charge told Mr. Martinez and his crew where to clean.[47] Mr. Martinez confirmed Ms. Thompson's description of directing cleaning crews at the OSU football stadium, including JKO personnel using walkie-talkies to instruct franchisees, performing inspections, and directing them to correct deficiencies.[48] In these situations, Mr. Martinez "felt like they were trying to treat me like I was their employee."[49]

---

[40] Id. 57:1-59:24.
[41] Zarate Tr. 29:1-7.
[42] Id. 76:25-77:1.
[43] Freeman Tr. 38:22-39:25.
[44] Id. 42:14-24.
[45] Martinez Tr. 26:16-28:6.
[46] Id. 35:8-36:4.
[47] Id. 28:7-25; 32:3-15.
[48] Id. 36:17-39:14; 45:18-46:21.
[49] Id. 155:10-11.

<u>JKO controls its customer relations</u>. JKO has exclusive communication with its customers concerning the most important aspects of the business relationship. JKO bids and contracts with customers; performs all billing and collections; designates franchisees to and removes them from accounts; fields customer service calls locally and in Dallas; ensures franchisees make any corrections to satisfy customer complaints; and handles account terminations without franchisee involvement. JKO and Dallas personnel meet each Wednesday to discuss customer call logs, complaints, and cancellations to ensure their customers are satisfied.[50] Franchisees are not involved in these important processes. JKO is "ultimately in charge" of customer service. ████

JKO works directly with its customers to make any changes to services and records them on Transaction Form A and its internal database to monitor its accounts.[51] The section titled "Contract Increase/Decrease" tracks any pricing changes. JKO, however, is not required to inform franchisees of pricing or other changes. For example, JKO recorded a $294 decrease on a school account serviced by James Myatt. Mr. Myatt learned that he lost this revenue when "a guy" from the school showed up one day and told Mr. Myatt he would be taking over two portable facilities Mr. Myatt had been cleaning.[52] JKO did not tell Mr. Myatt about the change and he "thought that was kind of a weird way to find out."[53]

The relationship between the franchise owner and the customer varies from account to account; however, even when franchisees communicate with customers, JKO controls

---

[50] Castro Tr. 52:19-53:20.
[51] Harper A Tr. 70:7-71:12.
[52] Myatt Tr. 105:14-25, Ex. 3.
[53] <u>Id</u>., 106:6-7.

the account and important communications. Mariel Rendon learned she lost a school account to a competitor when JKO's Ashley Richardson emailed her that the account was canceled.[54] The Martinezes recently lost three health care facility accounts they had cleaned for years when Ms. Thompson called and told them to turn in the keys.[55] Carleen Williams described her frustration in losing accounts with OSU facilities because, in her view, Ms. Thompson failed to address the customer's concerns that had to go through JKO.[56] Ms. Williams stated that Ms. Thompson is authorized "to have us stay or pull [the account] regardless.  She's the one that tells us what to do, how to do it . . . even though we're the franchise owner."[57]

When a customer terminates the contract, it notifies JKO in writing. JKO sends a follow-up letter ██████████████████████████████████████████ ████████████████████████████. Because the franchisee is not involved in this process he or she is not copied on the correspondence. Ex. 44. JKO records customer cancellation data and uses it for business analysis purposes. Ex. 42.

(d)     *JKO determines rate and method of payment for franchise owners.*
        (*Facts 43 to 50*).

JKO negotiates the price for all cleaning accounts it sells. In the few instances where franchisees have a lead, sell additional work, or request an increase, JKO must approve. Thus, franchisees cannot act independently in negotiating price. For example, Vernon Reed

---

[54] Rendon Tr. 98:20-99:17.
[55] See p. 28.
[56] Williams Tr. 26:17-28:21.
[57] Id. 28:16-21.

cleaned a Pepsi building for 12 years for the same rate. When he asked his point of contact for a pay increase the customer informed Mr. Reed that Pepsi had negotiated a reduced rate with JKO for multiple buildings (Mr. Reed was unaware) and reported him to JKO personnel who admonished him to not negotiate pricing.[58] Franchisees who "up-sell" additional work to JKO's customers cannot enter into contracts and JKO typically prices the additional work. For example, James Myatt testified that if he up-sells a carpet shampoo he contacts JKO personnel who give him permission, provide the paperwork, and "assist me on the pricing."[59] Rebecca Holmes testified that JKO had to document up-sales "as a work order for us to get paid for it . . . They would price it. We weren't able to price it."[60]

Customers pay JKO and JKO in turn pays the franchisees each month after deducting fees and expenses. JKO tracks and records all revenue and applicable deductions for each franchisee in the monthly Franchisee Report. Because franchisees do not receive copies of invoices sent to customers they must accept the information in these reports on face value. ██████████ Franchisees pick up their monthly reports and paychecks on the 5th of the month known as "Franchisee Day."[61]

---

[58] Reed Tr. 12:5-15:16.

[59] Myatt Tr. 22:15-23:1.

[60] Holmes Tr. 40:12-23. As noted on pages 34-35, JKO controls whether to increase or decrease pricing at any time. Franchisees are not always aware of pricing changes or terms. James Myatt, for example, serviced ███████████ and did not know he had to pay 160 hours to laborers at special rates. When he used 120 hours of labor, "[JKO] dinged me," requiring him to pay more. Myatt Tr. 74:10-75:24. After learning about the pricing he stated "it was a terrible – lousy contract." Id. 74:11-19. Carleen Williams also serviced ███████████ and testified she lost money and the account because JKO did not inform her of the labor pricing requirements. Williams Tr. 38:22-42:3.

[61] Notably, franchisees testified that JKO, like an employer, pays them hourly rates for college football stadium cleans and tracks and records hours worked. See pp. 33-34 above.

In computing a franchisee's monthly payment, JKO credits the franchisee for a customer's first monthly payment. If the customer does not pay by the next month's payday,[62] JKO deducts the funds via a "charge back." JKO regularly emails charge back notices to franchisees[63] and the amount can significantly reduce monthly pay compromising a franchisee's ability to perform assigned work.[64] Franchisees turn to JKO to obtain advances or loans to meet payroll.[65] JKO advanced $93,000 to Ashley Zarate, interest free, when she did not have money to pay cleaners.[66] JKO was slow on processing billing[67] and she told Ms. Harper: "I was going to have to pull – pull out of having Chesapeake [Arena] and Cox [Convention Center] because I couldn't meet payroll."[68] This reliance on JKO to perform work reflects economic dependence and an employment relationship.

(e)     *JKO controls other working conditions.  (Facts 51 to 58)*

JKO requires franchisees and cleaners to wear approved uniforms and nametags. Franchisees must have a method for JKO to promptly contact them to address any customer concerns, and must turn in necessary paperwork each month before payday. ██████

████████████████████████████████████████████████████████████████████

---

[62] ████████████████████████████████████████████████████ Harper A Tr. 83:7-19.
[63] Harper A Tr. Ex. 16; ██████
[64] For example, Whitney Hill's franchise had over $363,000 in charge backs in 2016 and 2017. Hill Tr. 55:1-23, Ex. 9.
[65] Williams, Tr. 93:20-94:1; Rendon Tr. 115:1-17; Hill Tr. 56:7-57:10.
[66] Zarate Tr. 102:19-103:15; 105:9-12.
[67] Id. at 102:15-25.
[68] Id. at 106:16-20.



Franchisees with less formal personnel practices ran the risk of violating their contractual obligations.

Pursuant to JKO's power to unilaterally change its policies, procedures, and relationship with its franchisees, it issued a new March 2017 version of its P&P Manual [69] JKO, however, may change these policies back or impose more requirements at any time. In addition, JKO retains the unilateral ability to determine whether a franchisee violated any policy or procedure.[70]

These controls are similar to requirements imposed upon employees and are indicative of an employment relationship.

### 2.   *Franchisees have little opportunity to affect profit and loss. (Facts 59 to 64).*

The opportunity for profit or loss must depend on managerial skills to indicate

---

[69] Franchisees in the system prior to March 2017 version (the vast majority) reviewed the 2002 P&P Manual at mandatory training. Harper A Tr. 68:15-18.

[70] JKO remains involved in employment practices for those franchisees who hire cleaners. Although not enforced, JKO requires franchisees to hire at least one employee. Franchisees such as Mariel Rendon and James Myatt hire cleaners from applications maintained at JKO's office. Rendon Tr. 119:23-121:1; Myatt Tr. 102:8-14.

independent contractor status and an individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit through managerial skills. Scantland, 721 F.3d at 1317. See also, Dole v. Snell, 875 F.2d 802, 809-810 (10th Cir. 1989) (although performing more work results in more income, "toiling for money on a piecework basis is more like wages than an opportunity for "profit,'" thus workers earnings "did not depend upon their judgment or initiative, but on [the employer's] need for their work."). Strict prearranged pay scales and situations that do not afford workers managerial discretion eliminate the opportunity to realize increased profits. Super Maid, 55 F. Supp. 3d at 1078.

Franchisees are constrained by the pricing terms JKO negotiated.[71] JKO prices bids based upon *its* ███████████ estimate of labor hours and costs. Because JKO charges a significant finder's fee and a host of other fees that are percentages of revenue, it is motivated to secure accounts to collect fees, even if the accounts are not priced to profit. The franchisee designated to clean for JKO's customer does not weigh in on the bid. This can pose problems for franchisees trying to earn a profit if JKO underbids to secure an account. James Myatt explained that JKO has "tightened" its pricing to obtain accounts making it difficult to profit.[72] Because of the pricing control, the opportunity for profit or loss depends more on the accounts JKO assigns than on using managerial judgment and skill. See Collinge v. IntelliQuick Delivery, Inc., Case No. 2:12-cv-00824, 2015 WL

---

[71] See Rendon Tr. 68:8-12; Gbodi Tr. 65:13-16; Holmes Tr. 39:1-3.
[72] Myatt Tr. 45:10-15, 78:18-80:24. Franchisees believe JKO underbids contracts: Messner Tr. 50:24-53:10; Williams Tr. 136:1-10; Hill Tr. 44:18-25, 89:2-91:17; Mann Tr. 31:16-33:15; Martinez Tr. 119:14-120:2.

1299369, at *4 (D. Ariz. Mar. 23, 2015) (concluding drivers' opportunity for profit or loss depends more on assignments than managerial skill where ability to increase profits was limited by pricing set by freight service).

JKO performs the primary "managerial skill" business functions and charges mandatory fixed fees for its services. In addition to royalty fees, franchisees pay JKO fees for accounting (billing, collecting, preparing revenue and fee reports, issuing checks), advertising/marketing, and technology licensing, as well as steep finder's fees for accepting work. Many franchisees go to JKO-affiliated vendors to pick up supplies and equipment and JKO deducts the cost from their monthly paycheck.[73] JKO customer service personnel receive complaints and manage responses. JKO controls advertising, including its website.[74] Unlike other franchise systems, JKO does not have an advertising council comprised of franchisees to advise the franchisor on advertising policies"[75] and franchisees do not advertise.[76] Those that do use word of mouth or attempt to sell additional work to their assigned customer accounts.[77]

Entrepreneurial opportunity is limited because franchisees work in a JKO-controlled fish bowl. JKO controls the business environment within the non-exclusive

---

[73] Harper A Tr. 32:5-33:12.

[74] FDD Item 12 p. 51.

[75] FDD Item 11 p. 48. JKO is required to disclose to prospective franchisees specific information about "[w]hether there is an advertising council composed of franchisees that advises the franchisor on advertising policies." 29 C.F.R § 436.5(k)(4)(iii) and (iv).

[76] Zarate Tr. 97:10-98:8; Messner Tr. 90:4-9; Freeman Tr. 55:8-57:12; Fuentes Tr. 115:20-23.

[77] Wilson Tr. 33:20-34:2; Holmes Tr. 40:2-23. Mitzi Messner described her attempts to offer customers special discounts for referrals. JKO told her to stop. Messner Tr. 90:10-19.

Territory, including competing against its own franchisees. JKO alone determines how many franchisees will occupy the Territory at any given time.[78] JKO advertises that it has "teams of professionals . . . who make it their business to sign new business for franchisees to service." Fact 12. Jani-King's sales force targets specialty customers such as hotels, casinos, resorts, hospitals, clinics, and doctor offices.[79] Facts 10-11. The typical franchisee cannot compete with the JKO business development machine. JKO designed the system to own the business and designate franchisees to perform the cleaning, pay fees, and buy equipment and supplies from vendors JKO contracts with for rebates.[80] Thus, JKO controls and regulates the competition and any entrepreneurial aspect of the franchise arrangement. Compare, Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 993 (9th Cir. 2014) (existence of limited entrepreneurial opportunity does not undermine employee status under state law).

JKO controls the supplies and equipment franchisees use by requiring them to purchase items in the "Supply and Equipment Package" and "Additional Electric Equipment"[81] even if a franchisee does not need them.[82] Franchisees purchase items from

---

[78] When asked how many franchisees were in the Territory, franchise owner James Myatt responded: "Not a clue. . . .  I hope they don't just flood this area with just more Jani-King franchises. Because there's, you know, only so much business." Myatt Tr. 115:2-16.

[79] JKO needs to be the principal customer account source because sales are ██████████ ████████████████████████████████████████████████████

[80] FDD Item 8, p. 36 states Jani-King receives rebates from its suppliers and its leasing affiliate earned $1,173,625 in revenue in 2018.

[81] FA pp. 31-33; FDD Ex. V.

[82] "[Y]ou have to purchase a long list of equipment, which most of it you don't even use." Messner Tr. 9:22-24.

JKO-approved vendors on account and JKO deducts the costs from their paychecks.[83] Some customers provide the supplies and equipment for franchisees.[84] In those instances where franchisees choose to find items that may cost less than items offered by JKO vendors, such activity does not involve meaningful managerial skill or judgment. See Acosta v. Senvoy, LLC, Case No. 3:16-cv-2293, 2018 WL 3722210 at *8 (D. Or. July 31, 2018) (noting that selection of cheaper equipment may lower costs, but involves little managerial skill relative to profit and loss).

Franchisees' management of cleaning personnel is more akin to supervisory work on behalf of JKO than independent business judgment and initiative that can influence profit and loss. A franchisee's decision about how much to pay cleaners is capped by JKO's pricing and fixed fees. Because JKO controls customer account pricing and the pricing for the many functions it performs, franchisees can earn more only by working more accounts and/or hours, which does not involve meaningful managerial skill to optimize profit.[85] Such lack of managerial skill is indicative of an employment relationship. See Scantland, 721 F.3d at 1316-17 ("Plaintiffs' opportunity for profit was largely limited to their ability to complete more jobs than assigned, which is analogous to an employee's ability to take on overtime work or an efficient piece-rate worker's ability to produce more pieces."); Solis v. Cascom, Inc., 2011 WL 10501391, at *6 (W.D. Ohio Sept. 21, 2011) (finding no opportunity for profit or loss where workers did not make decisions normally associated

---

[83] Harper A Tr. 32:5-33:12.

[84] See, e.g., Rendon Tr. 68:15-24; Myatt Tr. 31:25-32:7.

[85] In explaining an annual gross revenue increase Mariel Rendon stated: "I continued to take more accounts and worked." Rendon Tr. 111:3-11, Ex. 5.

with the operation of an independent business, but could only work more hours).

### 3. Individual Franchisees' Investment is Minimal Compared to JKO's Investment. (Facts 65 to 71).

This factor compares the investments of the worker and the employer. Goodly, at *4 (citing Baker, 137 F.3d at 1442). The focus is on the amount of investment in large capital expenditures, such as risk capital and capital investments, and not negligible items or labor itself. Id. (citing Dole, 875 F.2d at 1236); Paragon Contractors Corp., 884 F.3d at 1236 (citing Baker, 137 F.3d at 1441). See also, Snell, 875 F.2d at 810-11 (citing relevant cases and comparing cake decorators' $400 investment in tools to employer's business investments in rent, advertising, operating expenses, and labor).

Jani-King advertises its "Low Cost Franchise Opportunity" to franchisees that is "among the lowest cost" franchise opportunities. JKO represents that the total investment necessary to begin operation of a franchise presently ranges from $23,239 to $169,409, which includes $2,839 to $7,659, for supplies and equipment."[86] The majority of franchisees purchased the two least expensive Plans. Franchisees clean customer facilities and do not lease or own office space.[87] These expenditures do not involve business risk associated with real capital expenditure and are instead required by JKO to perform the assigned work.

Plan options range from E-4 (lowest) and E-10 (next lowest) to E-50 (highest). Only six outliers purchased Plans ██████████████ and none purchased higher levels.

---

[86] FDD Item 7 details estimated initial investment.
[87] ████████████████ provides Ashley Zarate an office rent-free for her services at their location. Zarate Tr. 44:10-19, 45:18-46:4.

Ex. 9 Att. A. A franchisee's Plan, however, has no bearing on long-term revenue. Management favorites like Whitney Hill, Mariel Rendon, Ashley Zarate and others purchased the cheapest Plans, but JKO awarded them large accounts making them the highest revenue generators.[88] JKO provides financial assistance with respect to the franchise fee[89] and advances funds for franchisee operations, which further minimizes risk in investment. Franchisees take advantage of the 24-month initial franchise fee installment plan (**Ex. 57**) and take advances to meet payroll (see page 38).

A JKO franchise has no meaningful value. Franchisees asked to identify their assets point to tools of the trade such as equipment and supplies.[90] When JKO permits a franchisee to terminate early it "repurchases" the franchise for the price of a signed release.[91] The franchise has no monetary value because JKO owns the accounts. A franchise sale does not require an asset purchase agreement because there are no assets to sell other than the right to service accounts (subject to JKO's control) and sometimes a few equipment items.[92]

JKO's annual expenses range from ███████████████████

---

[88] Ex. 28, Int. Resp. No. 15; Hill Tr. 29:22-31:12, Ex. 2; Rendon Tr. 24:11-18, Ex. 1; Zarate Tr. 52:14-19, Ex. 2.

[89] FDD Item 5 describes installment payments for each Plan level. See also, Ex. 57.

[90] Holmes Tr. 56:7-22; Wilson Tr. 93:18-22; Williams Tr. 103:20-104:6; Messner Tr. 120:22-121:1 ("I was so excited about this and loved the fact that I was going to own my own business. Again, naïve. When I found out that I owned absolutely nothing but the equipment I purchased and I had no control over anything, I was disappointed.").

[91] Holmes Tr. 23:13-25, 24:11-25, Ex. 3; Mann Tr. 20:23-21:2, Ex. 2.

[92] Fuentes Tr. 64:21-65:2; Duenas Tr. 34:4-35:22; Gbodi Tr. 15:24-18:10. Whitney Hill testified that she and her husband could not get a bank loan because they did not own the cleaning contracts – further illustrating a franchise's lack of value. Hill Tr. 58:6-19.

██████████████████████████████████████████

███████████████████████████████████ JKO's significant

investment compared to its franchisees supports a finding of an employment relationship.

### 4.     Permanence of the Working Relationship.  (Facts 72 to 74)

Independent contractors tend to have fixed work periods and transfer from job to job, whereas employees usually work for only one employer for a continuous and indefinite duration. Dole v. Snell, 875 F.2d at 811. The more permanent the relationship, the more likely the worker is to be an employee. Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 309 (4th Cir. 2006).

Franchisees are committed to long-term contracts to clean for JKO's customers. The noncompetition agreement prohibits them from working for non-JKO customers, including for the period of two years after the relationship terminates. Whether franchisees transfer among accounts or work on a full- or part-time basis, they clean exclusively for JKO customers, and thus, exclusively for JKO. Despite the 10- or 20-year franchise terms, the working relationship is indefinite much like employment at-will. A franchisee's ability to work is dependent upon JKO offering or approving accounts. Some franchisees may service the same accounts for months or years and regularly receive account offers. Other franchisees have no work after JKO meets its initial offering obligation.[93]

Because franchisees perform cleaning services exclusively for JKO on an indefinite basis, this factor supports their status as employees.

---

[93] Robinson Tr. 13:17-14:1, 19:5-21:2; N. Thompson Tr. 118:18-121:20; Messner Tr. 60:10-62:13; Freeman Tr. 28:5-29:22; Harper A Tr. Exs. 12-13.

5.   *Janitorial cleaning does not require sufficient specialized skill.
(Facts 75 to 77).*

A worker is more likely to be considered an employee if her job does not contain a
"requirement of specialized skills." Snell, 875 F.2d at 811. Specialized skills are distinct
from "'general occupational skills'" that employees in any line of work must have. Id.
(quoting Lauritzen, 835 F.2d at 1537). Franchisees perform cleaning services such as floor
care, trash disposal, and cleaning windows, bathrooms and other designated areas. This
type of work, although difficult and demanding, does not involve the type of specialized
skill that would support a finding that the workers are independent contractors. See Super
Maid, 55 F. Supp. 3d at 1077-78 (citing cases holding that cleaning and maintenance work
does not meet the specialized skill requirement). That franchisees receive training does not
change this result. Id. at 1078. Most franchisees come to JKO with no experience, but they
quickly learn how to clean. As noted on pages 41 to 42, JKO performs the principal
business functions and franchisees' purchasing of supplies and equipment and supervising
cleaners (if any) does not require sufficient specialized skill.

6.   *Franchise Owners' Work is an Integral Part of JKO's Business. (Facts 78
to 79).*

JKO is in the business of commercial janitorial cleaning. It is a "regional office" in
the overall Jani-King commercial cleaning system. JKO's website states that it is in the
business of providing commercial cleaning services to its customers, including "schools,
hospitals, car dealerships, office buildings, movie theaters and the list goes on and on." The

viewer can click a link to "Get A Cleaning Quote" directly from JKO, not a franchisee.[94]

JKO's sales department is dedicated to finding new cleaning business, it owns all cleaning contracts, and its "In House" personnel perform cleaning services for its customers when necessary. JKO's affiliate KOC operates and manages all business and cleaning functions for one of its largest franchisees. Ex. 4. JKO performs most business functions for its customers (billing, customer service, etc.) and pays itself directly from cleaning contract revenue and vendor rebates. JKO personnel inspect cleaning work and direct franchisees to correct deficiencies. Facts 34-35. Rather than hire employees to perform cleaning services for all of its customers, JKO hires individuals to clean through franchise arrangements. JKO is involved in all aspects of its commercial cleaning business and the services performed by franchisees are integral to its business.

The Court in <u>DeGiovanni v. Jani-King Int'l, Inc. *et al*</u>., Case No. 07-10066-MLW (D. Mass. June 6, 2012) found that franchise owners were employees under state law in part because "the undisputed facts show that the plaintiffs provide commercial cleaning services within the usual course of the business of the defendants, particularly Jani-King of Boston, [Inc.]"[95] a corporate subsidiary like JKO. The court specifically noted that "[Jani-King of Boston] works to obtain commercial cleaning contracts to be serviced by so-called "franchise owners" and "[p]eople who clean and/or get others to clean are essential to this business . . . [i]t is the usual way of providing cleaning service and the

---

[94] Ex. 51; https://www.janiking.com/jani-king-of-oklahoma-city-commercial-cleaning/.
[95] **Ex. 58**, p. 8. (The court's entire bench ruling on this topic is included in the exhibit).

cleaners are essential to the business of Jani-King, Boston."[96] See also, Awuah v. Coverall North America, Inc., 707 F. Supp. 2d 80 (D. Mass. 2010) (holding cleaning franchisees did not perform services outside franchisors usual course of business where franchisor sold the services, owned the contracts, trained the franchisees, and handled all billing).

For the foregoing reasons, the Court should find that JKO's individual franchise owners who perform the cleaning services are JKO's employees under the FLSA.

### E.     A Permanent Injunction Barring JKO from Violating the Record Keeping Provisions of the FLSA is Appropriate.

Employers must make, keep, and preserve records of wages, hours, and other conditions and practices of employment. 29 U.S.C. §§ 211(c) and 215(a)(5). However, because JKO denies that it is an employer under the FLSA, it does not keep records of hours worked by individual franchise owners performing the cleaning services or net wages for such work. Fact 81.

The FLSA authorizes prospective injunctive relief after violations of the FLSA, including record keeping violations under Section 15(a)(2), have been established. 29 U.S.C. § 217. When an injunction is sought to prevent the violation of a federal statute, the moving party need not establish that they will suffer irreparable harm.  Atchison, Topeka and Santa Fe Ry. Co. v. Lennen, 640 F.2d 255, 259 (10th Cir. 1981). The Tenth Circuit has held that "[t]he purpose of an injunction against future violations is remedial rather than punitive" and that "[s]uch injunctions do not place any substantive hardship on employers because they "'require[ ] [them] to do what the Act requires anyway—to comply with the

---

[96] Id., pp. 18 and 23.

law.'" Metzler v. IBP, Inc., 127 F.3d 959, 963 (10th Cir. 1997) (quoting Martin v. Funtime, Inc., 963 F.2d 110, 114 (6th Cir. 1992)). Courts assess several factors, including "the employer's previous conduct, its current conduct, and the reliability of its promises of future compliance." Metzler, 127 F.3d at 963. The court balances the finding of a violation "against factors indicating a reasonable likelihood that the violation will not recur," including the employer's intent to comply and the absence of repetitive violations and bad faith. Id.

JKO and its affiliates have denied an employment relationship with its franchisees under state laws and the FLSA in this and multiple other lawsuits identified in fn. 7 above and FDD Item 2. There is no indication that JKO will cease from violating the FLSA's record keeping requirements that are necessary to establish compliance. Franchise testimony established that many franchise owners work long hours with little to no pay,[97] but no records exist showing hours worked or pay rates. Based on past and ongoing noncompliance of JKO, an injunction to prevent future violations is appropriate.

## IV.   CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of the Secretary and against JKO and enter an injunction permanently restraining JKO from violating the record keeping provision of the FLSA.

---

[97] Myatt Tr. 48:19-20, 82:22-84:5 (works up to 12 hours per day with his son and wife, but does not pay himself); Hill Tr. 60:8-24 (husband and wife did not pay themselves for two years); Messner Tr. 20:16-21:8 ($8-10 per hour before expenses and taxes);Reed Tr. 12:5-13:22 (80 monthly work hours for $1,200 before expenses and taxes); Robinson Tr. 15:1-17:25, Exs. 2 and 3 (has not covered franchise fee paid in 2016).

Respectfully submitted,

Kate S. O'Scannlain, Solicitor of Labor
John Rainwater, Regional Solicitor
Timothy S. Williams, Acting Associate Regional
Solicitor
Lydia Tzagoloff, Counsel for Wage Hour Division


/s/Tyler P. McLeod
Tyler P. McLeod, Senior Trial Attorney
Karen E. Bobela, Senior Trial Attorney
United States Department of Labor
1244 Speer Boulevard, Suite 515
Denver, CO 80204
(303) 844-0936
Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

Service of the foregoing Plaintiff's Motion for Summary Judgment and Brief in

Support has been made this 4th day of March, 2020, by e-filing to the following:

Carrie Hoffman
Peter Loh
Brantley Smith
Foley Gardere LLP
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201


/s/Tyler P. McLeod

51