# EXHIBIT 22

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
     Civil Action No. CIV-16-1133
 3   _____

 4   DEPOSITION OF MICHAEL H. SEID
     December 18, 2019
 5   _____

 6   PATRICK PIZELLA, ACTING SECRETARY OF LABOR, UNITED
     STATES DEPARTMENT OF LABOR,
 7
     Plaintiff,
 8
     v.
 9
     JANI-KING OF OKLAHOMA, INC., a foreign corporation,
10
     Defendant.
11   _____

12                    A P P E A R A N C E S

13   For the Plaintiff:     TYLER P. McLEOD
                            U.S. Department of Labor
14                          Office of the Solicitor
                            1244 Speer Boulevard
15                          Suite 515
                            Denver, Colorado 80204
16
     For the Defendant:     CARRIE B. HOFFMAN
17                          PETER LOH
                            BRANTLEY SMITH
18                          Foley Gardere Foley
                            & Lardner, LLP
19                          2021 McKinney Avenue
                            Suite 1600
20                          Dallas, Texas 75201

21   Also Present:          Stephen Hagedorn

22

23

24

25
```

1          Deposition of MICHAEL H. SEID, the

2     Witness herein, called by the Plaintiff in the

3     above-entield matter on Wednesday, the 18th day of

4     December, 2019, commencing at the hour of 9:08 a.m.,

5     at 2021 McKinney Avenue, Suite 1600, Dallas, Texas

6     before Audra B. Paty, Certified Shorthand Reporter,

7     with and for the State of Texas, said deposition being

8     taken pursuant to Subpoena and Federal Rules of Civil

9     Procedure.

10    _____

11                     I N D E X

12                                           Page Number

13    Examination by Mr. McLeod                    3, 147

14    Examination by Ms. Hoffman                      145

15

16                   E X H I B I T S

17    Exhibit Number                    Initial Reference

18     1  Professional Qualifications and
          Experiences                               5
19
       2  Expert Report of Michael Seid             25
20
       3  Declaration of Michael Seid               23
21
       4  Franchise Agreement                       81
22
       5  Merry Maids Franchise Agreement           87

23

24

25

```
 1              P R O C E E D I N G S
 2                  MICHAEL H. SEID,
 3    having been first duly sworn, testified as follows:
 4                     EXAMINATION
 5    BY MR. McLEOD:
 6         Q.  Mr. Seid, my name is Tyler McLeod.  I'm an
 7    attorney with the U.S. Department of Labor.
 8         A.  Good to meet you.
 9         Q.  We met just right before this started?
10         A.  We did.
11         Q.  Right?  Have you been deposed before?
12         A.  I have.
13         Q.  And approximately how many times?
14         A.  Over 25, 30 years probably 50, 60.
15         Q.  Okay.  So you're familiar with the rules.  I
16    guess I would start, is there anything that would
17    prevent you from truthfully answering questions today?
18    Are you on any medications or substances that would
19    prevent that?
20         A.  No.  I mean, I had a bit of a migraine last
21    night, but I don't think it will affect me today.
22         Q.  Okay.  And what did you do to prepare for the
23    deposition today?
24         A.  Read my report, went back, read some of the
25    depositions again, looked at the complaint, read some
```

1    of the memos, had a meeting here yesterday with

2    counsel for Jani-King.

3         Q.   Okay.  And who did you meet with?

4         A.   I met with Carrie, met with Peter.  Stephen

5    Hagedorn was here, and we met for, I don't know, four

6    hours or so.

7         Q.   Okay.  And so how long total with your review

8    of your materials and preparation would you say you

9    spent?

10        A.   In preparation for this?

11        Q.   Yeah.

12        A.   Probably over, you know, the last week or so,

13   a few days.

14        Q.   Okay.  So I'm going to ask you a series of

15   questions today, and if you don't understand something

16   that I ask, if you could please make sure you ask me

17   to repeat it so that you do understand.  Can we agree

18   on that?

19        A.   Thank you.

20        Q.   Is that a yes?

21        A.   That is a yes.

22        Q.   And if you need to take a break, also let me

23   know.

24        A.   We'll do.

25        Q.   And I want to confirm your hourly rate.  Is

1  which I wrote and which was submitted to the court.

2      Q.  Is your name on it?

3      A.  Oh, yeah.  No, no, it's purely me.  It just

4  had a law firm's cover page on it.

5      Q.  And do you know, was that state or federal

6  court?

7      A.  State.  It's -- it was a very odd thing to

8  do, but I felt pretty strong about it.

9      Q.  So other than Jani-King, have you provided

10  testimony, whether by deposition or at trial, for

11  other commercial janitorial franchising companies like

12  JAN-PRO or Vanguard or Coverall?

13      A.  I'm going to have to look.  I'm not sure what

14  Clean It does, but there is a company Clean It.  They

15  may do residential cleaning.

16      Q.  Do you remember anything about that case?

17      A.  Not a clue.  I don't see anybody else on this

18  list.  My answer would have to be no based on this

19  list.

20              (Exhibit No. 2 marked.)

21      Q.  (BY MR. McLEOD)  Okay.  All right.  I'm going

22  to hand you what's been marked Exhibit 2.  Can you

23  identify that document?

24      A.  It appears to be my expert report in this

25  case.

1     Q.  And you prepared this?

2     A.  I did.

3     Q.  Did you have any assistance preparing it?

4     A.  No.

5     Q.  Okay.  On page 2, first paragraph, it says

6  you were engaged by Foley Lardner on October 11th,

7  2019?

8     A.  Yes.

9     Q.  And you issued the report, I believe, on

10  November 3rd; is that correct?

11     A.  November 3rd.

12     Q.  And did you do anything with respect to this

13  case involving Jani-King of Oklahoma prior to October

14  11th?

15     A.  I would have read the amended complaint.  I

16  would have read the response.  I don't know if I asked

17  for any other documents before I agreed to take the

18  case, but I would have read at least those two major

19  documents.  And I might have -- I probably had some

20  conversation with legal counsel for Jani-King if I had

21  any questions.  I just don't recall.

22     Q.  Would that have been Mr. Hagedorn?

23     A.  No, it definitely would not have been

24  Mr. Hagedorn.  It would either been Ms. Hoffman or

25  Mr. Loh.

1    that they are the same, but I did not read every

2    single one because they're identical other than the

3    name of the person generally.  I've read -- I read a

4    lot.  I read a lot.  This consumed my waking hours for

5    a long time.

6        Q.  After October 11th?

7        A.  After October 11th.

8        Q.  And in your report, you identified topics

9    that you might be called to testify about.  You have

10   opinions throughout the report.  You have summaries of

11   opinions.  And I just want to ask you if, you know,

12   all your opinions are included in this report

13   concerning the relationship between Jani-King of

14   Oklahoma as a franchisor and its franchisees and how

15   Jani-King and its systems -- or its system compares to

16   generally accepted standards, practices, duties and

17   responsibilities --

18       A.  Yes.

19       Q.  -- customarily observed in franchising?

20       A.  Yes, unless you raise something which I

21   hadn't thought of.

22       Q.  Okay.

23       A.  But everything I thought of is in the report,

24   all my opinions.

25       Q.  So as of today, are there any opinions you

1    have developed that you'd testify to if called to

2    testify in this case or whether at trial or deposition

3    or any proceeding?

4         A.   That are not in this report?

5         Q.   Yeah.

6         A.   No, there is nothing that I would testify on

7    again unless you asked a question that I hadn't

8    thought of.

9         Q.   Okay.  Page 7 at the bottom you identified

10   three limited circumstances based on your review of

11   materials where Jani-King has made an exception to

12   their normal practice.

13        A.   Uh-huh.

14        Q.   So I want to ask you some questions about

15   that.

16        A.   Okay.

17        Q.   And I guess I would first ask what do you

18   mean by exceptions to the normal practice?

19        A.   Jani-King is a franchisor.  They're not in

20   the cleaning business.  They have a management

21   company, which is fairly typical in franchising, where

22   they are managing -- not them directly, but I

23   understand an affiliate company or a company somewhere

24   down the channel where they are managing the

25   franchisee's action, but they are not doing it as the

1    the franchisor, which is normally in place, and the

2    back and forth for the day-to-day operations that need

3    to be responded to, whatever those may be, they would

4    then not be from Chickasaw to the franchisor, but they

5    would be to the management company because that's what

6    the role of the management company is.  I mean, if you

7    look in the McDonald's system, which, you know, I do

8    have familiarity with it, that's a fairly common

9    thing.

10        Q.  Do you know if this management company

11   arrangement is utilized by other commercial janitorial

12   franchise companies?

13        A.  I would be really surprised if it's not, but

14   I haven't looked at it there.

15        Q.  Is your answer yes or no on that?

16        A.  My answer would be that I would bet a lot

17   that it is, but have I looked at their documents, no,

18   but if you give me a couple of hours, I'll give an

19   answer.

20        Q.  I'm asking you right now.

21        A.  I have no idea right now, but I would be very

22   surprised if it's not.  It's a common thing.

23        Q.  So there's a reference between a liaison with

24   a school district.  Can you explain how this is an

25   exception to normal practices?

1    A.  Yeah, that came up -- I was reading in some

2  of the depositions when they started to deal with a

3  middle school, I think it was, and a sports stadium,

4  that there was a coordinating person from Jani-King of

5  Oklahoma on the site and wanted to know why that was

6  there.  So, again, I asked the legal counsel in that,

7  and what I pulled together from the depositions, it

8  was a contractual requirement of coordination given

9  the number of people.

10    Q.  Can we just focus on one at a time, like the

11  school district?

12    A.  I didn't focus on them in my own mind

13  separately, so let me look at them both -- I looked at

14  them both as --

15    Q.  What would be the role of the liaison?

16    A.  Probably -- most of the time when that

17  happens, and it happens frequently when you're looking

18  at mass gathering locations -- stadiums, arenas,

19  ballparks, universities, transportation facilities,

20  government facilities.  There is frequently a

21  requirement in those contracts, especially when you're

22  dealing with the federal government or state

23  governments, local governments, that there be --

24  instead of having periodic reviews of whether the

25  franchisee is meeting brand standards, those type of

1   entities will frequently ask that the franchisor

2   provide more frequent reviews of brand standards.  And

3   when that happens, you may see a franchisor personnel

4   on the site, but it's not frequent, but it's not, you

5   know, something that is, you know, the moonshot.  It

6   happens in franchising.

7          It depends upon the entity.  You will see

8   it in -- you see it in medical facilities a lot.

9   You'll see it in any place where it's a secure

10  facility.  So if I'm going -- if the franchisor is on

11  a military base, depending on the military base, it

12  might be there, but it's not unusual.  It's just a

13  requirement of the contract or the agreement that

14  somebody is there to look it over.

15     Q.  And did you look at the arrangements here

16  contractually on the requirement of liaisons?

17     A.  No, because it was only such a limited number

18  that it really didn't matter to my opinion.  If this

19  were, you know, every single contract, Jani-King was

20  on the site, but it wasn't.  Jani-King was on the

21  site -- or Jani-King had a person on the site.  And

22  best I can tell -- and from what I asked, three times

23  out of thousands of relationships, that's such an

24  insignificant blip that it really didn't interest me

25  that much.

1   STATE  OF  TEXAS )

2   COUNTY OF DALLAS )

3            I, Audra B. Paty, Certified Shorthand

4   Reporter, in and for the State of Texas, certify that

5   the foregoing deposition of MICHAEL H. SEID was

6   reported stenographically by me at the time and place

7   indicated, said witness having been placed under oath

8   by me; that review was requested pursuant to Federal

9   Rule of Civil Procedure 30(e)(1); and that the

10  deposition is a true record of the testimony given by

11  the witness.

12           I further certify that I am neither counsel

13  for nor related to any party in this cause and am not

14  financially interested in its outcome.

15           Given under my hand on this the **31**  **day of**

16  December, 2019.

17                                                        _____

18                        **Audra B. Paty, Certified**

                          **Shorthand Reporter No. 5987**

19                        **My commission expires 12-31-22**

20

21

22

23

24

25



# IN THE UNITED STATES DISTRICT COURT
# FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **EUGENE SCALIA, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,**<br><br>Plaintiff,<br><br>vs.<br><br>**JANI-KING OF OKLAHOMA, INC.,** a foreign corporation,<br><br>Defendant. | **Case Number: 5:16-CV-01133-G** |

## Expert Report Of Michael H. Seid
## Managing Director
## MSA Worldwide

## Submitted On Behalf Of
## Jani-King of Oklahoma, Inc.

On 11 October 2019, Foley & Lardner LLP, counsel for defendant Jani-King of Oklahoma, Inc., retained me as a testifying expert in the above referenced litigation with the United States Department of Labor. My fees are based upon my standard hourly rate and I am also reimbursed for all out of pocket expenses.

Credentials

My name is Michael H. Seid. I am the founder and Managing Director of MSA Worldwide and I have been engaged in that work for over 30 years. During that period, my practice has been devoted to licensing, distribution and franchising matters, in all the facets of domestic and international business. Included in my advisory work to clients is the design, development, implementation and refinement of franchising, licensing and other down-stream distribution programs; counseling clients; litigating support and acting as an expert witness. I have been the principal business advisor in the structuring and development of several hundred domestic and international franchise, licensing and distribution systems and have been an advisor to a significant number of established licensors, distributors, manufacturers and franchisors on a global basis. I have also reviewed the terms contained in what I estimate to be in excess of a thousand domestic and international licensing, distribution, and franchise offerings during the course of my career.

I am frequently referred to as a leading expert in franchising and MSA Worldwide, the firm that I founded, has been acknowledged by the International Franchise Association as "the leading strategic and tactical advisory firm in franchising."[1]

For well over twenty-five years I have served and continue to serve in a leadership position in the International Franchise Association ("IFA"). In February 2018, after combined terms totaling more than thirteen years, my most recent term on the Board of Directors of the IFA ended. During that twenty-five year period, I have served as a member of the IFA's executive committee, a board member and the chair of franchising's professionals organization, the Supplier

---

[1] The International Franchise Association Franchise Opportunities Guide - 2016

Forum. I currently chair or am a member of several committees and task forces for the IFA.

I have written and contributed to several books and other publications in the areas of franchising, licensing, and distribution. I have had numerous articles published and have contributed to a number of other publications, both legal and commercial in nature. I have spoken extensively on these subjects throughout the world. My knowledge of the subject of franchising and licensing and their standards and practices is extensive and is well respected by my peers, including those that practice franchise law.

I am an Adjunct Professor at the Fisher College of Business at The Ohio State University and developed and deliver a graduate school course on commercial and social franchising.

I am the principal author of the IFA's Statement of Guiding Principles and participated in the drafting of its Code of Ethics. I have offered expert opinions domestically and internationally for both plaintiffs and defendants and for franchisees and franchisors. My C.V., presented in Appendix A to my report, includes my credentials and accomplishments in franchising and business.

Scope of Engagement

Based upon my experience and expertise in franchising, I was engaged to address the issues raised in this matter from the perspective of generally accepted industry custom and practices. I am not offering any legal conclusions nor am I a fact witness.

I have reviewed pleadings that have been filed in this case, depositions and the exhibits attached to those depositions, certain agreements, manuals, training materials, and other documents listed in Appendix B of this report. Based upon my review of the material provided, and my experience, I may be called to testify on all aspects of franchising, including but not limited to, the relationship between franchisors, franchisees, and the standards, practices, duties, and responsibilities customarily observed in the franchisor/franchisee relationships.

I have been asked to prepare this report and am prepared to respond to the issues and opinions that may be raised in this matter. My opinions in this matter are and will be based on recognized standards and practices as they relate to franchising, the core relationship-defining document and the factual record, including the documents identified in Appendix B. I reserve the right to supplement my opinions based on additional discovery or in response to additional or supplemental expert reports. I also may supplement my report based on evidence that I have not had an opportunity to consider or if ongoing discovery reveals additional facts.

There are arguably three sources for standards in any industry: (1) rules, laws, and legal precedents that govern the industry; (2) customs and practices found in that industry; and (3) declarations made by acknowledged and recognized associations that represent industry members. My opinions will reflect those recognized standards.

The scope of my engagement was to explain the franchise business model, and the business operations of the franchisor including the standards, practices, duties and responsibilities customarily observed in such a relationship; and how Jani-King of Oklahoma, Inc. ("Jani-King" or "Franchisor"), as a franchisor and as a franchise system, compares to the generally accepted standards and practices in franchising.

I will discuss:

- That Jani-King and its franchisees are in separate and distinct businesses;
- That Jani-King is a licensor and its franchisees are licensees;
- That the roles and relationship of a franchisor and franchisee are distinct, substantive, and independent;
- That the Jani-King system operates in a manner common to other franchise systems in the United States;
- That, as is common in franchising, Jani-King and its franchisees share a common brand;

- That Jani-King offers a franchise opportunity with low barriers to entry, which is relatively unique among franchise systems and allows entrepreneurs of modest means to start their own business;
- That without the structure, support, and brand recognition of the Jani-King franchise system, entrepreneurs of modest means would be deprived of a beneficial opportunity to start and grow their own business;
- That Jani-King, as is required under the Lanham (Trademark) Act,[2] sets brand standards and then monitors its licensees' performance to those brand standards;
- That Jani-King does not license a method for the complete operation of the franchisee's independent business;
- That the degree of skill in managing and operating any business, including in the janitorial industry, is significant and is not limited to the cleaning of end user's facilities;
- That the Jani-King franchisees, as independent business owners—and not employees of Jani-King—are free to determine how they manage, supervise, and operate their business in meeting Jani-King brand standards;
- That Jani-King and its franchisees operate separate businesses, under an interdependent relationship, each having distinct and substantial operations; and
- Jani-King's role as the signatory in the commercial cleaning contracts entered into with end user customers is typical and necessary to maintain brand standards and prevent adverse consequences such as intra-brand competition, in the commercial cleaning industry.

In this type of relationship, the franchisor is responsible for developing its franchise system; establishing its brand standards; licensing it; protecting it; and supporting its franchisees in the marketing of their janitorial services and the delivery of those services to end users. The franchisee's business, on the other hand, provides the janitorial services to end users in a way that consistently follows the system's brand standards. Consistency in the delivery of brand standard products

---

[2] 15 U.S.C. § 1051 (1946)

and services to end users is essential to the successful operation and sustainability of every franchise system.

Factual Understanding

Among other facts discussed below, my opinions are based on the following key factual understandings:

The business of Jani-King is to own and operate a franchise system that licenses individuals and entities use of the Jani-King system, including its trade or service marks, to deliver janitorial services to end users in a manner that complies with the Jani-King brand standards.

In contrast, the business of the Jani-King franchise owners ("Franchisee" or "Licensee") is the actual delivery of janitorial services to end users in a manner that complies with Jani-King brand standards and delivers a uniform, consistent, sustainable and repeatable experience that end users expect from a Jani-King branded operation.

In this matter, the United States Department of Labor ("DOL") alleges in its Amended Complaint, among other things, that Jani-King improperly classifies it Franchisees as independent contractors rather than as employees.

Summary of My Opinions

As a franchisor, Jani-King does not control, manage or participate in the day-to-day operations of its Franchisees' businesses or have the right to do so. Jani-King has never hired, supervised, set wages, established working conditions, standards of employment, or discharged any of the employees of its Franchisees. Jani-King is not an officer, shareholder, supervisor, or partner in its Franchisees' janitorial businesses.

As with every other franchisor in the United States and internationally, Jani-King sets brand standards and reserves certain rights in its Franchise Agreement to protect its intellectual property licensed to its Franchisees. In the United States, this is a requirement of the Lanham Act. As discussed later in this report, control is also a

definitional requirement of the Federal Trade Commission's Franchise Rule that governs franchising in the United States.

It is well recognized that in a business format franchise, a franchisor like Jani-King, setting brand standards and supporting their franchisees in delivering those brand standards does not equate to day-to-day control over the franchisee's management of their independent business by franchisors. While each franchisee must perform in a way that is consistent with the franchisor's brand standards, how they do so are matters within each individual franchisee's control.

In a fast-food franchise system, for example, the franchisor may specify the type of french fries used, the source from where the french fries are purchased, how they are stored, how they are defrosted and the methods required for preparation. But, it is the franchise owner that selects which employee prepare the french fries, how many hours that employee will work and how much they are paid and which employee will deliver the food to the customer. In addition to preparing the french fries so that they taste and look precisely as the franchisor's brand standards require, in delivering the french fries to consumers, the brand standards set by the franchisor will also specify the time frame from ordering to delivery, the wrap the franchisor mandates and even which sack the order will be placed in. Consistency is what the consumer expects from any branded location.

In the commercial cleaning franchise business, the franchise owner provides cleaning services to end users and does so to the franchisor's brand standards. As with the franchise owner who sells the french fries, the Jani-King Franchisee controls the day-to-day operation of its business, including scheduling the cleaning (subject to end user's needs), hiring employees, addressing end user's concerns, and selling additional cleaning services that the end user may need. A franchisor's ability to trust in its franchisees doing so is a foundational element of every franchise relationship.

In three limited circumstances, based on my review of the materials provided, Jani-King has made exceptions to their normal practice. In one instance, Jani-King has established an affiliate company ("KOC Franchise Management, LLC") that manages certain aspects of the day-to-day operations for the Jani-King franchise

owned by the Chickasaw Nation. In two other instances, Jani-King has on location a liaison between the franchisee and the end user. In the first instance the end user is a school district and, as a contractual condition to securing the account, required the liaison. In the second instance the end user is a sports stadium owned by a major university and requested the liaison. Given the vast number of end users in the Jani-King system this is a *de minimis* number of direct relationships and, in my expert opinion, are merely exceptions and not an indicator of the overall Jani-King franchise system.

There is a difference between "sharing a brand" and being a part of a franchisor's operations. In all franchise systems, franchisors and franchise owners share a common brand. Sharing a common brand sometimes leads to the incorrect assumption that franchisors and franchisees operate the same "business," or are even in the same industry.

The Jack in the Box franchisor[3] and franchisees, for example, share the same brand, but only the franchisees prepare and serve burgers to customers. CertaPro Painters and its franchisees share the same brand, but only the franchisees paint houses. Likewise, Jani-King and its Franchisees share the same brand, but, with limited exception, only its Franchisees perform commercial cleaning. What each party to the relationship does as part of its business in bringing the product or service to market is different. While the roles are symbiotic (as with any national brand and its downstream delivery system), it is the role of the franchisor to manage the system, and it is the role of the franchisee to deliver to the end user the services marketed by the brand.

As further discussed in this report and based on my review of the material provided for my review; my experience in franchising; the customs and practices found in franchising; and the declarations by the acknowledged and recognized association that represent franchising, it is my expert opinion that:

---

[3] Jack in the Box, like many restaurant franchise systems, owns and operates some corporate stores ("owned operations") in addition to having franchised stores. In its role as a franchisor, however, Jack in the Box's business is distinct from that of its franchisees and does not include preparing and serving hamburgers to customers. Jani-King does not have any direct ownership of a cleaning franchise and thus there is a clear division between the business purpose of Jani-King and its franchisees.

(1) Jani-King is a well-structured business-format franchise system in the janitorial services industry and operates in a manner comparable to other franchise systems that provide janitorial services. Business-format franchise systems, like Jani-King, are ubiquitous in the United States and abroad, and play a substantial role in the United States economy.

(2) Like all business-format franchise relationships, the relationship between Jani-King and its franchisees is a contractual one, agreed to and codified in the relevant documents that define the Jani-King franchise relationship—that is the Jani-King Franchise Agreement, the Jani-King confidential operations manual and the training materials (the "Documents"). The obligations owed by each party, except where limited or required by law, are found only in these Documents. The agreement between Jani-King and its Franchisees is unambiguous. I am unaware of any generally accepted business or franchise industry practice that would recognize or acknowledge duties or standards other than those contained in the parties' agreement.

(3) The rights and obligations contained in the Franchise Agreement are substantially the same as those generally found in franchising, are directed toward ensuring compliance with Jani-King brand standards, as required by the Lanham Act, and do not demonstrate control over the day-to-day operations of Franchisees by Jani-King.

The obligations (policies) required for the management and operation of a Jani-King business by Franchisees are clearly set out in the Documents. These policies and procedures are essentially identical to the standards, practices, duties and responsibilities customarily observed in franchising, are not unique to Jani-King and similar/identical policies and procedures are extensively employed by other franchise systems, including those in the janitorial industry, based on my experience.

(4) Jani-King Franchisees are independent business owners operating under a license with Jani-King. Franchisees are solely responsible for their actions or inactions with respect to the manner in which they operate the day-to-day

affairs of their businesses. They are independently responsible for understanding their contractual rights and obligations, including their right to independently obtain new janitorial end users for their business as they were trained to do[4] and Jani-King is entitled to rely on its Franchisees' compliance within the terms of their agreements and other Core Documents.

(5) New franchisees, in all franchise systems, lack the necessary skills to manage and operate their businesses, and franchisors generally provide an initial training program. Based on my review, Jani King provides Franchisees with extensive training consisting of classroom and on-site training programs supported by operating manuals and training videos.

Managing any business, including a janitorial franchise business, is complicated and requires a significant degree of business skill. While a Franchisee's staff cleans the end user's facility and may be low wage, low skilled workers, managing and operating a janitorial franchise for a franchisee is complicated. Franchisees must be able to budget and manage their finances, conduct sales, recruit personnel and manage their human resources, schedule end user jobs, manage their ongoing relationship with the end users, identify and upsell new services to offer, maintain equipment, etc. While Jani-King's initial training and support provides some of these important skills, as in all franchise systems, the franchisor does not provide a system that delivers everything a business owner needs to know, and all franchisees seek support of outside professionals and other sources to obtain those additional skills.

(6) As required by the Jani-King Franchise Agreement, Jani-King provides its Franchisees with operational, marketing, contracting, billing, and administrative support in a manner consistent with industry standards and practices customarily observed in franchising, including in janitorial franchises. Based on my experience, these services are not unique to Jani-King and are present in many other franchise systems.

---

[4] Deposition of Vonnisha Dawn Freeman – page 12, line 4. Q. And when you say book on how to do training can you be more specific? I'm trying to understand what the train – that two-week training consisted of substantively. A. Yeah – The – book was kind of like a – a handbook, and so we would have to read it on how to go out and market ourselves to get new building, to go out and market our self....

Jani-King Operates a Business Format Franchise System

Based on the material provided for my review, including the DOL's Amended Complaint and the deposition questions the DOL's legal counsel asked, I think it is essential that I include in this report some foundational information about Business Format Franchising, the recognized style of franchising used by Jani-King and most franchisors in the United States and internationally.

Franchising enables individuals to no longer work for others and instead achieves the "Great American Dream" of independent business ownership. It is said frequently that when you become a franchisee "you are in business for yourself and not by yourself."[5]

The roots of franchising are well-established and are very deep in the commercial history of the United States. Commercial franchising (then called "co-partnerships" under British law) was first used in the American Colonies starting in 1731 by Benjamin Franklin (in his role as postmaster) to establish printing businesses. Included in each agreement was a provision that "the business of printing and disposing of the Work shall be under the Care, Management and Direction of the said [co-partner's name] and the working Part performed by him or at his Expense."

During the eighteenth and nineteenth centuries the government used franchising to develop municipal services including railroads, steamboats, ferries, water, gas, and electricity. In the second half of the nineteenth century, during the industrial revolution and the shift from an agrarian to a merchant economy, companies like the McCormick Harvesting Machine Company, General Motors, Ford Motor Company, oil and gas companies, and beverage companies like Coca-Cola established traditional franchise systems.

While some business-format franchises, including White Castle, Hertz, Howard Johnson, Roto-Rooter, Arthur Murray, and Dairy Queen, began between the

---

[5] International Franchise Association - http://www.franchise.org/industrysecondary.aspx?id=10008.

1930s and early 1940s, business-format franchising first became widespread following World War II due to the pent-up consumer demand, returning veterans, and the passage in 1947 of the Lanham Act. The Lanham Act made it possible for franchisors to license their brands to franchisees and obligated licensors to police the use of their intellectual property by licensees. Franchises are a defined type of license under federal law and those of several states.[6] During this period, business-format franchise systems like Dunkin' Donuts, Kentucky Fried Chicken, Burger King, McDonald's, Tastee-Freeze, Midas Muffler, H&R Block, Holiday Inn, and International House of Pancakes were established.

Beginning in 1971 in California and then in Washington in 1972, states began to enact regulations that required pre-sale disclosure and franchise registration. In 1979, the Federal Trade Commission ("FTC") enacted the Franchise Rule mandating pre-sale disclosure throughout the United States.

Franchising today, as a method of doing business, is thriving throughout the United States and is a material part of the U.S. economy. The IFA's Education Foundation records that in 2018 there were over 759,000 franchised establishments in the United States responsible for the creation of over 8 million jobs and $757 billion in economic output. Because of franchising, people in the United States have unparalleled access to products and services.

Franchising is a contractual relationship where the licensor/franchisor licenses to a licensee/franchisee/franchise owner the right to distribute a branded product or service using the licensor's prescribed method of doing business.

In a franchise relationship, the franchisee gains the advantages that come from the use of the franchisor's trade names, expertise, distinctive business appearance, standardization of products and services, and support. The franchisor is responsible for establishing its brand standards and for developing, licensing, supporting, and protecting the franchise system. The franchisee is responsible for

---

[6] https://www.investopedia.com/terms/f/franchise.asp - A franchise is a type of license that a party (franchisee) acquires to allow them to have access to a business's (franchisor) proprietary knowledge, processes, and trademarks in order to allow the party to sell a product or provide a service under the business's name. In exchange for gaining the franchise, the franchisee usually pays the franchisor an initial start-up and annual licensing fees.

providing the franchised products and services to end users in a way that consistently follows the system's brand standards.

The franchisor and franchisees perform different functions. The franchisor, by the nature of the relationship, delegates to the franchisees the responsibility, whether directly or through its employees and subcontractors, to operate according to the franchisor's prescribed brand standards. The franchisor does not generally manage, supervise, or operate the franchisees' day-to-day business.

There are essentially two forms of franchising in the United States today. The first is product distribution or "Traditional Franchising." This was the most common form of franchising prior to World War II. Under this model, the franchisor manufactures and sells finished or semi-finished products to dealers or franchisees. The franchisee, in turn, resells the product to consumers or others in the chain of distribution. Classic examples of this form of franchising are automobile, gasoline station, and soft drink franchises.

Much less common prior to World War II, but present everywhere today, is the "Business Format Franchise," which includes companies like Jani-King. What franchising does is provide individuals with an opportunity—an opportunity to own their own business.

The United States Department of Commerce ("DOC") in *Franchising in the Economy*[7] describes franchising as "a major force in the U.S. economy." The DOC defines a business-format franchise as including "not only the product, service, and trademark, but the entire business format itself—a marketing strategy and plan, operating manuals and standards, quality control, and continuing two-way communication," and notes that franchising offers "tremendous opportunities to individuals seeking their own businesses." Franchisees, according to the DOC enjoy "a competitive edge over other small business entrepreneurs."

Franchisors, like Jani-King, as with all licensors in the United States, are

---

[7] U.S. Department of Commerce, Franchising in the Economy 1986–1988.

required under the Lanham Act to exercise controls[8] over its licensees/franchisees use by of their marks and other intellectual property. Franchisors' periodic inspections, including those Jani-King performs, determine whether the delivery of branded products and services to consumers by their franchisees meet brand standards. They are precisely those required under the Lanham Act in order for the franchisor to protect its rights to their intellectual property.

Business-format franchisees deliver products or services to end users. Quick-service restaurants are often the brands people think of when they think of franchising. However, service franchise systems are widespread and there are at least 500 service-based franchise systems currently operating in the United States, including H&R Block, CertaPro Painters, Benjamin Franklin Plumbing, Critter Control, and Jani-King.

Franchisees in a business-format franchise system receive extensive training from the franchisor on the products and services they will deliver as well as ongoing support and evaluation in meeting the franchise system's brand standards. Franchisees are generally inexperienced in the trade when they enter the franchise system but through the training provided by the franchisor, gain a new trade.

It is a mistake to assume that the skills required by franchisees are limited to the delivery of products and services to end users. Managing and operating a McDonald's requires more than an understanding of how to prepare a hamburger. Likewise, the Jani-King Franchisee needs more than simply the knowledge of how to clean a commercial location.

Most franchisors, including Jani-King, provide franchisees with initial and on-going training. In the Jani-King system, this includes classroom and on-site training, supported with manuals and training videos. It is essential to understand that franchisors do not provide an entire business system to franchisees required to operate their entire business. And, as in any business, the business owner needs to

---

[8] https://www.justia.com/intellectual-property/trademarks/categories-of-marks/certification-marks/ - The Lanham Act places four requirements on those that own certification marks: standards, objectivity, exclusivity of use, and non-discrimination. First, the owner has to set relevant standards for quality, safety, or other characteristics and control the use of the mark by any parties it certifies.

supplement their skills with those provided by outside professionals and knowledge and experience obtained from other sources. During their initial training and support, in addition to learning how to clean commercial locations to Jani-King's brand standards, the franchisee is taught other important business skills including sales, scheduling, etc. The Jani-King franchise system, and its franchisees, are identical to every other franchise in this regard. Successful business owners learn the business skills they require over time and through actual experience.

Franchisees are independent business owners, so the franchisors do not generally manage, supervise, or direct the day-to-day operations of the franchisees in how they meet the franchise system's brand standards. Franchisees are free to sell their businesses during the time they are in the franchise system to individuals or entities that meet their franchisor's standards for new franchisees. The sale of a franchisee-owned business is a common occurrence throughout franchising for a franchisee's retirement or to maximize their investment.

It is essential to understand that in a franchise, while a franchisor and its franchisees **share a common brand**, the franchisor and its franchisees are **not in the same business;** each have different interdependent purposes in the relationship; and each operate independent businesses in distinctly different industries (functionally, practically, economically, and realistically). Franchisors, like Jani-King, are the licensor and Franchisees are the licensees whose rights, obligations, and limitations are included in the terms of the license found and governed by the written license (franchise) agreement.

As noted above, the offering of franchises throughout the United States is regulated by the FTC that mandates pre-sale disclosure. The FTC Rule defines a "franchise"[9] as follows:

*Franchise* means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

---

[9] Federal Trade Commission - "FTC Rule", 16 C.F.R. 436.

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or **has authority to exert a significant degree of control over the franchisee's method of operation**, or provide significant assistance in the franchisee's method of operation; and (Emphasis added)

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

Franchisors, like Jani-King, establish brand standards sufficient to deliver to consumers a quality and consistent end user experience, protect their trademarks and other intellectual property, and police the use of their intellectual property as required under the FTC Rule and the Lanham Act.

As noted earlier, franchisors do not license to franchisees every aspect of a business model required to operate their independent businesses and can only require adherence to the terms included in the underlying license. Understood, in all business-format franchise relationships, is that the franchisor is licensing a system for conducting a business under its—the franchisor's—marks that includes the products and services offered and sold by the franchisees as well as other elements of the consumer brand experience. The essential tool used to define the intended relationship between the franchisor and the franchisee in every business-format franchise system is the written franchise agreement.

Franchisors typically refer in the media to their overall business according to the products and services provided to consumers by their franchisees. This is the nature of franchising where the franchisor and franchisee are in different businesses while sharing a common brand. However, as discussed in this report, there are many functions a franchisor performs distinguishing it from their franchisee's business.

For example, major fast-food franchisors will typically have a research

department devoted to developing new products to bring to market similar to Jani-King's internal personnel who are focused on the development of new cleaning techniques and processes.

System accounts are common in franchising. I would be surprised if the DOL did not have negotiated pricing and terms with hotels and rental car companies as the Department of Defense and other federal and state agencies have for its employees. Similarly, Jani-King negotiates terms with end user cleaning opportunities that Franchisees can accept or reject. In most system accounts found in franchising, the franchisee does not have the same right to accept or reject the negotiated terms as does a Jani-King franchisee. In my expert opinion, this ability to reject opportunities is a factor that supports independent contractor status.

Franchisors, like Midas Muffler, Hertz, and Marriott, rely on system accounts to support their franchisees, have departments devoted to system accounts and execute system account agreements with end users. Others, including Express Personnel, ATC Healthcare, Goosehead Insurance, and commercial cleaning franchisors like Jani-King, provide accounting and other services to Franchisees and have departments dedicated to these functions. The functions the DOL highlights as indicative of an employment relationship between Jani-King and its Franchisees are, in fact, common throughout franchising and indeed fall within the mainstream of franchising in the United States.

In the Jani-King franchise system, the franchisor's major areas of responsibility include:

- Designing, developing and managing the franchise system;
- Setting brand standards;
- Recruiting and selecting of Franchisees;
- Establishing criteria for the Franchisees' offices;
- Approving Franchisees' offices;
- Initial and continuing training of Franchisees;
- Initial and continual headquarters and field support;
- Contract administration;

- Organizational administration;
- Research and development;
- System-wide account sales and administration;
- System consumer marketing;
- Brand communications;
- Operations and standards reviews;
- Meeting federal and state franchise rules and regulations;
- Capital formation; and
- Enforcing brand standards pursuant to the terms of the Core Documents.

None of the above includes providing cleaning services to end users as that is not generally a function of Jani-King as a franchisor.

### The Generally Accepted Standards in Franchising Support Independent Contractor Status for Franchisees

The IFA is the oldest and largest trade association in the world representing franchisors, franchisees and suppliers to the industry. Promulgated by the IFA is a Statement of Guiding Principles[10] detailing the relationship between the franchisor and the franchisee, which was unanimously adopted by the IFA's Board of Directors. I was the principal author of the IFA's Statement of Guiding Principles. In addition to me as its chairperson, included in the task force that drafted the Statement of Guiding Principles were one (1) franchisor and three (3) franchisees.

In drafting the IFA's Statement of Guiding Principles, our purpose was to detail and define certain industry standards and practices generally found in franchising. These standards are important, and several elements of the Guiding Principles are relevant to this matter. The unanimous adoption of the Statement of Guiding Principles by the IFA's Board of Directors supports the fact that these principles are generally accepted standards and practices in franchising. In part, the IFA's Statement of Guiding Principles state:

(1) Franchising is a unique business model. It is in the interest of the franchisor,

---

[10] https://www.franchise.org/about-us/mission-statement-vision-code-of-ethics.

each franchisee, the suppliers to the franchise system and the consuming public that **franchisors define, maintain, and enforce Brand Standards** throughout the franchise system. (Emphasis added)

(2) It is the goal of every business that each stakeholder be successful and franchising is no different. Franchisors and franchisees need to be profitable to be successful. However, as in any business model, **franchising is not immune to the risk of failure and neither the franchisor nor the franchisee is guaranteed economic success.** (Emphasis added)

(3) Franchisees should clearly understand the franchise business model before investing. It is the **responsibility of each prospective franchisee to conduct a thorough due diligence of the franchise system, to retain competent legal** and other advisors, and to **fully understand** the terms contained in the Franchise Disclosure Document before signing any **Franchise Agreement**. (Emphasis added)

(6) The licensor is the owner of its intellectual property, including without limit, its trademarks, trade secrets, methods and standards of operations. The Licensor has the right and also the obligation, under the law, to protect its intellectual property and **to define the terms under which it licenses to others the use of its intellectual property**. It is the terms contained in **the Franchise Agreement that define the license granted to franchisees and which govern the relationship between the franchisor and franchisee**. (Emphasis added)

(9) Clarity and transparency are essential for establishing and maintaining positive franchise relationships and for the goal of continuous improvements in the franchising environment. **Franchisors and franchisees should maintain proactive business policies, communication practices and regularly consult with each other for the enhancement of franchise relations.** (Emphasis added)

(10) Subject to the requirements under the law, franchisors should focus primarily on the business requirements of managing and striving for improvements to

their franchise system. Franchisors should support their franchisees and enforce Brand Standards necessary to enhance the economic performance for both the franchisees and the franchisor. **It is the responsibility of franchisees to manage the day-to-day affairs of their businesses to meet the franchisor's Brand Standards.** (Emphasis added)

These principles are the generally accepted customs and practices in franchising and reflect the shared understanding of franchisors and franchisees that it is the franchisee's, and not the franchisor's, right and responsibility to "manage the day-to-day affairs of its business to meet the franchisor's brand standards."

Franchise systems rely on the trust that the franchisee will operate to the franchisor's brand standards, the *sine qua non* of every franchise system. Based on my extensive experience, the breadth and limitations of the franchise agreement between Jani-King and its franchisees are clearly drafted and unambiguous.

Franchising is Governed by Contract Law

The relationship between Jani-King and its franchisees are governed by comprehensive, clearly written agreements that establish each party's rights and obligations. The unsupported extra-contractual duties that the DOL is attempting to impose relate to the purported ability of Jani-King to exercise control over its Franchisees. These rights and obligations do not exist in a properly-functioning franchise system and are not evident in any of the material I have reviewed, including in the Jani-King Franchise Agreement. Indeed, the obligation that the DOL is attempting to impose on Jani-King by arguing it as an employer to its Franchisees could not exist unless Jani-King and each of its Franchisees negotiate substantial and fundamental changes to their agreements and changes to how they operate in an interdependent relationship.

There are numerous references in franchise literature that support the generally accepted principle that the franchisor and franchisee share a common brand and that contract law governs the relationship between them.

"Parties to a Franchise Agreement are obliged to honor the terms of the

agreement during its term."[11]

"The relationship between the Franchisor and the Franchisee is essentially contractual. As such, principles of contract law govern the respective rights and obligations of the parties to the Franchise Agreement."[12]

"The Franchise Agreement describes explicitly the entire extent of the franchisor's relationship with its franchisees, outlining the terms and considerations by which the franchisees will be expected to operate their franchises. By establishing standards of operation, the agreement helps to both alert a franchisee as to what is expected of him or her as well as ensure system-wide uniformity throughout a franchise."[13]

"Franchising is a relationship between a franchisor and franchisee that is governed by a written agreement—the contract."[14]

"The law governing contacts is crucial in the franchise arena."[15]

"The entirety of the franchisor-franchise relationship is embodied in at least one contract—the Franchise Agreement—and perhaps other contracts concurrently entered into as well (such as development agreements, option agreements, construction agreements, leases and so forth)." "It is the franchise and franchise-related agreements alone which will govern the parties' rights, duties and obligations during and after the franchise relationship (augmented in eighteen states by the "franchise relationship" laws described earlier)."[16]

"Franchising is a form of business relationship based on a contract."[17]

---

[11] American Association of Franchisees and Dealers - Fair Franchising Standards (Standard 12.5), Keith J. Kanouse, Esq. Chair, Fair Franchising Standards Committee, April 1996.
[12] *Franchising – A Planning and Sales Compliance Guide*, Axelrad and Rudnick (Commerce Clearing House, Inc.) (Page 103).
[13] *How to Buy and Manage a Franchise – The Definitive Resource Guide If You're Thinking of Purchasing a Franchise or Turning Your Business Into One"* Boroian and Mancuso (Simon and Schuster) (Page 209).
[14] Franchising for Dummies, Thomas and Seid (Wiley Publications).
[15] An Introduction To The Law Of Franchising, Kaufmann and Oppenheim (The International Franchise Association) (Section 16 Page 1).
[16] Id.
[17] Federal Trade Commission – Enforcement of the Franchise Rule" dated July 2001 (Page 39).

Over the life of any business relationship, issues will arise, and guidance will be required by each of the parties on their respective rights and obligations. Were it ever adopted as a practice to ignore the clear, precise and explicit terms and boundaries contained in complex, well-written and negotiated bargains, and extra-contractual rights or obligations were allowed to override the express written terms, there would never be four corners of a document to examine for guidance.

It is only because contract law, as supplemented or modified by franchise relationship laws, governs the franchise relationship that government agencies, the courts, and the parties to the agreements can be certain of their rights and obligations. In this matter, based on my review of the material provided, it is my expert opinion that the DOL is attempting to impose obligations upon Jani-King that undermine the general and well recognized contractual and independent ownership relationship between a franchisor and franchisee.

One of the primary goals of business-format franchising is to assure uniformity in the end user experience from one franchised location to another. Blair and Lafontaine in *The Economics of Franchising* describe this principle:

"For all these reasons, franchisors care about maintaining uniformity. To this end, they exercise control over many important aspects of the franchisee's business, including appearance, hours of operation, location, and product quality. A major function of the franchise agreement under these circumstances is to specify contractual provisions that will remove or at least mitigate the fundamental incentive issue that arises because franchisees care about their own outlets' profits while the franchisor cares about system profits. Almost all franchise contracts contain specific provisions concerning expected franchisee performance. In fact, most franchise contracts incorporate by reference the whole set of directives contained in a very thick and detailed operations manual. Further, the contracts provide for the franchisor's right to monitor the performance of the franchisee through inspections, audits, mystery shopper programs, and so on. Most contracts also give franchisors the right to terminate the contract for good cause. Finally, the terms of franchise contracts typically give rise to *ex-post* rent,

namely amounts of money that the franchisee can earn within the relationship that are above what he could earn in his next best alternative."

The very brand standards and controls that the DOL claim establish an employee employer relationship between Jani-King and its Franchisees are the type of brand standards, controls, and support that are common in all franchise systems. They form the very definition of a business format franchise under the FTC Rule and are the elements required under the Lanham Act.

### Franchisor and Franchisee: Differing Roles, Rights and Responsibilities in a Business Format Franchise System

From an economics perspective, franchising is "just one of many ways a firm can choose to distribute its product or service."[18] "The essential economic rationale for franchising is that it permits businesses to achieve whatever benefits of large scale may be available in, for example, brand name and development and organization design, while harnessing the profit incentive and retailing efforts of local owners."[19]

Franchising is an alternative to vertical integration, where a business owns its entire distribution channel. Franchisors do not own the channels of distribution for their products and services. Instead, franchisors license independent third parties to distribute their product or service to the end user. There are significant trade-offs when a company licenses to others instead of selling the product or service themselves. The franchisor loses the profits from local sales activity and instead gets a defined fixed fee. The franchisee also trades stable employment for the opportunity and risk of owning their own business and, if successful, growing that business and creating equity for themselves and their family.

This tradeoff also comes with markedly different roles for the franchisor and franchisee. Because the franchisor is not actually delivering any products or services to the end user, and the franchisee has obtained a license to use the franchisor's brand in delivering those products and services, the franchisor must ensure that the

---

[18] Benjamin Klein, "The Economics of Franchise Contracts," Journal of Corporate Finance 2 at 10 (1995).
[19] *Id.*

products or services delivered to the end user by the franchisee are uniform from one franchise owner to another as required to meet end user expectations and comply with the Lanham Act. This is true in every franchise system.

Franchisees independently operate their own business within the framework of the established franchise system and attain the benefit of the brand recognition and consumer base. In that respect, franchisors, including Jani-King, must rely on their franchisees' performance because the franchisee is an independent business owner. Franchising is, at its foundation, a licensing relationship whereby each contracting party agrees to relinquish a certain amount of pre-relationship independence and opportunity and thereby gains an agreed-upon set of rights and obligations. Franchising is not a means by which the franchisor controls the franchisee's day-to-day management of its business.

The franchisee is contractually free of supervision, direction, and control in the performance of the day-to-day management and operation of their business by the franchisor. Just like every other franchisor throughout the United States, Jani-King has established brand standards, marketing standards, end user service and cleaning standards appropriate for its industry required to protect its intellectual property.

### The Necessity of Enforcing Brand Standards

For a franchisor such as Jani-King, the franchise brand is equivalent to its reputation with the public.[20] Consumers want to do business with brands they know and trust. Because of the equity inherent in a brand, consumers will generally pay more for a branded product or service rather than chance the purchase of a similar product or service from a brand they do not recognize or to which they have no emotional tie. Consumers equate purchasing a branded product or service with reducing their purchasing risks.[21] To create brand value, successful brands, like

---

[20] Fundamentals of Franchising, Fourth Edition, ABA Forum on Franchising, Chapter 1, IID.
[21] Hong-Youl Ha, The Effects of Consumer Risk Perception on Pre-Purchase Information in Online Auctions: Brand, Word-of-Mouth, and Customized Information, available at https://academic.oup.com/jcmc/article/8/1/JCMC813/4080398 (last accessed February 20, 2019).

Jani-King, must consistently deliver to end users an experience that matches or exceeds the brand's promise as presented in its marketing materials.

Intellectual property has replaced tangible assets as a major source of a company's value. As an example, it is often said that if all of Coca-Cola's plants and other physical assets in Atlanta were to disappear overnight, the company would still continue to operate simply because the value inherent in its brand exceeds that of its fixed assets. To protect the value of Coca-Cola's brand to its stakeholders, Coca-Cola sets and enforces its brand standards throughout its downstream channel of distribution, including those merchants that sell its products to consumers.[22]

Jani-King is a valuable and well-known brand in commercial cleaning. The Jani-King brand signals to potential end users a certain experience and level of quality. End users are purchasing not only the services delivered by Jani-King's franchisees but the entire end user experience associated with the Jani-King brand. This includes sales, billing, and end user service. Jani-King has made a significant investment in building, promoting, and protecting its marks and goodwill and has done so for many decades.

Successful brands must consistently deliver to their end users an experience that matches or exceeds the brand's promise in order to protect the brand's equity. Strong brand positioning brings with it the risk that misuse of the brand can lead to questioning of overall quality and consistency and damage to the equity value each other franchisee in the system has built in their businesses. In the age of instant, global communication, local experiences can have worldwide impact. This is the power, value, and frailty of any well-recognized brand.

In addition to brand risk, legal regulations applicable to franchising require franchisors to exercise certain controls. To comply with the Lanham Act, franchisors must control the use by its franchisees of its marks and other intellectual property. A franchisor's failure to police and control the use of its marks may imperil the franchisor's rights to those marks.

---

[22] https://www.coca-colacompany.com/stories/quality (last accessed February 20, 2019); http://klminc.com/brand_valuation/brand-valuation-and-corporate-assets (last accessed February 20, 2019).

**Jani-King Imposes Typical Franchise Controls, Not Supervisory Controls Over Franchisees' Day-to-Day Operations**

In reviewing the material provided in this matter and based on my business and franchise experience, the types of brand standards and the recommendations of best practices Jani-King uses are consistent with those that are customarily used in janitorial franchise systems and typical of those used in franchise systems generally.

Jani-King's rights are limited by the terms contained in its Franchise Agreement. Under that Agreement, Jani-King does not have the contractual right to, and, indeed, does not exercise any management controls over the Franchisees' businesses. The Franchisees are contractually free of supervision, direction, and control by Jani-King in the day-to-day management and operation of their businesses. Jani-King has the right to control the **result of a Franchisee's work** in specifying its brand standards but does not have the right to determine **when the work will be done or how or who will do the work.**

It is the Franchisees that clean the end users' facilities and perform the day-to-day management of their businesses. And, it is the Franchisees that choose how and when to meet Jani-King's brand standards.

Jani-King does not license to its Franchisees a complete business system prescribing a step-by-step mandated approach on how to meet Jani-King's brand standards. The Franchisees have the sole and exclusive right and responsibility to make critical decisions and manage their businesses, including the right and responsibility to:

- Decide which system to join;
- Decide whether to select an outside advisor and which outside advisor to assist them in conducting a thorough due diligence of the licensor's opportunity;
- Evaluate the terms contained in the agreement;
- Determine how much to invest in their businesses;
- Determine whether to finance all or a portion of their investments;
- Determine their lenders;

- Decide whether and when to hire employees (and who to hire) or to engage independent contractors (and which if any independent contractor to engage);
- Select employees or independent contractors;
- Select their management, professional staff, and other workers;
- Direct and evaluate the performance of its workers and contractors;
- Establish their human resource policies and practices including wages, bonuses, vacations, retirement, discipline, termination, and other employee benefits;
- Set the hours their staff work;
- Establish the responsibilities of their workers;
- Establish the work schedules for themselves and their workers;
- Supervise the performance of their workers, contractors, and professionals;
- Earn the financial rewards of business ownership and bottom line performance;
- Suffer the down-side risk of business ownership and bottom line performance;
- Meet all of their federal, state, and local regulatory obligations;
- Make all required federal, state, and local employee tax remittances;
- Respond to communications from government and regulatory authorities;
- Decide if and when to sell their businesses;
- Decide how to invest any profits or how to satisfy any loss incurred on the transaction; and
- Decide how to meet the brand standards of Jani-King.

The above list of independent actions is non-exhaustive but shows the breadth of independence that Franchisees have in operating their businesses.

The Role of Franchisors in General and Jani-King in Particular

Franchise systems are crafted to meet the needs of the end users served by the system's franchisees. To do so, franchisors like Jani-King design and develop their system to do several important functions. These include but are not limited to franchisee recruitment, sales, development, and contract administration, franchisee training and support, research and development for new products and services, or improvements to existing offerings, and marketing to the end user.

In addition to the functions listed above, franchisors engage in a broad range of other activities related to its business of supporting franchisees in delivering their product and services to end users consistent with the brand standards. In some franchise systems, the franchisor also manufactures the products that franchisees sell to end users or use in the products or services provided to the end users. For example, in the Chem-Dry franchise system, the franchisor sells the chemicals used to clean carpets. An affiliate of the franchisor manufactures them. Similarly, Little Caesars' franchisees purchase flour, dough, sauces, and toppings—the ingredients needed to make a Little Caesars' branded pizza to brand standards—from Blue Line, the distribution company an affiliate of the franchisor owns.

There are any number of franchisors also offering administrative and accounting services to their franchise owners. And, it is quite common in the "trades" franchise systems (i.e., plumbing, painting, electrical, foundation repair, pool services, disaster services, and residential and commercial cleaning services) for franchisors to have call centers or other means to help the franchisee connect with end users, make sales and schedule appointments.

There are many franchisors today that have introduced apps for consumer sales and communications that flow through the franchisor's server with back end support to track elements of the production and sales process. Domino's has recently offered consumers a product guarantee that franchisees must abide by similar to the guarantee Supercuts introduced in the 1980s, and few, if any, quick service restaurant franchisors do not mandate some form of pricing controls as they relate to their value meal offerings.

Based on my review of the information provided and my extensive experience in franchising, it is my expert opinion that Jani-King operates their respective businesses as a typical franchisor in the types and kinds of administrative support it provides to Franchisees. Similarly, Franchisees operate their independent business as a typical franchisee.

It is also clear that the day-to-day business operations of Jani-King are as a franchisor and that its role does not generally include performing commercial cleaning services for end users. That role is typically reserved for the Franchisees.

It is the role of the franchisees, as independent business owners, to deliver products and services to the end user consistent within the franchise system's brand standards. This is an essential element of any franchise system and why consumers prefer to purchase from branded providers.

While franchisees are required to meet the system's brand standards, how they achieve those requirements, including how they manage their businesses, supervise their staffs, recruit new end users, satisfy their existing end users, and "up-sell" additional products and services to their end users is exclusively up to them.

If the franchisees are aggressive in developing new accounts or up-selling existing accounts, if they exercise care in finding the right employees or independent contractors for each account, and if they control their expenses and manage their businesses well, they will prosper and be successful. If they do not, they are not likely to succeed. This is no different from any other business, whether in franchising or other business models.

Unlike Jani-King, the Franchisees provide commercial cleaning services to end users. Their businesses include one or more commercial cleaning accounts Jani-King either offers them and they choose to accept or which Franchisees independently sell and secure. Franchisees control their business activities and are responsible, as are all independent business owners, for managing their businesses.

Franchisees decide:

- What accounts to accept from Jani-King;
- When to clean the account (within the window of time set by the end user);
- The details concerning the manner in which the services will be performed for the account;

- Who—themselves, their employees or independent contractors, or both—will service the account;
- The compensation and benefits their employees and independent contractors receive;
- The equipment and supplies used; and
- A host of other independent account and business decisions they need to make.

Franchisees also decide how long they wish to keep a particular account and can, at their will, resign from any end user account, regardless of how their decision may impact Jani-King, its brand, or its goodwill.

As part of being independent business owners, Jani-King Franchisees must make decisions related to their human resources, including who to hire, the amount of compensation and benefits provided to each employee or independent contractor, and how they wish to conduct training. The Franchisees also make independent decisions regarding what vehicles to use for transportation; the equipment and supplies they need to purchase and where they will purchase them; the frequency and means of communicating with their end users; and whether they will provide only the services asked for or attempt to up-sell additional services their end users may need. Additionally, Franchisees, like all independent business owners, need to manage cash flow; pay their taxes; keep their books and records in a way that allows them to deduct appropriate business expenses; decide how to incorporate their businesses; obtain appropriate business licenses; purchase insurance coverage; engage appropriate legal and financial advisors; and perform a host of other administrative details.

As in any franchise system, Franchisees may not have the necessary skills or experience to manage and operate the day-to-day affairs of their business when they enter the franchise system. Franchising is the largest training engine for entrepreneurial skills in the world, and it is through the initial training and support of franchisors, including Jani-King, that franchisees learn these skills and are able to apply those skills to additional business opportunities. More than 50% of all franchises in the United States are owned by franchisees that own more than one

location and frequently in multiple brands. This is one of the major benefits to franchisees, including the Franchisees, of joining a well-developed franchise system.

As I would expect from a collection of independent business owners, Franchisees choose to operate their businesses in a variety of ways. Some Franchisees, like Ashley Zarate, sell accounts themselves, marketing to end users through word of mouth and referrals from existing end users. Franchisees like Carlene Williams rely on opportunities offered by Jani-King. Both Zarate and Williams have declined accounts offered to them by Jani-King without any consequence. Franchisees like Jermaine Russell do not clean end users' locations and instead focus on providing training and other support to their staff who perform the cleaning services. Franchisees like Vonnisha Dawn Freeman, in addition to having staff, also participate in cleaning end users' facilities. Franchisees in their deposition testimony or affidavits state that they independently recruit, hire, set the pay rate, and determine the W-2 or 1099 status for their staff and set the schedules for their own personnel. In addition, each Franchisee typically schedules when to provide their services to end users directly based on direct discussions with their end users. Franchisees in their depositions or affidavits viewed themselves as business owners and not as employees of Jani-King.

Running a franchised business requires substantial work and generally franchisees must dedicate, directly or indirectly, their efforts towards managing the operation and marketing of their businesses to achieve success. The same is true in the Jani-King franchise system. While many Jani-King franchises are small enterprises where the Franchisees and their families may perform some or all of the services to end users, the business still involves much more than performing cleaning and requires significant time and attention from the Franchisees. For example, in addition to cleaning end user accounts, based on the information I reviewed, Franchisees sell to end users additional services (such as window washing), can set the prices for those services themselves in discussion with their end users, and carefully analyze whether it makes sense to accept any new accounts that Jani-King may offer to them.

Franchisees do not, however, perform the franchisor functions that comprise Jani-King's core business activities. Franchisees have no role in ensuring that Jani-King complies with applicable rules and regulations governing franchising. They do not draft or update the Franchise Disclosure Document. They do not recruit new franchisees, train and support new franchisees, or set system brand standards. Although the size and success of Franchisees vary, all have a substantial set of business activities that are distinct from Jani-King's business activities.

### Selling Accounts and Handling Billing Are Support Services that Jani-King and Other Franchisors Provide, and They Help Make the Jani-King Opportunity Accessible to a Wide Range of Entrepreneurs

It is essential in this type of franchise offering for the franchisor to secure and own the end user contract. What Jani-King does in securing accounts and handling billing for Franchisees is not unique to the Jani-King franchise system. Franchisors provide those functions in a number of markets where it is feasible and advantageous to do so. In the case of Jani-King, in my expert opinion, these functions provide a substantial benefit to Franchisees, and many Franchisees could not operate their franchise businesses without these services Jani-King provides.

The support services provided by Jani-King do not merge the respective roles and responsibilities of the franchisor and franchisee. The function of the franchisor does not change—it is still to protect the brand, grow the franchise system, and support franchisees. The function of franchisees also remains the same in that they determine how to deliver the products or services to the end users in a manner that meets the franchisor's brand standards and grows their businesses.

Jani-King enters into a Maintenance Agreement with each end user in the Jani-King system. Besides being a distinct function from providing commercial cleaning services, this is a necessity given the profiles of Franchisees and the profiles of the end users. Jani-King, like all other franchisors in the janitorial franchising industry, offers business accounts to its franchise owners.

Since 2001 until recently, the FTC published an extensive information bulletin entitled "Buying a Janitorial Services Franchise" describing the typical practices found in the janitorial franchise business. While the bulletin no longer resides on its

website, the State of California has duplicated the FTC's bulletin in substantially the same format and content.[23] The FTC's current bulletin's format has changed but contains substantially the same information as the previous version.[24]

The State of California is a franchise registration state and requires franchisors to submit their Franchise Disclosure Documents for review to state regulators. After review, the State of California registers those offerings prior to any franchisors offering franchises. The original FTC's bulletin from the State of California's web site appears at Appendix C.

Consistent with the description in the Buying a Janitorial Services Franchise bulletin on the State of California website, Jani-King offers franchise opportunities for different levels of investment. The greater the franchise fee, the higher the amount of initial monthly business that Jani-King will offer to prospective franchisees. A higher guaranteed level of monthly business offerings may lead a Franchisee to purchase a more expensive plan, whereas a lower franchise fee and a commitment to service a smaller number of accounts may lead a franchise owner to purchase a less expensive plan. A Franchisee can then build, if it chooses, additional independently sourced business or request from the franchisor the opportunity to service additional franchisor-generated accounts.

Jani-King, like the typical janitorial franchisor, must have a signed maintenance agreement with an end user before offering that account to a Franchisee. Jani-King solicits and secures cleaning accounts for its Franchisees on a continuous basis.

Per the terms of the Franchise Agreement, Jani-King allows itself a sufficient time period within which it must offer a business opportunity to a Franchisee. This is called an "Initial Offering Period," and it allows Jani-King an appropriate amount of time to secure cleaning contracts for its Franchisees.

---

[23] https://dbo.ca.gov/wp-content/uploads/sites/296/2019/02/janitorial.pdf
[24] https://www.consumer.ftc.gov/articles/0067-buying-janitorial-service-franchise

The Franchisee may choose to accept or reject the cleaning account offered as described in the FTC bulletin. In addition, as a Franchisee becomes more experienced, and if they are so inclined, Franchisees may solicit their own end users and negotiate with them the terms of the cleaning assignment. The Jani-King Franchise Agreement expressly provides for this.

Section 4.19.2 of the Franchise Agreement states that:

"The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise."

As noted in the material I have reviewed, it is a routine practice for Franchisees to solicit potential clients for their businesses.

Although the same section provides that the contracts solicited by the Franchisees "must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the end user)," the Franchisees are still free to negotiate its terms.

Section 12.1 of the Franchise Agreement specifically states that:

"Nothing in this agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor."

Should the Franchisee choose not to accept a cleaning account that Jani-King offers, Jani-King must offer that cleaning account to a different Franchisee who can service the end user's account in order for Jani-King to fulfill its obligations under the Maintenance Agreement with the end user.

The methods used by Jani-King and other janitorial franchisors in the United States to secure cleaning accounts and offer them to franchisees is, in my expert opinion, the most sensible and responsible method for the franchisees, the end user, and the franchise system.

It would not be practical for Jani-King, as the franchisor, to bring a Franchisee that *might* be interested in a particular cleaning account into each and every

negotiation with end users. The janitorial service business is competitive, and timing is critical. An end user may be considering several proposals to meet its cleaning needs, and the only way that Jani-King (and other janitorial service franchisors) can offer specific and certain business opportunities to their franchisees is by securing the opportunity through contract before it makes the offer of the business to a Franchisee.

The biggest challenge for janitorial franchisees is securing end users, and for a variety of reasons, they may prefer or even require Jani-King to perform that function. As noted in the material I have reviewed, many janitorial franchisees do not have advanced business education or prior business experience. Many of the end users they wish to approach for business are midsize and large private or public companies. Some are chain operations with multiple locations that may be in a variety of markets. These end users generally issue Requests for Proposal and some may submit their business for bidding amongst providers. The business reality of a single independent franchisee entering into a pricing or service agreement that could impact another independent franchisee in the same system would be troubling if not unworkable. For this reason, franchisors in general, and not limited to janitorial franchise systems, enter into system accounts with pricing and services negotiated by the franchisor and serviced by franchisees.

Jani-King, as do other janitorial franchise system and other franchise systems in general, enable Franchisees to own and operate their businesses without having to respond to complicated RFPs and pitch to companies entertaining bids from sophisticated competitors. The ability to receive opportunities for end user cleaning accounts is a significant benefit for Franchisees and, based on the material I have reviewed, a benefit they appreciate. It is also a benefit provided by many janitorial franchisors throughout the United States.

If Jani-King and other janitorial franchise systems did not execute the cleaning service contract with the end user, there would be no way any janitorial franchisee could remain in business. As noted above, the end user seeks a national brand with national brand capabilities that makes the contracting process easy and provides them with the benefits that come from a branded experience. The structure

of direct contracting with Jani-King or other janitorial franchisors, and of offering opportunities to Franchisees, is the only possible way for this to happen effectively in this kind of business without the other adverse risk of intra-brand competition between franchisees.

### Contracting with the End User is a Common Franchisor Function and is Distinct from Performing the Cleaning Services

Marketing to end users is a typical function of all franchisors, and the methods of doing so and the franchisor's relationship with the end user depend on the nature of the product or service.

Most business-format franchise systems are destination businesses—the customer comes to the franchisee's location, and there is no written contract between the business owner and the customer. In those franchise systems, it is not practical or necessary for the franchisor to contract directly with the customer, and thus those franchisors generally do not. For example, Jack in the Box, as a franchisor, has no need to meet each customer, determine what meal they require, negotiate the price of the meal, when it will be presented to them at the counter, or collect payment from the customer at the franchisee's location. The transactions are small, episodic, and require no contracts. Customers choose Jack in the Box, like other destination businesses because it is convenient to the customer at the time the customer wishes to eat.

This is not what is required in non-destination trade franchise systems, like janitorial services, where the transactions are much larger, sustained, and governed by written contracts. In this type of franchise, the end user generally has to respond to a solicitation and, in most cases, be persuaded to switch from their existing service to the franchisor's brand.

Although Jack in the Box and other destination franchisors do not have contracts with the customers, they nonetheless consider the customers to belong to them and not to their franchisees. After all, the customers are coming to Jack in the Box, not "Joe's Jack in the Box." In most franchise systems, the franchisor owns all the customer information the franchisee obtains. The franchisee only has

transactional use of that information while the franchisee is part of the franchise system. For example, the franchise agreement for CertaPro Painters provides that:

> System Data. Franchisee and Franchisor agree that all data . . . including but not limited to, Customer Data, are deemed to have been derived from the goodwill of the "CertaPro" name and Proprietary Marks and, therefore, such System Data is considered Confidential Information and is owned by CertaPro. Franchisee agrees that CertaPro may use or access such System Data for any purpose without notice to Franchisee. Franchisee agrees to use the System Data only in the operation of and for the benefit of the CertaPro Business.[25]

In addition, many franchisors, as part of their business model, contract directly with end users when it makes business sense to do so. This occurs regularly in the hotel and car rental industries when the franchisor interacts directly with the end users at the point of making reservations and in establishing affinity clubs, reward programs and discount pricing. Brands like Hertz, Avis, Marriott, and Hilton all directly contract with their guests and end users and offer affinity clubs, rewards programs and discount pricing. Each of these programs are beneficial to the system's franchisees as it creates loyalty to the brand and drives additional business to all locations.

In the retail segment, companies like GNC also manage rewards programs where members can join to earn discounts on products they purchase and it is common today for franchisors to enter into system agreements with delivery services like Uber Eats, etc. In most of the trades, handymen, and home care franchises, franchisors have call centers that manage appointments for their franchisees and make sales for the franchisees. Direct contracting like that used by janitorial franchises is also common in franchise systems that have system account programs.

In a system account program, the franchisor enters into an agreement with an end user setting the price and conditions of service. Under those system franchise agreements, the franchisee is obligated to provide those products and services to the system account as negotiated by the franchisor.

---

[25] CertaPro Painters, Ltd. Franchise Agreement, Section 6.10

For example, Hertz has a Corporate Rate Program[26] that provides:

> Franchisor and its Affiliates may enter into contracts throughout the term of this Agreement with commercial entities, membership associations, governmental agencies and departments, and other groups and organizations under which the contracting party or others (e.g., customers of the contracting party) receive contracted rates, discounts or other benefits **("Corporate Rate Programs");** Franchisee agrees to fully and completely participate in, comply with, and adhere to, all such contracted rates, discounts or other benefits as Franchisor may from time to time prescribe in the Manuals or otherwise in writing, except as may otherwise be required by applicable law. Further, Franchisee agrees to comply with all of the terms and conditions of all Corporate Rate Programs as Franchisor may establish and modify them from time to time, including rebates and liability insurance coverages. Franchisee may not enter into any Corporate Rate Program or similar program other than those prescribed by Franchisor except with Franchisor's written consent.

System Accounts and Corporate Rate Accounts such as that included by Hertz in their franchise agreement are common and necessary for franchise systems to compete. These programs are of significant benefit to providing franchisees in those other systems as they are to Jani-King and its Franchisees.

Another reason franchisors choose to contract directly with the end user is to protect its goodwill. Protection of the goodwill of the franchisor attendant to a franchisee's use of a franchisor's service mark and system is a critical component of franchising. A franchisee may use and benefit from the franchisor's brand only so long as the franchise relationship continues. Upon the termination of the franchise relationship, the goodwill attributable to the franchisee's use of the franchisor's mark and system belong exclusively to the franchisor. As noted in the FTC's bulletin on "Buying a Janitorial Service Franchise":

> **Franchisor-owned accounts.** The franchisor may own all the customer accounts, including those that you get on your own. This means that if your franchise agreement ends, you will not be able to service the accounts for which you paid a fee, and you won't be able to service the accounts you got on your own, either.

---

[26] Hertz Franchise Agreement section L.14

Jani-King and other janitorial franchise businesses is the party to the agreement with the end user. In this way the franchisor has an effective method of protecting its goodwill (i.e., the ongoing relationship with the end user) at the expiration or termination of the particular franchise agreement or if the franchisee unilaterally chooses to no longer service the end user. If Jani-King could not immediately secure another Franchisee to fulfill the Jani-King system's obligation to a cleaning account after the existing Franchisee terminated or abandoned the account, it would do considerable damage to the Jani-King system's goodwill and intellectual property.

### Jani-King's Performance of Billing and Accounting Functions is Beneficial to Franchisees and is Distinct from Performing Commercial Cleaning

Billing, collection, and cash flow can be some of the greatest challenges a business owner faces. Jani-King provides billing and accounting support to Franchisees, and this is a material benefit. Without these services, in my expert opinion, most small janitorial franchisees could not function or be sustainable over a long time period. Additionally, as noted above, end users frequently have multiple locations spread out over one or more geographic areas that may hold multiple Franchisees. These end users naturally require a single point of billing that can provide them with consistently accurate accounting and terms. Intrabrand competition may confuse the end user and cause significant difficulty for the system. As provided in the Jani-King Franchise Agreement:

> "Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee."[27]

Few things are more sensitive in these types of businesses than proper billing and collection. Centralizing these critical functions with the franchisor benefits both the franchisee, the end user, and the franchisor by assuring consistency and accuracy in accounting. Billing and collections are critical in business-to-business services where customers make periodic payments, as in the janitorial, staffing or

---

[27] Jani-King Franchise Agreement section 4.7

personnel industry. Janitorial franchisors are not the only franchisors that perform billing and accounting functions for services provided by franchise owners.

By providing these services, janitorial franchisors also relieve the franchisee of the ministerial function of billing and collecting on accounts and allows the franchise owner to focus instead on delivering cleaning services to its end user. Also by providing the franchisee with payments, even where the end user has failed to pay on time, janitorial franchisors enable a franchisee to remain in business, because without a regular cash flow, these franchisees would likely fail.

There is a significant benefit to Franchisees in the way that Jani-King handles collections from end users and makes advance payments to Franchisees. If a Franchisee was not part of a commercial cleaning franchise system, it would not receive any money for the work if the end user did not pay. In the Jani-King system, a Franchisee receives revenue monthly for the services its franchise performed for the end user in the prior month without regard to whether the end user has paid for those services. Per the terms of the contractual relationship, if the customer does not eventually make a payment, it is appropriate for Jani-King to charge back to its Franchisees any advances made on uncollected accounts because the parties are independent businesses.

There are franchisors outside of the janitorial industry that also regularly provide accounting functions for their franchises. Franchisors in the staffing or personnel industry commonly perform billing and accounting in support of their franchise owners. Express Personnel, for example, provides the same accounting services to its franchisees as does Jani-King.

The Express Personnel franchise agreement includes that the franchisor will:

"Administer all accounting and bookkeeping records concerning payrolls, billings, accounts receivable and payroll taxes for associates."[28]

Similarly, the Express Personnel's franchise agreement provides:[29]

---

[28] Express Personnel Franchise Agreement section IV.F.
[29] Express Personnel Franchise Agreement section VII.B

> We shall submit all bills to clients for all associates furnished and shall instruct clients to remit payment directly to Us. You shall not render bills or statements to clients but shall use Your best efforts to collect bills in accordance with the policies and procedures in the Manual. If payment of any bill is made payable to You, payment shall be deemed to have been received in trust for Us, and You shall not deposit or convert the funds received and shall immediately forward the same, properly endorsed, to Us.

**Jani-King has lower barriers to entry than most franchise systems and provides opportunities for people of modest means to launch and grow their own business**

Jani-King is among the few franchise systems that requires a modest initial investment, significantly lower than most other franchise systems. The initial franchise fee in other franchise systems often is in the tens of thousands, and the total minimum initial investment required can be several times that, especially in industries that require a significant amount of equipment and a physical plant.

A Jani-King franchise is quite affordable. The minimum initial franchise fee for a Jani-King franchise is $16,250.00, and the total minimum initial investment is $20,662.00.[30] For someone who is looking to start a franchise business but has limited capital, Jani-King is one of the best options available for business ownership.

Franchisees and their family members may be employees of other companies, and they may have careers that have nothing to do with their other investments. Some may have multiple jobs and this is not uncommon in the United States today. Based on my experience in franchising, the majority of franchises today are owned and operated by entities that own and operate multiple locations. Further, it is very common in franchising for franchisees to have other jobs, be executives in multiple businesses, own multiple locations in multiple franchises and independently own other businesses. Based on my review of the material provided, Franchisees own other businesses and have other jobs in addition to their Jani-King businesses and Jani-King has no restrictions on them doing so, so long as they do not compete directly with their Jani-King business or the business of the other Jani-King Franchisees.

---

[30] Jani-King Franchise Disclosure Document

Any franchise can be a good option for a person that is inexperienced in business and without any management experience because a franchise system provides a brand that attracts customers and provides training and on-going support. Franchisors generally provide their franchisees with initial and on-going training, marketing, and support. This includes janitorial franchisors like Jani-King in assisting their franchisees in securing accounts (when they want them) and handling billing and collections.

Based on the material I have reviewed, the experiences of Jani-King franchise owners confirm Jani-King provides an opportunity that is accessible to people of modest means and that enables them to be successful and grow their business. This leads me to conclude that the Jani-King franchise system, with its low entry investment cost and significant support, is one of the most accessible franchise opportunities for people with limited resources and limited business experience.

### Franchisor Liability As An Employer To Its Franchisees Would Be Inconsistent With The Franchise Business Model

The federal government has defined a business format franchise as including "not only the product, service, and trademark, but the entire business format itself—a marketing strategy and plan, operating manuals and standards, quality control, and continuing two-way communication."[31] These are again the sorts of controls and practices that the DOL suggests make Jani-King liable as an employer of its franchisees.

If meeting the FTC definition of a franchise and the requirements of the Lanham Act creates unintended liabilities to franchisors by making them their franchisee's employers, as the DOL is attempting to do, in my expert opinion, it would make franchising impossible. It would also cause extreme damage to the U.S. economy, consumers, licensors, licensees, franchisors, franchisees and those that work in franchising.

When MSA, my consulting firm, designs franchise systems for our emerging franchisor clients, and when we provide advice to our established franchise clients,

---

[31] *Franchising in the Economy 1986-1988*, U.S. Department of Commerce (Feb. 1998).

we rely upon the fact that the rules that govern franchising do not create un-intended risks for our clients. It is common knowledge among professionals in franchising that when Congress enacted the Lanham Act, it did so to enable companies to license to independent third parties their intellectual property without risking the loss of their marks or their becoming employers to their licensees.

Without the generally accepted standard and principles and the express written terms contained in detailed lengthy agreements that clearly define each parties' rights and obligations, franchisors would be open to un-intended obligations and claims. These include, but are not limited to, claims by lending institutions, principal agency relationships, vicarious liability, joint-employment and the independent human resource and payroll practices of franchisees, and obligations to government and taxing authorities.

Were the DOL able to sustain such a claim based on the material provided for my review, material that clearly **does not substantiate such claims**, all franchisees would become the employees of their franchisors in the United States. The result would be that franchising as it currently exists, would no longer be a viable model in the United States, and the economic consequences on the overall U.S. economy would be substantial.

In franchising, the mere establishment of mandatory brand standards, recommended best practices, and support does not raise the franchisor to the level of operator of the franchisee's business or create an employment relationship. To suggest otherwise, as the DOL has claimed, would be contrary to the historic concept of the franchise relationship and construing that it does conflicts with the standards and practices found throughout the United States. Moreover, it is understood that, absent some contractual (or extra-contractual) right not present in the Jani-King franchise relationship, Jani-King lacks the ability to compel its Franchisees to lose their independent businesses ownership status and accept a new status, mandated by the DOL, of accepting the obligations of a Jani-King employee.

Summary of My Expert Opinions

In addition to the opinions expressed above, based on my experience in franchising, the generally accepted standards and practices in franchising, and the factual record I have reviewed, it is my expert opinion that:

- Franchisees own and operate their independent businesses under a license agreement with Jani-King.
- Jani-King lacks the contractual right or ability to exercise any management control over the day-to-day operations of Franchisees' businesses and has not done so.
- The Documents and other Jani-King policies are similar if not identical to those found throughout franchising, including those franchise systems in the janitorial industry, and establish brand standards and effect the reasonable and necessary controls required under federal law.
- As an independent business owners, Franchisees are entitled to the maximum benefits associated with their control over their investment, and in my expert opinion, the DOL should not require them to become employees of Jani-King.

This report is based upon the information reviewed to date. I welcome the opportunity to review additional information if and when it becomes available, including further discovery, and I reserve my right to change or modify my current opinions should it become necessary. My opinions are to a reasonable degree of probability within the standards of practice within franchising.

Michael H. Seid, CFE
Managing Director
MSA Worldwide
3 November 2019

Appendix A – Professional Qualifications and Experience

I am the founder and Managing Director of MSA Worldwide ("MSA"), a provider of domestic and international franchise advisory services.

During my professional career, I have been a senior operations officer, financial executive, consultant or accountant for companies within the franchise, retail, restaurant, personal services, healthcare, education and service industries. The International Franchise Association has published that MSA Worldwide, the firm I founded, is "the leading strategic and tactical advisory firm in franchising."

I have consulted both domestically and internationally for companies on the appropriateness of franchising, licensing and other methods of down-stream distribution of products and services; the design, development and implementation of franchise and licensing systems; and for established franchisors, non-franchisors and other multi-unit operators. MSA Worldwide also provides other professional services including but not limited to manuals; training programs; franchisee recruitment strategies; franchisor expansion strategies; real estate site selection and site development; franchisee advisory councils; franchise relations; joint-employment; crisis management; change strategies; and litigation support and the strategic restructuring of established companies.

Since 1987 through the present, I have primarily been a consultant to the franchise industry. I graduated from Long Island University with a BS in Accounting in 1975 and obtained my CPA in New York State in 1978. During the period 1970 through 1976, I was a member of the US Army Reserve and received an honorable discharge in 1976 with the rank of Staff Sergeant.

I am a frequent speaker at programs for the International Franchise Association, universities, law schools, and retail and professional organizations and have lectured and written for the ABA Franchise Forum and the IFA's Legal Forums. I have lectured at several universities and law schools including St. Thomas University, Georgetown Law School, New York University School of Law, Benjamin N. Cardozo School of Law, Nova University, the University of Arizona, Johnson & Wales University, MIT Sloan School of Management, Harvard Business School,

University of California San Francisco (Berkeley), Howard University and Emory University School of Law. I have spoken at the Doha Economic Conference in Qatar on the use of franchising to create a middle class in the Middle East and on behalf of the International Franchise Association I have testified and presented to Federal, State and Local legislators and regulators on franchising.

I have been appointed as an Adjunct Professor at The Ohio State University's Fisher College of Business and have developed and teach a graduate course of studies on Commercial and Social Franchising.

I have published numerous articles on franchising. I am the author of Franchising for Dummies, published by Wiley Publishing, Inc. My co-author for Franchising for Dummies was the late Dave Thomas, Founder of Wendy's International. I am also the author of Franchise Management for Dummies, published by Wiley Publishing, Inc. My co-author for Franchise Management for Dummies is Joyce Mazero, Esq., partner at Polsinelli. I have presented to the World Franchise Council, The World Bank, Harvard University, OPIC and University of New Hampshire, among other universities and private and public agencies on Social Franchising. I am the first recipient of the Franchise Update Hall of Fame Award.

MSA Worldwide is a member of the International Franchise Association's (IFA) Supplier Forum (SF). I serve on the SF's Board of Directors as a Past Chairman. In February 2018 I stepped down as a member of the IFA's Board of Directors after serving a combined total of over thirteen years and was the first professional ever elected to the IFA's board. During that period I also served as a member of the IFA's Executive Committee (1997 and 1998). I have served, and currently serve, as the chair or member of several committees and task forces and was a trustee of the IFA's Education Foundation.

I have completed the requirements and have been awarded the designation of CFE (Certified Franchise Executive) by the International Franchise Association's Education Foundation ("IFAEF"). I have developed and presented several courses for the IFAEF.

I am a Certified Public Accountant (inactive status) in the State of New York. I

am a member of the American Institute of Certified Public Accountants ("AICPA"), New York State Society of CPAs ("NYSSCPA") and am an associated member of the American Bar Association ("ABA").

I have been qualified as an expert in franchising in Federal and State Courts and in Arbitrations. I have testified in cases involving franchising, licensing and labor for franchisors and franchisees in the United States and internationally.

I am Chief Concept Officer and a member of the Board of Directors and Executive Committee of CFWshops, a Social Sector Franchisor established to provide clinical services and essential medicines in the peri-urban areas of Sub Saharan Africa. I also serve on the board and executive committee of the HealthStore Foundation and One Family Health as part of my commitment to the use of business format franchising as a method for improving the human condition and for having a world-changing impact on poverty, diseases and economic development. CFWShops is a franchisor member of the IFA, and I am the representative of CFWShops at the International Franchise Association.

I am on the Board of Directors of the William Rosenberg International Center of Franchising at the University of New Hampshire. I was appointed to the State of Connecticut Low Wage Employer Advisory Board, as a person with experience in the labor force needs of the large business community. I am a member of the External Advisory Board of The Ohio State University's Global Water Institute and on the Board of Advisors for Woman 360 in Ghana.

During the past five years, I have provided testimony in the following cases, in deposition, trial, or arbitration.

1. *Nestle Middle East, FZE vs. Crest Foods, Inc.* in the International Chamber of Commerce, International Court of Arbitration, ICC Case No. 22328/TO, retained by Mayer Brown LLP, 19 January 2018.

2. *Jos. A. Bank Clothier, Inc. vs. J.A.B – Columbia, Inc. et al.*, in the United States District Court for the Northern District of Maryland, Northern Division, Case Number 1:15-cv-03075 ELH, retained by Tayman Lane Chaverri, LLP, 2 April 2018.

3. *Clifford M. Gonzalez et al. vs. Famiglia-DeBartolo Franchise Systems, LLC et al.*, American Arbitration Association, Case No. 13114Y0054712, retained by The Richard Rosen Law Firm, 27 November 2013.

4. *PuroSystems, Inc. v. Michael Allen*, American Arbitration Association, Case No. 01-16-0003-8352, retained by Kostopoulos Rodriguez, PLLC, 11 November 2016.

5. *Sandra Villatoro et al. vs. CleanNet USA, Inc. et al.*, American Arbitration Association, Case Number 02-15-0005-2115, retained by Bartko Zankel Bunzel and Hahn Law, 25 February 2017.

6. *Barbara Kubiak et al. vs. Massage Envy Spa Uptown at West Village #211 et al.*, in the District Court 193rd Judicial District, Dallas County, Texas, Cause Number DC-15-11559, the Honorable Judge Carl Ginsberg, retained by Thorpe Shwer, 31 March 2017

7. *LMP Enterprises LLC et al. vs. Franchisor International LLC et al., in the* Superior Court of the State of Washington in and for Clark County, Case Number 14-2-00904-0, the Honorable Judge Addo Collier, retained by Faegre Baker Daniels LLP, 7 June 2016.

8. *Dr. Rocco Nelson, et al. vs. Dr. Mark Doyle, et al*, in the Superior Court for the State of Washington in and for King County, Case Numbers 16-2-02143-3 SEA and 16-2-02617-6 SEA, the Honorable Judge Jim Rogers, retained by Foster Pepper PLLC, 4 October 2016

9. *Emily Bruner, et al., v. James John Liautaud, et al.*, in the United States District Court for the Northern District of Illinois, Eastern Division, Case Numbers 14-CV-5509, 14-CV-1681, 15-CV-6010, the Honorable Judge Kocoras, Magistrate Judge Schenkier, retained by Seyfarth Shaw LLP, 11 January 2017.

10. *Lamington Resources, Inc. v. Burger King Corporation, et al.*, International Chamber of Commerce, International Court of Arbitration, Case No. 20786/RD, retained by Genovese Joblove & Battista, 19 October 2016.

11. *New Amsterdam Coffee & Tea Co. et al. v. International Coffee & Tea, LLC et al.,* American Arbitration Association, Action Number 72-Y-114-000138-14-JRL, retained by Bryan Cave LLP, 3 March 2014.

12. *PuroSystems, Inc. v. John Burke*, American Arbitration Association, Southeast Case Management Center, Case No. 01-14-0000-3162, Arbitrators John Barkett, Thomas Schultz, and Michael Nachwalter, retained by Faegre Baker Daniels LLP, 10 March 2015.

My writings and presentations include:

1.	Acquisition Fever (Franchising World Magazine)
2.	Analysis of Royalty Elimination in Manufacturing Franchisors (Leaders Franchising Business & Law Alert)
3.	Are You an Inadvertent Franchisor? (Retailing Update – Publication Of PWC)
4.	Best Practices – Royalties That Do More Than Pay the Rent (Leaders Franchising Business & Law Alert)
5.	Best Practices: Understanding Why Companies Operate at The Head of The Pack (35th Annual International Franchise Association Convention)
6.	Bias in The Media Coverage of Franchising (Franchise Update Magazine)
7.	Can You Still Become A Millionaire in Franchising? (Successful Franchising)
8.	Cooperation in Franchising (Franchise Update Magazine)
9.	Corporate Culture – DuPont Becomes A Franchisor (Leaders Franchising Business & Law Alert)
10.	Counseling A Start Up Franchisor (Presentation to The American Bar Association Forum on Franchising)
11.	Developing A Proper Franchise Program (Executives Guide to Franchise Opportunities)
12.	Developing A Start-Up Franchisor (Entrepreneur Magazine)
13.	Elements of Successful Franchising (International Franchise Exposition)
14.	Encroachment (Restaurant and Hospitality Group, Dallas, Texas)
15.	Fair Franchising Standards - Fair to Whom (Franchise Update Magazine)
16.	Financing Expansion Through Franchising (KPMG)
17.	Forward to Franchise Buying Book (Entrepreneur Magazine)
18.	Forward to Franchise Development Book (Entrepreneur Magazine)
19.	Franchise or Business Opportunity? Making the Choice (California Franchise and Business Guide)
20.	Franchising – The Engine for Growth (Franchise Update Magazine)
21.	Franchising for Dummies, 1st And 2nd Edition (Wiley Publishing)
22.	Franchising: Expansion Opportunity for Small Stores (Nat'l Federation Convention and Exposition)
23.	Getting the Information for International Expansion (8th IFA International Symposium on Franchising;)
24.	Global Expansion (KPMG)
25.	Global Expansion – *Pricing Negotiating and Selling* (National Restaurant Association)
26.	How Can I Provide Meaningful Support to My Franchisees in Site Selection Without Creating Potential Claims for Cause of Unit Failure at A Later Date? (Franchise Update Magazine)
27.	How Do I Get My Franchisee to Move Through Adolescence into Maturity? (Franchise Update Magazine)
28.	How to Expand Your System Through Non-Traditional Franchisees and Sites (10th Annual International Franchise Association Marketing Conference)
29.	If They Can See It - They Can Do It (Franchise Update Magazine)

30. International Expansion (Franchise Update Magazine)
31. Making the Franchise Decision (Workbook)
32. Managing Your Reputation in Times of Crisis (Leaders Publications – Franchising Business & Law Alert)
33. Market Dynamics V. Legislation.)
34. Is There A Place for Both in Franchising? (Continental Franchise Review)
35. Neighborhood Franchise Project (Local Initiatives Support Corporation)
36. New Markets - Closer to Home (Franchise Update Magazine)
37. No Victors Only Victims (Franchise Update Magazine)
38. Planning for Growth: Creating and Using the Business Plan (International Franchise Association)
39. Pricing of Franchisees: How to Charge for Fees, Area Development Fees, Etc (International Franchise Association)
40. Retail Modeling - The Science Behind Encroachment Avoidance? (Leaders Publications – Franchising Business & Law Alert)
41. Selecting Your Professional Advisor (Directory of Franchise Attorneys)
42. Shared Business Enterprise - Toward A New Franchise Paradigm? (Franchise Update Magazine)
43. Should I Institute Collective Bargaining to Settle Franchise Disputes? (Franchise Update Magazine)
44. Should There Be Mandatory Earnings Claims? (Franchise Update Magazine)
45. Strategic and Long-Range Planning (International Franchise Association)
46. Success in Franchising (Franchise Update Magazine)
47. Symposium Global Retailing (University of Arizona Southwest Retail Center for Education and Research)
48. Tactical Planning (Capital Franchise Association)
49. The Changing Landscape (Franchise World Magazine)
50. The Circus Comes to Town (Franchise Update Publications)
51. The Franchise Media and The McCall's Decorating Den Article (International Franchise Association)
52. The Franchisor Business Plan (Franchise World Magazine)
53. The National Franchise Council – Is This the Proper Forum for Self-Regulation in Franchising? (Franchise Update Magazine)
54. The Power of Franchising - As an Economic Development Strategy (International Franchise Association)
55. The Strategic Process: Developing the Financial Structure of a Franchise (Handbook of Franchise Management)
56. Timothy Bates Two - An Analysis of SBA Franchise Failure Study (Franchise Update)
57. Using Franchising as A Growth Model (Success Magazine)
58. Where It All Began: The Evolution of Franchising (Franchise Update Magazine)
59. The Role of Technology in Tactical Execution (International Franchise Assn.)
60. What Do We Do with Brokers? (North American Securities Administrators Association)
61. Articles As On-Line Expert For Entrepreneur.Com (Entrepreneur.Com)
62. Articles as On-Line Expert for Allbusiness.Com (Allbusiness.Com)

63. Adding A New Product (Franchise Times Magazine)
64. Area Representative (Franchise Times Magazine)
65. Back to Africa (Franchise Times Magazine)
66. Can't Any Lawyer Do It (Franchise Times Magazine)
67. Dealing with Real Estate Concerns (Franchise Times Magazine)
68. Discovery Days (Franchise Times Magazine)
69. Downturn in The Economy (Franchise Times Magazine)
70. Encroachment – The Role of The Lawyer and Consultant in Advising Clients (Franchise Times Magazine)
71. Encroachment Avoidance (Franchise Times Magazine)
72. Failure Rate (Franchise Times Magazine)
73. Going International (Franchise Times Magazine)
74. Grass Roots (Franchise Times Magazine)
75. Impact Policies (Franchise Times Magazine)
76. Is Now A Good Time to Franchise My Business (Franchise Times Magazine)
77. Making Changes to Established Systems (Franchise Times Magazine)
78. Money Mess (Franchise Times Magazine)
79. Negotiating Agreements (Franchise Times Magazine)
80. Patriot Act (Franchise Times Magazine)
81. Rebates or Kickbacks (Franchise Times Magazine)
82. The Real Challenge (Franchise Times Magazine)
83. Trying Times – Standard Solutions (Franchise Times Magazine)
84. Veterans Transition Franchise Initiative (Franchise Times Magazine)
85. What to Do About Franchisee Litigation (Franchise Times Magazine)
86. What Just Happened in America (Franchise Times Magazine)
87. Go for Brokers (Franchise Update)
88. How Will Wall Street's Melt Down Affect Small Business (Franchise Update)
89. Helping Franchise Systems Succeed: Avoiding the Pitfalls Encountered in The Early Stages of Franchising (International Franchise Association Legal Symposium)
90. The Respective Roles of The Franchise Consultant and The Franchise Lawyer in Structuring the Franchise System (American Bar Association Forum on Franchising)
91. Social Sector Franchising (HealthStore Foundation)
92. Creating a middle class through the development of franchising in the Middle East to deal with the causes of the Arab Spring (Eleventh Annual Doha Economic Conference, Doha, Qatar)
93. Social-sector franchising for healthcare (Micro-Franchising – How Social Entrepreneurs are Building a New Road to Development – Greenleaf Publishing)
94. Building a Change Culture (52nd IFA Annual Convention)
95. Basics of Developing a Franchise System (International Franchise Exposition)
96. Top Ten Mistakes Every Franchisor Should Avoid (53rd IFA Annual Convention)
97. Setting Fees and Marketing the Opportunity (ICFE Special Session)
98. Managing Change (ICFE Special Session)

99.   Exit, Succession and Estate Planning for Baby Boomer Franchise Owners (IFA 2014 Annual Convention)
100.  Grow Your Business with Franchising & Licensing (Baker Donelson 2014 NOLA)
101.  The Father of Franchising (About.com)
102.  Negotiating Franchise Agreements (About.com)
103.  Advantages and Disadvantages of Buying a Franchise (About.com)
104.  Advantages & Disadvantages of Joining a Mature Franchise System (About.com)
105.  Advertising Fees and Strategies for Franchisors (About.com)
106.  Albert Singer: The Myth about the 'Father of Franchising' (About.com)
107.  Are You Ready to Be a Franchisee? (About.com)
108.  Are You Ready to Franchise Your Business? The Threshold Analysis, Part One (About.com)
109.  The Threshold Analysis, Part Two: Franchisability criteria (About.com)
110.  The Threshold Analysis, Part Three: Available franchisees (About.com)
111.  The Threshold Analysis, Part Four: The support system and fees (About.com)
112.  The Threshold Analysis, Part Five: Your ability to expand (About.com)
113.  Basic Forms of Multi-Unit Development (About.com)
114.  Benjamin Franklin – Inventor, Statesman, Printer, Franchisor, Philanthropist (About.com)
115.  Buying an Existing Franchise (About.com)
116.  Failure Rate: Dealing with Failure in a Franchise System (About.com)
117.  Finding the Best Advisors in Franchising (About.com)
118.  Franchise or Business Opportunity? Making the choice (About.com)
119.  Franchise Relationship Structures (About.com)
120.  Franchising Definitions (About.com)
121.  Franchising Your Business, Part One: Overview (About.com)
122.  Franchising Your Business, Part Two (About.com)
123.  Franchising Your Business, Part Three (About.com)
124.  Franchising Your Business, Part Four (About.com)
125.  Franchising Your Business, Part Five (About.com)
126.  Going International (About.com)
127.  How Do You Spot a Franchise Opportunity to Avoid? (About.com)
128.  How Much Does a Franchise Cost? (About.com)
129.  How to Determine Your Royalty Fee Structure (About.com)
130.  How to Understand a Franchisor's Financial Performance Representation (About.com)
131.  If it walks like a duck – You may already be a franchisor (About.com)
132.  If You Are Thinking of Franchising Your Business (About.com)
133.  Is Every Franchise Going to Be a Success? (About.com)
134.  Negotiating a Franchise Agreement (About.com)
135.  Requirements to Open a McDonald's Restaurant (About.com)
136.  Roles of the Franchise Consultant and Franchise Lawyer (About.com)
137.  Start-Up Costs: Determining your initial franchise investment (About.com)
138.  The Franchise Disclosure Document (About.com)
139.  The History of Franchising (About.com)
140.  Top Ten Reasons to Invest in a Franchise (About.com)

141. Understanding the Franchise Agreement vs. the FDD (About.com)
142. What is a Franchise? (About.com)
143. Won't Any Lawyer Do? (About.com)
144. Union Challenges to Franchising in the U.S. (About.com)
145. The NLRB and SEIU – A Joint Enterprise Against Franchising (About.com)
146. Exclusive Territory (About.com)
147. Default and Termination (About.com)
148. The Bar Has Been Raised for Relationship Law Consideration (About.com)
149. Retail Theatre – Successful competing in an etail economy (About.com)
150. Retaining the NLRB Rider (About.com)
151. Franchising Creates over 27% of All Private Sector Jobs (About.com)
152. The Sky is Not Falling – At least not from Browning Ferris (About.com)
153. California 525 – What has been achieved (About.com)
154. Financial Performance Representation (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
155. The Basics of Developing a Franchise System (International Franchise Exposition)
156. Franchise Your Business (Baker, Donelson, Bearman, Caldwell & Berkowitz, PC)
157. Where Is the Point of No Return in Guiding Franchisees in People Matters? (International Franchise Association)
158. Franchise Training Programs (About.com)
159. How to find a franchise with a good Return on Investment (About.com)
160. The process of buying a franchise (About.com)
161. What support can you expect from a franchisor (About.com)
162. The history of franchising (About.com)
163. Sexual and Reproductive Care (International Franchise Association)
164. Social Sector Franchising (World Franchise Council)
165. Richard Griffin - How a Partisan Lawyer Can Get It So Very Wrong (Franchising World Magazine)
166. An Inventory of Potential Outcomes from Richard Griffin's NLRB opinion on Franchising – White Paper (International Franchise Association)
167. Fight for $15: The Tipping Point for Generational Poverty (About.com)
168. Franchise Management for dummies (Wiley Publishing, Inc.)
169. Social Franchising (International Franchise Association)
170. Joint Employment (International Franchise Association)
171. The Basics of Developing a Franchise System – An Educational Seminar for the International Franchise Association Staff (International Franchise Association)

I have presented at professional and trade associations including, but not limited to, the International Franchise Association, the International Franchise Association Education Foundation, the International Franchise Association's Legal Symposium, the National Restaurant Association, the National Retail Federation, the American Bar Association, Franchise Finance Forum, Franchise Update Multi-Unit Conferences, Australian Franchise Association, British Franchise Association, New

Zealand Franchise Association, Italian Franchise Association, World Franchise Association, U.S. Embassy Rwanda, Global Health Conference, Service Employees International Union, The World Bank, OPIC, and PharmAccess. I have also presented at universities and law schools including, but not limited to, St. Thomas University, Georgetown Law School, New York University School Of Law, Benjamin N. Cardozo School Of Law, Nova University, University Of Arizona, Johnson & Wales University, Harvard, MIT, UCSF (Berkeley), Emory University School of Law, University of New Hampshire, Howard University, and The Ohio State University.

Appendix B – Documents I Have Reviewed In This Matter

**Jani-King Oklahoma 3322–30019**

1-50: Declarations of Various Franchise Owners
51-83: Form Franchise Agreement
84-326: 2015 FDD
327-556: 2014 FDD
557-1534: Franchise Operations Manual
1535-1954: Partial FDDs
1955-1968: Jani-King Advertisements
1969-1980: Jani-King Job Descriptions
1981-2102: Jani-King Advertisements and Notices
2103: Jani-King Healthcare Services CD
2104: Jani-King Hotel & Resort Housekeeping CD
2105: Jani-King Green Cleaning CD
2106: Outpatient Services CD
2107-2190: Regional Director Training Guide
2191-2193: Jani-King Operating Statement
2194-2238: Policies & Procedures Manual
2239-2240: Balance Sheet, 2016
2241-2289: Safety Manual
2290-2320: Green Cleaning Training Program Manual
2321-2322: Balance Sheet, 2018
2323-2385: Sales Manual
2386-2388: Operating Statement, 2018
2389-2616: 2017 Jani-King of Oklahoma FDD
2617-2619: Operating Statement, 2017
2620-2842: JKO 2019 FDD
2843-3085: JKO 2016 FDD
3086-3089: Jani-King Maintenance Agreement
2090-3319: JKO 2018 FDD
3320-3321: Balance Sheet, 2017
3322 – 19325: Monthly Franchisee Reports
19326, 23958 – 24412, 28404 – 29160: Transaction A Forms
19327 – 19328: Account Inspection Scoring Explanation
19329 – 19353, 19372 – 19379, 23630 – 23652, 23776 – 23794: Franchise Call Log for
Charge Back notice.
19354 – 19371: Repurchase Agreements
19380 – 19501: Cancellation Reports
19502 – 23629, 23673 – 23775: Franchise Agreements, Transfer Agreements
23653 – 23672, 23904 – 23956: Default letters
23795: Charge back letter
23796: Inspection Report
23957: Form Delinquency letter
24413 – 25740, 26135 – 28403, 29161 – 29641: Invoices for janitorial supplies
25741 – 26134: Account Acceptance/Finder's Fee Agreement
29642 – 30019: Equipment Lease Agreement

## Department of Labor Production

1-996: The Department of Labor's Investigative File
997-1018: Standardized Position Description of Wage and Hour Investigation

## Deposition Transcripts and Exhibits

Anna Castro
Julio De La Sierra
Araceli Duenas
Vonnisha Dawn Freeman
Rosa Fuentas
Paul Gbodi
Christina Whitney Hill
Jill Hill
Rebecca Holmes
John Arthur Mann
Samuel Martinez
MitzyJo Messner
James Myatt
Sunday Nwamarah
Mariel Randon
Vernon C Reed Jr.
Carlos Rios
Gail Robinson
Shayne Tackett
Iris Thompson
Nakita Thompson
Carleen Williams
Vicki Wilson
Ashley Zarate

## Training DVDs

Healthcare Services
Hotel & Resort Housekeeping
Jani-King Franchise Training
Outpatient Services

Appendix C – Buying a Janitorial Services Franchise

# Buying a Janitorial Services Franchise



# Contents

How Janitorial Services Franchises Work     2

Problems You May Face                       3

The FTC's Franchise Rule                    7

Protect Yourself                            8

For More Information                        10

Glossary of Terms                           12

## INTRODUCTION

If you're thinking about starting your own business and have only a small amount to invest, you may be considering buying a janitorial services franchise. For a fee, a janitorial service company (the "franchisor") typically provides you (the "franchisee") with customers and marketing, billing and collection services.

Every franchisor has success stories to share. Be cautious. While success in the janitorial service industry is possible, it's not a guarantee.

A glossary of terms commonly used in the franchise industry is included at the end of this brochure.



## HOW JANITORIAL SERVICES FRANCHISES WORK

In a typical janitorial cleaning franchise, you pay the franchisor a fee for a "package" of cleaning accounts. The fee is based on the dollar value of cleaning accounts that the franchisor will make available. The fee usually is about half the gross income the accounts are supposed to generate in a year. For example, for a fee of $10,000, you'll get accounts worth $20,000; for a fee of $15, 000, you'll get accounts worth $30,000. You also may have to pay ongoing royalty or management fees.

The franchisor may offer you financing. This may sound especially attractive if you have trouble getting credit from traditional lenders.

The franchisor is supposed to offer you cleaning accounts that will produce the level of income represented in the package you purchased. However, several factors can affect that level of income. For example, if you don't accept an account, the franchisor may not have to offer you a substitute. Or, if you refuse an account because you feel it's located too far away, you may lose your right to that income. Also, if you lose accounts because you did a poor cleaning job, the franchisor doesn't have to replace those accounts.



## PROBLEMS YOU MAY FACE

The Federal Trade Commission and the California Department of Corporations advise you to use caution when thinking about buying a janitorial services franchise, which often appeal to immigrants and others who speak limited English. The franchise agreement you'll receive from the franchisor may be long and complex. It may be difficult to understand your legal rights and obligations, and the obligations of the franchisor. ***Consider getting professional advice.*** Ask a lawyer, accountant or business advisor to review the franchise agreement. The money and time you spend on professional help may save you from a bad investment.

Here are some of the problems you may face:

❖ *Accounts offered versus accounts received.* There may be a difference between the accounts the



franchisor ***promises*** to offer you and the accounts you actually receive, as well as the revenue that comes with them. For example, the franchisor may promise to offer you accounts generating $1,000 in monthly billings for the first year. To meet its obligations, the franchisor may offer you more than one cleaning account. But given time conflicts, distance issues or other problems, you may not be able to accept all the accounts the franchisor offers. What's more, the franchisor may offer the

3

same accounts to several franchisees on a first-come, first-served basis. If you can't accept an account because you can't get to the location, or if another franchisee accepts the account first, the franchisor may have satisfied its obligation to offer you accounts. Because the franchisor may not tell you about this policy before you buy the "package" of accounts, you should not count on receiving all the revenue that the franchisor promised at first.

❖ *Rejected accounts.* The franchisor may not have to replace an account that you reject.

❖ *Franchisor-selected accounts.* The franchisor usually selects accounts for you. The size, number and location of the accounts may not be what you expect. For example, the franchisor may require you to service more than one account at the same time, or the job sites may be far apart.

❖ *Lost accounts.* Most janitorial franchise agreements specify that if a customer cancels the cleaning contract, the franchisor doesn't have to replace the account for you. In fact, you may have to pay an extra sales and marketing fee for a new account to make up for the lost income.

❖ *Integration clauses.* The franchise agreement you sign may contain a clause that limits the terms of your agreement to those specifically detailed in the **written** franchise agreement. This means that any oral claims or promises made by the franchisor are not part of your agreement. This is one reason why it's so important to **get all promises in writing in the franchise agreement.**

❖ *First year time lag for receiving accounts.* The package of accounts you buy will suggest a level of income within a year. But the franchisor may take several months to supply you with the

4

promised accounts. That means you may not earn any income until several months *after* you've purchased the package, so you may not earn the estimated annual income. Therefore, it's important to have other sources of income during your first few months of operation.

❖ *Ongoing fees.* The franchisor may charge you a monthly management or service fee. You'll have



to pay the fee even if you don't have any income from your cleaning business that month. If you finance the franchise fee, you must make the monthly

payment on that debt whether or not you're receiving income from the cleaning business. And although you may find customers without the franchisor's help, any income from a cleaning account you solicit will be included when the franchisor calculates the royalty and management fees you owe.

❖ *Franchisor-owned accounts.* The franchisor may own *all* the customer accounts, including those that you get on your own. This means that if your franchise agreement ends, you will not be able to service the accounts for which you paid a fee, and you won't be able to service the accounts you get on your own, either.

❖ *Training.* Get information about the franchisor's training program *before* you invest. The franchisor decides the type of training you'll get. It may involve watching videos and reading books; it may not involve classroom or on-site training.

❖ *Contract bidding procedures.* The franchisor may not tell you how it bids for cleaning contracts or what specific services you must provide to the customers. The franchisor may only tell you that



you should be able to earn $12 to $15 an hour doing janitorial work. However, when bidding for cleaning contracts, the franchisor may offer your services at a lower rate, and you may have no say in whether the amount charged is reasonable. So even though the account is represented as being worth a certain amount of money, it may not be worth that much to you, and you may not be able to make a profit once you pay for expenses like supplies and transportation costs.

❖ *Short-term accounts.* People who operate janitorial franchises often find that customers rarely maintain an account for more than a year. That's because customers prefer short-term contracts so they can shop for the best deal. If the franchisor offers you replacement accounts, you may have to pay a new referral or marketing fee.

❖ *Performance obligations.* You may have to meet minimum monthly performance or growth requirements. If you don't, you may lose the franchise. Worse yet, you may not have the right to a refund of your franchise fee.

❖ *Payment for services.* The franchisor collects payment from your customers. If the customer doesn't pay, you don't get paid. The franchisor may not be legally obligated to force the customer

to pay, but if the franchisor sues for payment, you may have to pay the legal costs.

❖ *Personal guarantees.*  Many franchisors require



franchisees to personally guarantee the obligations of the franchise business. This means that if your business assets don't cover your franchise obligations, you could lose personal assets, like your home or car.

❖ *Anti-competition rules.*  You and your immediate family (your spouse and children) may not be allowed to have an ownership interest or perform services in another cleaning business, even if your family members don't have an ownership interest in your janitorial franchise.  This restriction may continue even after your franchise ends.

THE FTC's FRANCHISE RULE

By law, a franchisor must give you a detailed disclosure document.  The disclosure document should include:

- the total number of franchises, and the number of franchises terminated or not renewed during the previous year;
- the bases and assumptions for any claims about potential earnings or the earnings of existing franchisees;
- the cost of starting and maintaining the business;
- the names, addresses and telephone numbers of at least 10 franchisees who live closest to you (names, addresses and telephone numbers of at least 100 franchisees is required in some states);

7

- the background and experience of the franchisor's key executives;
- a fully audited financial statement of the franchisor;
- any lawsuits against the franchisor or its directors by franchisees; and
- the responsibilities you and the franchisor have to each other once you've purchased the franchise.

You should receive the disclosure document at least 10 business days *before* you pay any money or legally commit yourself to buying a franchise. Ten business days should give you enough time to review the document, get answers to your questions, talk to franchisees and get advice from an attorney, accountant or business advisor.

PROTECT YOURSELF

Buying a franchise is a big decision. Before you commit, take the following precautions:

❖ *Read the company's disclosure document.* Review it carefully to learn more about your obligations, the litigation history of the franchisor and failure rates. This information will help you decide whether franchisees are dissatisfied with the franchise.

❖ *Talk to other franchisees.* Don't rely only on the information the franchisor gives you. Talk to current and former franchisees about their experiences with the franchisor. Their names, telephone numbers and addresses should be in the company's disclosure document. The franchisor may refer you directly to franchisees who are known to be successful. Don't rely on references the company selects.

❖ *Contact your state franchise administrator.* If you live in California, Hawaii, Illinois, Indiana, Maryland, Minnesota, New York, North Dakota, Rhode Island, South Dakota or Virginia, your state has an office that regulates the offer and sale of franchises. Contact your state franchise administrator **before** you invest. Ask if the franchise you're considering is registered to offer franchises in your state. If you live in California, call the Department of Corporations at 1-866-275-2677 (866-ASK-CORP), or visit www.corp.ca.gov. If you live outside of California, you can find the name of your state franchise administrator, by calling the North American Securities Administrators Association at (202) 737-0900 or visit www.nasaa.org. You may also contact your state Attorney General (www.naag.org) or Better Business Bureau (www.bbb.org) for more information.

❖ *Get all promises in writing.* If a salesperson tells you that the franchisor will give you accounts near your home, but the written agreement defines the geographic area more broadly, it's what's in the written agreement that counts. If a provision in the agreement is different from anything you discussed with the salesperson, demand that the written agreement be changed. If a salesperson tells you that you should be able to make $12 to $15 an hour, make sure that prediction is included in the disclosure document. If the salesperson or franchisor won't agree, walk away from the deal.

❖ *Review the franchise agreement carefully.* It's important to understand all the conditions of the agreement. It controls your relationship with the franchisor. Make sure the agreement spells out the details so there are not surprises.

9

❖ *Understand your obligations.*  As a franchisee, you may have to pay royalties and other fees.  Find out exactly what types of fees you'll have to pay, how much you'll pay and how often.

❖ *Investigate claims about potential earnings.*  The estimated value of the package of accounts you buy may not reflect the income you'll earn from servicing those accounts.  Find out how the company assigns a value to the accounts.  Ask how many franchisees made the represented income and where those franchisees are located.

❖ *Be cautious when financing.*  While financing your purchase through the franchisor may seem appealing, the terms of the financing agreement may not be the best deal for you.  For example, you may have to sign a note to secure the debt and agree to terms that could make it tough for you to sue the company if you wanted to cancel your agreement.  Before you agree to franchisor financing, be sure you understand all the terms of the deal.

❖ *Consider getting professional advice.*  Ask a lawyer, accountant or business advisor to review the disclosure document and franchise agreement. The money and time you spend on professional help may save you from a bad investment.

## FOR MORE INFORMATION

The FTC also publishes a series of consumer brochures on franchising and business opportunities.  For free copies, contact the Consumer Response Center, Federal Trade Commission, Washington, DC 20580, 1-877-FTC-HELP (1-877-382-4357), TDD: (202) 326-2502, www.ftc.gov.  The FTC works for the consumer to prevent fraudulent, deceptive and unfair business

practices in the marketplace and to provide information to help consumers spot, stop and avoid them. To file a complaint, or to get free information on any of 150 consumer topics, call toll-free, 1-877-FTC-HELP, or use the complaint form at www.ftc.gov. The FTC enters Internet, telemarketing, identity theft and other fraud-related complaints into Consumer Sentinel, a secure, online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

The Department of Corporations also publishes a consumer brochure, "Look Before You Leap – A Guide to Buying a Franchise." A copy of this brochure is available on the Department's website, www.corp.ca.gov. For more information about California's requirements regarding the sale of franchises, contact the Department of Corporations at 1-866-275-2677 (866-ASK-CORP).

GLOSSARY OF TERMS

**Disclosure Document** – A written document that outlines the general franchise offering, including background information of the franchisor, a summary of the franchise agreement, and a list of current franchisees.

**Franchise Agreement or Franchise Contract** – The written document that spells out the legally binding obligations between the franchisor and the franchisee.

**Franchise Fee** – The purchase price for the franchise.

**Franchisee** – Any person who buys or invests in a franchise.

**Franchisor** – Any person who sells a franchise.

**Management or Service Fee** – A fee paid the franchisee for extra or ongoing support, such as providing additional or substitute accounts.

**Royalty Fee** – A specific payment made by the franchisee for the right to use the franchisor's trademark. In most instances, the franchisee pays this fee throughout the term of the agreement, regardless of anything else the franchisor may or may not do.