**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KEITH SONDERLING,**<br>**Acting Secretary of Labor,**<br>**United States Department of Labor,**<br><br>**Plaintiff,**[1]<br><br>**v.**<br><br>**JANI-KING OF OKLAHOMA, INC.,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. CIV-16-1133-G** |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, the Acting Secretary of Labor, United States Department of Labor, brought this lawsuit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., alleging that Defendant Jani-King of Oklahoma, Inc., a janitorial company that provides cleaning services, has violated the FLSA by failing to classify certain workers as "employees" and by failing to comply with the FLSA's recordkeeping requirements. *See* Am. Compl. ¶¶ 1-5 (Doc. No. 23).

Now before the Court are the parties' motions for summary judgment. *See* Doc. Nos. 100, 101, 102, 103, 106. Responses and replies have been filed, and the matter is now at issue. *See* Doc. Nos. 112, 113, 114, 115, 117, 118, 119.

[1] The Acting Secretary is hereby substituted as Plaintiff pursuant to Federal Rule of Civil Procedure 25(d).

## I. STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant must cite specific evidence sufficient to show that a genuine issue remains for trial. *See Ezell v. BNSF Ry. Co.*, 949 F.3d 1274, 1278 (10th Cir. 2020); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (noting that the court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be

insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

The Tenth Circuit has explained that "[t]he filing of cross-motions for summary judgment does not necessarily concede the absence of a material issue of fact. This must be so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted." *Brown v. Perez*, 835 F.3d 1223, 1230 n.3 (10th Cir. 2016) (internal quotation marks omitted). "Accordingly, 'cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Id*. (alteration and internal quotation marks omitted). "When the parties file cross motions for summary judgment, the Court is entitled to assume 'no evidence needs to be considered other than that filed by the parties.'" *Walsh v. Kchao*, No. CIV-18-807-D, 2021 WL 4495910, at *1 (W.D. Okla. Sept. 30, 2021) (quoting *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000)).

## II. FACTUAL BACKGROUND[2]

Defendant Jani-King of Oklahoma, Inc. ("JKO") is a Texas corporation and the regional franchisor for Jani-King International, Inc. Pl.'s Undisputed Facts ¶ 1 (*see* Pl.'s Mot. Summ. J. (Doc. No. 101) at 9-25). JKO maintains an office in Oklahoma City, Oklahoma. *Id.*

---

[2] The evidence relied upon in this Memorandum Opinion and Order is either undisputed or, if genuinely disputed, viewed with all reasonable inferences resolved in favor of the relevant nonmovant. *See Pepsi-Cola Bottling Co.*, 431 F.3d at 1255.

JKO offers janitorial cleaning services to the public and sells franchises for the performance of those services. *Id.* JKO licenses its "Jani-King" brand, goodwill, and system of business for use by individuals and corporate entities who sign franchise agreements with JKO. Def.'s Undisputed Facts ¶ 3 (*see* Def.'s Mot. Summ. J. (Doc. No. 106) at 10-37); Pl.'s Resp. (Doc. No. 112) at 3. Franchise agreements produced by JKO show that most franchises are owned by a single person: 68 franchises are owned by one individual (34 in their individual capacities and 34 indirectly through a corporate entity), 15 by two individuals (six in their individual capacities and nine indirectly through corporate entities), and two by three individuals (one in their individual capacities and one indirectly through a corporate entity). Pl.'s Undisputed Facts ¶ 4.

JKO's Franchise Disclosure Document ("FDD"), which is provided by JKO to prospective franchisees, states that the individual franchise owner "must participate personally in the direct operation of the franchise business." FDD Item 15 (Doc. No. 100-2). "The direct, on-site supervision must be done by a person who owns at least 1/3 of the business entity that owns [the] franchise." *Id.* Franchisees individually and "unconditionally" guarantee to JKO "the complete and timely performance . . . of all terms of the Franchise Agreement," including the performance of commercial cleaning services for JKO customers. FDD Ex. II.

Some franchise owners perform the cleaning services on their own or with assistance from family members. Some franchise owners hire others to perform some or all of the cleaning services. *See* Pl.'s Undisputed Facts ¶ 6; Def.'s Resp. (Doc. No. 115) at 9; Def.'s Undisputed Facts ¶ 26; Pl.'s Resp. at 14.

The franchise agreements enumerate the requirements and parameters of JKO's relationship with the franchise owners. Def.'s Undisputed Facts ¶ 4. The franchise agreements state that JKO will provide advertising and initial training to its franchisees. *See* Franchise Agreement ("FA") §§ 6.2-6.5 (Doc. No. 101-1). JKO will also provide additional training, promotion, and materials for a fee. *See id.* §§ 6.7, 6.9.

Franchisees agree to pay JKO a 10% royalty fee on monthly gross revenue as defined in the franchise agreement. Def.'s Undisputed Facts ¶ 11; *see* FA § 4.5.1. Franchisees also pay JKO an "advertising fee" on monthly gross revenue. Def.'s Undisputed Facts ¶ 13; *see* FA § 4.5.2. Franchisees pay a finder's fee (calculated pursuant to the franchise agreement) to JKO for business JKO offers to them in excess of the initial amount of business JKO is obligated to offer under the franchise agreement. Def.'s Undisputed Facts ¶ 14; *see* FA § 4.6. JKO has the "exclusive right" to perform all billing and accounting functions for the services provided by a franchisee owner. Def.'s Undisputed Facts ¶ 15; Pl.'s Resp. at 11; *see* FA § 4.8. Franchisees are subject to a mandatory monthly fee "to cover [JKO's] costs and expenses for this service." FA § 4.8.

## III. DISCUSSION

The Acting Secretary argues that the undisputed material facts show, for purposes of the FLSA, that JKO is an employer and its franchise owners ("FOs") are employees, with the result that JKO must comply with the recordkeeping obligations in 29 U.S.C. § 211(c) as to those FOs. JKO argues that the undisputed material facts show that the FOs are independent contractors and, therefore, JKO is a mere franchise operator and not an employer within the meaning of the FLSA.

*A. The Economic Reality Test*

Section 215 of the FLSA prescribes that it is unlawful for any person "to violate any of the provisions of section 211(c) of this title." 29 U.S.C. § 215(a)(5). Section 211(c) in turn requires "[e]very employer" subject to the FLSA to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices maintained by him" and to preserve and make available those records. *Id.* § 211(c).[3] The relevant records "include payroll records," "other basic employment records," and "records regarding minimum wage and overtime pay." *Scalia v. Ghosn*, 451 F. Supp. 3d 1215, 1224 (W.D. Okla. 2020) (citing 29 C.F.R. §§ 516.5, 516.6); *Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156, 1159 (10th Cir. 2018) (citing 29 C.F.R. § 516.2).

"The FLSA imposes duties on covered employers with respect to compensation and working conditions of non-exempt employees." *Acosta v. Maranto*, No. CIV-15-1378-D, 2017 WL 4158659, at *2 (W.D. Okla. Sept. 19, 2017).[4] The FLSA broadly defines who is an "employer":

---

[3] "The authority to enforce violations of any requirements set forth in § 215, including record-keeping violations under § 211(c), lies with the Secretary of Labor." *Thapa v. Patriot Inv. LLC*, No. 22-cv-02178, 2023 WL 3865761, at *7 (D. Colo. June 7, 2023). The federal district courts "have jurisdiction, for cause shown, to restrain violations of" § 215. 29 U.S.C. § 217.

[4] The protections of the FLSA extend to both employees engaged in interstate commerce and employees "employed by an enterprise engaged in [interstate] commerce." *Acosta v. Maranto*, No. CIV-15-1378-D, 2018 WL 1997770, at *5 (W.D. Okla. Apr. 27, 2018); *see* 29 U.S.C. § 203(s); *Aaron v. Kansas*, 115 F.3d 813, 816 n.2 (10th Cir. 1997). Because JKO's personnel and franchisees indisputably handle equipment and other goods "that have been moved in" interstate commerce, and JKO's annual gross revenue "is not less than $500,000," JKO is an "enterprise" under the FLSA. 29 U.S.C. § 203(s)(1)(A); Pl.'s Mot. Summ. J. at 9; Pl.'s Reply (Doc. No. 117) at 2 n.2; Parties' Stipulation 3(c) (Doc. No. 46).

> In relevant part, an "employer" as defined by FLSA "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." *See* 29 U.S.C. § 203(d). "'Person' means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." *Id.* § 203(a). With certain exceptions not relevant here, "the term 'employee' means any individual employed by an employer." *Id.* § 203(e)(1). And the term "'employ' includes to suffer or permit to work." *Id.* § 203(g). Federal courts have recognized that "the breadth of these definitions is both intentional and obvious." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014). "'The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is the broadest definition that has ever been included in any one act.'" *Id.* (quoting *In re Enterprise Rent-A-Car Wage & Hour Emp't Prac. Litig.*, 683 F.3d 462, 467-68 (3d Cir. 2012)) (internal quotation and citation omitted).

*Maranto*, 2017 WL 4158659, at *2 (alteration, citation and internal quotation mark omitted); *accord Dole v. Snell*, 875 F.2d 802, 804 (10th Cir. 1989) ("Courts have adopted an expansive interpretation of the definitions relating to employment status under the FLSA . . . in order to effectuate its broad remedial purposes." (footnote omitted)).

Whether a worker is an employee for purposes of the FLSA is governed by the "economic reality" test:

> The Supreme Court has emphasized that the "striking breadth" of [the verb "employ"] "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." [*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).] Thus, in determining whether an individual is covered by the FLSA, our inquiry is not limited by any contractual terminology or by traditional common law concepts of "employee" or "independent contractor." Instead, the economic realities of the relationship govern, and the focal point is whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself. The economic reality test includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records.

> In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach.

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440-41 (10th Cir. 1998) (omission, citations, and internal quotation marks omitted); *see also Jani-King of Okla.*, 905 F.3d at 1159-60 ("It is well settled that the economic realities of an individual's working relationship with the employer—not necessarily the label or structure overlaying the relationship—determine whether the individual is an employee under the FLSA.").

*B. Application of the Economic Reality Test to Determine Whether JKO Is Required to Comply with 29 U.S.C. § 211(c)*

Both parties rely upon the economic reality test as a basis for entry of summary judgment in their favor on Plaintiff's FLSA claim. Plaintiff argues that, pursuant to this test, the FOs are employees of JKO. JKO argues, conversely, that application of this test establishes both the FOs' status as independent contractors and JKO's status as a franchising operator. Following the process outlined in *Baker*, the Court, first, makes findings regarding the historical facts and, second, makes findings regarding the six outlined factors. For ease of discussion, these steps are grouped by factor. Finally, looking

to the totality of circumstances, the Court determines whether the FOs are "employees" under the FLSA. *See Baker*, 137 F.3d at 1440-41. Throughout this analysis, the Court views the parties' arguments through the lens of Rule 56, meaning that the Court's findings and conclusions are based on the undisputed material facts established by the summary-judgment record.

1. Findings of the Court

*a. Degree of Control Exerted over the Worker*

i. Historical Facts

JKO prescribes the terms and conditions for admitting new franchisees into its territory, including a list of 11 "Requirements Prior to Operation," among others. *JKO Policies & Procedures* § 2.3 ("P&P," Doc. No. 101-8). Franchisees must: complete "to Jani-King's satisfaction" all segments of the training program, score passing test grades, pass a criminal background check, and sign a franchise agreement that includes non-compete and confidentiality provisions and a guaranty to assure performance of all obligations under the agreement. *Id.* §§ 1.3, 2.3; FA §§ 4.2.3, 4.20.1, 5.2.2, 5.2.3; J. Hill Dep. 20:10-17, 68:22-69:19 (Doc. No. 100-23); FDD Ex. II. As a condition to renewing an expired franchise agreement and continuing to provide commercial cleaning services, a franchisee must sign a general release of all claims against JKO. *See* FA § 9.3; FDD Ex. XI.

JKO contracts with its customers and retains exclusive ownership of all customer accounts. J. Hill Dep. 115: 3-12. JKO's contracts, policies, and disclosures state: (a) "The contracts under which Franchisee will provide service are and will remain the property of

[JKO].”; (b) “All contracts and agreements for services must be on our approved forms, in our name only and signed by one of our employees. You are not allowed to enter into contracts for services.”; (c) “The Maintenance Agreement relating to this Account is and shall at all times remain the property of Jani-King and be subject to the policies, procedures and performance standards of Jani-King.”; (d) All customer contracts for either services or supplies are “required to be between the client and [JKO] and will remain the property of [JKO] for the life of the agreement. . . . [O]wnership rights . . . are the sole property of Franchisor.”; and (e) Any customer contract solicited by an FO “must be drafted and/or approved by [JKO]” and remains the property of JKO, with JKO retaining the right to suspend or cancel the account at its sole discretion. FA §§ 4.21.2, 6.1.1; FDD Items 12, 16; P&P §§ 3.39, 4.33; Acct. Acceptance/Finder’s Fee Agreement ¶ 5 (Doc. No. 100-25).

JKO actively markets and sells commercial cleaning services in its territory. Such efforts include purchasing sales leads, conducting market research, and handling outbound and inbound sales inquiries. JKO and its affiliates advertise to prospective franchisees:

> Jani-King has teams of professionals at the regional office level that make it their business to sign new business for franchisees to service. So if you’re not comfortable with soliciting new business, you can partner with the regional office to have new business offered to you.

J. Hill Dep. 187:20-188:11; A. Castro Dep. 6:19-7:4 (Doc. No. 100-26); Parties’ Stipulation 3(b); J. Harper Dep. 17:6-18:25, 64:8-65:14 & Ex. 2 (Doc. No. 101-3); Def.’s Resp. to Pl.’s Interrog. No. 16 (Doc. No. 101-13); JKO Website, “Low Cost Franchise Opportunity” (Doc. No. 100-28).

If JKO offers an available customer account to an FO, and the FO chooses to accept, the FO must sign an Account Acceptance/Finder's Fee Agreement (Doc. No. 100-25) and attend a walk-through where a JKO representative introduces the franchisee to the customer and the franchisee can view the facility. JKO's policies state that the FO must accept the account "before a [w]alk[-t]hrough takes place," and some franchisees stated that they had to accept accounts in advance. Other FOs testified that they were not required to accept the account prior to participating in a walk-through. P&P § 2.21; JKO Training Manual (Doc. No. 101-15) at 1; I. Thompson Dep. 84:6-14 (Doc. No. 100-13); M. Rendon Dep. 26:21-27-14 (Doc. No. 101-16); N. Thompson Dep. 86:7-11 (Doc. No. 100-31); A. Castro Dep. 21:23-22:16; J. Myatt Dep. 62:4-23 (Doc. Nos. 102-17, 114-13); R. Holmes Dep. 47:1-5 (Doc. Nos. 101-9, 114-14).

JKO executes the customer contracts—called "maintenance agreements" or "MAs"—with customers for commercial cleaning services. JKO is a party to the MAs and retains exclusive ownership of all customer accounts. JKO then offers, to franchisees chosen by JKO, the right to perform cleaning services for customers pursuant to the executed MAs; a franchisee can accept or reject the offered customer account. *See* FA §§ 4.6, 6.6; Def.'s Undisputed Facts ¶¶ 7, 8, 9; Pl.'s Undisputed Facts ¶ 9; Pl.'s Resp. at 10-11. If the franchise owner accepts the account, the "[f]ranchisee is responsible for choosing the times and methods of providing the services" "in conjunction with" both the customer's instructions and the terms of the MA. All such services must be performed to the satisfaction of the customer, in accordance with the terms of the MA between JKO and the customer, and "to the performance standards of" JKO. FA § 4.19.

JKO asserts that the purpose of its being a party to the MAs is to maintain uniformity, consistency, and brand standards. Being a party also allows JKO "to remove a franchisee from a customer contract." J. Hill-Harper Decl. ¶ 14 (Doc. No. 106-1).

The "Cleaning Schedule" for a customer account is set forth in the MA and specifies what areas to clean and how often. JKO negotiates each Cleaning Schedule based on its assessment of the cleaning work and pricing. JKO's policies require FOs to perform the commercial cleaning work in "strict accordance with the performance standards of Jani-King, including the Cleaning Schedule." Some FOs testified that they communicated directly with customers regarding cleaning schedules or quality issues, however. P&P § 2.8; Acct. Acceptance/Finder's Fee Agreement ¶ 5; A. Duenas Dep. 18:2-5, 18:14-22 (Doc. No. 114-17); V. Wilson Dep. 16:23-17:3 (Doc. No. 102-7); MA & Cleaning Sched. (Doc. No. 101-18) at 3-4; J. Harper Dep. 79:20-80-15 & Ex. 14; J. Hill Dep. 18:12-19:13, 36:9-24.

JKO personnel sometimes accompany FOs the first time they clean for new customers. JKO is authorized to review the cleaning services provided under the MA to ensure they are performed to JKO's standards. JKO personnel also perform quality-control inspections to ensure the franchisee's work complies with the applicable MA and Cleaning Schedule and to otherwise evaluate work performance. I. Thompson Dep. 8:14-9:25, 11:14-21, 41:6-19, 44:11-25, 46:19-20, 82:10-83:15; J. Hill Dep. 34:23-35:10, 202:4-13; FA § 4.19.3; FDD Item 12.

JKO is authorized to suspend or remove an FO from an account upon a customer's request or if JKO determines that the FO failed to comply with JKO's policies or failed to

meet performance standards. JKO has removed FOs from accounts when inspection scores are low, customers complain or cancel, the cleaning schedule or MA is not followed, or the FO does not comply with the franchise agreement. FA §§ 4.19(1), 4.19.2, 4.19.6, 4.19.7, 8.1; P&P §§ 2.10, 3.33, 3.37(4), 4.31(1)-(4); J. Hill Dep. 61:5-62:23, 207:22-208:12; I. Thompson Dep. 39:8-40:10; Def.'s Resp. to Interrog. Nos. 4, 5 (Doc. No. 101-17).

An FO may choose to stop servicing a customer's account. The franchise agreement prescribes that a franchisee wishing to quit an account for any reason "must notify [JKO] . . . in writing" pursuant to certain deadlines. Some FOs testified that they notified JKO by telephone when they wanted JKO to transfer the account to someone else. FA § 4.21.1; W. Hill Dep. 43:10-23 (Doc. No. 102-24); J. Hill Dep. 62:24-63:7; A. Zarate Dep. 69:13-24 (Doc. No. 115-3); S. Martinez Dep. 60:19-25 (Doc. No. 102-15).

Franchisees attend mandatory initial training to learn JKO's "methods and practices of professional cleaning services." JKO can require or recommend that franchisees repeat their initial training or complete additional training, with refusal to attend resulting in suspension of any account offers to that franchisee. JKO may terminate the franchise agreement on several grounds, including a determination that an FO has "abandon[ed]" its business or has failed to cure any violation of the franchise agreement or JKO manuals, such as failing to maintain required standards or "engag[ing] in conduct [that] reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System." An FO may terminate its franchise agreement "with or without cause" upon 90 days' written notice to JKO. FDD Item 11; P&P §§ 1.1, 1.7, 1.10, 1.12; FA §§ 4.18, 6.1.2, 6.5, 8.1(a)-(g), 8.3.

Franchisees are subject to non-compete clauses and cannot perform commercial cleaning services for non-JKO customers during the term of their franchise agreements. FOs also are prohibited from cleaning for non-JKO commercial customers for two years after their franchise agreements expire or are terminated. FA §§ 4.15.1, 4.15.2, 5.2.3(c), (d); FDD Ex. II; J. Hill Dep. 77:22-78:14.

JKO's policy states: "JANI-KING'S SYSTEM-WIDE STANDARDS REQUIRE THAT A CLIENT'S CONCERN MAY NOT GO UNANSWERED FOR MORE THAN FOUR (4) HOURS." JKO's policies further provide that if a franchisee cannot respond to a complaint submitted to JKO within four hours, JKO will assess a $50 complaint fee, plus $50 per hour service fee and expenses, for the time spent by a JKO representative to rectify the issue. If an FO does not timely resolve the customer's issue to the customer's satisfaction, JKO "will transfer" the account to another FO. P&P §§ 4.8-4.9, 4.18, 4.20; FDD Item 6.

Franchisees are trained to "[s]ell Jani-King" by telling potential customers: "Be assured that the Jani-King Regional Office remains totally involved and ultimately in charge of making sure your needs and concerns are taken care of." JKO's contracts, disclosures, and policies give it control over the pricing of any customer accounts obtained by an FO: "[A]ll contracts for the provision of services by Franchisee must be drafted and/or approved by [JKO] acting reasonably and in good faith."; "[B]efore Franchisee . . . presents a client or potential client with a sales presentation, Franchisee must have the bid proposal (and any presentation materials Franchisee has created on its own) reviewed and approved by [JKO's] Regional Director"; JKO's "staff must approve all proposals and

contracts for services."; "All proposals must have the approval of [JKO] before they can be presented to the client."; and "[a]ny increase or decrease of the monthly billing rate for any Jani-King client must be approved, in writing," by JKO. JKO Sales Manual (Doc. No. 101-24) at 7; FA § 4.21.2; P&P §§ 3.40, 4.33; FDD Item 12; JKO Training Manual at 5.

Customers send written notice to JKO to cancel services. JKO in turn corresponds with the customer to conclude the business relationship. J. Hill Dep. 190:16-24; JKO Correspondence (Doc. No. 101-25).

JKO performs all customer billing and accounting functions for all accounts serviced by the FO. JKO invoices the customers, the customers pay JKO, and JKO in turn pays the FO any amounts remaining after deducting fees and costs. FA §§ 4.8, 4.8.1; P&P § 3.1; FDD Item 11; MA § 2.1. JKO's provision of "contracting, billing," and other services is "not unique to [JKO] and [is] present in many other franchise systems." Seid Report (Doc. No. 114-23, at pp. 14-86) at 24, 53-56.[5]

If a customer has not paid for an invoice by the end of a month, JKO will advance to the franchisee the amount of the invoice payment for the first unpaid month as if paid. If the customer does not pay within the following month JKO will "charge back" the franchisee any sums that JKO had advanced to the FO. Payment terms and invoice timing

---

[5] Plaintiff has moved (Doc. Nos. 95, 96) to exclude the testimony of JKO's witness Michael H. Seid, who has presented an expert report opining on "generally accepted industry custom and practices" in franchising and business. Seid Report at 17. For purposes of the Motions for Summary Judgment, the Court has assumed that the exclusion request would be denied and that JKO would be permitted to present Mr. Seid's opinions for consideration by the factfinder.

vary depending on JKO's contract with the customer. P&P §§ 3.11, 3.17, § 3.18; J. Hill Dep. 90:3-20.

JKO "will provide initial assistance in the collection process" when a customer is delinquent, but it is the ultimate responsibility of the FO to collect any outstanding payment owed by a customer. Only JKO, not the franchisee, can suspend or cancel cleaning services to the customer based upon nonpayment. P&P §§ 3.14, 3.15; J. Hill Dep. 90:21-92:11, 166:13-167:4.

In lieu of furnishing copies of the invoices JKO sent to customers, JKO prepares a monthly "Franchisee Report" for each FO showing gross revenue and the amount due to the franchisee, if any, after all deductions (e.g., fees, costs, chargebacks). If an FO "wishes to inspect actual copies of invoices to designated accounts," the FO must submit a written, signed request to "view the copies on file in the Regional Office." P&P §§ 3.1, 3.3, 3.4. The fifth day of each month is "Franchisee Day," and the FOs who are owed money pick up their monthly paychecks and Franchisee Reports at JKO's office. P&P § 3.17; FA § 4.8.1; J. Harper Dep. 68:2-5; *see* Franchisee Reports (Doc. No. 101-26).

Franchisees must wear "an approved, neat, and clean uniform" and name tag while cleaning for JKO's customers. Each month FOs are responsible for turning in paperwork (e.g., customer sign-off sheets, extra work forms) so JKO can create an invoice for each job and issue paychecks. JKO requires franchisees to have an email address and other means for JKO to promptly contact them. The Franchise Agreement provides that franchisees must hire at least one employee other than the franchise owner. JKO reserves the right to modify its policies, procedures, and the franchise relationship at any time,

including policies "pertaining to the operation of Franchisee's franchised business." FA §§ 4.19.1, 4.26, 4.29, 4.30; P&P Intro.; *id.* §§ 2.21, 4.3; FDD Items 7, 15; JKO Manual § 2.18(15) (Doc. No. 101-22); J. Harper Dep. 26:8-22; J. Hill Dep. 41:18-42:25.

ii. Factual Findings

"A worker's ability to act autonomously or with some degree of independence tends to show that he or she is an independent contractor," rather than an employee. *Elkins v. Powersports Pit Stop LLC*, No. 21-CV-00030, 2023 WL 2574362, at *3 (D. Utah Mar. 20, 2023). "To assess the degree of control, the trier of fact must consider the [worker's] independence in setting his work schedule and other work conditions, the extent of the defendant's supervision, and the [worker's] ability to work for other employers." *Id.* (citing *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1235 (10th Cir. 2018)).

Based upon the above, the Court finds that the undisputed material facts establish:

- JKO exercises substantial control over admission into and termination from JKO's franchise system.
- JKO exercises substantial control over the franchisees' assignment to and removal from all JKO customer accounts.
- Franchise owners cannot perform commercial cleaning services for non-JKO customers during the term of the franchise agreement and for two years thereafter.
- JKO has the authority to control the franchisees' cleaning schedule, work performance, and customer service.

- JKO determines the rate and method of payment for franchise owners, controls multiple other working conditions, and may revise its policies or impose additional requirements at any time.

JKO's exercise of "substantial control over the manner and method of [the franchisees'] work," coupled with the franchisees' "lack of independence over" customer accounts, "is more consistent with employee rather than independent contractor status." *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1076-77 (N.D. Ill. 2014) (finding that the control factor weighed in favor of maids qualifying as employees where the business "conduct[ed] training and set training standards," specified certain cleaning products and methods, required the maids to work in business-branded uniforms, and issued work schedules); *Baker*, 137 F.3d at 1441 (internal quotation marks omitted).

*b. The Worker's Opportunity for Profit or Loss*

i. Historical Facts

Franchisees are required to service JKO customer accounts pursuant to the pricing terms set forth in the maintenance agreement between JKO and the customer. Some FOs testified that they had "work[ed] with JKO" to attempt to obtain a rate increase or had spoken directly with a customer regarding a rate increase on the cleaning services identified in the applicable MA. MA ¶ 2.1; M. Rendon Dep. 68:8-12; P. Gbodi Dep. 65:13-16, 116:5-117:7 (Doc. Nos. 100-20, 114-8); R. Holmes Dep. 39:1-3; J. Mann Dep. 14:14-24 (Doc. No. 102-20); M. Messner Dep. 92:13-20 (Doc. No. 102-25) (testifying that she obtained a rate increase by filling out "[JKO's] form amendment to the contract," "get[ing] the client to sign it," and "send[ing] it to [JKO] for approval").

JKO's sales team prepares bids for prospective customer accounts, using a process that includes estimating labor hours. JKO's process of "[e]stimating the cost of cleaning services is part science and part art." Def.'s Resp. to Pl.'s Interrog. No. 16. When a bid is rejected, JKO's sales representatives try to negotiate with the prospective customer. *Id.*

All FOs perform cleaning services in a non-exclusive Territory. JKO controls how many franchisees to admit into the Territory. The FOs therefore compete against each other for potential customers. FA § 2.1; FDD Item 12; JKO Reg'l Dir. Training Guide (Doc. No. 101-28) at 5; J. Hill Dep. 97:18-21.

JKO charges FOs at the following rates for the following business functions that JKO performs: (a) for 3% of gross monthly revenue, JKO provides "all billing and accounting functions" for services and supplies that franchisees provide to customers and prepares monthly Franchisee Reports summarizing business during the previous month; (b) for 1.5% to 2% of gross monthly revenue, JKO provides exclusive advertising and marketing services, including online advertising and maintenance of its website and social media; (c) for a "finder's fee" equal to approximately three months of the contract proceeds, JKO refers customer accounts to franchisees; (d) for 2.5% to 5% of gross monthly revenue, JKO provides "hardware, proprietary or third party software, and other equipment utilized in the Jani-King system"; (e) for up to $50 per hour, JKO may provide additional training. FDD Items 6(3), 6(4), 6(5), 6(6), 6(9), 11; P&P 2.31, 3.1; FA §§ 4.5.2, 4.6, 4.7, 4.8, 4.8.1.

In addition to the above charges and fees, the franchisee is required to purchase equipment and supplies identified as the "Supply and Equipment Package" and "Additional

Electric Equipment" in the franchise agreement. These can be purchased from JKO or from another vendor if preferred. JKO reserves the right to require a franchisee "to purchase all cleaning equipment and supplies . . . from one of [JKO's] affiliates or from an approved vendor." JKO "receive[s] rebates" on supplies sold to FOs by approved vendors, as well as discounts on purchases from those suppliers that "may not be available" to FOs. FA § 4.4; FDD Item 8.

ii. Factual Findings

Based upon the above, the Court finds:

- Franchisees have no independent contractual relationship with customers.
- JKO has a contractual relationship with each of the customers.
- JKO controls or substantially controls all significant financial aspects of the customer accounts, including bidding, pricing, and billing.
- The opportunity for FOs to affect their profits through their own business decisions and initiatives is limited. Franchisees may perform cleaning duties to a level that satisfies an assigned customer account and may attempt in some ways to obtain new customers; however, the FOs may not independently negotiate the price or scope of work with a prospective or established customer. Similarly, FOs have some control over their business expenses, but many of the expenses are dictated through the obligation to pay JKO for services at a specified cost or percentage of gross revenue.

While sharing features of both, this set of circumstances is more akin to the type of defined exchange of pay for labor that characterizes an employee relationship rather than

the type of generation of profits through decisions about jobs, pricing, and expenses that characterizes an independent contractor relationship. *See Baker*, 137 F.3d at 1441 (upholding district court's finding that the workers "had no opportunity to experience a profit or loss consistent with the characteristics of being independent businessmen" where the workers could not bid on jobs and "[t]here [wa]s no indication [they] share in the profits (or losses) of [the] business" (internal quotation marks omitted)); *see also Paragon Contractors Corp.*, 884 F.3d at 1236.

*c. The Worker's Investment in the Business*

i. Historical Facts

JKO sells franchises on a continuum pricing scale that presently ranges from $16,250 at the bottom (level E-4) to $142,750 at the higher end (level E-50). The lower the Plan level purchased, the lower are JKO's monetary "offered business" obligations and the duration of JKO's "offering period" to the franchisee. For example, if a franchisee purchases the E-4 Plan for $16,250, JKO must offer business of $4000 per month for 150 days (five months). Franchisees with older Franchise Agreements purchased Plans on a scale beginning with A as the lowest ($8000 fee for $500 monthly business for 120 days), B the next lowest ($9500 fee for $1000 monthly business for 120 days), and scaling up. Of the franchise agreements produced by JKO, 61 identify the Plan purchased. Of those, 41% of the purchased Plans are at the lowest level (E-4 or A) and 43% are at the second lowest level (B). JKO's most recent FDD states that "[t]he total investment necessary to begin operation of a Jani-King franchise ranges from $23,239 to $169,409," which includes $2839 to $7659 for required supplies and equipment. FDD Cover Page; *id.* Items 1, 5.

JKO advertises a "Low Cost Franchise Opportunity" and asserts that some of its "investment plans" are "considered to be among the lowest cost franchise opportunities available." Franchisees can pay a percentage of the initial franchise fee in installments deducted from monthly revenue, without interest. JKO also loans money to franchisees to perform cleaning services. JKO Website, "Low Cost Franchise Opportunity"; FA § 4.3; FDD Item 5; J. Harper Dep. 39:16-42:25.

Franchisees are responsible for paying their workers and for payment of payroll taxes and insurance. R. Fuentes Dep. 31:21-32:3 (Doc. No. 102-14); V. Wilson Dep. 40:25-41:5; M. Messner Dep. 91:23-92:3; J. Myatt Dep. 72:22-73:4. Franchisees also lease or purchase supplies and equipment to operate their businesses. J. Myatt Dep. 32:10-21; S. Nwamarah Dep. 31:12-19, 51:20-52:9 (Doc. No. 102-18).

JKO's financial statements show annual operating expenses and costs of goods sold ranging from $11.6 million to $13.9 million for 2016 through 2018. JKO Fin. Statements (Doc. No. 101-4).

ii. Factual Findings

To analyze this factor, the Court "compare[s] the investments of the worker and the alleged employer." *Paragon Contractors Corp.*, 884 F.3d at 1236. The operating framework described above—an FO's significant initial investment and liability for ongoing supplies, equipment, payroll, taxes, and other expenses—is generally consistent with the classification of the franchisees as independent contractors.

Other aspects of the record, however, suggest that the framework is illusory. An FO's initial investment is minimal relative to JKO's and can be deducted over time from

the FO's compensation. The FO's ongoing expenses are largely dictated by and paid to JKO and, again, are deducted from the FO's compensation. When reduced to its essentials, this compensation structure, as well as the disparity in the amounts invested by the FOs and JKO, bears characteristics of a pay-for-labor employment model.

*d. The Permanence of the Working Relationship*

i. Historical Facts

The term of JKO's franchise agreement is historically 20 years and more recently 10 years. A franchisee may renew a Franchise Agreement upon its expiration. P. Klein Aff. ¶ 5 (Doc. No. 101-6); *id.* Ex. A; FA § 9.2. As noted above, JKO prohibits franchisees from providing commercial cleaning services for non-JKO customers, although franchisees may, and some do, perform residential cleaning services or engage in other kinds of work. FA §§ 4.15.1, 4.15.2, 5.2.3(c), (d); FDD Ex. II; J. Hill Dep. 77:22-78:14.

ii. Factual Findings

"Generally speaking, 'independent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." *Baker*, 137 F.3d at 1442 (internal quotation marks omitted). Here, while the franchisees' relationships with JKO are not indefinite—as they last for a 10- or 20-year term—they are sufficiently continuous (and exclusive) as to support that this is an employer-employee relationship. *See Harris v. Skokie Maid & Cleaning Serv.*, No. 11-C-8688, 2013 WL 3506149, at *9 (N.D. Ill. July 11, 2013) ("[The business owner] cannot have it both ways: that is, she cannot claim that her maids are independent contractors, who

would traditionally be free to use their skills wherever they please, and simultaneously prevent them from working for other maid services in the Chicagoland area.”).

*e. The Degree of Skill Required to Perform the Work*

i. Historical Facts

Franchisees come from all work backgrounds and do not need any specific expertise. J. Hill Dep. 57:11-19, 71:16-18. Commercial cleaning work includes mopping, sweeping, window washing, dusting, trash disposal, and cleaning walls, bathrooms and other areas, although some FOs sell additional services such as waxing and stripping floors. FDD Item I; I. Thompson Dep. 44:15-46:5, 48:22-24. JKO’s Director of Operations testified that, while an FO must “be able to clean well and quickly” to be successful, this skill is one “that a franchise owner can learn quickly.” The Director of Operations also testified that a successful franchise owner is one who also actively participates in running the business, is smart about hiring, and can communicate well with the customers. I. Thompson Dep. 50:7-19, 50:20-52:9.

ii. Factual Findings

If a job requires specialized skills, “the worker is more likely to be considered an independent contractor.” *Paragon Contractors Corp.*, 884 F.3d at 1237. “[S]pecialized skills are distinct from general ‘occupational skills’ that any good employee in any line of work must have.” *Id.* (alteration and internal quotation marks omitted).

> Although certain highly specialized job skills support independent contractor classification, skills are not the monopoly of independent contractors, as all jobs require some modicum of skill. Maintenance work, such as cleaning, sweeping floors, mowing grass, unclogging toilets, changing light fixtures, and cleaning gutters, does not necessarily involve such specialized skills as

> would support independent contractor status. In *Skokie Maid*, the court determined that cleaning services, although difficult and demanding, were even less complex than those maintenance services.

*Super Maid*, 55 F. Supp. 3d at 1077-78 (alteration, citations, and internal quotation marks omitted) (citing *Skokie Maid & Cleaning Serv.*, 2013 WL 3506149, at *8); *see Paragon Contractors Corp.*, 884 F.3d at 1237 (finding that no specialized skills were needed to perform general maintenance and attend day-to-day operations of a pecan grove).

Here, the basic service offered by FOs—commercial cleaning—"may be difficult and demanding, but it does not require special skill." *Super Maid*, 55 F. Supp. 3d at 1078 (internal quotation marks omitted). To the contrary, the franchisees "merely develop their skills" through training and on the job. *Dole*, 875 F.2d at 811. The fact that a new franchisee must attend initial training "does not change the calculus." *Super Maid*, 55 F. Supp. 3d at 1078. While the one-time training required by JKO may "develop[] the baseline job skills" of the franchisees, there is no indication in the record that the franchisees' staff attended that training in order to perform the same tasks. *Id.*[6] And the franchise agreement contemplates the direct supervision of the FO over such staff in providing cleaning services. *See* FDD Item 15 (Doc. No. 100-2) (requiring "direct, on-site

---

[6] Alternatively, even if the record reasonably supported a finding that FOs were required to have specialized skills to perform their commercial cleaning services, an FO who accepts a contract is "told by [JKO] when and where to [clean]" and "does not exercise those skills in any independent fashion." *Baker*, 137 F.3d at 1443. The record reflects that there are limited opportunities for franchisees to "exercise . . . initiative" or "make . . . judgment decisions on the job site." *Id.* (internal quotation marks omitted). Accordingly, such use of special skills "does not necessarily indicate [the FOs] are independent contractors." *Id.*

supervision . . . by a person who owns at least 1/3 of the business entity that owns [the] franchise").

In sum, the facts established through the summary-judgment record reflect a lack of a requirement of specialized skill and, therefore, support classification of FOs as employees. *Cf. Baker*, 137 F.3d at 1439, 1443 (internal quotation marks omitted) (finding that rig welders who performed "skilled welding" in gas industry facilities and were "routinely tested and certified" were "highly skilled").

*f. The Extent to Which the Work Is an Integral Part of the Business*

i. Historical Facts

In addition to licensing its brand, goodwill, and system of business to individuals and corporate entities who want to run their own business, JKO leverages the "Jani-King" brand to sell accounts it then offers to the FOs. FDD Item 1; FA §§ 1.1-1.4.

JKO advertises on its website:

> [W]e clean schools, hospitals, car dealerships, office buildings, movie theaters and the list goes on and on. . . . We keep the entire [University of Oklahoma] stadium clean and we're proud to be the Official Cleaning Company of Oklahoma Sooner Football.
>
> Contact us today for a FREE cleaning evaluation and bid.

The viewer can click a link to "Get A Cleaning Quote" directly from JKO. JKO Website, "Jani-King of Oklahoma City Commercial Cleaning" (Doc. No. 100-52).

JKO itself owns a franchise and reserves the right to clean for customers directly. JKO has provided cleaning services to customers when a franchisee was not available.

FDD Item 20; Def.'s Resp. to Pl.'s Interrog. No. 3 (Doc. No. 100-53); J. Harper Dep. 21:25-23:1, 24:12-25:21.

ii. Factual Findings

Based on these facts, and other undisputed material facts as detailed above, the Court finds:

- JKO's operations revolve around commercial cleaning jobs.
- JKO finds new cleaning business and negotiates and executes all cleaning contracts with customers.
- JKO performs or exercises substantial control over most business functions for the franchisees and pays itself directly from cleaning contract revenue.
- JKO provides detailed instructions to FOs on how to perform cleaning services, through the franchise agreements and JKO policy as well as the Cleaning Schedule specified in the MA with each customer (and negotiated by JKO).
- JKO inspects cleaning work performed by FOs and has the authority to direct FOs to correct deficiencies or be terminated from a customer account.
- JKO occasionally provides cleaning services itself.

Accordingly, the record clearly reflects that the FOs' work "is an important, and indeed integral, component" of JKO's business. *Baker*, 137 F.3d at 1443. This factor thus "support[s] consideration of [the FOs] as . . . employee[s] of" JKO. *Paragon Contractors Corp.*, 884 F.3d at 1237.

2. Conclusions of the Court

As JKO argues, the FOs are akin to independent contractors in some regards. For example, they are permitted to reject cleaning contracts, they independently own their franchise entities, they make a significant initial investment, they lease or purchase supplies and equipment, and they may to some extent hire others to perform cleaning services. *See supra*; Def.'s Mot. Summ. J. at 40-44. The rights and obligations of FOs relative to JKO align, in other respects, with there being an employer-employee relationship between JKO and the FOs.

The Court concludes that the totality of the circumstances as demonstrated through the undisputed material facts more reasonably reflects that the FOs, "as a matter of economic fact, depend upon [JKO's] business for the opportunity to render service," rather than being "in business for themselves." *Baker*, 137 F.3d at 1443. Even when all reasonable inferences are construed in JKO's favor as a nonmovant, the record does not plausibly reflect that the FOs "act autonomously" or with a sufficient degree of independence to "set them apart from what one would consider normal employee status." *Id.* at 1441 (alteration and internal quotation marks omitted).

Having considered the factors, historical facts, and factual findings above, the Court concludes that the undisputed material facts establish as an economic reality that Defendant's franchise owners are employees of JKO, rather than independent contractors, within the broad definitions of employer and employee specified in the FLSA.[7]

[7] JKO emphasizes franchisees' testimony showing that they at times exercised more discretion in performing their cleaning services than JKO's stated policies would allow.

*C. Plaintiff's Request for Injunctive Relief*

Pursuant to 29 U.S.C. § 217, Plaintiff seeks a permanent injunction enjoining JKO from violating 29 U.S.C. §§ 211(c) and 215(a)(5). *See* Am. Compl. ¶¶ 1, 23. As explained by the Tenth Circuit,

> [p]ermanent prospective injunctions serve to effectuate congressional policy against substandard labor conditions by preventing future violations. The purpose of an injunction against future violations is remedial rather than punitive. The movant—in this case, the Secretary—bears the burden of satisfying the court that an injunction is necessary.
>
> Prospective injunctions are an essential tool to effectuate the policy of the FLSA because the cost of compliance is placed on the employer rather than the employee or the government.

*Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997) (citations omitted).

"The Tenth Circuit instructs courts to look at 'many factors' when determining whether injunctive relief is proper." *U.S. Dep't of Lab. v. Guess & Co. Kan., L.L.C.*, No. 24-2292, 2026 WL 1109347, at *7 (D. Kan. Apr. 24, 2026) (quoting *IBP*, 127 F.3d at 963).

---

*See supra*; Def.'s Mot. Summ. J. at 42; *see*, *e.g.*, R. Holmes Dep. 47:1-5 (stating that she did not have to accept the customer contract until she had walked through the building); A. Duenas Dep. 18:2-5 (stating that she "would just negotiate with" the client to change the cleaning schedule"); M. Messner Dep. 103:15-104:11 (stating that she did not purchase most of the supplies required by JKO but that JKO "[n]ever knew"). The cited deviations from JKO's express requirements (requirements that JKO is free to unilaterally change) are isolated examples and insufficient to create a genuine dispute as to a fact *material* to whether FOs are employees—e.g., whether JKO controls the designation of customer accounts or prohibits FOs from taking other commercial cleaning jobs. Likewise, testimony from FOs that they made a profit working for JKO does not create a genuine dispute as to whether FOs are "economically dependent upon [JKO] during the time period they work for [JKO], however long or short that period may be." *Baker*, 137 F.3d at 1443; *see* Def.'s Mot. Summ. J. at 28-29, 45-46 (citing S. Martinez Dep. 126:18-127:9; A. Zarate Dep. 57:13-60:11). Relatedly, "[a]n employee is not permitted to waive employee status, despite having signed independent contractor agreements." *Jani-King of Okla.*, 905 F.3d at 1160 (internal quotation marks omitted).

Among those factors are "the employer's previous conduct, its current conduct, and the reliability of its promises of future compliance." *IBP*, 127 F.3d at 963. "When a past violation is found, courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith." *Id.*

JKO and other Jani-King franchisors have denied an employment relationship with its franchisees under both the FLSA and state law. *See* FDD Item 2; Pl.'s Mot. Summ. J. at 8 n.7, 25. Consistent with this view, JKO does not keep records of the hours worked by individual FOs performing cleaning services. Def.'s Resp. to Pl.'s Req. Admis. No. 3 (Doc. No. 101-14). The Court has concluded otherwise, however. Accordingly, Plaintiff's requested injunction will "not place any substantive hardship on [JKO] because" such relief will only "require [JKO] to do what the Act requires anyway—to comply with the law." *IBP*, 127 F.3d at 963 (alteration and internal quotation marks omitted).

Based on the foregoing, the Court is satisfied that entry of an injunction is necessary and is appropriate in this matter. *See id.* at 965 (affirming district court's grant of permanent injunction where "it [was] an understatement to state that [the employer] ha[d] not made extraordinary efforts to prevent recurrence of such violations in the future" (internal quotation marks omitted)).

## CONCLUSION

The Court concludes, for the foregoing reasons, that the undisputed material facts in the record establish that Defendant's franchise owners are employees for purposes of the

Federal Labor Standards Act and that Defendant Jani-King of Oklahoma, Inc. is, therefore, subject to the requirements of 29 U.S.C. § 211(c). No genuine factual issue necessitates a trial on the merits of this case. Plaintiff is therefore entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED:

(1) Plaintiff's Motion for Summary Judgment (Doc. Nos. 100, 101) is GRANTED;

(2) Defendant's Motion for Summary Judgment (Doc. Nos. 102, 103, 106) is DENIED; and

(3) Plaintiff's Motion to Exclude (Doc. Nos. 95, 96) is DENIED AS MOOT.

IT IS FURTHER ORDERED:

Pursuant to 29 U.S.C. § 217, Defendant Jani-King of Oklahoma, Inc., its officers, agents, servants, employees, and all persons and entities acting at its direction, are permanently enjoined and restrained from violating sections 11(c) and 15(a)(5) of the FLSA, including as follows: Defendant Jani-King of Oklahoma, Inc. shall not, contrary to 29 U.S.C. §§ 211(c) and 215(a)(5), fail to make, keep, or preserve adequate and accurate records of its employees, and of the wages, hours, and other conditions and practices of employment maintained by Defendant Jani-King of Oklahoma, Inc., as prescribed by 29 C.F.R. §§ 516.0 et seq.

A separate judgment shall issue.

IT IS SO ORDERED this 21st day of September, 2026.

Charles B. Goodwin

CHARLES B. GOODWIN
United States District Judge